**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KENNETH T. VAIL,                                 :
                                                 :    No. 02-CV-2933
                    Plaintiff                    :
                                                 :
         v.                                      :
                                                 :
HARLEYSVILLE GROUP, INC.,                         :
                                                 :    JURY TRIAL DEMANDED
                    Defendant                    :    Electronically Filed


**DEFENDANT HARLEYSVILLE GROUP, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**



BLANK ROME LLP


Anthony B, Haller, Esquire (PA 37017)
Julie E. Reid, Esquire (PA 89848)
One Logan Square
Philadelphia, PA 19103
(215) 569-5690
(215) 832-5690 (facsimile)

Attorneys for Defendant
Harleysville Group, Inc.


Dated: July 15, 2004

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................2

        A.     Background to Vail's Hiring ......................................................................2

        B.     Early Performance Problems .....................................................................3

        C.     Vail's Injury and Return to Work .............................................................4

        D.     Continued Performance Problems .............................................................4

        E.     Staff Complaints ........................................................................................5

        F.     Decision to Terminate Vail's Employment ...............................................5

        G.     Vail's Injury, Prognosis And Recovery. ...................................................6

        H.     Applicable Employment Policies ..............................................................7

        I.     Events Following Vail's Termination of Employment with Harleysville ...............8

        J.     Key Admissions .........................................................................................8

III.    STANDARD FOR SUMMARY JUDGMENT.................................................10

IV.     ARGUMENT....................................................................................................10

        A.     Summary Judgment Should Be Granted to Harleysville Because Vail is Not
               Disabled Having Suffered A Temporary Injury Which Did Not Cause Substantial
               Long-Term Or Permanent Limitations. ...................................................10

        B.     Summary Judgment Should Be Granted Because Vail Is Not Substantially
               Limited in Any Major Life Activities.....................................................13

        C.     Summary Judgment Should Be Granted in Harleysville's Favor On Vail's Failure
               to Accommodate Claim ...........................................................................17

        D.     Summary Judgment Should Be Granted In Harleysville's Favor Because There Is
               No Evidence That Harleysville Regarded Vail As Disabled ...................18

        E.     Summary Judgment Should Be Granted To Harleysville Because Vail Has No
               Evidence That Harleysville's Performance-Based Reasons for Terminating His
               Employment Were A Pretext For Disability Discrimination. .................19

1.    Vail Was Terminated For Performance Reasons...................................19

2.    The Arguments Asserted by Vail in an Effort to Show Pretext are Without Merit. ....................................................................................................22

V.    CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................10

*Hoffman v. Potter*, Civil Action No. 02-3678, 2004 U.S. Dist. LEXIS 6355 (E.D.
    Pa. March 2, 2004) ...................................................................................................20

*Jones v. School Dist. of Phila.*, 198 F.3d 403 (3d Cir. 1999) ...........................................20

*Kelly v. Drexel University*, 94 F.3d 102 (3d Cir. 1996) ........................................ 14-15, 18

*Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61 (3d Cir. 1996) ...........17

*Marinelli v. City of Erie*, 216 F.3d 354 (3d Cir. 2000) ...............................................14, 16

*McDonald v. Comm. of Pennsylvania, Dept. of Public Welfare, Polk Center,* 62
    F.3d 92 (3d Cir. 1995) ............................................................................................11

*Penchishen v. The Stroh Brewery Co.*, 932 F. Supp. 671 (E.D. Pa. 1996), <u>aff'd</u>,
    116 F.3d 469 (3d Cir. 1997) ...............................................................................14, 18

*Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375 (3d Cir. 2002) ...............................................11

*Shaner v. Synthes (USA)*, 204 F.3d 494 (3d Cir. 2000) ........................................ 19-21, 23

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) .............................. 10, 13-14, 16, 18

*Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180 (3d Cir. 1999) .........................................14

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) ................. 10, 13-14

*Yudkovitz v. Bell Atlantic Corp.*, Civil Action No. 02-CV-3029, 2004 U.S. Dist.
    LEXIS 1165 (E.D. Pa. January 12, 2004)............................................................15, 20

## FEDERAL STATUTES, REGULATIONS AND COURT RULES

42 U.S.C. § 12102(2) ........................................................................................................10

42 U.S.C. § 12112(b)(5)(A)...............................................................................................17

29 C.F.R. § 1630.2(i) ........................................................................................................13

120113.00201/21289921v9

29 C.F.R. § 1630, App. § 1630.2(i) ............................................................... 13

29 C.F.R. § 1630.2(j) ............................................................... 11, 13-14

29 C.F.R. § 1630, App. § 1630.2(j) ............................................................... 10, 13-14

29 C.F.R. § 1630.2(l) ............................................................... 18

Fed. R. Civ. P. 56(c) ............................................................... 10

Fed. R. Civ. P. 56(e) ............................................................... 10

iv

I.    **INTRODUCTION**

In his amended complaint, plaintiff Kenneth T. Vail ("Vail") claims that defendant, Harleysville Group, Inc. ("Harleysville"), violated the American's With Disabilities Act ("ADA") by terminating his employment on September 7, 2000.[1]  As explained in detail below, summary judgment should be granted to Harleysville because Vail is not a "disabled" person within the meaning of ADA, he was not regarded as disabled, and he was terminated for performance problems which permeated his short tenure with the company and culminated in open dissent among his staff who complained bitterly about his abusive management style.

