# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH T. VAIL, | : | |
| | : | No. 02-CV-2933 |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| HARLEYSVILLE GROUP, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant | : | Electronically Filed |

## DEFENDANT HARLEYSVILLE GROUP, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

BLANK ROME LLP

Anthony B, Haller, Esquire (PA 37017)
Julie E. Reid, Esquire (PA 89848)
One Logan Square
Philadelphia, PA 19103
(215) 569-5690
(215) 832-5690 (facsimile)

Attorneys for Defendant
Harleysville Group, Inc.

Dated:  July 15, 2004

Pursuant to the Court's February 3, 2004 Rule 16 Status Conference Order, Defendant, Harleysville, Inc. ("Harleysville"), by and through its attorneys, hereby submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.[1]

## A.    General Background

1.    Harleysville is an insurance company underwriting commercial, property, and casualty lines of insurance, headquartered in Harleysville, Pennsylvania.  Its Loss Control Department is involved in supporting underwriters by assessing, identifying and managing risks for customers who are clients or potential clients.  (Ex. A, Vail Dep. at 55-60; Ex. D, Harleysville website materials).

2.    The Loss Control department also performs work internally for Harleysville's own risk management initiatives and handles direct sold service for unbundled insurance.  (Ex. A, Vail Dep. at 55-60).

3.    Harleysville maintains a comprehensive Employee Manual that describes many of Harleysville's policies, procedures, benefits and resources, a copy of which is provided to all incoming employees.  (Ex. E, Employee Manual).[2]

4.    The Employee Manual contains an Employment At Will policy, which informs employees that either the employer or the employee can terminate the employment relationship at any time for any lawful reason and explicitly states that nothing in the Manual creates a contract between an employee and Harleysville.  (Ex. E, Employee Manual, Section 1, p. 1).

---

[1] This statement of undisputed material facts is based principally on admissions from Plaintiff Kenneth Vail's ("Vail's") deposition and other undisputed testimony and documents.  Citations to deposition transcripts will be cited with the Exhibit letter from the Exhibit list, followed by the deponent's last name and page number(s) of their deposition testimony and/or a referenced deposition exhibit (e.g., Ex. A, Vail Dep. at 20).  Other principal exhibits will be directly referenced in the text.

[2] Unless otherwise noted in a particular paragraph, the Employee Manual referred to in this Statement is the 1999 Employee Manual, which was the version in effect during Vail's employment.

5.      The Employee Manual contains an Equal Employment Opportunity policy, which provides that Harleysville makes all employment decisions without regard to any protected characteristic, and that its policies prohibit illegal discrimination or harassment of any kind.  (Ex. E, Employee Manual, Section 1, p. 1).

6.      Also, within a "Supervisor's Supplement" to the Employee Manual, which contains guidelines for supervisory and management employees relevant to supervising staff members, one guideline mentions procedures to aid supervisors in correcting employees' performance problems.  It explicitly states that "[t]he Company reserves the right to terminate employment at will, with or without reason, at any time.  Depending on the circumstances, the Company may however, try to correct the problem first."  (Ex. E, Employee Manual, Supp., pp. 3-4).

7.      That guideline further provides examples of certain steps that may be used as appropriate based on the situation, but does not provide that employees must receive "progressive discipline" or be placed on a "plan for improvement."  (Ex. A, Vail Dep. at 170; Ex. E, Employee Manual, Supp., pp. 3-4).

8.      Further, the guideline differentiates between the level of counseling and warning necessary depending on an individual's length of service, reflecting that for short-tenured employees, less formal corrective action is expected than for longer-tenured employees.  (Ex. E, Employee Manual, Supp., pp. 3-4; Ex. M, Geckeler Ver. St., ¶ 5).

9.      Harleysville offers long-term disability benefits to regular full-time employees with less than three (3) years of service who have been out of work for at least thirty (30) days after the onset of an illness or injury.  (Ex. C, Geckeler Dep. at 15-16; Ex. E, Employee Manual, Section 5, p. 2;).

10.    The maximum duration for which an employee can receive long-term disability benefits is twenty (20) weeks after the benefits commence, and eligible employees who receive the benefits will receive sixty (60) percent of their base salary.  (Ex. E, Employee Manual, excerpts, Section 5, p. 2).

11.    After six (6) months of employment, regular full-time employees are eligible to participate in Harleysville's Salary Continuation Plan and receive full salary compensation for a length of time determined by the length of the employee's service at the onset of an illness or injury.  (Ex. A, Vail Dep. at 84; Ex. E, Employee Manual, Section 4, pp. 2-3).

**B.    Reorganization of Loss Control Function**

12.    In early 2000, shortly before Harleysville hired Plaintiff, Kenneth Vail ("Vail"), Harleysville reorganized its Loss Control Department.  (Ex. B, Weinstein Dep. at 6).

13.    With the reorganization, Harleysville sought to better serve its customers by centralizing the Loss Control function and the Loss Control management positions and creating four (4) new Regional Manager positions.  (Ex. B, Weinstein Dep. at 6; Ex. C, Geckeler Dep. at 5-6).

