**EXHIBIT A (Part I)**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

— — —

KENNETH T. VAIL,         :  CIVIL ACTION
      Plaintiff,     :
                     :  NO. 02-CV-2933
      VS.           :
                     :
HARLEYSVILLE GROUP, INC., :
      Defendant.     :

— — —

Wednesday, March 24, 2004

— — —

Oral Deposition of KENNETH T. VAIL, taken pursuant to notice, at the Law Offices of Blank Rome, LLP, One Logan Square, 18th & Cherry Streets, Philadelphia, Pennsylvania, beginning at 9:30 AM, before Dennis Corsi, Registered Professional Reporter and Notary Public.

— — —

DENNIS CORSI COURT REPORTING
Registered Professional Reporters
814 Park Avenue
Collingswood, New Jersey 08108
(856) 854-7223

CONDENSED TRANSCRIPT WITH KEY-WORD INDEX

Page 19

1 respond to their tentative findings?
2    A. That would be correct.
3    Q. Not withstanding the charge that you filed,
4 the detailed questionnaires that you submitted and the
5 rebuttal that was submitted on your behalf, the EEOC
6 found that there was no merit to your charges; isn't
7 that correct?
8    A. I disagree.
9    Q. On what basis do you disagree?
10    A. My recollection of the document I received
11 from the EEOC is that they could not reach a
12 conclusion as to the merits of the charges.
13    Q. So based on what you had been given, they
14 weren't able to conclude that a violation of the
15 statute had occurred; is that correct?
16    A. Would you care to point out to me where it
17 is in the letter?
18    Q. If you go back to exhibit one, the last
19 page --
20    A. You mean the line that reads, "Based upon
21 its investigation, the EEOC is unable to conclude that
22 the information obtained establishes violations of the
23 statutes?"
24    Q. You agree that that is their finding?

Page 20

1    A. If you're asking me were they unable to
2 conclude, yes, I disagree with that.
3    Q. And based on what they were presented with,
4 they didn't think there was a violation; right?
5       MS. HUTNIK: I object to the form of
6 the question.
7       THE WITNESS: I disagree with your
8 comment.
9 BY MR. HALLER:
10    Q. So you think they did find that a violation
11 of the statute occurred?
12    A. No. I take it at its literal
13 interpretation, which is that they were unable to
14 conclude, which means that they couldn't make a
15 decision.
16    Q. That's how you read it?
17    A. Yes.
18    Q. What was the date that you first started
19 work at Harleysville?
20    A. My recollection is March 27th of 2000.
21       Are we done with exhibits one, four and
22 five?
23    Q. For now.
24    A. Thank you.

Page 21

1    Q. Do you recall what your compensation package
2 was when you started with Harleysville?
3    A. My recollection of my compensation when I
4 started at Harleysville was an annual salary that
5 calculated out to approximately $82,004 a year. My
6 recollection of Harleysville was that their acceptance
7 letter to me didn't list the salary on an annual
8 basis. It was bi-weekly. I don't recall the specific
9 number, but if you have that document available, I'll
10 be glad to look at it. In addition to the bi-weekly
11 salary, my recollection is that there was a one-time
12 bonus of approximately $3,000, but I'm sure that would
13 be covered in the paperwork that Harleysville has
14 regarding the specifics.
15    Q. What other benefits were you entitled to as
16 part of your package in addition to the salary?
17    A. In addition to the salary, there was a
18 company vehicle and a number of user selected benefits
19 for health. I can't recall the specifics as I sit
20 here right now. I do remember there was participation
21 in the 401-K, which assuming that the organization
22 performed acceptably, had some contributory value to
23 the employees. I don't recall when specifically that
24 was to have been awarded.

Page 22

1    Q. There was some kind of matching
2 contribution?
3    A. That's my understanding.
4    Q. Do you recall the specifics of that?
5    A. I'm sorry. I don't.
6    Q. Anything else as far as a compensation
7 package?
8    A. Well, compensation in the context of time
9 off. That's all I can remember right now. I'm
10 sorry. I do remember something else. There was also
11 a home office where Harleysville paid for certain
12 expenses with the home office. There was also a cell
13 phone. There was an expense account. I may be able
14 to think of more, but that's what I can recall right
15 now.
16    Q. Did you elect to take health benefits
17 through Harleysville as an employee?
18    A. I did.
19    Q. Does your wife work, by the way?
20    A. Yes.
21    Q. Is she eligible for health benefits at her
22 place of employment?
23    A. My understanding is she was selectable
24 benefits. I'm sorry. Was that question as of today

Page 23

1 or back on March 27 of 2000, so I'm clear on what
2 you're asking me?
3    Q. Let's start as of today.
4    A. The answer is correct, yes.
5    Q. As of September 1st, 2000.
6    A. September 1st, my recollection is the same.
7    Q. So your total salary including bonus from
8 Harleysville would have been $85,004?
9    A. My recollection for the first year is that
10 would be correct. After the first year, the bonus
11 provision, to my recollection, would not have been
12 repeated. It was a one-time bonus.
13    Q. It was a one-time bonus?
14    A. Correct.
15    Q. Did you, in fact, receive that bonus?
16    A. My recollection is, yes.
17    Q. So your base compensation package was then
18 $82,004?
19    A. That's correct.
20    Q. I'm going to show you a document we'll mark
21 as Vail deposition six.
22       (Whereupon exhibit Vail-6 was marked
23 for identification.)
24 BY MR. HALLER:

Page 24

1    Q. Mr. Vail, I've put before you a document
2 that we've marked as Vail deposition six, which is a
3 letter to you from St. Luke's Hospital where, I
4 believe, you currently work; is that correct?
5    A. That's correct.
6    Q. And you are still working there?
7    A. That's correct.
8    Q. This was an offer to join their management
9 team as the director of risk management at a base
10 salary of $85,000; is that right?
11    A. Yes.
12    Q. In addition to the base salary, did you get
13 any other benefits?
14    A. I have time-off benefits. I have certain
15 other benefits available to me, which I don't recall
16 the specifics right now. I believe there's a minor
17 contribution for a vision plan.
18    Q. Health benefits are available through St.
19 Luke's; is that right?
20    A. They're available, but I've opted out.
21    Q. You opted out to take your wife's plan?
22    A. That's correct.
23    Q. Is that because it's a better plan? Why did
24 you opt out?

Page 25

1    A. At the time, my assessment of the two plans
2 is that my wife's plan was the more comprehensive of
3 the two.
4    Q. After after you left Harleysville, did you
5 then opt into your wife's plan?
6    A. I don't recall specifically when I became
7 enrolled in her plan, but I do recall at the time I
8 left Harleysville, I did have coverage under her
9 plan.
10    Q. So at no point have you been without medical
11 coverage since, at least, March 27th of 2000?
12    A. The nature and character of the coverage
13 changed. I don't recall specifically in what
14 dimension. If you're asking did I have a type of
15 coverage, yes.
16    Q. Are there any out-of-pocket expenditures
17 you've had since September 6th, 2000 under whatever
18 plans you've been covered by that you would not have
19 had had you remained in the Harleysville plan that you
20 can think of sitting here today?
21    A. Possibly. I don't have the details to
22 answer that question accurately, and I know you
23 wouldn't want me to guess.
24    Q. I'd like you to tell me to the best of your

Page 26

1 knowledge if you can think of anything.
2    A. I don't have information to make that
3 decision.
4    Q. How would you go about finding that
5 information?
6    A. The mechanics of that would be to go back
7 through receipts and look at the receipts and what
8 co-pays there were, if any, and apply that to the
9 coverages that would have existed under Harleysville
10 and apply that to the coverages that exist in my
11 wife's plan. You're asking me to answer a question
12 that I'm not prepared to answer.
13    Q. Can I take it then that you're not seeking
14 any damages for out-of-pocket medical expenses?
15    A. No.
16    Q. I can't?
17    A. I'm going to defer to counsel on that. I'm
18 not sure I understand the question. Would you mind
19 rephrasing it?
20    Q. I'm just trying to ascertain whether or not
21 there's any claim in this case, and if so, whether
22 there's any support for a claim as to out-of-pocket
23 medical expenses.
24    A. As I sit here today, I can't recall

Page 27

1 specifically one way or the other, but I would reserve
2 the right through counsel to make that information
3 available if it's appropriate.
4    Q. Mr. Vail, without getting into an argument,
5 we did request specific details of the damages you
6 were requesting through interrogatories, so I'm going
7 to have to waste time in a deposition finding it out.
8 We got a very general response. I'm sitting here
9 today in a deposition, which is your chance to testify
10 about your claims and your damages in this case, and
11 I'm asking you a very straight-up question. Can you
12 think of anything by way of out-of-pocket medical
13 expenses, subject obviously to further verification,
14 but can you think of anything?
15    A. I understand your question now. I believe
16 I've answered it. As I sit here right now, no, not
17 that I can think of right now.
18    Q. What date did you start working at St.
19 Luke's?
20    A. My first date of employment, as I recall,
21 was February 18th, 2002. I believe that would be
22 memorialized in exhibit number six.
23    Q. Between September 6th, 2000 and February
24 18th, 2002, were you employed by any company or

Page 28

1 entity?
2    A. None, other than myself as a sole
3 proprietor.
4    Q. So St. Luke's was the first job you had
5 after you left Harleysville, putting aside your own
6 consulting business?
7    A. That's correct.
8    Q. Are you still operating your consulting
9 business?
10    A. On a very limited basis, yes. Basically,
11 it's a sideline.
12    Q. But you're still doing some personal
13 consulting work?
14    A. Yes. There were a number of ongoing
15 commitments that extend far into the future. I'm
16 sure, as an attorney, you can appreciate that.
17    Q. St. Luke's doesn't have a problem with you
18 doing that?
19    A. No.
20    Q. Have you requested permission to do that?
21    A. My boss knows that I have occasional
22 sideline work.
23    Q. What's the nature of the sideline work?
24    A. I provide safety and security consulting to,

Page 29

1 at this point, the legal industry. I consult in
2 personal injury cases.
3    Q. You're aware, are you not, that you would
4 not have been able to have that side business as an
5 employee of Harleysville?
6    A. At the time I was employed by Harleysville,
7 I wasn't involved in consulting to the legal
8 industry.
9    Q. I understand you hadn't gotten into that
10 consulting business at that time. That wasn't my
11 question.
12    A. I'm sorry. Rephrase your question then so I
13 can understand it.
14    Q. You understand, did you not, that you would
15 not have been permitted by Harleysville to be working
16 for them and have that kind of side business?
17    A. What kind of side business?
18    Q. The side business that you --
19    A. My side business?
20    Q. The side business that you've just
21 described.
22    A. Well, the side business that I described for
23 you is what I'm involved in now. The side business
24 that I was involved in earlier did not involve the

Page 30

1 legal services industry. I had ongoing commitments
2 that I handled when I was with Cigna contractually for
3 Cigna and I also had with EBI Companies as an
4 accommodation for self-insureds who had direct safety
5 consulting needs that had nothing to do with the legal
6 industry nor anything to do with insurance. So if
7 you're asking me did I have the understanding that
8 Harleysville would have barred any sideline business,
9 no, I don't have that understanding.
10    Q. You would not have been able to do the
11 sideline business in which you're currently engaged.
12 That's my question.
13    A. I don't have direct knowledge that
14 Harleysville would have absolutely prohibited it, but
15 in my own judgement, I wouldn't have undertaken such
16 assignments while employed by Harleysville.
17    Q. So you wouldn't have done it, and you
18 believe but don't know for certain that Harleysville
19 would not have permitted you to do it; right?
20    A. It's my belief that Harleysville would have
21 frowned on me consulting in personal injury cases,
22 which I didn't do while I was employed by
23 Harleysville.
24    Q. Could you put Vail deposition two in front

Page 31

1  of you for a minute and go to page three?
2      A. Are we done with number six?
3      Q. For now. In response to a question about
4  the amount of any income you've received since
5  September 7th, 2000, you set out four years of income,
6  and I just want to be sure that what's stated here is
7  accurate.
8      A. I have a correction for 2003. Since the
9  time that this request for information was presented
10 to me, I've completed my 2003 tax return, and my
11 consulting business net income is $65. What you see
12 under 2003 for O'Malley & Langan and Costopoulos,
13 Foster and Fields is not reflective of my net income
14 as a consultant.
15     Q. Is that because of expenses?
16     A. Sure.
17     Q. So what's reflected here is the revenue?
18     A. That's the gross revenue based on 1099s.
19     Q. Is the entry for O'Malley correct?
20     A. I'm sorry.
21     Q. The entry for O'Malley, is that correct?
22     A. For 2003, no. The entries for O'Malley &
23 Langan and Costopoulos, Foster and Fields was for
24 consulting. That was $65. These figures are gross

Page 32

1  income that are unrelated to the net income or the
2  taxable income.
3      Q. Those are gross incomes for you? We'd have
4  to look at your tax return to ascertain what expenses
5  you are claiming against the income?
6      A. Yes.
7      Q. Is there anything else you'd like to amend
8  in terms of this response?
9      A. In the year 2000, just so we're clear, the
10 income from that particular consulting business was
11 earned after my termination from Harleysville.
12     Q. Other than the things you've just said, the
13 information is accurate?
14     A. Based on my recollection, the information
15 you see for salary figures were taken directly from
16 either W-2s or 1099s. I believe it's a 1099G for the
17 unemployment compensation. Those figures, to the best
18 of my information, knowledge and belief, were
19 accurate.
20     Q. In 2002 and 2001, the income you received
21 from your consulting business is accurate?
22     A. Yes.
23     Q. So in the year 2002, your income was in the
24 region of $90,900 or so?