Following a re-organization, Vail was hired to fill one of four newly created Loss Control Regional Manager positions.  His job was to build and manage a team of employees and to perform a variety of critical administrative tasks such as quality reviews and vendor reports. From the start, Vail's performance was substandard.  His manager, Gary Weinstein ("Weinstein"), voiced concerns about work not getting done and, as early as May 1, 2000, set these concerns out in writing.

On June 2, 2000, Vail was shot in the leg while attending a rifle competition.  This injury required surgery.  After a brief period in the hospital, Vail began recuperating and receiving physical therapy at home.  The prognosis for full recovery was good.  Within two weeks, Vail requested permission to start work from home because he was temporarily limited in driving.  By August 21, 2000, Vail was able to return to full responsibilities.  Other than using a crutch or a cane to help him walk, he was able as of September 1, 2000 to perform all of his daily life activities.  His outpatient therapy records show him getting progressively fitter, walking, jogging,

---

[1] On June 22, 2004, Vail filed an amended complaint in which he withdrew his claim of age discrimination under the Age Discrimination in Employment Act.

120113.00201/21289921v9

biking, and sprinting.  There is no evidence of any substantial, long term or permanent limitation on his physical abilities.

Vail's performance did not improve when he returned to work from his injury.  Despite being relieved of a large portion of his responsibilities as an accommodation to his temporary limitation, Vail failed to submit timely quality reviews and vendor reports, leading to complaints from underwriters.  In an ever-increasing level of frustration, Weinstein counseled him about the lack of progress and told him explicitly that his future depended on immediate improvement. This did not occur.  When Vail's staff learned he was to resume field duties, they approached Weinstein to complain about his management style.  At a meeting held on August 31, 2000 at the end of an off-site seminar, Harleysville received a stream of complaints about Vail from his staff. Against the backdrop of his performance issues, Harleysville decided to terminate Vail's employment.  The company did not experience similar problems with any of the other three new Regional Loss Control Managers.

Based on these undisputed facts and as a matter of law, Vail's claims fail and should be dismissed.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS [2]

### A.    <u>Background to Vail's Hiring</u>

Harleysville is an insurance company underwriting commercial, property, and casualty lines of insurance, headquartered in Harleysville, Pennsylvania.  Its Loss Control Department is involved in supporting underwriters by assessing, identifying and managing risks for customers who are clients or potential clients.  In early 2000, Harleysville reorganized and consolidated the

---

[2] For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.  This Statement of Undisputed Material Facts is based principally on Vail's admissions as well as other relevant undisputed portions of deposition testimony and documents.

Loss Control Department.  Spearheaded by Weinstein, Vice President of Loss Control and Premium Audit, Harleysville centralized the loss control function by creating four (4) new Regional Manager positions.  Weinstein was looking for managers with leadership skills and the ability to quickly and effectively build a team and motivate staff members.  Vail was hired to fill the Regional Manager position for the Mid-Atlantic Region.  He began employment with Harleysville on March 27, 2000 and reported directly to Weinstein.  Vail's responsibilities, like those of the other three Regional Managers, included managing his staff, conducting field visits, assigning and reviewing vendor reports and surveys, and conducting regular quality reviews of his staff.  He was also responsible for working with underwriting units to identify target market segments, and to review service files and non-service files, the vast majority of which were available electronically.  (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 1-2, 12-24).

### B.    Early Performance Problems

From early on in Vail's tenure, Weinstein began having concerns about Vail's ability to successfully perform his job.  Weinstein communicated his priorities and expectations to Vail both verbally and in writing and gave him feedback that certain tasks, including providing quality reviews or reports for his staff members, were not being completed   Vail admitted that these concerns were raised with him.  On May 2, 2002 Weinstein wrote an e-mail to Vail expressing his frustration about tasks not getting done.  Vail responded by saying he would improve.  As Harleysville later discovered, Vail was also having significant problems managing and relating to his staff.  (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 25-33).

120113.00201/21289921v9

### C.    Vail's Injury and Return to Work

On Monday, June 5, 2000, Vail informed Weinstein that he was unable to come to the office because he had been injured on June 2, 2000 when he fell off of a tower.  On June 7, 2000, Vail told Weinstein that he had in fact been shot at a sporting gun event, was hospitalized, and would undergo surgery.  On June 12, 2000, Vail informed Weinstein that he was looking forward to a quick and speedy recovery and returning to work as soon as it was prudent to do so and he could continue to effectively contribute from his home office.   Vail had no sick leave or short-term disability benefits available to him and wanted to return to work.  Although Weinstein offered Vail the opportunity to work part-time, Vail insisted that he could work full-time beginning on June 19, 2000.

Harleysville granted all of Vail's requests to enable him to work full-time and receive his full compensation including allowing him to work from home until he could resume working from the office, extending his work day to whatever hours he desired to allow for frequent breaks throughout the day, and eliminating all of his travel-related responsibilities (i.e., thirty (30) percent of his job functions) while he worked from home.  Throughout the summer of 2000, Vail continuously relayed to Harleysville that his prognosis was good, that he was healing quickly and that he expected fully to recover.  He reiterated his desire to work full-time and insisted he could effectively do so with the "accommodations" Harleysville provided him.   (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 34-53, 75).

### D.    Continued Performance Problems

Upon his return to work in mid-June 2000, and over the next several weeks, Vail failed to complete several critical job tasks, such as reviewing vendor reports, preparing a sufficient number of quality control reports for his staff and reviewing service files from his region.