14.    At the time of the reorganization, Gary Weinstein ("Weinstein"), Vice President of Loss Control and Premium Audit Department, drafted a written job description for the Loss Control Regional Manager position, which Human Resources approved.  (Ex. B, Weinstein Dep. at 4, 6; Ex. F, Job Description).

**C.    Plaintiff's Hire and Initial Period of Employment**

15.    To fill the newly-created Regional Manager positions, Weinstein sought to hire individuals with leadership skills and who were able to motivate their staff members.  (Ex. A, Vail Dep. at 66-68).

16.     Weinstein recruited and interviewed Vail, who represented himself as an experienced manager and had worked in several jobs where he held leadership positions. (Ex. A, Vail Dep. at 66-67; Ex. B, Weinstein Dep. at 5, 8).

17.     Weinstein hired Vail as a Loss Control Regional Manager for the Mid-Atlantic Region, and Vail commenced employment at Harleysville on or about March 27, 2000.  (Ex. A, Vail Dep. at 20, 55; Ex. B, Weinstein Dep. at 5, 8; Ex. C, Geckeler Dep. at 5).

18.     Upon his hire, Harleysville awarded Vail a $3,000 bonus and agreed to compensate him at an annual salary of approximately $82,000 and provide him numerous employment benefits.  (Ex. A, Vail Dep. at 21-23).

19.     Vail reported directly to Weinstein.  (Ex. B, Weinstein Dep. at 17; Ex. C, Geckeler Dep. at 6).

20.     Shortly prior to the commencement of his employment, Weinstein sent Vail a "welcome aboard" memorandum via email detailing the specific requirements of Vail's position and informing Vail that the job required hands-on involvement.  (Ex. B, Weinstein Dep. at 7-8, 41-42).

21.     Vail received a copy of Harleysville's Employee Manual when he first arrived at Harleysville.  (Ex. A, Vail Dep. at 80).

22.     Vail understood that he was an employee at will.  (Ex. A, Vail Dep. at 80-81).

23.     Vail possessed responsibility towards vendors in assigning work, reviewing a sample of that work, and where appropriate, issuing recommendation letters to insureds resulting from the surveys that vendors completed, and Vail was also charged with assigning work and reviewing samples from his staff members, and coaching and counseling his staff.  (Ex. A, Vail Dep. at 62-63, 66).

5

24.     Vail's duties included making regular quality control assessments of his staff's work, working with underwriting units to identify in which segments of which markets they could profitably write business, and reviewing service files and non-service files, the vast majority of which were available electronically.   (Ex. A, Vail Dep. at 63, 66; Ex. B, Weinstein Dep. at 11, 34-35).

25.     It is important for the Loss Control Regional Manager to have the respect of his staff and that staff be willing to take direction from their manager, and it is not good management to demean or disparage staff when trying to get them to learn and conform to new requirements of the company.  (Ex. A, Vail Dep. at 71).

26.     Vail's verbal feedback to his staff was poorly received.  (Ex. B, Weinstein Dep. at 13).

27.     Vail's staff ended up complaining about him on numerous occasions to Vail himself as well as Weinstein and Alice Geckeler ("Geckeler"), Assistant Vice President, Recruitment and Retention (formerly Harleysville's Human Resources Consultant and then Manager).  (Ex. B, Weinstein Dep. at 30-31).

28.     Specifically, Vail's staff members told Vail that his comments made them uncomfortable and that he treated them unfairly.  (Ex. B, Weinstein Dep. at 30-31).

29.     Weinstein also continuously expressed his concern to Vail about the timeliness of completing tasks both verbally and in writing, and gave him feedback that certain tasks, including providing quality reviews or reports for his staff members, were not getting done.  (Ex. A, Vail Dep. 97; Ex. B, Weinstein Dep. 11, 17).

30.     Between March 27, 2000 and May 2, 2000, Weinstein expressed concern to Vail about the timeliness of tasks being performed. (Ex. A, Vail Dep. at 97).

120113.00201/21289913v6

31.     On May 1, 2000, Weinstein emailed Vail and expressed his frustration that some necessary tasks were not being timely completed and directed Vail to master certain tasks and focus on certain priorities including properly training his administrative assistant and performing critical tasks.  (Ex. G, May 1, 2000 and May 2, 2000 emails).

32.     On May 2, 2000, Vail responded by email that the situation would quickly improve.  (Ex. G, May 1, 2000 and May 2, 2000 emails).

33.     As of May 2, 2000, Vail understood that Weinstein gave high priority to having quality control performed on reports, recommendations written up, and work logged out in a timely fashion.  (Ex. A, Vail Dep. at 95-96; Ex. G, May 1, 2000 and May 2, 2000 emails).

**D.     Plaintiff's Injury**

34.     On Friday, June 2, 2000, Vail sustained a gunshot wound, which required hospitalization and surgery, while participating in the National Tactical Invitational, a sporting gun event unrelated to his employment at Harleysville.  (Ex. A, Vail Dep. at 106-108, Ex. H, June 12, 2000 email).

35.     On or about Monday, June 5, 2000, Vail telephoned Weinstein from the hospital and informed him that he sustained an injury by falling from a tower.  (Ex. A, Vail Dep. at 108-110; Ex. B, Weinstein Dep. at 18; Ex. H, June 12, 2000 email).