Page 33

1      A. If you have a calculator, I'll gladly do the
2  math.
3      Q. Well, it was in excess of $90,000. Can we
4  agree on that?
5      A. If you calculated the numbers and presented
6  that to me, I have no reason to doubt it.
7      Q. That was more than you would have earned had
8  you continued to work at Harleysville; am I correct?
9      A. I don't know the answer to that question
10 because, as you asked me earlier, there were
11 variable -- If I didn't mention it previously,
12 another recollection has just come to me. There was
13 also a variable component to the compensation at
14 Harleysville.
15     Q. What do you mean by that?
16     A. What I mean by that is there was a form of
17 profit sharing, which I don't recall the specifics
18 on. I'm sure the good folks at Harleysville would be
19 able to provide you with that information, but I do
20 recall that the organization took pride in sharing
21 successes with their employees, and one vehicle for
22 doing that was a variable component, so if you're
23 asking me specifically would it have been impossible
24 for me to have earned at Harleysville what I earned in

Page 34

1  2002 by the combination of St. Luke's and my
2  consulting business, I can't answer that
3  affirmatively.
4      Q. You don't know?
5      A. I don't know.
6      Q. We would have somebody at Harleysville
7  answer that question?
8      A. If my employment would have been retained,
9  but I don't know how they would answer it.
10     Q. I want to show you a document we'll mark as
11 Vail deposition seven.
12        (Whereupon exhibit Vail-7 was marked
13 for identification.)
14 BY MR. HALLER:
15     Q. Mr. Vail, do you recognize this to be the
16 application form that you completed for your position
17 at St. Luke's?
18     A. I don't recall if it's the entire form, but
19 it does look like what I completed at the time when I
20 made application.
21        MR. HALLER: It looks like this was not
22 copied correctly, so I'm going to ask the court
23 reporter to mark the document that I have, which is
24 two-sided, as the official court record, and I'll get

Page 35

1  a copy made of the other side.
2  BY MR. HALLER:
3      Q. Mr. Vail, I've put before you a document
4  marked as Vail-7, which is the two-sided document; is
5  that correct?
6      A. Yes.
7      Q. And that is your signature on the bottom
8  page of the document?
9      A. Yes, it is.
10     Q. You can certainly take your time to look at
11 it if you need to. Is that your application form?
12     A. May I take some time to look at it?
13     Q. You may.
14     A. Thank you.
15        There are notations on here that I don't
16 remember making. I'm sorry. Your question was?
17     Q. I don't think I had a question pending.
18        MS. HUTNIK: You just asked if he
19 recognized the document.
20        THE WITNESS: That is not the document
21 I signed. There's writing on here that I didn't sign.
22 BY MR. HALLER:
23     Q. Mr. Vail, putting aside the one handwritten
24 note on the back of that document.

Page 36

1      A. There are additional notations on the bottom
2  here that I didn't write.
3      Q. Are you saying this is a forged document?
4      A. No, not at all.
5      Q. Does it appear to be the application form
6  that you signed with some additional notes written on
7  it?
8      A. With the question put that way, yes.
9      Q. You did certify when you signed the
10 application form that the information provided was
11 true and correct; did you not?
12     A. I did, and the companies and employers that
13 are shown there are accurate, to my recollection.
14     Q. Was there a reason why you did not disclose
15 to St. Luke's that you had worked at Harleysville?
16     A. Yes.
17     Q. Why was that?
18     A. I found that it added nothing to my
19 background in terms of my education, knowledge or
20 experience. My employment at Harleysville had been
21 done in virtually similar capacities years before at
22 Cigna, and in my view, it added nothing to my
23 background or experience.
24     Q. Were you aware that St. Luke's was going to

## Page 37

1 do reference checks based upon the employees you had
2 listed?
3  A. Yes.
4  Q. Are you aware that, in fact, they did do
5 reference checks?
6  A. If you're presenting that to me, I have no
7 reason to doubt it.
8  Q. You don't think it was material to St.
9 Luke's that you had been somewhere and had been
10 terminated from your employment?
11  A. In my opinion, no.
12  Q. You would agree though that St. Luke's might
13 have a different view of that?
14  A. I don't have an answer to your question.
15  Q. You lied on your application form; didn't
16 you?
17  A. I disagree with that characterization. I
18 disclosed my employment, as I recall it.
19  Q. You consciously omitted your employment with
20 Harleysville because you didn't want St. Luke's to
21 know about it; isn't that correct?
22  MS. HUTNIK: I'm going to object. I
23 think it's been asked and answered.
24  You can answer.

## Page 38

1  THE WITNESS: My answer to that
2 question is simply this: If you're asking did I not
3 disclose Harleysville to St. Luke's, that answer is
4 yes. If you're asking did it make a difference in
5 terms of my evaluation as a candidate, my answer is
6 no.
7 BY MR. HALLER:
8  Q. Well, that's up to St. Luke's and not your
9 decision; isn't it?
10  A. I'm sorry. Why are you asking that
11 question?
12  Q. We have agreed that you did not disclose
13 it. That we've agreed on?
14  A. Yes.
15  Q. That it was consciously omitted from your
16 summary of work experience.
17  A. Yes.
18  Q. And you did that because you didn't want St.
19 Luke's to know of the circumstances of your
20 termination from Harleysville; didn't you?
21  A. I disagree.
22  Q. You did want them to know?
23  A. You phrased a very narrow question, and I'm
24 disagreeing with your premise.

## Page 39

1  Q. It's not a question whether you agree or
2 disagree. The answer is yes or no really to that
3 question.
4  A. Let me give you a more direct answer. No.
5  Q. You omitted it consciously because, as I
6 hear your testimony, you believe that it didn't add to
7 your experience?
8  A. Yes.
9  Q. Are you aware that you can be terminated for
10 falsifying an application form?
11  A. If the form had been falsified, I believe
12 that is correct. I'm not saying that I falsified an
13 employment application; far from it.
14  Q. Sitting here today, you don't know how St.
15 Luke's might view the fact that your employment with
16 Harleysville was omitted from the document?
17  A. I also didn't list employment when I was in
18 high school for a pharmacy I worked at, nor did I list
19 employment at a restaurant when I was in high school
20 for the same reasons that I didn't list the employment
21 at Harleysville. It added nothing to my experience.
22  Q. That was your most recent job experience
23 prior to working for St. Luke's?
24  A. No. My most recent job experience was as a

## Page 40

1 consultant.
2  Q. It was your most recent full-time employment
3 with another entity?
4  A. Correct.
5  Q. I'm not sure I got an answer to my question
6 though, which is: Are you aware that St. Luke's can
7 terminate an individual for falsifying their
8 application form?
9  MS. HUTNIK: I think he did answer it.
10  THE WITNESS: I believe that option is
11 available to them if they choose to view it that way.
12 BY MR. HALLER:
13  Q. Do you agree that it's really St. Luke's
14 judgement as to whether the omission was material and
15 a falsification or not?
16  A. I'm sorry. Give me the context of the
17 question a little more, please.
18  Q. It's really up to St. Luke's to determine
19 whether or not that omission amounts to a material
20 falsification of your application?
21  A. St. Luke's would have the ability to make
22 that determination.
23  Q. Sitting here today, you don't know how they
24 would view learning that you had not disclosed that

## Page 41

1 information?
2  A. That's correct.
3  Q. On your application form, there is a
4 question as to whether or not you're able to perform
5 the essential functions of the position for which
6 you're applying, and your answer is yes.
7  A. Yes.
8  Q. That answer is correct?
9  A. Yes.
10  Q. You needed no accommodation of any kind for
11 any physical limitation to do the job at St. Luke's;
12 did you?
13  A. Not as of the day of my application for
14 employment.
15  MR. HALLER: I think I'd like to take a
16 very quick break.
17  MS. HUTNIK: Fine.
18  (Break taken in the proceedings from
19 10:30 AM to 10:38 AM.)
20 BY MR. HALLER:
21  Q. Mr. Vail, I'm going to show you a document
22 we'll mark as Vail deposition eight.
23  (Whereupon exhibit Vail-8 was marked
24 for identification.)

## Page 42

1 BY MR. HALLER:
2  Q. Do you recognize this to be a copy of your
3 resume?
4  A. At some previous time. It's not current.
5 It's not correct.
6  Q. Do you recognize this to be the resume that
7 you submitted to St. Luke's along with your
8 application form?
9  A. I don't recall specifically.
10  Q. You did submit a resume to St. Luke's; did
11 you not?
12  A. I recall submitting a resume. I don't
13 recall specifically if it was this one.
14  Q. If I was to represent to you that this was
15 provided to us by St. Luke's, would that help refresh
16 your recollection?
17  A. I would have no reason to doubt it. I don't
18 recall specifically, but I have no reason to doubt
19 that.
20  Q. Again, this resume omits your employment at
21 Harleysville; does it not?
22  A. It does.
23  Q. Other than that omission, is it generally
24 accurate as to your employment up to May of 2000?

Page 55

1   A. That's my recollection.
2   Q. And that was Gary Weinstein?
3   A. Yes.
4   Q. Did you interview with Gary Weinstein?
5   A. Yes.
6   Q. As far as you're aware, he was the one that
7 decided to offer you a job?
8   A. To my knowledge, yes.
9   Q. Would you very briefly tell me what function
10 the loss control department played within the context
11 of Harleysville?
12   A. As it was presented to me and as it actually
13 occurred were two different things, but when I came to
14 Harleysville, what I found was basically a reporting
15 service for underwriting. In other words,
16 underwriting issued requests for surveys for
17 commercial insureds, and the loss control staff went
18 out and gathered data and occasionally made
19 recommendations for improvement from a risk reduction
20 standpoint, and then presented that to the
21 underwriters in the form of a written report.
22   Q. Was the responsibility you had in the
23 Mid-Atlantic the area that you were responsible for?
24   A. Correct.

Page 56

1   Q. Within that area, were you confined to
2 commercial underwriting?
3   A. That's my recollection.
4   Q. What did that cover?
5   A. It could have been anything literally from A
6 to Z in any type of operation. The underwriting units
7 in each of the various branch offices were known as
8 specific underwriting directions or appetites that
9 they would prefer a particular type of industry or
10 type of business over another.
11   Q. What I'm trying to find out is what you mean
12 by the term commercial in this context. Is that a
13 line of insurance?
14   A. Commercial would be nonresidential,
15 non-personal, businesses, organizations.
16   Q. And for commercial, there would be a variety
17 of lines and insurance?
18   A. Yes.
19   Q. What would those be?
20   A. Harleysville was a full-line insurer, which
21 included everything from workers' compensation to
22 property to commercial general liability to products
23 liability, auto insurance, physical damage liability,
24 inland marine. That's the bulk that I recall.

Page 57

1   Q. When you used the term underwriting, you
2 said underwriting issued requests. What are you
3 referring to?
4   A. My recollection at Harleysville, the
5 underwriting department had the primary liaison with
6 the agency force. Harleysville primarily sold through
7 independent agents who presented submissions to
8 Harleysville for acceptability of insurance coverage,
9 including pricing, terms and conditions, and the
10 underwriters would be the ones that would make the
11 decision as to whether or not a specific application
12 would advance forward to be rated, to be surveyed and
13 to have a price quotation issued. The same
14 underwriters, and perhaps different underwriters, I
15 don't recall specifically, at Harleysville also had
16 the responsibilities to underwrite renewal business
17 where the underwriter would have the mission to insure
18 that that entity's operations were still within an
19 accepted class for Harleysville; that the policies
20 were issued appropriately; that the underwriter
21 understood the exposure controls for the business, and
22 that the entity was a reasonable risk for Harleysville
23 to maintain their insurance.
24   Q. The underwriters were located in the field?

Page 58

1   A. There were underwriters located within the
2 home office who had specific responsibilities, and
3 there were also underwriters located in various branch
4 offices.
5   Q. An example you gave of an agent submitting
6 an application for insurance on behalf of a potential
7 insured, if that included different lines of business,
8 would there be one underwriter that dealt with that,
9 or would there be more than one underwriter?
10   A. I don't recall specifically at
11 Harleysville. More often than not, it was a single
12 underwriter, although there were referral underwriters
13 that specialized in a certain type of business.
14   Q. Coming back to what the people reporting
15 were doing in the Mid-Atlantic, you would be
16 supporting the underwriters in terms of gathering
17 field data?
18   A. That was a part of the mission of the loss
19 control unit.
20   Q. What else?
21   A. Another component would involve risk
22 improvement work on existing business.
23   Q. Could you elaborate for me, if you could,
24 what that involved?

Page 59

1   A. That would involve identifying exposures to
2 loss and developing appropriate recommendations to
3 mitigate that loss that would result in lower
4 frequency or lower severity to that insured, which
5 would then involve Harleysville being the beneficiary
6 of having less claims pay-outs.
7   Q. So the first responsibility is the
8 assessment of the risk going in and efforts to
9 identify what the risks are and support the
10 underwriting process; right?
11   A. That's correct.
12   Q. Then the second component was that an
13 existing insured try to minimize the risk that
14 Harleysville had it insured for?
15   A. That's correct.
16   Q. Any other main kind of objectives of the
17 organization?
18   A. Yes, there were a couple. There was also
19 work done internally for Harleysville's own risk
20 management initiatives. There was also, to my
21 recollection, the division that involved direct sold
22 service for unbundled insurance.
23   Q. What does that mean, direct sold service?
24   A. What that means is that if an entity outside

Page 60

1 the insurance contract had a need from a safety
2 standpoint, if they chose to do so, could contract
3 directly with this entity of Harleysville to purchase
4 loss control services.
5   Q. Which would be the field people going and
6 making risk assessments and suggestions for
7 improvements?
8   A. Yes.
9   Q. When you referred to "own risk management
10 initiatives", what did you mean?
11   A. Harleysville is an organization that was
12 operating in a number of states with a number of
13 locations, and just as Harleysville an insurer would
14 evaluate an insured, Harleysville risk management
15 evaluated themselves internally, and they would draw
16 on the loss control resource to assist in those
17 evaluations.
18   Q. When one of the people reporting to you
19 would go out in the field to support underwriting,
20 would that be termed a survey? Is that the right
21 terminology?
22   A. That's what I would call it. Some in
23 Harleysville referred to them as inspections.
24   Q. They would do a survey or inspection of the

Page 61

1 commercial premises that was involved; is that right?
2   A. Yes.
3   Q. Then would they do some kind of report?
4   A. Yes.
5   Q. That report would be submitted to whom?
6   A. Typically to the underwriter who requested
7 it.
8   Q. Did it go to you first as the manager?
9   A. No. I was not a conduit for staff reports.
10 Those reports would be sent directly to the requesting
11 underwriter.
12   Q. Were there reports that they had to submit
13 to you?
14   A. If I would specifically ask for one, yes,
15 but I don't have a specific recollection as I sit here
16 right now that I can recall.
17   Q. Would there be occasions where you would get
18 a third party to come in and do the surveys for you?
19   A. Yes.
20   Q. Why would that be; geographic coverage?
21   A. It could be for any number of reasons,
22 including the complexity of the type of the work,
23 where that work was located, the volume of work in a
24 particular area. A vendor may have specialized in a

Page 62

1 certain type of work; for example, a restaurant book
2 where the primary objective was to evaluate repetitive
3 types of exposures over and over again.
4   Q. Those third-party providers are termed
5 vendors; is that right?
6   A. That's one term given to them.
7   Q. Did you have some responsibility for the
8 vendors?
9   A. Yes.
10   Q. What was your responsibility toward the
11 vendors?
12   A. My responsibilities toward the vendors was
13 to assign work and to review a sample of that work,
14 and where it was appropriate, issue recommendation
15 letters to insureds resulting from the surveys that
16 those vendors completed.
17   Q. Did you have the same basic kinds of
18 responsibilities with respect to your staff; that is,
19 to assign work and review the surveys and then do
20 recommendation letters?
21   A. The recommendation letters would have been
22 done by the staff.
23   Q. But you would assign work and review
24 samples?