4

These problems started to impact the business and underwriters complained to Weinstein about the backlog. Weinstein repeatedly communicated with Vail via telephone and email about his dissatisfaction with Vail's performance and the poor service level in Vail's region. On July 15, 2000, Weinstein sent a detailed e-mail reviewing the recurring problems with Vail's performance and told him unambiguously that his success going forwarded depended on his timely and thorough completion of these tasks. Vail accepted responsibility for his region's poor performance and admitted that Weinstein was "not a happy camper." (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 54-78).

> ### E.    Staff Complaints

In anticipation of Vail's return to the office and his field responsibilities in August 2000, several of Vail's staff members raised serious complaints about Vail's management style with Weinstein and Alice Geckeler ("Geckeler"), Assistant Vice President, Recruitment and Retention. On or about August 31, 2000, Geckeler met with Vail's staff after a conference in Harrisburg, Pennsylvania. She was told that Vail made his staff uncomfortable, he was abrasive and nasty, he harassed and verbally abused them, he threatened to fire them, he humiliated them, he did not provide constructive feedback, he micro-managed and was an ineffective manager. In fact, at least one staff member stated that they would resign if Vail remained employed, and others said that they had sent out resumes in search of new employment opportunities. (For more detail, please refer to Harleysville's Separate Statement of Undisputed Material Facts, ¶¶ 86-92).

> ### F.    Decision to Terminate Vail's Employment

Based on the documented performance problems and the poor morale of Vail's staff members so bitterly expressed to Geckeler, Harleysville decided that the situation needed to be fixed. As a result, Harleysville decided to terminate Vail's employment and look for a

5

replacement.  On September 7, 2002 Weinstein and Geckeler meet with Vail and told him that, in their opinion, things were not working out and that he was a poor fit for the organization.  To help him bridge to new employment, Vail was offered a severance package.  He was presented with a form document used normally in the context of a reduction in force.[3]  This form mistakenly referred to the termination as being a layoff.  Harleysville promptly corrected this mistake and any resulting confusion.[4]  (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 93-111).

### G.    Vail's Injury, Prognosis And Recovery.

Soon after his injury, both Vail and his attending surgeon, Dr. Reid, reported that his prognosis was good and that he should fully recover and be able to return to the office in August 2000.  The physical therapists who worked with Vail at his home in June and July 2000 noted that he was progressing well.  Vail admitted that as of his return to the office on August 21, 2000, his only limitations involved walking with an assistive device, not lifting over thirty (30) pounds, and not traveling excessively, and that as of September 7, 2000, he could perform all major life activities.

Throughout the fall of 2000, Vail's physical therapy regimen progressed to skipping, running, biking and sprinting.  Vail admitted he could sprint but not "like Carl Lewis."  By December 6, 2000, Vail could walk without an assistive device.  As of June 2001, Dr. Reid reported that Vail's fractured had completed healed, his range of motion was nearly symmetric

---

[3] Harleysville does not normally give severance when employees are terminated for cause so there was no form for this situation.

[4] In an October 6, 2000 letter to Vail's counsel, Harleysville wrote as follows:  "The letter Mr. Vail received from the Human Resources Department regarding his termination should not have been sent to him – it was a mistake. Mr. Vail's position, the Loss Control Manager for the Mid-Atlantic region, was not eliminated. . . . .Therefore please disregard the letter.  As Mr. Vail knows from the meeting he attended on 9/7/00 with Gary Weinstein and Alice Geckeler, his employment was terminated because of his poor performance of his job duties.  Neither his age nor his physical limitations played a role in the decision to terminate his employment."

with the opposite uninjured side, his prognosis was excellent, and no limitations were placed on any activities. With time, Vail progressed and returned to his prior functional level including recreational hiking and mountain biking on less challenging trails. His only testimony as to continuing limitations was that he stopped kayaking, serious hiking and mountain biking on demanding trails. (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 119-150).

### H. Applicable Employment Policies

Harleysville's Employee Manual makes clear that all employees are terminable at will (i.e. at any time for any reason not prohibited by law). There is no specific requirement that employees be placed on a formal corrective action plan before termination. By way of example, Gary Weinstein was terminated in or around February 2001 without counseling or warning of any kind because the department was under-performing. The Supervisors' Supplement to the Employee Manual provides a guide to supervisors and managers in giving performance feedback to employees and states as follows:

> The procedures listed below are to be used to aid an employee in correcting performance problems. The sooner a problem is addressed, the sooner it will be corrected. For instance, if it is obvious in the first month of employment that the employee cannot do the job for which he or she was hired, termination can occur fairly easily after holding corrective discussions with the employee.

> The Company reserves the right to terminate employment at will, with or without reason, at any time. Depending on the circumstances, the Company may however, try to correct the problem first....

The guide clearly differentiates between the level of counseling and warning necessary depending on an individual's length of service. Vail received consistent counseling and warning of the type and level to be expected given his short tenure.

120113.00201/21289921v9

As a short term employee, Vail was not eligible to receive sick pay or short term disability benefits.  He could, after a 30 day waiting period, have applied for long-term disability benefits but he was back at work within two weeks with doctor's clearance.  (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 3-11).

I.     **Events Following Vail's Termination of Employment with Harleysville**

In February 2002, Vail commenced employment with St. Luke's Hospital and Health Network and made over $90,000 that year, more than he could have made in one year at Harleysville.  At the time Vail applied for a position at St. Luke's in October 2001, he needed no accommodation of any kind for any physical limitation.  Vail also recovered a $385,000 settlement against the individual who shot him in an action which included a claim for lost wages and compensation.  (For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts, ¶¶ 112-118).