36.     On or about June 7, 2000, Vail telephoned Weinstein and mentioned that he was in the hospital and would undergo surgery.  (Ex. A, Vail Dep. at 108-110; Ex. B, Weinstein Dep. at 18; Ex. H, June 12, 2000 email).

37.     During their June 7, 2000 conversation, Vail revealed to Weinstein a significantly different and more accurate version of how he sustained his injury (that he had been shot at a sporting gun event rather than fallen from a tower).  (Ex. A, Vail Dep. at 108-110; Ex. B, Weinstein Dep. at 18-20; Ex. H, June 12, 2000 email).

120113.00201/21289913v6

38.    On June 12, 2000, Vail emailed Weinstein and described how he sustained his injury and explained why he may not have been truthful when he originally informed Weinstein about his injury.  (Ex. H, June 12, 2000 email).

39.    In his June 12, 2000 email to Weinstein, Vail also informed Weinstein that he was "looking to return to work as soon as it is prudent to do so," looking forward to a quick and speedy recovery, he can continue to effectively contribute, and that there is much he can do from his home office.  (Ex. A, Vail Dep. at 111; Ex. H, June 12, 2000 email).

40.    At the time of Vail's injury, he had not yet accrued any paid sick leave or vacation leave.  (Ex. B, Weinstein Dep. at 36; Ex. C, Geckeler Dep. at 40).

41.    Also, Vail was not entitled to leave pursuant to the Family and Medical Leave Act of 1993.  (Ex. C, Geckeler Dep. at 45-46).

42.    Vail acknowledged that Harleysville's Salary Continuation Plan only applied to employees who had been employed for at least six months.  (Ex. A, Vail Dep. at 84).

43.    Vail acknowledged that he never made a claim for long-term disability benefits because he did not need those benefits, nor was he entitled to those benefits as he was able to come back to work very quickly after his injury.  (Ex. A, Vail Dep. at 84-85, 87-88; Ex. C, Geckeler Dep. at 15-16).

44.    In fact, Vail told Weinstein that he did not want to go on disability benefits and that he wanted to return to work.  (Ex. B, Weinstein Dep. at 37).

45.    Following his injury, Vail's firm plan was to return to work on a full-time basis as quickly as possible, consistent with his doctor's recommendations.  (Ex. A, Vail Dep. at 88-89, 111).

120113.00201/21289913v6

46.     Harleysville offered Vail the opportunity to work part-time, but Vail informed Harleysville that he wanted to work a full-time schedule, to which Harleysville agreed.  (Ex. B, Weinstein Dep. at 23, 36-37).

**E.     Plaintiff's Employment from his Home**

47.     After a two week period in which he did not work, Vail resumed working full-time from his home office on Monday, June 19, 2000.  (Ex. A, Vail Dep. at 111).

48.     Harleysville granted Vail's requests to work from home, work a full-time but flexible schedule (taking frequent breaks and extending his work day however long he needed), and eliminate all travel.  (Ex. A, Vail Dep. at 112-114; Ex. B, Weinstein Dep. at 26, 43-44; Ex. C, Geckeler Dep. at 22).

49.     Approximately thirty (30) percent of Vail's job responsibilities involved travel, including riding with staff members and attending staff, branch, agent or agency council meetings.  (Ex. A, Vail Dep. 116, 144-145; Ex. B, Weinstein Dep. at 33-34; Ex. C, Geckeler Dep. at 28; Ex. I, July 15, 2000 and July 20, 2000 emails).

50.     While working at home, Harleysville allowed Vail to forego all of his traveling-related responsibilities and focus on the rest of his duties that he indicated he could perform. (Ex. B, Weinstein Dep. at 33-34).

51.     Vail believed that Weinstein expected and "very much wanted [him] to work," and they shared a mutual objective of getting Vail back to work as quickly as possible.  (Ex. A, Vail Dep. at 114-115, 121-122).

52.     Vail believed that Weinstein preferred that he work full-time.  (Ex. A, Vail Dep. at 138).

53.     Vail could electronically access all of the work that Harleysville assigned to him while he worked from home.  (Ex. B, Weinstein Dep. at 26-27).

120113.00201/21289913v6

54.    After Vail returned to work in June 19, 2000, Weinstein conversed with him on numerous occasions about Weinstein's priorities and expectations, expressed displeasure with the un-timeliness of Vail's work, and instructed Vail to concentrate on quality control reviews and feedback to staff on reports, survey assignments to staff and vendor report and recommendation review, which Vail understood to be necessary and important parts of his job. (Ex. A, Vail Dep. at 118-120).

55.    On June 21, 2000, Weinstein emailed Vail and asked him to "review and delete, or rewrite any recs [recommendations] to policyholders. This is a top priority as we are getting inquiries/complaints regarding time service…. Let's make sure we don't add any delay to the process." (Ex. A, Vail Dep. at 119-120; Ex. J, June 21, 2000 email).

56.    Weinstein's June 21, 2000 email also directed Vail to "concentrate on QC reviews and feedback to staff on reports, survey assignments to staff, and vendor report and rec review. You need to review all vendor reports with recs…. This is not something that Carley [Vail's administrative assistant] can do. Hope all went well with the doctor today…. We are all wishing you a safe and speedy recovery." (Ex. A, Vail Dep. at 119-120; Ex. J, June 21, 2000 email).