Page 63

1   A. That's correct.
2   Q. So you did have a quality control function
3 as manager?
4   A. Yes.
5   Q. And you needed, on a regular basis, to check
6 the quality of the work that your staff was doing?
7   A. Yes.
8   Q. And that was an important function?
9   A. That was a function.
10   Q. It was an important function; wasn't it?
11   A. You'd have to ask the person making the
12 characterization. It was a function.
13   Q. As far as Gary Weinstein was concerned, it
14 was an important function?
15   A. Are you asking me to speak for Mr.
16 Weinstein?
17   Q. If you know.
18   A. I believe that he felt it to be important.
19 Whether it was the most important, I wouldn't say
20 that.
21   Q. Could you, in your own words, describe the
22 responsibilities of the loss control regional manager
23 job that you assumed in March of 2000?
24   A. It was an entirely new position, in that the

Page 64

1   Harleysville organization had just gone through a
2 re-engineering and reorganization whereby the focus of
3 control of the loss control unit shifted from the
4 individual branch manager to the home office under Mr.
5 Weinstein. The regional manager, to a certain extent
6 when I came in, was to create order out of chaos.
7 What I mean by that is to establish certain functional
8 relationships. For example, when I was hired, there
9 wasn't so much as an assistant or a place to work to
10 reach out to the people on the staff and make some
11 inquiries as to what the current reality was, to
12 assist in the planning and establish goals and
13 objectives for the department. When I was originally
14 recruited for this position, it was with the
15 understanding that Harleysville would be growing to
16 larger markets, which are called large accounts, and
17 that there would be additional expertise needed to
18 help manage the servicing of those accounts. Once I
19 set foot into Harleysville, I found it was just the
20 opposite. There were some large accounts, but the
21 work shifted away from the large accounts to small
22 business, which fundamentally shifted the initial
23 focus for what my recollection was as to why I was
24 recruited.

Page 65

1   Q. I'm trying to get your basic day-to-day
2 responsibilities in that position.
3   A. Day to day initially, it involved a lot of
4 clerical tasks that would have been much more
5 efficiently handled by a functional support person,
6 had there been one. It involved reviewing work on an
7 automated and, I must say, arcane system; assigning
8 the work in that system to loss control
9 representatives or to vendors, and then reviewing a
10 sample of that work when it was completed. It also
11 involved coaching and counseling staff, many of whom
12 were woefully ill prepared to make the leap to the
13 transition to electronic reporting, which was
14 occurring just at the time when I had joined
15 Harleysville. There were some staff members who could
16 barely turn the computer on and get to the
17 application, let alone make it work. We had vendors
18 who were, in many cases, not equipped electronically
19 to receive requests electronically. It had to be done
20 manually through the mail. At the time I joined that
21 organization, we had literally no framework for vendor
22 management, in that basically it was a free decision
23 on the part of the assigner of the work as to what the
24 expectation was that that work would look like when it

Page 66

1 came back and to what terms and conditions.
2   Q. That would be requisitions?
3   A. I don't recall what the term was, quite
4 frankly.
5   Q. I want to make sure I understand what your
6 basic job responsibilities were. You said reviewing
7 and assigning work on the automated system and
8 reviewing work of vendors, and then coaching and
9 counseling staff.
10   A. I also worked with the underwriting units to
11 help focus where they could profitably write business
12 in what segments of what markets. What few large
13 accounts did present, I was involved in the initial
14 review, depending on which office it was. I also
15 provided loss control training for managers and
16 underwriters, as well as loss control staff.
17   Q. Anything else in terms of basic job
18 responsibilities that you can think of?
19   A. That covers the bulk. There, of course, are
20 always others, but none that I can recall right now.
21   Q. Given what you described about the
22 reorganization and the need to help put in place the
23 framework for loss control functions being primarily
24 supported by the home office, did you understand that

Page 67

1 Gary Weinstein was looking for people in the loss
2 control regional manager position who had leadership
3 skills?
4    A. Yes.
5    Q. In your interview process, did you present
6 to Gary Weinstein your view of your own leadership
7 ability?
8    A. Yes.
9    Q. Would you agree with me that it was
10 particularly important, given the reorganization, that
11 the loss control regional managers be able to motivate
12 the staff?
13    A. My understanding when I took that job was
14 that there was fundamental work to do with not only
15 motivating people, but getting people to the point
16 where they could even do the job functionally. So
17 when we're talking about leadership skills, there are
18 different leadership techniques for different points
19 in time. I took a rather long view, based on the
20 model that was used at EBI quite successfully, of
21 having the right people in the right job before
22 resources are devoted to educating those people on
23 doing the right path that needs to be done. In my
24 assessment, which I discussed with Weinstein many

Page 68

1 times and he frequently agreed, many of the people on
2 that staff lacked fundamental skills to do that job
3 correctly.
4    Q. But you do agree that Gary Weinstein was
5 looking for the loss control regional managers to
6 motivate the staff?
7    A. I think that's accurate.
8    Q. And you agree that that was an important
9 part of your responsibility?
10    A. It was a responsibility. The question is,
11 where in the time line does one look at it as being
12 most important?
13    Q. In terms of motivation, what would you say
14 are the attributes that you brought to the table as a
15 leader of that particular unit?
16    A. I understood the loss control function
17 implicitly from my 20 years in the business. In
18 addition, I saw the work at a much higher perspective
19 than your average loss control person would, having
20 served as a branch manager at EBI and having had
21 million-dollar responsibility. I had served as a
22 consultant at Cigna on sold service projects and
23 understood what it was to service that client base in
24 addition to the insured that takes what they get from

Page 69

1 a loss control specialist. I understood implicitly
2 that every exposure has its corresponding control.
3 Some exposures are more important than others. I also
4 brought to the table the perspective that sometimes it
5 does make sense to have exceptions to procedures where
6 it makes sense to do so from a business standpoint;
7 understanding the pieces of insurance and how it fits
8 together to deliver a product to the policyholder;
9 understanding that problems do have solutions, and
10 they are solvable; helping people to understand that
11 they have personal responsibilities and pride and
12 discipline in the work that they do; bringing to the
13 table over 12 years of intense computer experience,
14 having been there and done that in prior organizations
15 and knowing what it takes to do it effectively, and
16 seeing that there was a fundamental gap in the skills
17 at Harleysville and seeing it was possible to coach
18 people on the phone long distance as to what were
19 complex procedures that were intuitive to use;
20 providing direct feedback to help them do a better job
21 the next time and not providing false assurances to an
22 individual that they were doing stellar work when it
23 was clear to me, in some cases, they weren't; helping
24 people identify where they can improve, providing

Page 70

1 recommendations to them about target dates for
2 completion where appropriate; challenging staff to
3 make sure they understood the basic nature of the job
4 and what they were to accomplish and why they were
5 doing it, and in the bigger picture, how it integrated
6 into the results of the organization. I think that's
7 a reasonable summary.
8    Q. There was a heavy emphasis toward the
9 technical experience, from what you just told me.
10 What in terms of people skills do you think you
11 brought to the table as a leader of that unit?
12    A. The most important is matching the task and
13 the job with the correct person so they could excel.
14 I was extremely limited in my flexibility to do so at
15 Harleysville. Since Harleysville had just gone
16 through a major reorganization, there were apparently
17 bad feelings among people, including people in
18 management positions who were now in a field role.
19    Q. You were aware coming in that some of those
20 tensions existed?
21    A. Yes, but at the time that I was hired, it
22 was clear to me that there were additional steps to be
23 taken to either turn that situation around or hire
24 appropriately. What I found subsequently on coming on

Page 71

1 board with Harleysville is that was never Weinstein's
2 intention. Quite the opposite.
3    Q. Would you agree that it was important for
4 the loss control regional manager to have the respect
5 of the staff who worked for him or her in the
6 organization?
7    A. In the long run, absolutely. How one gets
8 to that respect is sometimes not apparent to those who
9 don't understand the motivations for it.
10    Q. And it's important that staff be willing to
11 take, particularly given the circumstances that you
12 described, direction from the manager?
13    A. Yes.
14    Q. And you would agree that it's not good
15 management to demean or disparage staff as you go
16 along this process of trying to get them to learn and
17 conform to the new requirements?
18    A. I would agree with that.
19    Q. You would agree, would you not, that it's
20 not good management to be dictatorial in your approach
21 to staff?
22    A. Not necessarily.
23    Q. You disagree with what I just said?
24    A. There are times when it's appropriate to be

Page 72

1 that.
2    Q. Would you agree that it's not a good idea to
3 be overbearing in the way you deal with staff?
4    A. In a situation where it's a salvageable
5 relationship, I agree that that is not a good
6 long-term strategy.
7    Q. Would you agree that it's important to have
8 sensitivity to individuals' personal issues that may
9 affect their work?
10    A. Yes.
11    Q. And you wouldn't, as a manager, want to say
12 something to somebody that was offensive?
13    A. Not knowingly, no.
14    Q. Had you, in any of the jobs you had before
15 Harleysville, ever had a situation where your staff
16 had sort of revolted against your management style?
17    A. No.
18    Q. Do you agree that that would have been not a
19 good development in terms of your job situation?
20       MS. HUTNIK: I object to the form.
21       You can answer.
22       THE WITNESS: Could you restate the
23 question, please?
24 BY MR. HALLER:

Page 79

1 Q. I asked you whether you recognize this to be
2 the job description.
3 A. No.
4 Q. Your testimony is you had not seen this
5 before?
6 A. Yes.
7 Q. Please, take a minute to review it.
8 A. I've read it.
9 Q. Do you agree generally that this is an
10 accurate description of the job that you held as loss
11 control regional manager?
12 A. That's consistent with my recollection.
13 Q. I'm going to show you a document we'll mark
14 as Vail deposition 10.
15 (Whereupon exhibit Vail-10 was marked
16 for identification.)
17 BY MR. HALLER:
18 Q. Mr. Vail, I've put before you what we've
19 marked as Vail deposition 10, which is an organization
20 chart, and I'd just ask you to tell me whether or not
21 that accurately describes the organization in loss
22 control and premium audit when you were an employee of
23 Harleysville.
24 A. There was originally a manager in the west

Page 80

1 region, which is the box at the lower left-hand
2 corner, who was discharged at some point. I don't
3 recall the gentleman's name. My recollection is that
4 that position was vacant sometime after I started with
5 Harleysville. The home office structure here, to my
6 recollection, is accurate. The premium audit
7 structure, I don't specifically remember Jim Houck.
8 I'm not saying he wasn't there. I don't have a
9 recollection of him. The premium audit manager for
10 the west, which is in the bottom right-hand corner, I
11 have no recollection of who that person was or wasn't,
12 and Walt Moyer, I have no recollection of who that
13 was.
14 Q. Did you receive a copy of the employee
15 manual when you first joined the company?
16 A. I believe I did on the date that I started.
17 I don't recall specifically when.
18 Q. But you did receive it at some point?
19 A. I believe I did. Every document I had of
20 that nature I turned over to my counsel. I don't
21 recall specifically. I believe so, but I don't have a
22 specific recollection.
23 Q. You understood, did you not, that the nature
24 of the relationship between the company and all of its

Page 81

1 employees was an at-will relationship?
2 A. I've heard that said at a supervisor
3 orientation seminar. I understood that that was
4 Harleysville's position.
5 Q. Do you recall that the employee manual
6 specifically stated that the relationship was at will,
7 meaning that either the employer or the employee can
8 terminate the relationship at any time for any reason
9 that's not prohibited by law?
10 A. I understood that to be Harleysville's
11 position.
12 Q. And you recall that being in the manual?
13 A. I don't recall it specifically, but if you
14 care to show it to me, I'd be glad to speak to it.
15 Q. So you understood during the time that you
16 worked there that you could be terminated at any time
17 for any reason that wasn't prohibited by law?
18 A. With the key phrase being not prohibited by
19 law, yes.
20 Q. You were aware, were you not, that any
21 salary continuation for illness did not kick in until
22 you've been an employee for six months?
23 A. No, I don't understand that to be the case.
24 Q. You had only been employed for a little over

Page 82

1 two months at the time of your injury; isn't that
2 correct?
3 A. On or about.
4 Q. At that time, you really did not qualify for
5 any kind of sick pay or short-term disability
6 benefits; isn't that right?
7 A. To my recollection, I did qualify for
8 disability benefits. The nature and character of what
9 the specific benefits were I don't recall. I do have
10 a specific recollection that that option was available
11 to me.
12 Q. Could you tell me what your understanding
13 was?
14 A. My understanding was that there was a
15 waiting or elimination period that was involved in the
16 collection of benefits for disability. I understood
17 that I had 16 weeks of disability available to me as
18 an injured employee, and I was guaranteed a position
19 upon return.
20 (Whereupon exhibit Vail-11 was marked
21 for identification.)
22 BY MR. HALLER:
23 Q. I'm going to show you what's been marked as
24 Vail deposition 11, and I have it tabbed. Are you

Page 83

1 looking at the section on salary continuation for
2 illness?
3 A. Was that a question?
4 Q. Yes.
5 A. Yes.
6 Q. You see what is says specifically is that if
7 you've been employed for less than six months, you
8 don't get any salary continuation benefits for
9 illness.
10 A. That's what it says.
11 Q. Does that refresh your recollection on the
12 policy?
13 A. We may be talking two different terms here,
14 and if so, perhaps you can clarify it for me. My
15 understanding of Harleysville's benefits package for
16 new employees is that an employee of less than, I
17 believe it's a year, and I'm going off my memory, and
18 this is a four-year reference, was entitled to 60
19 percent of base pay as disability after a certain
20 period of elimination waiting. That is different than
21 what it says here.
22 Q. Let's go through it.
23 A. I do recall seeing documentation from Alice
24 Geckeler that questioned that same thing and a

Page 84

1 response by Luanne Arcaro that validated it. Maybe
2 we're just in the wrong section to cover that.
3 Q. You'll agree that under this policy though
4 for illness if you'd been employed for less than six
5 months, there's no entitlement to salary
6 continuation?
7 A. That is what it says.
8 Q. If you go forward in the document, I think
9 probably to the next tab, there is something that
10 describes long-term disability. Do you see that?
11 A. Yes.
12 Q. Do you see that employees that have less
13 than one year at Harleysville at the onset of illness
14 or injury causing a continuous period of disability
15 have a maximum of 20 weeks of long-term disability
16 available to them?
17 A. I see that.
18 Q. You never made application for long-term
19 disability benefits at any time; did you?
20 A. Not that I recall.
21 Q. That was because you were able to come back
22 to work relatively quickly from your injury?
23 A. My physician approved me to work at home
24 under restricted circumstances.