J.     **Key Admissions**

In his deposition, Vail admitted among other things, the following:

1.  Between March 27, 2000 and May 2, 2000, on several occasions, Weinstein expressed concern to Vail about the timeliness of tasks being performed and in an e-mail dated May 1, 2000, made clear that Vail needed to improve his performance.

2.  Vail's consistent plan was to return to work on a full-time basis as quickly as possible, consistent with his doctor's recommendations.

3.  Vail never considered applying for long-term disability benefits, nor would he be entitled to those benefits as he was able to come back to work very quickly after his injury.

4.  Harleysville granted Vail's requests to work full-time at home on a modified schedule with flexible hours and temporarily to eliminate all travel (i.e., thirty (30) percent of his job).

5.  Vail believed that Weinstein very much expected and wanted him to work full-time,

and they shared a mutual objective of getting Vail back to work as quickly as possible.

6.  Weinstein expressed an increasing crescendo of frustration with the lack of progress in Vail's region and, as of July 20, 2000, Vail understood that Weinstein was telling him in no uncertain terms that he was not satisfied with Vail's performance.

7.  By the third week in August 2000, there were some staff members for whom Vail still had not performed five (5) reviews.

8.  Based upon the numerous performance issues that Weinstein raised with Vail during his short tenure, Vail understood that "the writing was on the wall."

9.  On September 6, 2000, Weinstein told Vail that he was dissatisfied with Vail's performance.

10.  During Vail's termination meeting, Weinstein and Geckeler told him that things were not working out and that Vail was a poor fit for the organization.

11.  On July 20, 2000, Vail informed Weinstein that he just met with his surgeon, his healing was on track, and that he was making progress and expected to fully recover.

12.  As of early September 2000, Vail could do everything he could do before his injury in order to live on a daily basis, and he could walk with the assistance of a cane or crutch

13.  By October 2000, Vail could ride a mountain bike.

14.  By December 6, 2000, Vail could bike for more than one (1) mile, and he could do everything he could do before his injury in order to live on a daily basis.

15.  Vail returned to his prior functional level.

(For more detail, please refer to Harleysville's separate Statement of Undisputed Material Facts.)

### III.    STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, a plaintiff "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### IV.    ARGUMENT

#### A.    Summary Judgment Should Be Granted to Harleysville Because Vail is Not Disabled Having Suffered A Temporary Injury Which Did Not Cause Substantial Long-Term Or Permanent Limitations.

As a threshold matter, Vail's claim fails because Vail suffered a temporary injury which did not result in any substantial permanent or long-term limitations.

The ADA defines a "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarding as having such an impairment. 42 U.S.C. § 12102(2); Sutton v. United Air Lines, Inc., 527 U.S. 471, 478 (1999). In order for an impairment to constitute a disability under the ADA, its impact must be permanent or long-term. [5] Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002). It is well established in this

---

[5] Regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") interpreting the ADA instruct that the following factors should be considered in determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the

Circuit that temporary, non-chronic impairments of short duration do not constitute a disability covered by the ADA, even where the medical condition is severe. Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir. 2002) (citing McDonald v. Comm. of Pennsylvania, Dept. of Public Welfare, Polk Center, 62 F.3d 92, 95-96 (3d Cir. 1995) (an employee who returned to her duties following a two-month period of incapacity after surgery was not disabled, because any limitations that she experienced were not permanent, nor for such an extended time as contemplated by the law)); see also, 29 C.F.R. § 1630, App., 1630.2(j) (a broken leg which may take several weeks to heal is an impairment of fairly brief duration and therefore not a disability).

A case directly on point with similar facts is the Fourth Circuit's recent decision in Pollard v. High's of Baltimore, Inc., 281 F.3d 462 (4th Cir. 2002). There, an employee had a severe back injury which required surgery and a leave of absence from work for approximately nine (9) months. Id. at 465. Ultimately, the plaintiff's doctor approved her to return to work with minor lifting and bending restrictions and the limitation of an eight-hour workday. Id. at 465. Affirming the district court's grant of summary judgment, the Fourth Circuit held that she was not "disabled" within the meaning of ADA. Despite the seriousness of the injury and the long recuperation necessary, the undisputed evidence still established only a temporary impairment. "Recovering from surgery can frequently take several months…but physical impairments while recuperating from surgery are not evidence of a permanent disability." Id. at 462 (citation omitted). The only restrictions on the plaintiff upon returning to work were that she not lift more than 25 pounds or bend repetitively. The Court held these restrictions as a matter of law did not constitute a substantial limitation on a major life activity. Id. at 462. In reaching this

---

impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j).

conclusion, the Court relied on the contemporaneous statements by the plaintiff and her doctors about the temporary nature of her condition.  As the Court stated:

> Pollard repeatedly communicated to High's that she was ready and able to return to full-time duty as an Area Supervisor.  And Pollard has admitted that, during her employment with High's, neither she nor any of her treating physicians or attorneys ever communicated to any High's official that her physical impairment was permanent.  As the district court correctly noted, they could not have done so because there was no medical evidence at that time to support a conclusion that Pollard's condition was long-term or permanent.

Id. at 470.