57.    Weinstein perceived, based on what Vail had told him, that Vail was fully able to perform his job full-time, but for his limitations on travel. (Ex. A, Vail Dep. at 121).

58.    In fact, throughout the summer of 2000, Vail continually informed Weinstein that he expected to make a full recovery. (Ex. A, Vail Dep. at 222; Ex. B, Weinstein Dep. at 44).

59.    In the wake of a reorganization when Harleysville needed leadership and management, it was clear to Vail that Weinstein expected him to work and perform his job, and Weinstein unequivocally stated his priorities and aggressively wanted Vail to perform his job responsibilities. (Ex. A, Vail Dep. at 121-122).

60.     On July 15, 2000, Weinstein emailed Vail and stated that due to Vail's injury, he was not currently tasked with riding with his staff, attending staff, branch, agent or agency council meetings, and that his day-to-day supervision and training of his administrative assistant had been transferred to another employee, which temporarily removed at least 30% of the normal tasks expected of a regional manager.  (Ex. A, Vail Dep. at 144-145; Ex. I, July 15, 2000 and July 20, 2000 emails).

61.     Weinstein's July 15, 2000 email also reiterated several tasks that Vail needed to perform, many of which were not getting done, and about which he spoke to Vail on numerous occasions both before and after his injury, such as:  promptly reviewing and rewriting the recommendations and transmitting all vendor reports; performing no less than five (5) quality control report reviews per month per staff member and providing written feedback on each report; until he is able to spend multiple days riding with staff, providing written feedback on at least ten (10) reports per staff member, particularly if quality is below standard; reviewing all existing service files from his region, evaluating the service being providing, and provide written feedback to the staff member and file containing suggestions for future service and a critique of he existing plan; completing a review of the existing files and then promptly reviewing the top 200 list of accounts for each of his region's branches to review previous surveys and service provided and to generate survey/service requests for him or his staff to work with those accounts.  (Ex. A, Vail Dep. at 145-146; Ex. B, Weinstein Dep. at 41; Ex. I, July 15, 2000 and July 20, 2000 emails).

62.     Weinstein concluded his July 15, 2000 email with a stern warning to Vail that he must improve his performance:

> Ken, while you are completing some tasks, you repeatedly put off
> certain tasks that I have identified as essential.  It took an

unexpectedly long time to review and transmit the vendor reports that were sent to you electronically.  You are also not reviewing the paper vendor reports for price, quality, and recommendations.

In summary, your task is to promptly assign the work, monitor the time service, production, and quality (vendor and staff), and take the necessary actions to bring deficient areas up to standard.  This includes training, mentoring and grooming.  Additional administrative tasks including assigning survey work and paying vendor bills, completing performance reviews, and so on must be completed in a timely manor.  [sic]

<u>Your success going forward depends on your timely and thorough completion of all of the above tasks.</u>

(Emphasis supplied) (Ex. A, Vail Dep. at 146-149; Ex. I, July 15, 2000 and July 20, 2000 emails).

63.     Weinstein's July 15, 2000 email put Vail on notice of Weinstein's expectations and that Weinstein legitimately wanted certain tasks to be timely completed.  (Ex. A, Vail Dep. at 151, 154).

64.     After reading Weinstein's July 15, 2000 email, Vail understood that Weinstein was "not a happy camper" about the way things were going in Vail's region, and that things were not progressing according to Weinstein's plan.  (Ex. A, Vail Dep. at 150, 151).

65.     Weinstein was informing Vail in no uncertain terms that he was not satisfied with Vail's performance, his numerous emails constituted notice of his dissatisfaction, and Vail understood that Weinstein was giving him very explicit direction as to what he needed from Vail concerning output.  (Ex. A, Vail Dep. at 146, 154).

66.     On July 18, 2000, Weinstein emailed Vail stating that there is a "real major problem with overdue work in your territory," "She [Carley] has received at least 20 inquiries form [sic] underwriters looking for late stuff," and that "we have a total breakdown in service." (Ex. A, Vail Dep. at 139, Ex. K, July 18, 2000 email).

67.     Vail understood that it was not good for there to be backlog as described in Weinstein's July 18, 2000 email.  (Ex. A, Vail Dep. at 140; Ex. K, July 18, 2000 email).

68.     Weinstein's July 18, 2000 email reiterated his increasing level of frustration with the unacceptable management of Vail's region.  (Ex. A, Vail Dep. at 140-142, 149; Ex. K, July 18, 2000 email).

69.     To that end, Weinstein's July 18, 2000 email reminded Vail that the service level in his region was unacceptably poor, that he must provide substantially better service to their underwriting customer, and that Weinstein and others are spending way too much time managing Vail's region.  (Ex. A, Vail Dep. at 141; Ex. K, July 18, 2000 email).

70.     In Vail's July 20, 2000 response to Weinstein's July 15, 2000 email, he reiterated that he originally informed Weinstein that he wanted to work a full-time schedule and thought he could handle it, and that as of July 16, 2000, he is entirely off of his pain medication and is much stronger and able to sit and work for much longer periods of time.  (Ex. A, Vail Dep. at 151, Ex. I, July 15, 2000 and July 20, 2000 emails).