Page 85

1  Q. And ultimately approved you to work and
2  return to the office?
3  A. Yes.
4  Q. What I'm trying to get at, Mr. Vail, is: As
5  of the time you were injured, you had no ability to
6  get salary continuation from Harleysville.
7  A. Based on these documents, that's correct. I
8  don't have a specific recollection of this at the
9  time, but I have no reason to doubt what you portrayed
10 to me.
11 Q. If you were unable to work, you would not
12 have been able to receive income; right?
13 A. No.
14 Q. You're agreeing with me?
15 A. No, I'm disagreeing with you.
16 Q. On what basis?
17 A. That long-term disability would have
18 provided income.
19 Q. But you never made application for long-term
20 disability; right?
21 A. It wasn't necessary.
22 Q. Let me ask it differently. Do you recall
23 what the waiting period was for applying for long-term
24 disability?

Page 86

1  A. Not specifically.
2  Q. Do you believe it to be 16 weeks?
3  A. No.
4  Q. You don't know?
5  A. I know it was not 16 weeks. My recollection
6  was employment was guaranteed for 16 weeks. The
7  elimination or waiting period was somewhere between,
8  to my recollection, two to four weeks, but that's a
9  very fuzzy recollection, and I don't warrant it as
10 being accurate.
11 Q. Could you go to page 206? Do you see under
12 eligibility for long-term disability that if you're a
13 full-time employee with less than three years of
14 service, you're eligible to participate in the
15 long-term disability plan 30 workdays after the onset
16 of an illness or injury?
17 A. I see it.
18 Q. Do you personally know what criterion you
19 have to meet in order to be considered as somebody who
20 has a long-term disability?
21 A. No, I don't.
22 Q. You never considered yourself at the time
23 somebody who had a long-term disability; did you?
24 A. That's a different question. I disagree

Page 87

1  with you. The first question you asked me was did I
2  understand the criteria today. I don't have a
3  recollection of what that criteria was at the time.
4  If you care to show it to me, I'll be glad to look at
5  it.
6  Q. You didn't consider yourself at the time
7  somebody who needed long-term disability; did you?
8  A. It was unknown. I had no way to know.
9  Q. Well, your doctor said you could come back
10 to work.
11 A. Yes, he did.
12 Q. So you didn't need long-term disability.
13 A. I would not have known the answer to that
14 question. If you're asking did I make application for
15 long-term disability, at that point in time, it wasn't
16 necessary. Did I know with certainty that I would
17 never have a long-term disability as a result of my
18 injury? Absolutely not. I had no way to know that.
19 Q. But within a short period of time, you knew
20 you wouldn't need to apply for long-term disability
21 because your doctor was certifying that you could
22 return to work.
23 A. He and I thought I would be okay. Neither
24 of us knew it.

Page 88

1  Q. Mr. Vail, sometime in June of 2000, your
2  doctor said you could come back to work with certain
3  restrictions; right?
4  A. I remember at some point he said I could
5  return to work. I don't remember specifically when.
6  Q. It wasn't that long after your injury; was
7  it?
8  A. I don't recall.
9  Q. You never considered applying for long-term
10 disability; did you?
11 A. No, at that point in time, I didn't.
12 Q. In fact, you were interested in getting back
13 to work as quickly as possible to avoid income loss?
14 A. I was interested in getting back to work as
15 quickly as I could without compromising my ability to
16 heal.
17 Q. Because otherwise, you didn't have an income
18 or wouldn't have had an income.
19 A. I would of had less income. I would of had
20 income through disability through the eligibility
21 period, as we've discussed previously.
22 Q. If your doctor was certifying soon after
23 your injury that you were able to come back to work,
24 there is no way you would have qualified for long-term

Page 89

1  disability; is there?
2  A. I don't know. I don't know the answer to
3  that question.
4  Q. Regardless of that point, you yourself were
5  trying to come back to work on a full-time basis as
6  quickly as you could, consistent with whatever
7  recommendations your doctor was making?
8  A. That's correct.
9  Q. I'm going to show you a document that we
10 will mark as Vail deposition 12.
11      (Whereupon exhibit Vail-12 was marked
12 for identification.)
13 BY MR. HALLER:
14 Q. Mr. Vail, I've put before you a document
15 we've marked as Vail deposition 12, which is a
16 two-page document containing two E-mails, one from
17 Gary Weinstein you sent on the 1st of May, 2000 at
18 5:53 PM and a response from you to Mr. Weinstein on
19 May 2nd, 2000 at 8:35 AM. Do you have that document
20 in front of you?
21 A. I do.
22 Q. Do you recall receiving this document, the
23 original E-mail?
24 A. No, I don't. I'd be happy to read through

Page 90

1  it and see if it refreshes my memory.
2  Q. Sure.
3  A. I remember it.
4  Q. In the E-mail to you, Mr. Weinstein is
5  asking why some items have not been logged out of the
6  system.
7  A. That is the E-mail where he says I'm doing a
8  great job.
9  Q. Can you just stick to my question?
10 A. Sure.
11 Q. The question went to the fact that he told
12 you that he was asking Craig why some items had not
13 yet been logged out of the system. My question is:
14 What does that refer to; what aspect of your job?
15 A. My recollection was in the context of
16 assignments that had been submitted as being completed
17 but not taken out of the system, a loss control
18 automated system, as being completed.
19 Q. Was that something that you were responsible
20 for making sure was done?
21 A. For making sure it was done, yes.
22 Q. He says, "Our system won't permit
23 backdating." What does that mean?
24 A. My recollection of the context of that

Page 91

1 comment was the system would not allow an actual
2 completion date to be entered. It artificially
3 provided the date as of when the entry was made. If
4 the work had been completed on Monday the 1st and it's
5 Wednesday the 3rd and one would go to make an entry of
6 completion of Monday the 1st, it wouldn't accept
7 that. It would only recognize Wednesday the 3rd. The
8 context of backdating is not fraudulently changing the
9 date. It's recognizing what the actual date was.
10    Q. But the system wouldn't allow that?
11    A. That's what it says.
12    Q. Mr. Weinstein refers to having a hard enough
13 time meeting service requirements without counting
14 some on-time work as late. What's he referring to
15 when he says meeting service requirements?
16    A. Getting work completed within the due dates
17 requested. Whatever his intent was I can't speak to.
18    Q. Would those be due dates requested by
19 underwriters?
20    A. Correct.
21    Q. So the underwriters for whom you were
22 providing services would want a response by a certain
23 deadline?
24    A. If the underwriter theoretically put in the

Page 92

1 due date of tomorrow and we didn't have the work
2 closed out of the system by tomorrow, then technically
3 that would be an overdue assignment, even if the work
4 had been completed.
5    Q. The consequence of an overdue assignment is
6 what?
7    A. The numbers don't look as favorable.
8    Q. Could you explain what you mean by that?
9    A. I think you need to clarify what you mean by
10 overdue assignment. If you mean overdue assignment in
11 the sense that the assignment was done and not entered
12 in the system on time, that's one thing. If you mean
13 the work didn't get done when it was supposed to have
14 been done, that's another.
15    Q. Let's start with that. It was important for
16 your staff to respond within the deadlines set by the
17 underwriters?
18    A. Correct.
19    Q. That was a goal for the organization?
20    A. That was the goal, recognizing that not
21 every due date was a reasonable due date.
22    Q. If the organization wasn't meeting those
23 goals, it was not providing the timely service that it
24 was setting out to provide; right?

Page 93

1    A. That would be one conclusion.
2    Q. And that would not reflect well on the
3 management of the organization?
4    A. That was a judgement to be made.
5    Q. Well, certainly somebody in senior
6 management would make that judgement based on looking
7 at the raw data?
8    A. I wouldn't presume to speak for them.
9    Q. Mr. Weinstein was saying, "The last thing I
10 want is people criticizing us for not doing things on
11 time when they've been done on time, and they just
12 haven't been entered into the system?"
13    A. I think that would be a reasonable
14 interpretation.
15    Q. Then he also talks about, "Please, QC all
16 reports, write up the necessary rec's and log the work
17 out." What did that mean to you?
18    A. At the time, it meant very little to me,
19 since it was physically impossible to QC every
20 report. There would be a bottleneck of monumental
21 proportion not have the structure in place to support
22 it. I attempted to get clarification in my response
23 to him.
24    Q. What did you understand QC a report to

Page 94

1 mean?
2    A. Loosely review. What context that review
3 takes is undefined.
4    Q. It would be reviewing reports from the
5 field?
6    A. That would be my interpretation.
7    Q. So he wanted you to do that. He also wanted
8 you to write up the necessary requisitions; right?
9    A. I'm not sure I understand requisition.
10    Q. It says write up the necessary rec's.
11    A. That's an abbreviation within the industry
12 for recommendations.
13    Q. So write up the necessary recommendations?
14    A. Correct.
15    Q. Was that something that you were responsible
16 to do?
17    A. That's a negligible item in terms of who
18 would be delegated to that task. It was something I
19 could have done. I wouldn't have done it on employee
20 reports. I would have done it on a vendor report or
21 delegated it to someone else to do.
22    Q. Vendor reports you would have done on a loss
23 control representative report, you would have assigned
24 it back to them to do it?

Page 95

1    A. They would have done it as part of the basic
2 task.
3    Q. When that's done, you can then log the work
4 out; right?
5    A. That's my understanding.
6    Q. He also says, "Please, even review PMAs work
7 to see which reps do the best job." What does that
8 mean?
9    A. My recollection of the context of that part,
10 that's short for PM Associates, which was a vendor,
11 and there were different representatives within PM
12 Associates that had Harleysville assignments, and Gary
13 Weinstein was asking us to determine which out of
14 those vendor employees was doing the most effective
15 job for the Harleysville work.
16    Q. He also tells you in this E-mail that he
17 designed the manager's job with a lot of hands-on
18 involvement; right?
19    A. That would be an understatement.
20    Q. So you knew from Gary that he expected his
21 managers to do a lot of hands-on work?
22    A. As of this date, yes. As of the time of my
23 hire, no.
24    Q. But as of this date, May 2nd, you understood

Page 96

1 that?
2    A. Yes.
3    Q. So as of May 2nd, you understood, rightfully
4 or wrongly, that Gary Weinstein was giving high
5 priority to having a quality control done on the
6 reports, having the recommendations written up and the
7 work logged out in a timely fashion?
8    A. Per his definitions, yes. Did I understand
9 exactly what he meant and every nuance of how he
10 presented it to me, no, which is responded to him on
11 May 2nd.
12    Q. Between March 27th, 2000 and May 2nd, 2000,
13 do you recall having any conversations with Gary about
14 his expectations of your performance?
15    A. In selected aspects, yes.
16    Q. What do you remember in selected aspects?
17    A. My recollection is in late June, Mr.
18 Weinstein --
19    Q. My question was between March 27 and May
20 2nd.
21    A. I misunderstood your question. Please,
22 strike my answer. Could you repeat the question?
23    Q. I asked you whether between March 27th and
24 May 2nd, 2000 you recall having any conversations with

Page 97

1 Gary Weinstein about his expectations of you or your
2 performance.
3    A. We had various conversations about loss
4 control generically in the Mid-Atlantic region
5 specifically, but I don't recall any specific aspects
6 that were negative or critical of my performance, as I
7 sit here now, but if you have something available to
8 show me, I'd be glad to look at it.
9    Q. I'm just asking for your recollection.
10    A. No, I don't.
11    Q. Do you recall him expressing concern over
12 the timeliness of things getting done?
13    A. Yes, timeliness was a discussion point for
14 him.
15    Q. Again, that question was in the time frame
16 March 27th to May 2nd. So you're saying timeliness
17 issues came up?
18    A. Well, here's one of them before us.
19    Q. I understand.
20    A. I don't have a specific recollection of what
21 day and what time and what was said, but I do recall
22 general conversations around timeliness.
23    Q. Did you do any field visits between March
24 27th and June 2nd, 2000?