In the present case, the undisputed evidence establishes the existence of a serious injury which imposed only temporary limitations on Vail's activities.  There is no evidence to suggest that he is subject to a permanent or long-term limitation on his activities.  The immediate prognosis after his surgery was that he would make a full recovery.  Vail's own reports were similarly upbeat and optimistic.  He was cleared to return to work two months after his surgery with restrictions only on lifting more than 30 pounds.  By August 21, 2000, he was able to walk with an assistive device and drive so as to be able to resume his full responsibilities.  Vail admitted in his deposition that, as of September 1, 2000, he could perform *all* of his daily life activities.  With continued physical therapy in the fall of 2000, Vail progressed to walking distances, skipping, running, biking and sprinting (albeit in his words he could not sprint like Carl Lewis).  He admitted that by December, 2000 he could do everything he needed to do on a daily basis and could walk without a cane.  He testified in his deposition that he has fully recovered and, through a course of rehabilitation and exercise, has returned to his prior functional level.  In these circumstances, he is simply not a person with a "disability" under ADA.

12

**B.    Summary Judgment Should Be Granted Because Vail Is Not Substantially Limited in Any Major Life Activities**

Even assuming, *arguendo*, that Vail could establish that there are permanent or long-term consequences to his injury, his claim still fails because there is no evidence that he is substantially limited in any major life activity.

Merely having an impairment does not make one "disabled" under the ADA; a plaintiff must also demonstrate that the impairment presently prevents or severely restricts him in performing one or more major life activities. Toyota, 534 U.S. at 198; Sutton, 527 U.S. at 482. "Substantially limited" has been defined as "unable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity" as compared to an average person. 29 C.F.R. § 1630.2(j). The word "substantially" clearly precludes impairments that interfere with a major life activity in only a minor way from qualifying as disabilities. Toyota, 534 U.S. at 197; see also, 29 C.F.R. § 1630, App., 1630.2(j). Major life activities, those activities that an average person can perform with little or no difficulty, include caring for oneself, performing manual tasks, walking, working, sitting, standing, and lifting. 29 C.F.R. § 1630.2(i); 29 C.F.R. § 1630, App. § 1630.2(i). Additionally, "major life activities" only refer to those activities that are of central importance to most people's daily lives, and the impairment's impact must also be permanent or long-term. Toyota, 534 U.S. at 197-198. Further, if a person is taking measures to correct for, or mitigate, an impairment, the effects of those measures must be taken into account when judging whether that person is substantially limited in a major life activity and thus disabled under the ADA. Sutton, 527 U.S. at 482.

To be substantially limited in the life activities of caring for oneself and performing manual tasks, it is necessary to ascertain whether, among other things, a plaintiff can perform household chores, bathe, brush his teeth and perform other activities of principal importance to most people's daily lives. Toyota, 534 U.S. at 201-202. Moreover, if the major life activity is walking,[6] comparatively moderate restrictions on the ability to walk are not disabilities; rather, a plaintiff must show that he is severely restricted in his ability to walk. Kelly v. Drexel University, 94 F.3d 102 (3d Cir. 1996); Penchishen v. The Stroh Brewery Co., 932 F. Supp. 671, 674-675 (E.D. Pa. 1996), aff'd, 116 F.3d 469 (3d Cir. 1997) (plaintiff who showed that she walked and climbed stairs slowly cannot create a genuine issue of fact as to whether she is disabled); Taylor v. Pathmark Stores, Inc., 177 F.3d 180 (3d Cir. 1999) (plaintiff not substantially limited in ability to walk where he could stand and walk for fifty (50) minutes at a time and could carry on most regular activities that require standing and walking). A person who had once been able to walk with extraordinary speed would not be substantially limited in the major life activity of walking if, as a result of a physical impairment, he or she were only able to walk at average speed, or even at moderately below average speed; only someone who cannot walk at all or can only walk for very brief periods of time would be substantially limited under the ADA. 29 C.F.R. § 1630, App., 1630.2(j). Also, the Third Circuit has held that a person limited to lifting no greater than ten (10) pounds is not substantially limited in his ability to lift. Marinelli v. City of Erie, 216 F.3d 354, 363-364 (3d Cir. 2000).

---

[6] When the major life activity under consideration is "working," the statutory phrase "substantially limits" requires, at a minimum, that a Plaintiff allege that he is unable to work in a broad class of jobs in various classes as compared to the average person with comparable training, skills and abilities; the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. Sutton, 527 U.S. at 491; 29 C.F.R. 1630.2(j)(3)(i). Vail does not allege that he is substantially limited in the major life activity of working, and he admitted he required no accommodations when he applied for a job at St. Luke's in October 2001. (Ex. B, Vail Dep. at 41).

14

The Third Circuit's decision in <u>Kelly v. Drexel University</u> is directly on point. There the plaintiff severely fractured his hip, which left him with a noticeable limp. In addition, he was diagnosed with post-traumatic degenerative joint disease of his hip, which was a permanent condition. Affirming the district court's grant of summary judgment, the Third Circuit held that the plaintiff was not substantially limited in the major life activity of walking so as to be disabled under ADA. The evidence established that the plaintiff believed he could not walk more than one mile or so, he could not jog, and when he climbed stairs, he had to hold the rail and pace himself slower than an average person. <u>Kelly</u>, 94 F.3d at 106. Based on those facts, the Court concluded that no fact finder could reasonably conclude that the plaintiff's injury significantly restricted his ability to walk as compared with an average person. <u>Id.</u> at 105, 108.