71.     On July 20, 2000, Vail informed Weinstein that he just met with his surgeon who told Vail that his healing was on track, and Vail stated that he was making progress and expected to fully recover.  (Ex. A, Vail Dep. at 153; Ex. I, July 15, 2000 and July 20, 2000 emails).

72.     Vail looked forward to getting things back on track, as he understood that the management of his region was not going as Weinstein planned.  (Ex. A, Vail Dep. at 151; Ex. I, July 15, 2000 and July 20, 2000 emails).

73.     Vail was at least partially responsible for the breakdown in service in his region. (Ex. A, Vail Dep. at 142).

13

74.     From July 20, 2000 through the third week in August, Vail had not completed even five (5) written feedback reports for some of his staff members, even though Weinstein charged him with performing at least ten (10) per staff member.  (Ex. A, Vail Dep. at 155-156; Ex. I, July 15, 2000 and July 20, 2000 emails).

75.     Weinstein offered Vail the opportunity to work part-time, but Vail believed that Weinstein would much prefer if he continued full-time, which he did, and as of July 20, 2000, Vail was fully committed to working on a full-time basis, and there was no lingering issue regarding whether he might work reduced schedule.  (Ex. A, Vail Dep. at 138, 173).

76.     On July 26, 2000, Weinstein emailed Vail and reminded him that they are very long overdue on providing report review feedback to all of his staff members; Weinstein is spending way too much time discussing that topic with Vail every week and trying to get him to complete the first round for each staff member and move on to the next; Vail repeatedly committed to completing the reports and has not even completed five (5) report reviews for half of his staff members during his entire term with Harleysville; and that Vail he needed to quickly increase the pace of his report reviews as his staff deserves his feedback.  (Ex. A, Vail Dep. at 162-164; Ex. L, July 26, 2000 email).

77.     Vail had no reason to dispute the facts highlighted in Weinstein's July 26, 2000 email, and he agreed that it was not "positive" that Weinstein had to follow-up with him about certain tasks that were not being completed.  (Ex. A, Vail Dep. at 162-164; Ex. L, July 26, 2000 email).

78.     Vail agreed that it is not a good situation where a manager has to constantly tell an employee to do tasks and keep reminding him to complete those tasks.  (Ex. A, Vail Dep. at 166).

14

**F.**    **Events after Plaintiff Returned to the Office**

79.    On August 21, 2000, Vail returned to the office full-time.  (Ex. A, Vail Dep. at 173; Ex. C, Geckeler Dep. at 32).

80.    Prior to his return, Vail received two return-to-work notes from his doctor:  the first contained no restrictions, and the second contained a restriction on lifting objects over thirty (30) pounds.  (Ex. A, Vail Dep. at 174-176).

81.    At the time of his return to the office in August 2000, Vail could walk with an assistive device.  (Ex. A, Vail Dep. at 289).

82.    As of August 21, 2000, Vail was able to drive, and his only limitations involved walking with an assistive device, not traveling more than necessary, and not lifting over thirty (30) pounds; Vail had no mental limitations nor concentration problems.  (Ex. A, Vail Dep. at 178, 263-264).

83.    After his return to the office on August 21, 2000, neither Vail nor his doctor made any written requests to anyone at Harleysville for any restrictions or limitations on his work.  (Ex. A, Vail Dep. at 222).

84.    On or about August 28 through August 31, 2000, Vail attended and presented at a loss prevention seminar near Harrisburg, Pennsylvania.  (Ex. A, Vail Dep. at 189-190).

85.    Vail drove approximately 80-85 miles from his home to the seminar.  (Ex. A, Vail Dep. at 190).

**G.**    **Staff Complaints**

86.    On or around Vail's return to the office on August 21, 2000, several of his staff members approached Weinstein concerning various complaints they had about Vail including harassment and unfair treatment.  (Ex. B, Weinstein Dep. 29-30).

120113.00201/21289913v6

87. Weinstein arranged for Vail's staff members to meet with Geckeler at the conclusion of the seminar. (Ex. B, Weinstein Dep. at 30).

88. The staff members in attendance at the meeting included John Diehl, Bob Griffin, Bob Panteleo, Ted Semetowsky, Ann Dymond, Gary Gillespie, Jerry Walker, Scott Welch, and Bill Cassell. (Ex. M, Geckeler Ver. St., ¶ 8).

89. At the meeting, Vail's staff members voiced numerous concerns and complaints about him. (Ex. A, Vail Dep. at 197; Ex. M, Geckeler Ver. St., ¶¶ 9-10).

90. The comments, which Geckeler relayed to Weinstein, included that Vail only did 5 reviews over a four-month period; that he is confrontational; that he intimidates staff saying, "I'll fire you"; that he lied to the staff about his accident; that he made disparaging remarks and belittled staff; that he made an insensitive comment about a staff member's wife who was pregnant saying to the staff member "are you sure it is yours?"; that he is cocky, arrogant, short and rude; that he does not give direction; that he nit-picks reports; that he had alienated staff; that he does not know how to assign work; that he treats staff like commodities; that a staff member did not want to go on field visits with him and dreaded the possibility; that staff were offended when he held a meeting he termed a "come to Jesus meeting"; that he micro-managed staff. (Ex. M, Geckeler Ver. St., ¶¶ 9-10, 12).