Page 98

1    A. March 27th and June 2nd, no. I was on
2 approved leave. Excuse me. I take that back. May
3 27th to June 2nd I was on approved leave. From March
4 27th to June 2nd, yes, I did.
5    Q. With whom did you do field visits?
6    A. I'll have to go back into my memory bank.
7 If you give me a couple minutes, I'll be glad to think
8 about who that was. I remember going on a field visit
9 with Scott Welsh. I remember going on field visits
10 with Frank Theodore Semakosky. I may have gone on
11 field visits with one of the Harrisburg
12 representatives. I don't recall specifically. That's
13 what I can recall. There may have been more, but I
14 can't recall it specifically.
15    Q. What do you recall about your field visit
16 with Scott Welsh?
17    A. I don't recall if there was more than one
18 location. I know we went to one of his more elaborate
19 service accounts where he had been consulting with
20 them over a period of time. For the most part, his
21 interactions were professional and appropriate with
22 the staff. He was working on issues that, in my
23 judgement, were appropriate for a loss representative
24 to address. I thought he had a good rapport with the

Page 99

1 people that he was consulting with. After the fact,
2 the contact that he was working with called me for
3 advice and counsel, which I gave. I gave him some
4 pointers from a consulting standpoint of how he could
5 be more effective. That's my recollection.
6    Q. You do recall talking to him about areas of
7 improvement?
8    A. Areas of improvement in the sense of how it
9 could be done better, but not necessarily that he was
10 deficient in his delivery of services, just to
11 clarify. I remember reviewing reports of many other
12 individuals, but in terms of specific field visits, at
13 that point, I had just really begun in April to start
14 that in earnest, and I wasn't able to pick it up again
15 until September.
16    Q. On your field visits, did you go in with the
17 representative, or did you let them go in and have
18 them report back to you?
19    A. I rode with that person, so basically I
20 shadowed and observed what they did.
21    Q. Then after the meeting with the insured, did
22 you, on occasion, take the rep out and say, "I don't
23 think you did this right" and ask the right questions
24 and go back?

Page 100

1    A. There would be a debrief afterwards.
2 Whether it was positive or negative depends upon what
3 occurred in the transaction.
4    Q. Do you recall ever sending someone back in
5 after the debrief?
6    A. As I sit here today, I don't have a specific
7 recollection of that. It's possible. I don't
8 recall.
9    Q. What do you recall of your field visit with
10 Ted Semakosky?
11    A. There was more than one that I recall. One
12 of the field visits involved a restaurant where it was
13 obvious the business had been closed for quite some
14 time. It was apparent from my perspective that that
15 individual made no credible attempt to schedule an
16 appointment to make sure that someone would be there,
17 so there wasn't much to assess except for the fact
18 that we didn't get the maximum efficiency out of that
19 visit that day because there was no one there to let
20 us in. I remember a survey of a service station
21 convenience store where there were basic exposures
22 that, quite frankly, were overlooked, and I felt
23 should have been, at least, discussion points during
24 that survey. In my questioning and discussion after

Page 101

1 the survey was completed, it became apparent to me
2 that the individual never even wanted to discuss those
3 items because in some cases, they were never
4 identified and in some cases significantly lowered the
5 value.
6    Q. Did you send the rep back in that location?
7    A. I don't recall.
8    Q. Anything else recall about your visits with
9 Mr. Semakosky?
10    A. As I sit here today, it's difficult to
11 recall specifically. I'd have to go back to
12 documentation that I don't have access to in order to
13 refresh my memory. If you care to share it with me,
14 I'd be glad to do it.
15    Q. I'm just asking for your recollection at
16 this point?
17    A. Not at this point.
18    Q. Do you have a specific recollection of your
19 field visits with the Harrisburg representative?
20    A. Not as I sit here right now.
21    Q. Were you aware of the fact that Mr.
22 Semakosky and his wife had had problems getting
23 pregnant?
24    A. No.

Page 102

1    Q. You weren't?
2    A. After a conversation with Gary Weinstein, a
3 comment had been made and intended lightly in jest and
4 apparently was interpreted otherwise by Mr. Semakosky,
5 and he had relayed his concerns about that to Mr.
6 Weinstein, and Weinstein and I had discussed it, and I
7 provided my perspective on the interaction, and I was
8 surprised to find the reaction, and obviously, knowing
9 the context, I would never make that comment in any
10 kind of derogatory fashion. It simply wasn't my
11 intent.
12    Q. So this was something that you said during a
13 field visit that later was reported back to you?
14    A. I don't remember in the context of the field
15 visit. I remember in the context of a telephone
16 call.
17    Q. Was that a telephone call just with Mr.
18 Semakosky, or were there other people on the line?
19    A. My recollection is it was with the
20 individual, but I don't have a specific recollection
21 of the discussion.
22    Q. Sitting here today, do you recall anything
23 about your conversation with Mr. Semakosky?
24    A. I had many conversations with him. Are you

Page 103

1 asking about this one specifically?
2    Q. Yes, this one specifically that led to some
3 kind of complaint being made.
4    A. Yes, I do.
5    Q. Tell me, as best you recall, what was said
6 in the conversation.
7    A. I don't recall what led up to it and what we
8 were discussing at the moment. I remember him
9 indicating some comments about his wife being
10 pregnant, and in retrospect, I obviously wouldn't say
11 it to him knowing what I know now, nor would I say it
12 to anyone else, but I made the comment lighthearted
13 joking, and I'm paraphrasing now, "You got to make
14 sure it's yours." Then he said, "Hey, Ken, I don't
15 joke about things like that." I don't remember the
16 specific words he used or the context in which it was
17 offered, but he indicated to me that he had some prior
18 incident with another relationship where somebody
19 falsely accused him, to my recollection, of fathering
20 a child. I don't remember specifically. I said
21 something to the effect, "No problem, Ted. I
22 understand." Then I went on. I don't recall what the
23 timing of it was between that discussion and the
24 discussion with Gary Weinstein, but Gary asked me

Page 104

1 about it, and I told him my recollection of it, and we
2 had some conversation whether or not it would have
3 been appropriate to call Ted and apologize at that
4 point, and the decision was reached that that wouldn't
5 have been appropriate. I had other conversations with
6 Ted, and he never brought it up, and that was that.
7    Q. So at some point, Mr. Weinstein spoke to you
8 about this incident?
9    A. Yes, we had a discussion about it.
10    Q. Was it in the context of some other business
11 being discussed, or was this a conversation that he
12 had with you specifically about this incident?
13    A. My recollection was that it was an aside to
14 a number of other business issues.
15    Q. What is it that you recall Mr. Weinstein
16 telling you?
17    A. I don't remember what he told me
18 specifically, but I do recall discussing the situation
19 and the context in which the comment was made that in
20 retrospect that it wouldn't be appropriate to make
21 those comments, and it wouldn't happen again.
22    Q. Why in retrospect would it not have been
23 appropriate to make that comment?
24    A. Well, certain individuals one can joke with

Page 105

1 in certain ways and it's not offensive, and certain
2 individuals interpret certain comments differently,
3 and the offense is in the ear of the interpreter and
4 not in the mouth of the speaker. There was no
5 intention made in any way to provide any denigration
6 to Mr. Semakosky or anyone he had ever been associated
7 with. All I can speak to is intent. I can't speak to
8 intention. I would not joke with him in any form ever
9 again.
10    Q. Was there anything in particular about Mr.
11 Semakosky's circumstances that made this more of a
12 sensitive remark that it otherwise might have been?
13    A. Not to my knowledge that I can recall.
14    Q. Is it your testimony that nobody ever told
15 you that he and his wife had a lot of difficulty
16 getting pregnant, and that's why he found it so
17 insensitive?
18    A. I have no recollection of that comment. I
19 don't know if Weinstein mentioned it.
20    Q. You're saying you didn't learn that? You
21 just don't remember?
22    A. I don't remember.
23    Q. Do you know what reputation you had as a
24 manager at Cigna among the staff that reported to

Page 106

1 you?
2    A. Sure.
3    Q. How would you describe it? How would you
4 characterize your reputation?
5    A. My expectations for quality. I expected the
6 job to be done, to do what it would take to get the
7 job done, to do a thorough job for the organization so
8 the organization's assets were properly protected.
9    Q. Would you agree that you had a reputation of
10 driving your staff hard?
11    A. I've been told that driving nature is part
12 of my personality. That wouldn't surprise me.
13    Q. You're a very demanding manager; aren't
14 you?
15    A. I would not be surprised if some people
16 would say that.
17    Q. You were injured sometime in the late
18 morning of Friday, June 2nd?
19    A. That's my recollection.
20    Q. You hadn't been at Harleysville very long.
21 Did you take the day off on June 2nd?
22    A. I had asked for permission from that time
23 frame of whatever that Monday or whatever the holiday
24 was. I believe, if I'm not mistaken, it was a holiday

Page 107

1 weekend, Memorial Day weekend, so one of those days I
2 would have had as a holiday. The other day I would
3 have asked permission from Gary Weinstein to take
4 those days without pay, and he would have approved
5 it. I was due back to work the following morning,
6 which I believe was the 5th. I don't have a calendar
7 in front of me, but that's my recollection.
8    Q. I'm going to show you a document we'll mark
9 as Vail deposition 13.
10    (Whereupon exhibit Vail-13 was marked
11 for identification.)
12 BY MR. HALLER:
13    Q. Do you recall sending this E-mail to Gary
14 Weinstein describing what had happened to you?
15    A. Yes, I do.
16    Q. And this gave the circumstances and details
17 of your injury?
18    A. Yes.
19    Q. Is it your testimony that this is an
20 accurate reflection of what happened to you?
21    A. From what I knew at that point in time, that
22 was accurate. There may be differences in terms of
23 times or individuals I might have referenced, but the
24 general nature and character of what happened is

Page 108

1 accurately represented as I knew it when I sent this
2 E-mail.
3    Q. Without going into all the gory details, you
4 were shot in the right hip area?
5    A. That's correct.
6    Q. Then the bullet passed through your body
7 injuring your upper right leg, shattering your upper
8 right femur and breaking your pelvis; is that right?
9    A. That's correct.
10    Q. Then you had two operations, the second of
11 which was successful?
12    A. That's correct.
13    Q. And the injuries were repaired by attaching
14 plates and screws to stabilize the femur, hip and ball
15 joint?
16    A. That's correct.
17    Q. Were those devices used on a temporary basis
18 until it fully healed?
19    A. No. They're permanent.
20    Q. In this E-mail, you make mention of the fact
21 that you did not tell Mr. Weinstein the full situation
22 of the circumstances of injury when you spoke to him
23 on June 5th. My question to you is: What did you
24 tell him on June 5th, if you recall?

Page 109

```
 1    A. I have a fuzzy recollection of that
 2 conversation. I had been on very intense pain
 3 medication, including morphine, from Friday the 2nd
 4 through that Monday the 5th after having endured two
 5 operations, so my state of mind was not what you would
 6 call lucid and competent at that point. I didn't
 7 react to the morphine very well. I had a very
 8 difficult time with it. If you can vision the
 9 psychedelic movies of the 1960s with some of the
10 horrific images available, that's what I saw. I
11 remember calling Mr. Weinstein in extreme pain, and
12 for lack of a better term, what I would now view as a
13 lack of capacity, and I remember telling him that I
14 wouldn't be in Monday, and I had remembered being on a
15 tower, and I remember some discussion about a tower.
16 I don't remember specifically what I told him. I
17 remember telling him I wouldn't be in. I was hurt.
18 That's really all I can remember.
19    Q. Did he at some point relate to you the fact
20 that you had told him that you had fallen off a tower
21 and injured your leg?
22    A. I called him after the cobwebs cleared out a
23 little bit a few days later when I was still in
24 extreme pain and still on medications including
```

Page 110

```
 1 patient controlled analgesics, which I didn't tolerate
 2 well. You should find that I was switched from
 3 morphine to Demerol, which made me a lot more
 4 clearheaded. I do remember speaking with Mr.
 5 Weinstein subsequently when he relayed to me that he
 6 had determined that I was injured at this NTI event by
 7 a participant who shot me, and I told him, yes, that's
 8 what happened. I also recall in that conversation
 9 indicating to him I had no idea why I told him the
10 other story because it made no sense. Why would I
11 make up something like that that's easily verifiable?
12 It makes no sense at all. To this day, I still can't
13 explain it. I do know that I wasn't thinking clearly
14 at the time of the conversation on Monday the 5th, and
15 I was a little bit more clearheaded a few days later.
16    Q. Did you give Mr. Weinstein a reason why you
17 wanted these days off without pay?
18    A. I don't recall him asking.
19    Q. Were you concerned that if he found out that
20 you had done it to be a range officer and judge for a
21 National Tactical Invitational event that he might
22 question that?
23    A. I saw that in the E-mail. When you're
24 medicated where you can't think straight, I'd only be
```

Page 111

```
 1 speculating.
 2    Q. As of June 12th, you on your own initiative
 3 informed Mr. Weinstein that you were looking to return
 4 to work as soon as it was prudent to do so?
 5    A. Yes.
 6    Q. Your consistent plan after you were injured
 7 was to get back to work as soon as you possibly
 8 could?
 9    A. That was my plan as of this point. Prior to
10 this, I didn't know if I would be able to or under
11 what circumstances, but if I could, yes.
12    Q. Were you paid for any period between June
13 2nd and June 12th?
14    A. Erroneously, yes. It was Mr. Weinstein's
15 intent that I not be paid for the time that I took off
16 until I went back on or about the 19th. I had
17 discussions with Mr. Weinstein about that, indicating
18 that I had received a paycheck, and he said that was
19 an error, and that he would correct it with payroll.
20 I think careful review of Harleysville's payroll
21 records will show a subsequent two-week period that I
22 was working but I didn't get paid to compensate for
23 the two weeks that I wasn't supposed to get paid.
24    Q. You weren't supposed to get paid because you
```