A very recent case, <u>Yudkovitz v. Bell Atlantic Corp.</u>, Civil Action No. 02-CV-3029, 2004 U.S. Dist. LEXIS 1165 (E.D. Pa. January 12, 2004), is also instructive. There, the plaintiff's multiple sclerosis, even in remission, created several difficulties for him including mobility problems with his left leg and left arm. <u>Id.</u> at *1-2. As a result, he walked slower and with a slight limp, had difficulty climbing steps, used a cane as needed, lacked the mobility he had in his youth, and could not lift or move items around the house. <u>Id.</u> at *2. His physician testified that the plaintiff experienced left-sided weakness, fatigue and an altered gait. <u>Id.</u> at *19. However, the plaintiff could walk around the house, on a flat surface, and outdoors, although he was careful not to trip over uneven pavement <u>Id.</u> at *2. Since he presented no evidence that he suffered from any more-than-moderate restrictions, the Court found that his condition did not substantially limit him in the life activities of walking and lifting. <u>Id.</u> at *19-20.

In the present case, there is even less evidence of limitation than in either <u>Kelly</u> or <u>Yudkovitz</u>. Two and a half months after the date of his injury, Vail was able to drive to work

and his only asserted limitations involved walking with an assistive device, not traveling more than necessary, and not lifting over thirty (30) pounds.  Moreover, as <u>Sutton</u> mandates, any assistive device that Vail used must be considered when judging his ability to perform major life activities.  <u>Sutton</u>, 527 U.S. at 482.  As of September 2000 after Vail came back to work at the Harleysville office, Vail could do everything he needed to do to live on a daily basis (including eating, brushing his teeth, going to work, etc.), and he could walk with the help of a crutch or a cane.  Since the Third Circuit held that a lifting restriction of ten (10) pounds or less is not significantly restrictive, Vail's ability to lift up to thirty (30) pounds certainly does not connote any substantial limitation.  <u>Marinelli</u>, 216 F.3d at 363-364.  Throughout the fall of 2000, Vail's physical therapy regime included biking, jogging, and sprinting.  Six months after his injury, Vail no longer needed to walk with an assistive device, and he could do everything on a daily basis to live that he did before his injury.  One year after his injury, Vail's physical therapist noted that he was doing well with only a trace limp.  Vail further testified that he hiked and biked off-road.  The fact that Vail could not sprint "like Carl Lewis" when he finished his therapy or that he gave up kayaking, serious hiking, and mountain biking on the same trails that he used to ride does not lend credence to his claims. These activities do not plausibly constitute activities central to most people's daily lives.  Vail himself admitted he has been able to return to his prior functional level.  No reasonable jury could find that Vail is substantially limited in any major life activity.  He is not a person with a disability under the ADA and his complaint should be dismissed.

16

**C.    Summary Judgment Should Be Granted in Harleysville's Favor On Vail's Failure to Accommodate Claim**

Vail's failure to accommodate claim is fundamentally flawed because (1) Harleysville had no duty to accommodate Vail's condition and (2) Vail admits that Harleysville provided him with all his requested "accommodations".

Under the ADA, an employer is required to make reasonable accommodations to the known physical limitations of an otherwise qualified individual *with a disability* unless the employer can show that the accommodation would constitute an undue hardship on the operation of its business.  42 U.S.C. § 12112(b)(5)(A); Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 69 (3d Cir. 1996).  Where the evidence establishes that the employer provided the requested accommodations, there is no basis to bring an action.  Lawrence, 98 F.3d at 69-70 (summary judgment appropriate where the plaintiff's own deposition showed he was provided the requested flexible schedule for doctor visits and the requested help from another employee when he was required to carry large portfolios to weekly meetings).

Here, Vail's claim suffers from two fatal defects.  First, for the reasons discussed above, he is not a person with a disability under the ADA and the duty to accommodate never arises.  Second, Harleysville granted every request Vail made for "accommodation" including permitting him to work from home, reducing temporarily his responsibilities, allowing him to work a flexible schedule, and providing him the equipment he needed to work from home.  Upon his return to work, Harleysville accepted without any disagreement the limitations on lifting and excessive travel recommended by his doctor.

In sum, Harleysville did more than it was legally required to do to help Vail succeed and continue to receive an income.  There is no basis for a failure to accommodate claim and this aspect of his complaint must also be dismissed.

120113.00201/21289921v9

**D.    Summary Judgment Should Be Granted In Harleysville's Favor Because There Is No Evidence That Harleysville Regarded Vail As Disabled.**

Vail also asserts as an alternative theory of recovery a claim that Harleysville is liable because it regarded him as disabled.  There is no factual basis for this claim.

Under the third prong of the definition of disability under ADA, an individual may be covered if he (or she) is *regarded* by the employer as having a physical or mental impairment that substantially limits a major life activity.  Sutton, 527 U.S. at 489.  To establish a claim under this theory, a plaintiff must prove either (1) that the employer mistakenly believes that a person has a physical impairment which substantially limits one or more major life activities; or (2) that the employer mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities.  Id.; see also, 29 C.F.R. § 1630.2(l).  In either event, the plaintiff must prove that the employer entertains this misconception about the individual by reference to the reactions and perceptions of the persons working with the individual.  Sutton, 527 U.S. at 489; Kelly, 94 F.3d at 108-109.  The mere fact that an employer is aware of an employee's impairment is insufficient as a matter of law to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.  Id. at 94 (court rejected argument of employee who alleged that he walked with a visible and apparent limp and that his employer was aware of his problem).  See also, Penchishen, 932 F. Supp. at 675 (employer's knowledge of an employee's injury and observation of her impairment in her ability to walk did not create a genuine issue of fact as to whether the employer perceived the impairment as a substantial limitation on any major life activity).