91. At least one staff member told Geckeler that he would resign if Vail was allowed to continue in his job, and several staff members told her that they had sent out resumes in search of other employment opportunities. (Ex. M, Geckeler Ver. St., ¶ 10).

92. Based on the severity the complaints, it was clear that Vail had lost the trust of his staff. (Ex. H, Geckeler Ver. St., ¶ 11).

**H.**    <u>Plaintiff's Termination of Employment with Harleysville</u>

93.    Weinstein made the decision to terminate Vail's employment.  (Ex. B, Weinstein Dep. at 48-49).

94.    Weinstein decided to terminate Vail's employment because throughout his employment, he felt that Vail performed poorly and ignored critical job functions despite repeated counselings, and because of the numerous complaints communicated by his staff members as to his unworkable management style.  (Ex. B, Weinstein Dep. at 47, 49-52).

95.    On the morning of September 6, 2000, Weinstein called Vail and directed him to return to the office that day.  (Ex. A, Vail Dep. at 198).

96.    Upon Vail's return to the office on the afternoon of September 6, 2000, Weinstein informed him that he intended to arrange a meeting with Geckeler, Vail and Weinstein to review the staff feedback that had been collected at the Harrisburg meeting.  (Ex. A, Vail Dep. at 199).

97.    That same day, Weinstein told Vail that he was dissatisfied with his performance. (Ex. A, Vail Dep. at 199).

98.    On September 7, 2000, Geckeler and Weinstein met with Vail in Geckeler's office and informed Vail that Harleysville terminated his employment effective that date.  (Ex. A, Vail Dep. at 200-201; Ex. C, Geckeler Dep. at 6).

99.    At his termination meeting, Geckeler and Weinstein informed Vail that he was a poor fit for the organization and that things weren't working out, and that Harleysville was terminating his employment based on numerous complaints from Vail's staff about his management style   (Ex. A, Vail Dep. at 201, 204-206; Ex. B, Weinstein Dep. at 48; Ex. C, Geckeler Dep. at 13-14).

120113.00201/21289913v6

100. Vail received consistent counseling and warning of the type and level to be expected given his short tenure, and Vail has no evidence that other similarly situated employees were treated differently. (Ex. M., Geckeler Ver. St., ¶ 6).

101. Gary Weinstein, a senior manager who worked at Harleysville for approximately eleven (11) to twelve (12) years, was terminated from Harleysville in or around February 2001 without counseling or a warning of any kind because his department was underperforming. (Ex. B, Weinstein Dep. at 4-5, 15).

102. Three other Regional Managers who were hired around the same time as Vail progressed well and completed their work including key quality reviews, transmittals and vendor report reviews. (Ex. B, Weinstein Dep. at 50-51).

103. It occurred to Vail that perhaps the "writing was on the wall" based on the numerous performance issues that Weinstein raised with Vail during his short tenure. (Ex. A, Vail Dep. at 207-208).

104. Typically, when Harleysville terminates the employment of a management employee who has less than one (1) year tenure, it does not offer the employee a severance package. (Ex. B, Weinstein Dep. at 52).

105. Although Vail was not entitled to a severance package as a matter of Harleysville policy, Harleysville granted Weinstein's request to offer Vail a severance package to help him until he found another position. (Ex. B, Weinstein Dep. at 52-53; Ex. C, Geckeler Dep. at 12-13).

106. Harleysville would not likely have offered Vail a severance package without Weinstein's suggestion and request. (Ex. B, Weinstein Dep. at 53).

107.    At the September 7, 2000 meeting, Geckeler and Weinstein provided Vail with a "form" severance package which mistakenly contained language pertaining to a reduction in force.  (Ex. B, Weinstein Dep. at 51-52; Ex. C, Geckeler Dep. at 6-7, 9-10, 12).

108.    A human resources assistant prepared Vail's severance paperwork utilizing existing form documents applicable to a reduction in force that should have been tailored to the specific circumstances surrounding Vail's termination.  (Ex. C, Geckeler Dep. at 7).

109.    When Harleysville identified the errors in the severance documents, it promptly notified Vail's counsel in writing, explaining that the severance package containing reduction in force language was given to Vail in error, and reiterating that Harleysville terminated Vail for valid reasons of which it had informed Vail at his termination meeting on September 7, 2000. (Ex. A, Vail Dep. at 203-204; Ex. C, Geckeler Dep. at 8; Ex. N, Oct. 6, 2000 letter).

110.    Specifically, Harleysville's October 6, 2000 letter to Vail's counsel stated:

> The letter Mr. Vail received from the Human Resources Department regarding his termination should not have been sent to him – it was a mistake.  Mr. Vail's position, the Loss Control Manager for the Mid-Atlantic region, was not eliminated. . . . Therefore please disregard the letter.
>
> As Mr. Vail knows from the meeting he attended on 9/7/00 with Gary Weinstein and Alice Geckeler, his employment was terminated because of his poor performance of his job duties. Neither his age nor his physical limitations played a role in the decision to terminate his employment.