Page 112

```
 1 weren't eligible for any sick time?
 2    A. I didn't qualify for compensation on my
 3 direct salary and wouldn't quality unless I elected to
 4 take long-term disability.
 5    Q. Which you didn't want to do?
 6    A. At that point, no.
 7    Q. Then you say, "I know that I can continue to
 8 effectively contribute with appropriate
 9 accommodations." Do you see that?
10    A. I'm on the second from the last paragraph on
11 the second page. I can't find it. Where are you
12 reading from?
13    Q. I'm sorry. It's the last paragraph.
14    A. I wrote that, if that's what you're asking
15 me.
16    Q. You say "with appropriate accommodations".
17    A. Yes.
18    Q. What were the accommodations that you were
19 requesting as of that time in order to enable you to
20 return to work?
21    A. I asked for a modified schedule, the ability
22 to work at home if I felt up to it, and given my
23 inability to travel due to my disability at that point
24 that affected my mobility and I couldn't walk unaided,
```

Page 113

```
 1 not to travel. My surgeon strongly advised against
 2 unnecessary travel because it put me at a significant
 3 complication of aggravation and additional injury
 4 should I become involved in a car accident with my
 5 plate and screws holding my leg together until such
 6 time as it healed.
 7    Q. Your office location was at the home
 8 office?
 9    A. It was.
10    Q. In Harleysville?
11    A. Yes.
12    Q. Did you also have a place in the field that
13 you could use?
14    A. I don't understand the question.
15    Q. Did you have an office in the field that you
16 could use?
17    A. What field?
18    Q. Was there any other office that you had?
19    A. I had an office in my home.
20    Q. Was there any other office that Harleysville
21 provided you, other than the home office?
22    A. No. I would travel to different offices,
23 but I didn't have a location in any of the other
24 offices.
```

Page 114

```
 1    Q. You would agree, would you not, that a
 2 significant component of the job responsibilities was
 3 to travel in the field?
 4    A. In normal circumstances, absolutely.
 5    Q. So what you were asking from Mr. Weinstein
 6 was the ability to continue your job at full pay, but
 7 not travel?
 8    A. Yes.
 9    Q. And to work from home?
10    A. Yes.
11    Q. And to work on a modified schedule, which
12 would involve flexible hours?
13    A. Yes.
14    Q. You believe that with those accommodations
15 that you would be able to perform the remaining
16 portion of your job?
17    A. I thought so at that time, yes.
18    Q. Did you discuss those requests with Mr.
19 Weinstein?
20    A. Yes.
21    Q. It's true, is it not, that he agreed to
22 allow you to work at home with a modified schedule and
23 not have to travel?
24    A. It was my impression that he very much
```

Page 115

1 wanted me to work.
2 Q. He wanted you to work?
3 A. Yes.
4 Q. And you wanted to work?
5 A. At that time, yes.
6 Q. From Mr. Weinstein's perspective, it's a new
7 organization, and he wanted to get it up and running.
8 He obviously didn't want to have one of his key
9 managers out without the work being covered; right?
10 A. I think history would speak that he approved
11 that arrangement.
12 Q. So the two of you had a mutual objective of
13 getting back to work as quickly as possible?
14 A. Yes.
15 Q. You said that you believed at that time that
16 you would be able to return to work on a full-time
17 basis with accommodations.
18 A. I thought so.
19 Q. Mr. Weinstein thought you would be able to
20 do that; didn't he?
21 A. I don't know what Mr. Weinstein thought.
22 You'd have to ask him the question.
23 Q. Do you know what percentage, if you put a
24 percentage on it, of your job was the travel

Page 116

1 component; 25, 30 percent of the job?
2 A. That's an interesting question. In setting
3 up the new region, a lot of my time was to be in the
4 home office. My plan was to transition to the greater
5 component of field travel over time, which was delayed
6 by my injury and disability, so the accommodation was
7 basically to shelve that plan and to put it further
8 out on the time line to see how I could heal and what
9 I could accomplish and establish. I don't have a hard
10 number to give to you at that point in time as to what
11 it should have been. It was a brand-new situation.
12 Q. If Mr. Weinstein thought it was 30 percent
13 of the job based upon what other people were doing,
14 you wouldn't contest that; would you?
15 A. I think that would be a reasonable number
16 over time.
17 Q. When did you actually go back to work on a
18 full-time basis with the accommodations that we've
19 discussed?
20 A. If you're referring to the accommodations of
21 working at home with the modified schedule, that would
22 have been on or about June 19th. I was actually
23 called for a teleconference prior to that point, and
24 it was agreed that I wouldn't be working. I think

Page 117

1 that was on or about the 16th, but I wasn't paid for
2 that.
3 Q. Shortly after you arrived at the company,
4 you arranged a dial-in conference for all of your
5 staff members?
6 A. I found it an effective technique to
7 communicate with remote representatives and still
8 establish some sense of conversation, yes. I used
9 teleconferences frequently.
10 Q. You did that soon after you arrived?
11 A. That's my recollection.
12 Q. What did you say to the staff on that first
13 dial-in conference call, if you recall?
14 A. I don't recall specifically. If memory
15 serves me correct, I sent a memo out to the region
16 establishing certain parameters about what they were
17 to accomplish and how we were going to go about it.
18 My recollection is that the first one was used to go
19 through those points and just introduce myself and go
20 through what the direction would be for the region,
21 and in a broad sense, how to go about accomplishing
22 it.
23 Q. Did you state to the group what your
24 expectations were of them?

Page 118

1 A. I'm sure I did. That would be consistent
2 with what I would have done.
3 Q. You don't remember the details?
4 A. I don't have a specific recollection of the
5 conversation.
6 Q. So you returned to work after your injury on
7 the 21st of June working from home with a modified
8 schedule. I'm sorry. On the 19th of June; right?
9 A. 19th of June.
10 Q. Am I correct that Mr. Weinstein gave you
11 certain tasks that he wanted you to perform?
12 A. We had various conversations about things to
13 be done.
14 Q. Do you recall him telling you what his
15 priorities were at that point in time?
16 A. We had numerous conversations. This is
17 after the period of June 19th; correct?
18 Q. Yes, after June 19th.
19 A. We had numerous conversations about
20 processing vendor work and making sure that that got
21 done. There was a backlog situation with my injury
22 where reports were stacking up. In other words, the
23 pipeline hadn't stopped. Vendors were doing work that
24 had been assigned, and it was coming in for that

Page 119

1 entire period that I was out of commission, both
2 figuratively and literally. Getting back into the
3 saddle, so to speak, to get these things up to speed I
4 found to be a difficult task due to the amount of
5 energy I had at the time. The longer I would sit, the
6 worse it would hurt, and I couldn't get relief. Also,
7 at a point, I was taking pain medication that was
8 making me drowsy. We had conversations about the
9 timeliness of work.
10 Q. To come back to my specific question, you
11 agree that Mr. Weinstein, after you returned to work,
12 began to set priorities in terms of what he expected
13 from you?
14 A. Yes, I would agree with that.
15 Q. I'm going to show you a document we'll mark
16 as Vail deposition 14.
17 (Whereupon exhibit Vail-14 was marked
18 for identification.)
19 BY MR. HALLER:
20 Q. I've put before you Vail deposition 14,
21 which is an E-mail sent to you from Mr. Weinstein on
22 June 21st. Do you recall receiving this E-mail?
23 A. I don't have a specific recollection of it,
24 but if you're portraying it was sent, I have no reason

Page 120

1 to doubt it.
2 Q. In this, he told you that as a top priority,
3 you had to review and delete or rewrite any
4 recommendations for transmittal to the underwriters
5 and recommendations to policyholders.
6 A. Right. And I was doing just that.
7 Q. He told you he wanted you to concentrate on
8 quality control reviews and feedback to staff on
9 reports, survey assignments to staff and vendor report
10 and recommendation review; right?
11 A. That's what it says.
12 Q. So you understood at that point in time that
13 these were his priorities?
14 A. And I was working on them.
15 Q. You agree that these are all things that
16 were a necessary and important part of your job?
17 A. They were both necessary and important, and
18 I was doing them.
19 Q. You agree that he was setting achievable
20 goals for you?
21 A. Well, achievable under the circumstances.
22 In retrospect, no, I don't think so at all. I think
23 this was a monumental task for someone with the
24 injuries that I had to concentrate for that length of

Page 121

1  time and without the support that I had.
2  Q. I understand that you told Mr. Weinstein a
3  couple of weeks later that you had been having some
4  difficult concentrating, or whatever phrase exactly
5  you used, but at this point in time, you had told Mr.
6  Weinstein that you were able to come back full time;
7  right?
8  A. Yes.
9  Q. So from his perspective, his perception was
10 this person is able to do the job, but for the
11 limitations on travel?
12 A. And regardless of what writings he may have
13 sent, it was clear to me verbally that Mr. Weinstein
14 expected me to work.
15 Q. There was a job to be done; right?
16 A. Yes.
17 Q. And this was in the wake of a reorganization
18 when things needed leadership and management; right?
19 A. Yes.
20 Q. There was nothing wrong in Mr. Weinstein
21 wanting you to do the job; is there?
22 A. I don't disagree with that.
23 Q. You would agree that he was pushing you to
24 do the job because, rightfully or wrongly, you told

Page 122

1  him you could do the job?
2  A. Well, I found him to be aggressive.
3  Q. He was aggressively trying to get you to do
4  the job because, except for the travel, you said you
5  could work; right?
6  A. Well, I can't speak for Mr. Weinstein.
7  Q. And in aggressively trying to get you to do
8  the job, he stated unequivocally certain priorities
9  about what he wanted done?
10 A. He did.
11      MR. HALLER: Let's take a break.
12      (Break taken in the proceedings from
13 1:50 PM to 2:29 PM.)
14 BY MR. HALLER:
15 Q. Mr. Vail, good afternoon.
16 A. Good afternoon.
17 Q. We're proceeding on the same basis as this
18 morning under the same guidelines. Is that
19 understood?
20 A. I understand.
21 Q. Thank you.
22      I'm going to show you a document that we'll
23 mark as Vail deposition 15.
24      (Whereupon exhibit Vail-15 was marked

Page 123

1  for identification.)
2  BY MR. HALLER:
3  Q. Mr. Vail, do you recognize this to be an
4  E-mail that you sent to Gary Weinstein and Alice
5  Geckeler concerning your medical progress as of June
6  22nd, 2000?
7  A. Yes.
8  Q. Why were you reporting this to Alice
9  Geckeler in addition to Gary Weinstein?
10 A. My understanding was she was the human
11 resource representative who Gary Weinstein had been
12 consulting with.
13 Q. At this time, how were you just getting
14 around physically?
15 A. As of June 22nd, I was required to use
16 crutches. My mobility was severely restricted. It
17 was obvious to anyone that was looking at me that I
18 needed crutches.
19 Q. Here you say that Dr. Reid had approved you
20 to work at home, provided you take rest breaks as
21 needed to minimize pain and pressure on the trauma.
22 A. That's correct.
23 Q. It's true, is it not, that at this time,
24 there was a good prognosis on your recovery from

Page 124

1  injury?
2  A. From a medical perspective, if that's what
3  you're asking. My recollection of the recovery is
4  that it looked good for the bone to knit. Whether or
5  not I would regain mobility was anyone's guess.
6  Q. In this E-mail, you're reporting that this
7  type of injury simply needs time to heal the
8  structural members and connective tissue. Do you see
9  that?
10 A. I do.
11 Q. Was that your understanding at this time as
12 of June 22nd?
13 A. The context of the comment was that verbally
14 Mr. Weinstein was concerned that I wasn't making the
15 progress he expected, and at that point, my
16 recollection was he was even talking about me
17 returning to the office, which I clearly couldn't do,
18 and the intent of the comment was to put in
19 perspective that time can't be rushed when it comes to
20 long bone injuries and potential recovery from them.
21 Q. It says that this type of injury simply
22 needs time to heal the structural members and
23 connective tissue.
24 A. That's correct. I'm informing you as to the

Page 125

1  intent behind it.
2  Q. What's being conveyed to Gary Weinstein and
3  Alice Geckeler is there was obviously a limitation on
4  your ability to get around, but with time, everything
5  should be fine; right?
6  A. No. I think that's a matter of
7  interpretation. I look at that as a serious issue of
8  fact regarding how one would interpret that. I could
9  tell you how I intended that, which is not how you
10 interpreted it back to me.
11 Q. What you're saying is you don't know how
12 that was interpreted by Gary Weinstein and Alice
13 Geckeler?
14 A. I have no way to know that.
15 Q. I'm going to show you a document we'll mark
16 as Vail deposition 16.
17      (Whereupon exhibit Vail-16 was marked
18 for identification.)
19 BY MR. HALLER:
20 Q. Mr. Vail, is this a letter that you wrote to
21 Dr. Spence Reid on June 26th, 2000?
22 A. Yes. I recall this.
23 Q. Am I correct in saying that he knew to
24 respond to information on what your medical situation

Page 126

1  was for Harleysville's internal purposes?
2  A. The reason I sent this letter to Dr. Reid is
3  that Harleysville had a representative. I believe
4  Jenny Ludwig Hill sent me a disability record form
5  that needed to be completed, and section two of that
6  form required the attending physician's statement,
7  which I obviously wasn't in a position to provide, so
8  it had to be forwarded on to Dr. Reid, and in doing
9  so, I put a cover on this to facilitate his response
10 back to Harleysville.
11 Q. So this would be your thoughts to help Dr.
12 Reid?
13 A. Yes.
14 Q. What you say as of June 26th to Dr. Reid is
15 that the arrangement for you to work at home on a
16 flexible schedule is working okay, provided you take
17 frequent enough breaks throughout the day as needed.
18 A. That's what it says.
19 Q. Was that an accurate statement at the time?
20 A. From my perspective, yes.
21 Q. Then you say, "I would appreciate actively
22 returning to work by August 28, 2000, provided that it
23 is safe to do so." Why did you want to return by
24 August 28?

Page 127

1   A. That was the date of an off-site seminar
2 that Mr. Weinstein asked me to be a presenter at and
3 also to develop materials for.
4   Q. As of June 26th, did you personally feel
5 that that was an achievable date based on how you
6 felt?
7   A. I felt horrible as of June 26th. I was
8 hoping that I would feel better. As of today, I'm
9 still in pain, but it's all relative.
10   MR. HALLER: Off the record.
11      (Discussion held off the record.)
12      (Whereupon exhibit Vail-17 was marked
13 for identification.)
14 BY MR. HALLER:
15   Q. I've put before you what we've marked as
16 Vail deposition 17, which is a disability record
17 completed by your physician, Dr. Spence Reid. Have
18 you seen this document before?
19   A. No, only the section one part when I sent it
20 out. I've never seen section two before today.
21   Q. Do you see that Dr. Reid completed this
22 document on or about July 6th?
23   A. Yes.
24   Q. It says prognosis good?