Here, there is absolutely no evidence that anyone at Harleysville considered Vail to be substantially limited in any major life activity.  The undisputed evidence establishes quite the opposite -- Harleysville considered Vail's injury temporary, non-permanent and not significantly

limiting.  All of the information that Vail and his doctors relayed to Harleysville indicated that his injury would heal quickly, he was progressing rapidly, his prognosis was good, and he expected fully to recover.  Beginning almost immediately after his injury, Vail continually informed Harleysville of his progress and reiterated that he could work full-time and wanted to return to the office and resume all of his responsibilities as soon as possible.  Weinstein believed that he could perform his job from home, was pushing him to meet performance expectations, and believed based on his doctor's note that he was fully cleared to resume all functions by August 21, 2000.  Vail himself testified that Weinstein wanted him to work full-time rather than the part-time, pressed him to perform his job responsibilities, and wanted him to return to the office as quickly as his doctors would allow.

In sum, there is no evidence that Harleysville regarded Vail as substantially limited in any major life activity.  This aspect of his complaint should, therefore, also be dismissed.

**E.    Summary Judgment Should Be Granted To Harleysville Because Vail Has No Evidence That Harleysville's Performance-Based Reasons for Terminating His Employment Were A Pretext For Disability Discrimination.**

Vail's disability discrimination, failure to accommodate and "regarded as" claims also fail because he was terminated for legitimate performance reasons and he has no evidence that these reasons were a pretext for unlawful discrimination.  Vail's arguments to the contrary are of no avail.

**1.    Vail Was Terminated For Performance Reasons.**

In order to establish a *prima facie* case of disparate treatment under the ADA, a plaintiff must establish that he (1) is a disabled person under the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) has suffered an adverse employment action as a result of discrimination.  Shaner v. Synthes (USA), 204 F.3d 494, 500 (3d Cir. 2000) (citations omitted).  The burden then shifts to the

19

defendant to articulate a legitimate non-discriminatory reason for its actions.  If the defendant

satisfies that burden, the plaintiff then must prove by a preponderance of the evidence that the

legitimate reasons offered by the defendant are pretextual.  The ultimate burden of persuading

the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all

times with the plaintiff.  Shaner, 204 F.3d at 500-501 (citations omitted).

At the summary judgment stage, courts focus on whether there is sufficient evidence

from which a jury could conclude that the defendant's reasons for an adverse employment action

constitute a pretext for intentional discrimination.  Shaner, 204 F.3d at 501 (citing Jones v.

School Dist. of Phila., 198 F.3d 403, 412-13, n. 8) (3d Cir. 1999)).[7]  Courts have clearly held that

substandard performance, proffered and substantiated by the employer, constitutes a

legitimate non-discriminatory reason so as to support the grant of summary judgment.  Shaner,

204 F.3d at 504-505; see also, Yudkovitz, 2004 U.S. Dist. LEXIS at *25; Hoffman v. Potter,

Civil Action No. 02-3678, 2004 U.S. Dist. LEXIS 6355, *9 (E.D. Pa. March 2, 2004).  Where an

employer has received poor performance reviews before an employer's knowledge of an injury

or impairment, the courts will not infer pretext.  Shaner, 204 F.3d at 504-505; Yudkovitz, 2004

U.S. Dist. LEXIS at *26-28.

The Third Circuit's decision in Shaner is dispositive of the issues in Harleysville's favor.

There, the plaintiff alleged that, after he informed his employer that he suffered from multiple

sclerosis, there was a "sudden change" in his performance evaluations.  Shaner, 204 F.3d  at 504.

However, the evidence clearly indicated that the plaintiff had received poor performance

evaluations, containing similar criticisms, before the employer knew about his medical condition.

---

[7] To discredit the employer's proffered reason(s), the plaintiff cannot simply show that the employer's decision was wrong or mistaken; rather, the plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons that a reasonable fact finder could rationally find them unworthy of credence.  Shaner, 204 F.3d at 501 (citations omitted).

Id. Affirming the grant of summary judgment in the employer's favor, the Third Circuit held

that there was insufficient evidence on which a reasonable jury could infer pretext. As the Court

stated:

> [W]ith respect to the disparate treatment claim, we hold that
> Shaner has not presented enough evidence to permit a factfinder
> either to disbelieve the company's articulated reasons, or to
> conclude that discrimination on account of disability was the real
> reason for any of the alleged improper actions.

Id. at 494. See also, Yudkovitz (summary judgment granted on ADA claim where performance

criticism began several months before disability disclosed and where there was no evidence that

the disability played a role in the employer's criticism of his performance or decision to

terminate).

In the present case, Weinstein began encountering problems with Vail's performance

before his injury. On May 1, 2000 he was so frustrated that he wrote an e-mail to Vail

expressing his concerns about quality reports and reviews not being done and Vail's repeated

failure to complete necessary tasks. These same problems continued after the injury despite the

fact that Vail had more time to devote to administrative tasks. Weinstein counseled Vail on

several occasions about the backlog on reports and quality reviews, and he established goals and

objectives which Vail consistently failed to meet. Weinstein sent frequent e-mails to Vail

reminding him of the priorities, expectations and his shortcomings including those sent on May

1, June 21, June 28, July 15, July 18, July 26 and August 11, 2000. Weinstein expressly

informed Vail in writing that his success going forward depended on his timely and thorough

completion of his critical tasks, and that his region experienced "real major problems"

concerning long overdue work, including complaints from underwriters. Vail recognized the

need for improvement and, in his deposition, he admitted that he accepted responsibility (at least

in part) for his region's poor performance. Weinstein hired Vail with the expectation that he

would perform his job without the need for constant intervention. Based on the documented performance issues, there was ample basis to terminate.