(Ex. N, Oct. 6, 2000 letter).

111.    Vail chose to not sign the agreement and release.  (Ex. B, Weinstein Dep. at 53).

## I.    Events Following Plaintiff's Termination of Employment

112.    Since his separation from Harleysville, Vail has not received any treatment for any mental or emotional problems.  (Ex. A, Vail Dep. at 227).

120113.00201/21289913v6

113.    On May 29, 2002, Vail and his wife, Pamela Vail, filed a negligence lawsuit against Peter Gill ("Gill") in connection with the injury that Plaintiff sustained on June 2, 2000, and their complaint alleged that as a result of Gill's negligence, Vail was unable to pursue his usual occupation for extended periods of time, and that he suffered lost wages and other lost employment benefits.  (Ex. A, Vail Dep. at 239-240; Ex. O, Vail v. Gill Complaint).

114.    On January 10, 2003, Vail settled his the entirety of his claims against Gill for $385,000.  (Ex. A, Vail Dep. at 240-247, 253-254; Ex. P, General Release).

115.    Between September 7, 2000 and February 18, 2002, Vail operated a consulting business.  (Ex. A, Vail Dep. at 27-28).

116.    On or about February 18, 2002, Vail commenced employment with Vail commenced employment with St. Luke's Hospital and Health Network ("St. Luke's") as the Director, Risk Management with an annual base salary of $85,000, as well as various employment benefits, and in 2002, Vail earned in excess of $90,000 from his employment at St. Luke's.  (Ex. A, Vail Dep. at 24, 27, 32-33; Ex. Q, January 10, 2002 letter).[3]

117.    Following his termination of employment with Harleysville and prior to obtaining employment with St. Luke's Hospital and Health Network, Vail received full medical coverage from his wife's benefits plan.  (Ex. A, Vail Dep. at 25).

118.    At the time Vail applied for a position at St. Luke's in October 2001, he needed no accommodation of any kind for any physical limitation.  (Ex. A, Vail Dep. at 41; Ex. R, St. Luke's Application).

---

[3] By letter dated May 14, 2004, Vail's counsel acknowledged that beginning in February 2002, Vail has earned more money that he would have made at Harleysville.

**J.**    **Plaintiff's Injury and Recovery**

119.    Following Plaintiff's injury on June 2, 2000, from approximately June 11 through July 7, 2000, he received home care physical therapy from Beth Pretti and Carrie Hrichak of Lehigh Valley Home Care ("LVHC").  (Ex. A, Vail Dep. at 257; Ex. S, LVHC records).

120.    Soon after Vail's treatment with Dr. Reid began, Dr. Reid informed Vail that he expected Vail to be able to ambulate without crutches in approximately fourteen (14) weeks and be able to return to the office by that time, and that it was possible for Vail to recover sooner if he followed a rigorous course of recovery.  (Ex. A, Vail Dep. at 130-132).

121.    On June 22, 2000, Vail emailed Weinstein and Geckeler with a medical progress update, in which Vail stated that:  Dr. Reid, his orthopedic surgeon, was pleased with his progress; Dr. Reid instructed Vail's physical therapist to increase Vail's range of motion exercises; Dr. Reid approved him to work at home provided he takes rest breaks as needed; he was feeling relatively better and is doing OK with the work-at-home schedule; Dr. Reid said that Vail's injury "simply 'needs time to heal the structure members and connective tissue'"; and he looks forward to returning to full productivity as soon as he can.  (Ex. A, Vail Dep. at 122-124; Ex. T, June 22, 2000 email).

122.    On June 26, 2000, Vail informed Dr. Reid (and copied Harleysville) that the work-at-home arrangement with a flexible schedule is working out fine, provided he takes frequent breaks throughout the day as needed.  (Ex. A, Vail Dep. at 126; Ex. U, June 26, 2000 letter).

123.    Throughout the summer of 2000, Vail told Weinstein that he expected to make a full recovery and he could perform the essential functions of his job with the modifications that were made to his schedule.  (Ex. A, Vail Dep. at 222).

124.    On or about July 6, 2000, Dr. Reid submitted a Disability Record Form to Harleysville, noting that Vail's prognosis was "good."  (Ex. A, Vail Dep. at 127-128; Ex. V, Disability Record Form).

125.    As of July 7, 2000, the LVHC records indicate that Vail was able to, among other things, ambulate independently, walk on even and uneven surfaces and climb stairs with or without railings (i.e., needs no human assistance or assistive devices), and that Vail was alert, oriented, able to focus and shift attention, comprehends and recalls task directions independently; able to groom himself unaided, bathe independently, make meals, feed himself; and perform light housekeeping tasks.  (Ex. A, Vail Dep. at 258-262; Ex. S, LVHC records).

126.    As of August 21, 2000, Vail could make his meals, brush his teeth, brush his hair and dress himself.  (Ex. A, Vail Dep. at 262).