Page 128

1   A. Yes.
2   Q. Do you have any information as to whether
3 this information was conveyed to Gary Weinstein or
4 Alice Geckeler?
5   A. I have no idea.
6   Q. It may have been, but you don't know?
7   A. I don't know.
8   Q. So based on the E-mail that we marked as
9 Vail deposition 15 and your letter of the 16th and Dr.
10 Spence Reid's response, it would appear that you were
11 likely to make a full and complete recovery in a
12 relatively short period of time; isn't that correct?
13   A. No. I don't know how you would get that
14 conclusion from a simple one-word statement "good".
15   Q. I was asking you about a combination of the
16 three documents, which would be, "This type of injury
17 simply needs time to heal the structural members and
18 connective tissue", your statement that the flexible
19 work arrangements was working okay, and you would
20 appreciate returning on August 28th, and the doctor's
21 statement that the prognosis was good.
22   A. I would disagree with your conclusion.
23   Q. You would disagree with that?
24   A. I do disagree.

Page 129

1   Q. Let me ask you this: Is it a reasonable
2 interpretation of those documents that you would make
3 a relatively speedy recovery?
4   A. I would not reach that conclusion from those
5 documents.
6   Q. What conclusion would you reach from those
7 documents?
8   A. What I would reach is that based on the
9 progress to date, it's what Dr. Reid expected.
10   Q. He expected a full recovery in a short
11 period of time based on progress to date.
12   A. I don't know anyone that said to me it was
13 expected to be a full recovery. Medical doctors
14 typically don't guarantee results, nor should they,
15 because the results are contingent on many factors,
16 one of which happens to be how well the healing
17 process takes and what pieces of prior functionality
18 return. No one at that point knew. So in my view,
19 since you've asked my opinion, it's inappropriate to
20 make the conclusion that there would be a complete and
21 full recovery in a relatively short period of time
22 based on the documents that you've placed before me
23 that's the basis of your conclusion.
24   Q. I'm assuming that at times that you

Page 130

1 consulted with the doctor up to this point you asked
2 him what he thought the recovery period would be.
3   A. Yes.
4   Q. Did you?
5   A. Yes, I did.
6   Q. What did he tell you?
7   A. In the context of recovery as far as
8 returning to some semblance of walking, whether that
9 was aided or unaided, at that point, he couldn't
10 predict. He told me that in this type of injury, it's
11 not unusual to take 14 weeks to get to the point where
12 one can ambulate on two legs without having to use
13 crutches. To add to that answer, at no time did Dr.
14 Reid make any guarantees whatsoever that I would, in
15 fact, do that or would be capable of doing that
16 because he, quite frankly, told me he didn't know.
17   Q. In terms of those conversations and the
18 reassurances that you were trying to get from him, his
19 best estimate was that you'd be able to walk again
20 without the use of crutches or other aids within 14
21 weeks?
22   A. No, he never said that. What he said was
23 that I'd be on my feet again if all went well within a
24 14-week period without any guarantee that I would

Page 131

1 actually ever achieve it. He told me he didn't know.
2 You asked me this three different ways, and it's the
3 same answer each time. He just didn't know.
4   Q. I was asking what he told you. That's what
5 I was asking. I was trying to understand your earlier
6 answer where he described his experience in terms of
7 14 weeks. Maybe I misunderstood your testimony.
8 Please, clarify it.
9   A. Again?
10   Q. It's not again. I'm asking you to clarify
11 it because based on your prior answer, either I
12 misunderstood your answer or you contradicted your
13 answer. Regardless of it, let's sort of start from
14 scratch. What I was trying to get at was what did Dr.
15 Spence Reid tell you in terms of his best estimate of
16 your recovery period? He must have told you
17 something.
18   A. He did. I'll reiterate it again. For the
19 record, I don't recall contradicting my own
20 testimony. What I recall from my discussion with Dr.
21 Reid is that we had conversations about a best-case
22 scenario of when he thought that I might be on my feet
23 again, undefined as to whether or not that would be
24 with or without ambulatory aids. Dr. Reid's opinion

Page 132

1 at that point in time, and I don't recall specifically
2 when that was, but it would have been around that June
3 time frame, was that it would take 14 weeks or so to
4 be able to accomplish that. I remember asking him,
5 "Is it possible that it could be done sooner if all
6 went extremely well and I follow a rigorous course of
7 recovery?" He said, "Theoretically, it's possible,"
8 but he couldn't guarantee that that would happen or
9 what degree of mobility I would have at that point in
10 time, since he doesn't guarantee medical results based
11 on surgery that he conducts. Does that clarify what I
12 was attempting to answer?
13   Q. That does. Thank you.
14   A. Sure.
15   Q. As a follow-up question in terms of what
16 you'd be able to do in 14 weeks, what did he say if
17 everything went well?
18   A. That I should be able to return to the
19 office without making any guarantees as to my
20 mobility.
21   Q. That would mean that you would be able to
22 walk without crutches?
23   A. No. I just said that I would be able to
24 return to the office without making any guarantees as

Page 133

1 to mobility. So based on my prior answer, again, he
2 indicated that he couldn't predict whether or not my
3 walk would return without aids; to what degree I'd be
4 ambulatory. He just didn't know.
5    Q. I'm having a very hard time understanding
6 this, to be very frank with you, Mr. Vail. You report
7 to the company that the operation was successful. You
8 yourself believed that you could return to work in a
9 relatively short period of time, at least by August
10 28th. The doctor says the prognosis is good. Yet,
11 you seem to be trying to take the position that the
12 doctor had no idea what was going to happen with your
13 injury. I honestly don't for a second believe that.
14 Dr. Spence Reid, I presume, gave you much more
15 encouragement than that; isn't that true?
16    A. No. I'm telling you what I recall. I'm not
17 going to fabricate an answer based on my
18 recollection. I'm telling you what he told me as I
19 recall it.
20    Q. It turned out that you recovered then more
21 quickly than he would have anticipated?
22    A. Yes, through a lot of hard work.
23    Q. When you say through a lot of hard work, was
24 that through some kind of exercise regimen?

Page 134

1    A. Absolutely, but that recovery took place
2 well after my discharge from Harleysville. When I was
3 discharged from Harleysville, I couldn't walk without
4 a cane, and that was pushing it. I really needed
5 crutches for any length of any kind of stride. I
6 needed assistive devices to ambulate, and it was clear
7 to anyone who would look at me that that was a
8 problem.
9    Q. As I understand it, you were using a cane at
10 that point; right?
11    A. I was using a crutch and a cane. Near the
12 end when I was discharged from Harleysville, I was
13 doing my best to do with a cane. What I was doing at
14 that point is carrying things in my off-side to the
15 extent that I could accomplish it, and it was much
16 easier to do it with a cane. I had to walk slower and
17 be more careful. My gait was unsteady at that point.
18 I could not walk without an assistive device.
19    Q. You could walk with an assistive device?
20    A. History has proven that to be the case with
21 crutches and a cane, yes.
22    Q. Let me try and understand this. You said
23 that through some kind of exercise regimen, you were
24 able to fully recover; is that right?

Page 135

1    A. I'm sorry.
2    Q. You said that with an exercise regimen, you
3 were able to recover.
4    A. After my discharge from Harleysville, yes.
5 My recovery was not immediate, and that recovery is
6 not complete.
7    Q. Describe to me the exercise regimen that you
8 went through.
9    A. I went through a rigorous course of painful
10 physical therapy with Muhlenberg Outpatient Physical
11 Therapy beginning sometime after my discharge from
12 Harleysville and continuing into what I recall was the
13 holiday season at the end of 2001. I don't recall the
14 exact start and stop times, but I'm sure they'd be
15 reflected in the record.
16    Q. Just describe to me the physical therapy
17 that you did.
18    A. Initially, it was range of motion with the
19 hip and leg. Later, it was strength training and a
20 combination of range and motion and strength training
21 followed with different exercises that the physical
22 therapist would prescribe, which I don't recall
23 specifically what they were, but they involved
24 equipment inside the physical therapy department.

Page 136

1    Q. Were you doing exercises on a treadmill or
2 anything like that?
3    A. Not initially. I couldn't support it.
4 Eventually at some point, I was placed on a treadmill
5 with supports where I could hold on, and the intent of
6 that was to build strength. I also did exercises
7 which are called therabands, which are basically
8 stretchy type cable like a rope, but it's made of
9 plastic, and it has a certain give to it so one can go
10 through range of motion and strength at the same
11 time.
12    Q. At what point in time were you able to walk
13 without difficulty without using an assistive device?
14    A. Well, even today, it's still difficult for
15 me to walk because it's painful, and I have to work
16 very hard at it, but in terms of my ability to walk
17 without an assistive device and ambulate, I used
18 crutches up until about the time of my discharge from
19 Harleysville predominantly. Then I switched to a
20 cane, and the cane took me through on or about
21 February of 2002. At that point, I was able to walk
22 without assistive devices consistently. How well I
23 did it is another matter. The quality of walking is
24 also an issue that goes far beyond whether I can or I

Page 137

1 can't. As of that point, I was able to walk on my own
2 without assistive devices.
3    Q. From sometime in September of 2001, you were
4 able to walk using a cane?
5    A. Yes.
6    Q. Have you continued on some kind of exercise
7 regimen even after you finished with Muhlenberg?
8    A. Yes.
9    Q. What does that consist of?
10    A. Those are exercises that the therapist gave
11 me to do that I can do in my home.
12    Q. Do you go on long walks; do you jog,
13 anything like that?
14    A. No. I find that uncomfortable to go on long
15 walks or jog. My exercises are more range of motion
16 and strength.
17    Q. Do you recall that Mr. Weinstein reassigned
18 one of your performance appraisals just to help you
19 catch up?
20    A. I recall an assignment of performance
21 evaluation to John Strouse, who did not handle it
22 contemporaneously, to my recollection.
23    Q. Did you discuss, at any point around the
24 late June, early July time frame, cutting back to

Page 138

1 part-time status?
2    A. There was a brief discussion with Gary
3 Weinstein around that, and I believe there was E-mail
4 traffic back and forth regarding that topic.
5    Q. What do you recall the discussion being?
6    A. The discussion I don't recall specifically.
7 The E-mails, I recall Gary Weinstein offering me the
8 chance to go to reduced hours with a reduction in
9 pay. At the time, I considered that option, and my
10 assessment was that the words were on the page, but it
11 really wasn't a sincere offer by the way he had spoken
12 to me verbally, which I don't recall specifically, but
13 I do have a recollection of a general notion that he
14 didn't really want me not working. He wanted the work
15 to get processed and get done. So I continued to
16 work.
17    Q. So he continued to have a preference that
18 you would be working on a full-time basis?
19    A. That's my recollection.
20    Q. Although he did make the offer that if you
21 wanted, he would be willing to work with you and allow
22 you to go on a part-time basis?
23    A. I don't remember it being in the E-mail, but
24 I don't remember it being credible from my assessment

Page 139

1 of it.
2 Q. I'm going to show you a document we'll mark
3 as Vail deposition 18.
4       (Whereupon exhibit Vail-18 was marked
5 for identification.)
6 BY MR. HALLER:
7 Q. Mr. Vail, I've put before you a document
8 we've marked as Vail deposition 18. It's an E-mail
9 dated July 18th, 2000 from Gary Weinstein to you. Do
10 you recall receiving this E-mail?
11 A. I have a vague recollection of receiving
12 this E-mail.
13 Q. In this E-mail, he's telling you that
14 there's a major problem with overdue work in your
15 territory. Do you see that?
16 A. Yes.
17 Q. And you agree that that was the situation at
18 that time?
19 A. Yes.
20 Q. It says, "She has received, at least, 20
21 inquiries from underwriters looking for late stuff."
22 Do you know what that means?
23 A. Not specifically. My interpretation of it
24 would be that there were survey requests that

Page 140

1 underwriters had made that had not been returned to
2 them as completed.
3 Q. You understand that it wasn't a good thing
4 for there to be that kind of backlog?
5 A. Yes.
6 Q. Then he mentioned something about 50 open
7 requests for surveys. Do you know what that referred
8 to?
9 A. No.
10 Q. Was that a lot?
11 A. I'm not sure. It depends on the context.
12 One possible interpretation of that comment is that
13 there were 50 requests that had not been assigned.
14 That in and of itself would not necessarily be unusual
15 because there was quite a pipeline of requests moving
16 through that system.
17 Q. Who is Alan Benancasta?
18 A. That's a typographical error. I believe
19 what Mr. Weinstein intended to say was Alan Bencassa,
20 who was a principal of PM Associates that was one of
21 the vendor firms retained by Harleysville.
22 Q. Mr. Weinstein refers to a conversation you
23 had with Mr. Benancasta in which you told him that you
24 knew that he said it was late, and he'd get it when he

Page 141

1 could, no special rush. Do you know what that means?
2 A. May I take a moment to read it? I don't
3 recall it specifically.
4 Q. Yes.
5 A. I don't recall having that conversation in
6 that context with Mr. Benancasta. I actually don't
7 recall having any conversation with him. I'm not
8 saying it didn't occur. I just don't recall.
9 Q. Mr. Weinstein ends this E-mail saying, "Ken,
10 the service level in your region is unacceptably
11 poor. We must provide substantially better service to
12 our underwriting customer. Bill, Craig and I are all
13 spending way too much time managing your region." Do
14 you see that?
15 A. Yes.
16 Q. You agree, do you not, that there was an
17 increasing crescendo of frustration being exhibited by
18 Mr. Weinstein with the lack of progress in getting
19 things done in your region?
20 A. None more frustrated than myself.
21 Q. I asked you as to Mr. Weinstein. You would
22 agree with that?
23 A. I think that would be a reasonable
24 conclusion.