These issues were compounded by the staff grievances which surfaced after employees learned Vail was returning to field responsibilities. The complaints were bitter and heartfelt. Employees stated that Vail was mean, overbearing, abrasive, nasty, harassed and verbally abused them, humiliated them, did not provide constructive feedback, micro-managed and was an ineffective manager. At least one employee threatened to resign if he came back and others said they had their resumes on the street . Harleysville had a short tenured manager who was not meeting reasonable expectations for a person with his experience in a critical role following a reorganization. Instead of Vail building a cohesive team, his troops were close to mutiny. Vail may disagree with his staff's view, but it is undeniable that morale was poor. Others hired at the same time for the indentical role in other regions were not having these difficulties. For Weinstein to have ignored these issues in the Mid-Atlantic Region would have been imprudent. The fact that he chose to fix the problems by replacing Vail cannot possibly be viewed as a pretext for disability discrimination.

### 2.  The Arguments Asserted by Vail in an Effort to Show Pretext are Without Merit.

Vail appears to base his pretext argument on two arguments. (1) that his severance packaged referred to his termination as part of a lay-off and (2) that Harleysville's policy required he be given a formal corrective action plan before termination.

With respect to the severance document, the undisputed evidence is that Vail was given a form document which mistakenly referred to his termination as a lay-off due to a reduction in force. The document should have been tailored to his particular situation. It was not. The mistake was promptly identified and corrected. Weinstein told Vail that he was dissatisfied with

his performance on September 6, 2000 and, at the termination meeting the next day, both Weinstein and Geckeler told Vail that Harleysville was terminating his employment because things were not working out and that Vail was a poor fit.  Vail admitted he knew the "writing was on the wall" based on the numerous performance issues which Weinstein raised with him during his short tenure.

Vail's contention that Harleysville should have provided him with a formal performance improvement plan fails to establish pretext on several levels.  First, as Vail admits, he was an employee at will and could be terminated at any time.  Second, the undisputed evidence demonstrates that Harleysville gave Vail increasingly direct warnings regarding his poor performance, forming appropriate "progressive discipline" for a short-tenured senior level manager.  As Geckeler stated, Vail received counseling and warning of the type and level to be expected given his short tenure.  Third, there is no company policy requiring a more formal written performance improvement plan.  In fact, Weinstein, a long-tenured senior manager, was terminated without progressive discipline and even without prior warning.  Fourth, Vail is asserting that there is a contractual requirement to give him a performance improvement plan, but the Employee Manual is explicit that it is not a contract.  Fifth, Vail has not identified any similarly situated individuals who Harleysville treated differently.  Sixth, Harleysville was presented with an unusual situation:  it hired Vail with the stated aim of building a cohesive team in his region, yet almost immediately Vail failed to perform critical job tasks and alienated his staff with his abrasive management style.  There is no rule of law to suggest that an employer must continue in employment a person who is not a good fit for its organization.  Sixth, as a matter of law, the courts do not sit as a super-personnel department to second-guess employment decisions of this nature.  Shaner, 204 F.3d at 501.

## V.    <u>CONCLUSION</u>

This is not a close case.  Vail did not have a long-term or permanent substantial limitation of his major life activities.  He is not a person protected by the ADA and has no cause of action under this statute.  He was not regarded as disabled.  There was no duty to accommodate and he was given any help which he requested.  Moreover, he did not perform his job at an acceptable level and continued to under-perform against expectations despite counseling and warning.  He managed in a short time to lose both the confidence of his own boss as well as the people who reported to him.  For all of the reasons discussed in this brief, Harleysville respectfully requests that the Court enter an Order granting Harleysville's Motion and award to Harleysville a judgment in its favor on all counts.

Respectfully submitted by:


BLANK ROME LLP

/s/ Anthony B. Haller
Anthony B. Haller, Esquire (PA 37017)
Julie E. Reid, Esquire (PA 89848)
One Logan Square
Philadelphia, PA 19103
(215) 569-5690
(215) 832-5690 (facsimile)

Attorneys for Defendant
Dated:  July 15, 2004                    Harleysville Group, Inc.

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I filed the following documents electronically via the Court's Electronic Case Filing ("ECF") System, and the documents are available for reviewing and downloading from the ECF System:  Defendant Harleysville Group, Inc.'s Motion for Summary Judgment, supporting Memorandum of Law, Proposed Order, Request for Oral Argument, Statement of Undisputed Material Facts, and Appendix of Exhibits.

Additionally, I hereby certify that on this date, I served a true and correct copy of the foregoing documents via first-class prepaid mail upon:

Donald P. Russo, Esquire
117 East Broad Street
P.O. Box 1890
Bethlehem, PA  18016-1890

Susan Hutnik, Esquire
720 Washington Street
Easton, PA  18042

Vanessa M. Nenni, Esquire
117 East Broad Street
Bethlehem, PA  18018

Mickey K. Thompson, Esquire
Thompson Law Offices
115 East Broad Street
Bethlehem, PA  18018

/s/ Anthony B. Haller
Anthony B. Haller

<u>Dated</u>:  July 15, 2004

25