127.    On August 10, 2000, Vail informed Weinstein by email that his doctor approved him to return to the office on August 21, 2000, he is to use one crutch until his next doctor's visit on September 6, 2000, and that until then he must walk with a crutch and cannot lift over thirty (30) pounds; Vail presented no other restrictions to Harleysville.  (Ex. B, Weinstein Dep. at 21; Ex. W, August 10, 2000 email).

128.    In August 2000, Vail received two return-to-work notes from his doctor:  the first contained no restrictions, and the second contained a restriction on lifting objects over thirty (30) pounds.  (Ex. A, Vail Dep. at 174-176; Ex. X, Return-to-Work notes).

129.    After his return to the office on August 21, 2000, neither Vail nor his doctor made any written requests to anyone at Harleysville for any restrictions or limitations on his work. (Ex. A, Vail Dep. at 222).

130.    As of September 2000 after Vail came back to work at the Harleysville office, Vail could do everything he needed to do to live on a daily basis, and he walked with an assistive device (i.e., crutch or cane).  (Ex. A, Vail Dep. at 289).

131.    As of September 13, 2000, Vail was "doing very well," an x-ray showed that he was healing well, and he was ambulating with a cane for long distances but without an assistive device for short distances.  (Ex. Y, Penn State-Hershey Medical Records).

132.    From approximately September 18 through November 29, 2000, Vail received outpatient physical therapy from Brian Boyle ("Boyle") of Muhlenberg Hospital Center ("Muhlenberg").  (Ex. A, Vail Dep. at 265; Ex. Z, Muhlenberg records).

133.    As of September 18, 2000, Vail had excellent rehabilitation potential to return to his prior functional level.  (Ex. Z, Muhlenberg records).

134.    As of September 20, 2000, Vail told his Boyle that he has no problem with home exercise program.  (Ex. Z, Muhlenberg records).

135.    As of September 27, 2000, Vail could ride his bicycle on the road and ride a stationary bike for about ten (10) minutes.  (Ex. Z, Muhlenberg records).

136.    As of October 9, 2000, Vail could walk on a treadmill for twelve (12) minutes and had sore hamstrings because he went pretty hard on his bike the other day.  (Ex. Z, Muhlenberg records).

137.    On October 18, 2000, Vail told Boyle that on the previous day, he did not even think about his walking.  (Ex. Z, Muhlenberg records).

138.    As of October 25, 2000, Vail had made significant progress with range of motion, mobility and strength and had mountain-biked off road, began jogging at 4.5 miles per hour on a

treadmill for one (1) minute, and was ambulating independently with an assistive device.  (Ex. A, Vail Dep. at 273, 275; Ex. Z, Muhlenberg records).

139.    As of November 1, 2000, Vail was doing very well and was able to walk an unlimited amount.  (Ex. Y, Penn State – Hershey Medical Records).

140.    As of November 5, 2000, Vail could jog on a treadmill.  (Ex. A, Vail Dep. at 275; Ex. Z, Muhlenberg records).

141.    As of November 20, 2000, Vail progressed to running and skipping.  (Ex. Z, Muhlenberg records).

142.    As of November 22, 2000, Plaintiff told Boyle that, without an assistive device, he "was able to walk all over Manhattan yesterday…. We have definitely made progress."  (Ex. A, Vail Dep. at 271-272, 279-280; Ex. Z, Muhlenberg records).

143.    As of November 26 and 27, 2000, Vail was running and sprinting, although in his words he could not sprint "like Carl Lewis".  (Ex. A, Vail Dep. at 276; Ex. Z, Muhlenberg records).

144.    As of December 6, 2000, Vail could jog one-quarter (¼) mile on soft surfaces; jog for at least five (5) minutes; perform sprints (6 repetitions of 50 yards); had made significant progress with his running; and returned to mountain biking.  (Ex. A, Vail Dep. at 276-279; Ex. Z, Muhlenberg records).

145.    By December 6, 2000, Vail could do everything he needed to do on a daily basis to live, and he could walk without an assistive device.  (Ex. A, Vail Dep. at 288).

146.    As of January 10, 2001, Vail was able to walk, bend, kick and run, and x-rays showed he appeared to be healed.  (Ex. Y, Penn State – Hershey Medical Records).

120113.00201/21289913v6

147.    Since Vail's physical therapy ended, he has hiked approximately twice and occasionally rides a bicycle on the road and off road on smooth surfaces.  (Ex. A, Vail Dep. at 285-287).

148.    Vail still rides mountain bikes, although he no longer races them, and he gave up kayaking and serious hiking.  (Ex. A, Vail Dep. at 183).

149.    As of June 2001, Vail was doing well with just a trace limp.  (Ex. Z, Muhlenberg records).

150.    When he started therapy, Vail understood that if he worked hard, <u>he could return to his prior functional level, which he, in fact, did</u>.  (Ex. A, Vail Dep. at 269).


Respectfully submitted by:

BLANK ROME LLP


<u>/s/ Anthony B. Haller</u>
Anthony B, Haller, Esquire (PA 37017)
Julie E. Reid, Esquire (PA 89848)
One Logan Square
Philadelphia, PA 19103
(215) 569-5690
(215) 832-5690 (facsimile)

Attorneys for Defendant
<u>Dated</u>:  July 15, 2004                    Harleysville Group, Inc.

120113.00201/21289913v6