Page 142

1 Q. These were legitimate concerns on his part;
2 right?
3 A. Yes.
4 Q. It's true, is it not, that he felt that you
5 were responsible, at least in part, for this breakdown
6 in service?
7 A. I don't know specifically what he felt. I
8 can't answer for him.
9 Q. You were, in fact, at least in part,
10 responsible for this breakdown in service?
11 A. I was certainly involved in managing the
12 region, and if the notion is that the service was poor
13 because I was managing the region, I don't totally
14 agree with that because there were many extenuating
15 circumstances that impacted that performance.
16 Q. What were the extenuating circumstances?
17 A. Among them was the fact that I couldn't be
18 on site to help manage the work process for that
19 particular assistant. In the conversations that I had
20 with Carley Jespersen, she related to me that she
21 didn't feel she was getting the assistance internally
22 to help her be successful, and I don't mean me, but
23 people around her physically in the home office. We
24 had a situation where I couldn't get out and meet with

Page 143

1 the vendors. I could talk to them over the
2 telephone. We had a situation where the system's
3 connection into the mainframe computer was abysmally
4 slow. The E-mail system on the outside at that time
5 when one was working remote was considerably different
6 than the one inside, in that it had an entirely
7 different interface and was exceedingly slow and hard
8 to manipulate. This created barriers for me to get
9 this done effectively.
10 Q. From the high level of Mr. Weinstein's
11 position though, he had underwriting customers who
12 were unhappy. He had backlogs. And your situation
13 was not helping resolve that; right?
14 A. I would agree with that.
15 Q. Yet, there were some things that he had
16 asked you from early on to get done that were not
17 getting done, such as the vendor reports and the QC
18 reviews for staff members.
19 A. But for my disability, I don't believe any
20 of this would have been a factor.
21 Q. Are you saying that in this period of time,
22 you weren't really able to do the job properly?
23 A. Not at all. What I'm stating is that it was
24 extremely difficult to do the job under these

Page 144

1 circumstances.
2     THE WITNESS: Any objection if we take
3 a short break?
4     MR. HALLER: That's fine.
5     (Break taken in the proceedings from
6 2:29 PM to 2:33 PM.)
7     (Whereupon exhibits Vail-19 through
8 Vail-21 were marked for identification.)
9 BY MR. HALLER:
10 Q. Mr. Vail, I've put before you what we've
11 marked as Vail deposition 19. It contains two
12 E-mails, one dated July 15th from Gary Weinstein to
13 you, and then a response from you to him dated July
14 20th. Do you have that document in front of you?
15 A. I'm searching for the July 15th. Is that
16 part of 19?
17 Q. Yes, at the bottom of the page.
18 A. Yes, I have it.
19 Q. Do you recall getting the E-mail from Mr.
20 Weinstein dated July 15th?
21 A. Yes.
22 Q. In this E-mail, he states, "Due to your
23 injury, you are not currently tasked with riding with
24 the staff, attending staff or branch or agent or

Page 145

1 agency council meetings." That was correct as of that
2 time?
3   A. Yes, that was correct.
4   Q. Also, day-to-day supervision and training of
5 Carley Jespersen, your administrative assistant, had
6 been transferred to Craig Campbell.
7   A. That's what it says.
8   Q. That's true as of that time?
9   A. That's how it was presented to me, yes. I
10 went there to see it happen.
11   Q. Then he goes on to say, "The tasks we talked
12 about repeatedly prior to and following your injury
13 include promptly reviewing and rewriting all vendors reports
14 recommendations and transmitting all vendors reports
15 and performing no less than five QC report reviews per
16 month per staff member and providing written feedback
17 on each report reviewed." Do you see that?
18   A. I see what it says. I disagree with it.
19   Q. It's true, is it not, that you and he had
20 talked about these things before your injury?
21   A. We talked about them; however, I wouldn't
22 characterize as repeatedly, and there was certainly no
23 discussion of raw numbers, as I recall.
24   Q. But you'd agree, at least, you discussed

Page 146

1 this before your injury?
2   A. Yes. I believe there was documentation to
3 that effect that you introduced.
4   Q. As of this time, you understood that he was
5 giving you very explicit direction as to what he
6 needed from you as to output?
7   A. Yes.
8   Q. And until you were able to ride with your
9 staff, he wanted 10 reports per staff member as
10 opposed to five?
11   A. Yes.
12   Q. He also says you were asked to review all
13 existing service files from your region and evaluate
14 the service being provided. Do you see that?
15   A. Yes.
16   Q. What are service files?
17   A. To my recollection, service files were files
18 on accounts that had some type of ongoing service
19 provided to them beyond the initial loss control
20 survey, whether there was a specific improvement
21 initiative that we were attempting to accomplish with
22 the client or a request that the client may have had
23 for specific services in the generic sense.
24   Q. He wanted you to examine those files and see

Page 147

1 what was needed and to make sure people were following
2 it up?
3   A. Yes. Unfortunately, those files weren't in
4 my possession.
5   Q. So you had to get them from somewhere?
6   A. I didn't have them.
7   Q. Then he says, "Ken, while you are completing
8 some tasks, you repeatedly put off certain tasks that
9 I have identified as essential." Do you see that?
10   A. Which paragraph are you on?
11   Q. The third to the last paragraph.
12   A. Yes, I see it.
13   Q. He said, "It took an unexpectedly long time
14 to review and transmit the vendor reports that were
15 sent to you electronically." Do you see that?
16   A. I do.
17   Q. And he said, "You are also not reviewing the
18 paper vendor reports for price, quality and
19 recommendations."
20   A. I didn't have paper reports to review. The
21 paper reports were in Harleysville's home office.
22   Q. You needed to get them; right?
23   A. They needed to be shipped to me, yes.
24   Q. So in order to do that, you would have your

Page 148

1 administrative assistant or somebody ship them to
2 you?
3   A. At this point, I think she might have been
4 terminated. That left me with no administrative
5 assistant whatsoever.
6   Q. But you needed to get them in your hands in
7 order to do the review?
8   A. In order to do the review, I had to have
9 access to the information.
10   Q. It was your responsibility to make sure you
11 had access to the information?
12   A. That's what Mr. Weinstein is saying.
13   Q. Then he says, "In summary, your task is to
14 promptly assign the work, monitor the time service,
15 production and quality, vendor and staff, and take the
16 necessary actions to bring deficient areas up to
17 standard." Do you see that?
18   A. I do.
19   Q. Then he says, "Additional administrative
20 tasks including assigning survey work and paying
21 vendor bills, completing performance reviews and so on
22 must be completed in a timely manner." Do you see
23 that?
24   A. Yes.

Page 149

1   Q. Then he says, "Your success going forward
2 depends on your timely and thorough completion of all
3 the above tasks." Do you see that?
4   A. Yes.
5   Q. You agreed earlier in the previous E-mail
6 that it reflected a growing sense of frustration on
7 Mr. Weinstein's part with the output from your region,
8 and from your desk in particular; right?
9   A. Yes.
10   Q. This is another level up now in terms of
11 frustration; isn't it?
12   A. I don't know if I'd characterize it as
13 another level up. Nowhere does it say my job is in
14 jeopardy or I would be terminated or I would be denied
15 due process of improvement, if that's what his concern
16 was. I don't make that connection here.
17   Q. Mr. Vail, according to your resume, you're
18 an experienced manager; right?
19   A. Yes.
20   Q. When your manager says to you your success
21 going forward depends on your timely and thorough
22 completion of all the above tasks after he has
23 previously in writing told you to do these things,
24 that is a clear indication that if you don't get them

Page 150

1 done, your job may be on the line; isn't it?
2   A. No. My experience as a manager tells me
3 quite the opposite. In my experience as a manager, if
4 I had counseling with an individual who worked for me
5 that the consequences were that dire, it would be
6 exceedingly clear to them what they had to do to be
7 successful and all barriers in their past would be
8 removed. Otherwise, I, as a manager would be a
9 failure.
10   Q. When Mr. Weinstein says your success going
11 forward depends on your timely and thorough completion
12 of all of the above tasks, what did you interpret from
13 that comment?
14   A. In my interpretation, that meant that I
15 wouldn't get a raise. Maybe there would be a
16 performance improvement plan at some plant. Maybe
17 there would be due process.
18   Q. You knew that it spelled trouble. It was
19 just the degree that we're quibbling over; right?
20   A. I understood the context in which it was
21 made. In my interpretation of it, it means he's not a
22 happy camper about the way things are going in this
23 region. I believe I responded to his message.
24   Q. I understand. I'm just trying to understand

Page 151

1 what you interpreted from this E-mail, and I think
2 you've answered that question. He was also putting
3 you on notice of his expectations; wasn't he?
4    A. He has expectations in this E-mail.
5    Q. In your response, you try and explain to him
6 some of the reasons why things are as behind as they
7 were at that point; right?
8    A. That's correct.
9    Q. Then you end by saying, "I look forward to
10 getting things back on track." Do you see that?
11    A. I do.
12    Q. So you understood things were not going
13 according to planned?
14    A. I think I've already mentioned that.
15    Q. In this E-mail, you say to Mr. Weinstein
16 that you asked him if he would consider reduced hours
17 as opposed to what you testified earlier that it was
18 his suggestion.
19    A. When I testified earlier, it was in the
20 context of the E-mail he sent to me. I don't
21 understand the question you just asked. Could you
22 rephrase it?
23    Q. I read this last sentence in the second
24 paragraph of your response to say that on July 6th,

Page 152

1 you asked Mr. Weinstein if he would consider reduced
2 hours for the weeks of July 10th and 17th, and he said
3 he didn't want to do that.
4    A. That's correct.
5    Q. So contrary to your earlier testimony, it
6 was you, not Mr. Weinstein that raised the issue of
7 some kind of part-time schedule.
8    A. I don't know that that's contrary to my
9 prior testimony. The question you asked was specific
10 in its context, and I answered it to the best of my
11 ability. What you didn't ask me, to my recollection,
12 was who first initiated the discussion around
13 part-time hours. I remember early when Mr. Weinstein
14 first came to meet with me after I was injured at my
15 home, there was some discussion around the hours to be
16 worked, and quite frankly, I don't recall who at that
17 point introduced it, but that's my earliest
18 recollection of discussion around hours to be worked.
19 I recall the second discussion around this time frame
20 after I was being hammered by Mr. Weinstein to get the
21 vendor reports done that week on or about the 26th,
22 and quite frankly, I was exhausted, a combination of
23 pain and physically demanding work. Believe me, it
24 was physically demanding to even sit in the chair at

Page 153

1 that point. It was tough. I did the best I could and
2 got through it, and it was hard. Based on that
3 experience, I did have a conversation with Gary
4 Weinstein about reducing hours, and at that point, it
5 was clear to me that that was not an option that was
6 under consideration.
7    Q. Anyway, as of this time, July 20th, you just
8 met with your surgeon, and he told you that your
9 healing was on track, and you were making progress,
10 and he expected you to fully recover?
11    A. No. It says I'm making progress, and I
12 expect to fully recover.
13    Q. So you expected to fully recover?
14    A. I expected to recover from the very first
15 part of the incident, but that's my mental composition
16 and makeup.
17    Q. But that's what you're telling Gary
18 Weinstein?
19    A. Correct.
20    Q. And that's what he has to go on in terms of
21 his judgement of what he has to understand.
22    A. That's one of the pieces of information he
23 has to go on.
24    Q. You say, "I understand that the report

Page 154

1 reviews are important." Do you see that?
2    A. Yes.
3    Q. You're not contesting in this case that
4 there's anything wrong with Mr. Weinstein wanting
5 those to be done and done on a timely basis?
6    A. That's correct.
7    Q. So whether this was notice of possible
8 termination, you concede that Mr. Weinstein was
9 telling you in no uncertain terms that he wasn't
10 satisfied with your performance?
11    A. I agree with the latter part of your
12 statement. I disagree wholeheartedly that this was in
13 any way notice of a discharge from my position or my
14 position was in any way in jeopardy.
15    Q. Putting that aside.
16    A. That's what I heard you to say.
17    Q. It was notice of his dissatisfaction?
18    A. I would agree with that.
19    Q. Were you aware that at this point, he was so
20 concerned about your performance that he was now
21 involving Alice Geckeler in making sure she knew about
22 these problems?
23    A. No.
24    Q. Do you recall how many QC reports you had

Page 155

1 done by the third week in August?
2    A. I don't recall.
3    Q. You have no idea?
4    A. No.
5    Q. So if Mr. Weinstein were to say that you did
6 not meet the goal of 10 quality control reports per
7 staff member, you would have no basis to disagree with
8 that?
9    A. All the information that I had relative to
10 reviews that I had completed were resident in my
11 computer, and that computer was returned to
12 Harleysville on the date of my termination, so I have
13 no way to know what those records say at this point,
14 nor do I recall specifically what they said.
15    Q. If Mr. Weinstein would say you hadn't even
16 done five per person, you have no way of contesting
17 that; do you?
18    A. Five per person, I would disagree with that
19 based on recollection. Over what period of time is
20 that five per person at issue?
21    Q. From July 20th until the third week in
22 August.
23    A. My recollection is that there were some
24 individuals where that was the case. I can't recall

Page 156

1 specifically who they were.
2    Q. It's true, is it not, that there continued
3 to be a backlog on the vendor reports for some weeks
4 after July 20th?
5    A. I don't recall specifically when they were
6 caught up, but I have no reason to doubt that there
7 was still a backlog at that point.
8    Q. I've put before you a document marked as
9 Vail deposition 20. This is a series of E-mails
10 beginning July 19th, 2000 and continuing to July 20th,
11 2000 concerning Carley Jespersen's resignation. Do
12 you see that?
13    A. I see an E-mail dated July 19, if that's
14 what you're referencing.
15    Q. There's an E-mail from Carley Jespersen to
16 Craig Campbell dated July 19th.
17    A. I see it.
18    Q. And then a message from Mr. Weinstein to you
19 dated the 20th at 7:42 AM.
20    A. I see it.
21    Q. And then your response to Gary Weinstein
22 dated July 20th, 2000 at 9:24 AM.
23    A. Yes.
24    Q. And the original message is an E-mail from