**EXHIBIT A (Part II)**

**Page 157**

1 Carley Jespersen announcing her decision to resign
2 from the company and to seek opportunities elsewhere.
3   A. I see that.
4   Q. Did you personally talk to Carley Jespersen
5 about her decision to resign?
6   A. The morning of the 20th, I believe I did. I
7 don't recall my schedule exactly on the 19th, but I
8 have a recollection that I might have been at Hershey
9 Medical Center that day, which would have taken me
10 away from my home office. Therefore, I would not have
11 had access to E-mail. Unless someone tracked me down
12 and told me this was occurring, I have no way of
13 knowing it. I have a notion of remembering that I was
14 in transit either to or from Hershey Medical Center.
15 It's possible on the 19th I did speak with her by cell
16 phone, but I don't have a specific recollection of the
17 conversation. Does that answer your question? I lost
18 track of what you're asking me.
19   Q. Do you recall having any conversations with
20 Carley Jespersen about her decision to resign?
21   A. On the 20th, I do not. I do not have a
22 specific recollection prior to that, although it's
23 possible I may have spoken to her.
24   Q. Did you call her on the 20th, or did she

**Page 158**

1 call you?
2   A. My recollection is I called her.
3   Q. What do you recall about your discussion
4 with her?
5   A. She was upset. Based on what I'm reading
6 here now, it comes back a little clearer to me; that
7 she sounded like she had been crying. She was
8 obviously upset to me over the telephone. I asked her
9 why. She told me about her notice and she was leaving
10 Harleysville and she wasn't getting the support she
11 needed. It was an untenable situation. She felt like
12 she was being forced out.
13   Q. So your testimony is you spoke to her on the
14 20th?
15   A. That's what I recall.
16   Q. And what you just described was the
17 conversation you had with her on the 20th after she
18 had handed in her notice?
19   A. The first recollection I have of her notice
20 of resignation was that morning of the 20th. That's
21 what I remember.
22   Q. If you take a minute to look at this E-mail,
23 it cannot possibly be correct; can it, your
24 testimony?

**Page 159**

1   A. Why is that?
2   Q. Because in this E-mail, which refers to the
3 conversation you've just described as having occurred
4 on the 20th, it says "I called Carley early
5 yesterday", which would have been the 19th, "to follow
6 up on the Langer invoices, and it sounded as though
7 she had been crying. When I asked if anything was
8 wrong, she said that she was giving her notice of
9 resignation." Do you see that?
10   A. I stand corrected. You're absolutely
11 right. My recollection is incorrect.
12   Q. You spoke to her on the 19th. She told you
13 that she was going to resign.
14   A. I'm sorry. I don't have a specific
15 recollection of the time line, but that's what it
16 says.
17   Q. What she told you was that she feels
18 overwhelmed, and that no matter what she does, it's
19 not the right thing; right?
20   A. I remember that, yes.
21   Q. You got the impression that she felt
22 stressed out?
23   A. Yes.
24   Q. That was the sum and substance of what she

**Page 160**

1 told you that's reflected here?
2   A. That's not everything we talked about. This
3 is a summary of my recollection of the conversation
4 for what I felt was pertinent to share with Mr.
5 Weinstein.
6   Q. Other than what's reflected in this
7 document, what did she tell you happened on the 19th?
8   A. I remember some discussion about Mennonites,
9 and not specifically in any context that I can
10 recall. Apparently, the organization had a Mennonite
11 background, which means nothing in the context of this
12 conversation to me, but apparently meant something to
13 her. She just didn't feel it was a tenable situation
14 for her to remain in.
15   Q. She was having trouble coping with work;
16 right?
17   A. Apparently.
18   Q. You had previously referred to her as an
19 inexperienced administrative assistant?
20   A. I did.
21   Q. And Mr. Campbell had another job to do,
22 other than the job that you were supposed to of
23 managing her and training her; right?
24   A. That's my understanding.

**Page 161**

1   Q. So this was a decision that she made based
2 on the circumstances? It was her own decision;
3 correct?
4   A. I don't know what drove her to make that
5 decision.
6   Q. You simply don't know; right?
7   A. Other than what she relayed to me; that she
8 felt stressed out and overwhelmed, and she wasn't
9 getting the support from the co-workers and home
10 office around her.
11   Q. Was some of that directed to you in terms of
12 lack of support?
13   A. I didn't get that impression.
14   Q. You tried to persuade her to stay; right?
15   A. Yes. In fact, I asked if there was anything
16 that we could do to make her change her mind, and she
17 said, no.
18   Q. So she knew that she wasn't being
19 terminated; that she could stay if she wanted to?
20   A. You'd have to ask her that question.
21   Q. You don't know?
22   A. I don't know.
23   Q. You personally have no facts to suggest that
24 she was constructively discharged; do you?

**Page 162**

1   A. Other than the fact that she relayed to me
2 about her concern with the organization and the
3 interface and lack of support from those people in the
4 home office, no.
5   Q. Do you know what the term constructively
6 discharged even means?
7   A. I know what it means to me.
8   Q. What does it mean to you?
9   A. What it means to me is that the atmosphere
10 has become so difficult, a person in that circumstance
11 would be treated as though they're no longer valued
12 and their services are not needed, yet, they haven't
13 been given formal notice.
14   Q. I'm going to show you a document we've
15 marked for identification. I've put before you a
16 document we marked as Vail deposition 21. It's dated
17 July 26th from Gary Weinstein to you. It's again
18 stating his concerns about priorities. Do you recall
19 receiving this E-mail?
20   A. I do.
21   Q. In the third paragraph, he says, "We are
22 very, very long overdue on providing report review
23 feedback to all of your staff members." Do you see
24 that?

Page 163

1  A. I see that.
2  Q. You don't have any reason to dispute that as
3  of that time; do you?
4  A. No. All the evidence is resident on the
5  computer that I no longer have.
6  Q. As of July 20th, he had undertaken that you
7  were going to take care of it and get things back on
8  track; right?
9  A. I'm sorry.
10  Q. As of July 20th in your response to Mr.
11  Weinstein's E-mail, which you agreed was putting you
12  on notice of his dissatisfaction, you had undertaken
13  to take care of the staff reviews?
14  A. Not in the six-day period.
15  Q. You had undertaken to get things back on
16  track?
17  A. Correct, but I didn't warrant that it would
18  be at a specific point in time.
19  Q. He notes at this time, despite his repeated
20  efforts to get you to do this, that you have not even
21  completed five report reviews for half of your staff
22  members during your entire term with Harleysville. Do
23  you see that? "You have repeatedly committed to
24  completing these on an ongoing basis and not even

Page 164

1  completed five report reviews for half of your staff
2  members during your entire term with Harleysville.
3  Please, quickly increase the pace of report reviews.
4  Your staff deserves your feedback." Do you see that?
5  A. I do.
6  Q. You have no facts to dispute that that's
7  what you were saying?
8  A. It looks to me that on half of them, I did,
9  and then he's saying on some of them, I didn't.
10  Q. But that's over the entire period that you
11  had been working there.
12  A. The entire period wasn't that long a period
13  of time.
14  Q. And yet, this is the staff that you said
15  earlier needed some close management direction.
16  A. Some of which did. Some of which didn't.
17  Q. A couple, you said, didn't.
18  A. Correct.
19  Q. I'm going to show you a document we'll mark
20  as Vail deposition 22.
21       (Whereupon exhibit Vail-22 was marked
22  for identification.)
23  BY MR. HALLER:
24  Q. Before I go to Vail deposition 22, I have

Page 165

1  one more question on the previous exhibit, 21. Did
2  you recognize the fact that Mr. Weinstein had to send
3  you yet another E-mail asking you to complete the
4  staff reviews was not a good sign from a perspective
5  of his evaluation of your performance?
6  A. I don't recall receiving a performance
7  evaluation.
8  Q. That wasn't my question though.
9  A. Would you, please, restate your question.
10  Q. You had received an E-mail a few days
11  earlier that you admitted in this deposition was an
12  indication of his serious concerns over your
13  performance. Now he writes another E-mail to you
14  saying that you haven't met his expectations as to the
15  priorities that he set. My question to you is: Did
16  you understand that that did not go well for his
17  assessment of your performance?
18  A. In a certain sense, he reversed his
19  priorities. In his prior message on the 20th, he
20  asked me to focus on the quality assurance work. On
21  the 26th, he reverses course and asks me to focus on
22  management assessment and employee hiring practices
23  training seminar that's scheduled for August. Those
24  six days later is not, in my view, an appropriate

Page 166

1  expectation to have of a person who doesn't have
2  access to the information to have all that work
3  completed. If you're asking me is this a follow-up
4  with a twist to the previous message on the 20th, it
5  is. Is it a reasonable expectation to have that work
6  completed in six days? No, it's not, in my view.
7  Q. Do you agree that the fact that Mr.
8  Weinstein had to do a follow-up memo was a bad thing
9  from your perspective?
10  A. I don't look at it as positive. The fact
11  that Mr. Weinstein chose to send that message was his
12  prerogative.
13  Q. Given that you are an experienced manager,
14  do you not recognize the problem that is reflected by
15  Mr. Weinstein's need to constantly remind you about
16  the same things over a period of time beginning in May
17  and continuing until, at least, July 26th?
18       MS. HUTNIK: I'm going to object to the
19  form of the question.
20       You can answer.
21       THE WITNESS: As an experienced manager
22  in a different culture, this is counter-cultural to
23  what my expectations would have been. Also, contrary
24  to experience I had in the training session that was

Page 167

1  in May before my injury, I found it so difficult to
2  comprehend that Harleysville would portray a
3  progressively disciplinary policy with five steps, and
4  then totally disregard it. To answer your question,
5  yes, as an experienced manager, I was baffled by this
6  type of communication.
7  BY MR. HALLER:
8  Q. Mr. Vail, if you have an employee and you
9  have to constantly say to an employee I need you to do
10  this and those things do not get done and you have to
11  keep reminding them, that's not a good situation; is
12  it? Can we agree on that?
13  A. In general, yes. With regard to this
14  particular circumstance, that kind of expectation, in
15  my view, is unreasonable.
16  Q. Is it your position that if Mr. Weinstein
17  put you on a performance improvement plan that would
18  have been a better way to improve the situation?
19  A. It would have been more understandable. May
20  I add to my answer?
21  Q. No, not unless it's responsive.
22  A. It is responsive.
23  Q. If you didn't finish your response, you can
24  continue. I don't want to interrupt your response.

Page 168

1  A. There we go with the word simply again. I
2  didn't mean to interject that. If Mr. Weinstein was
3  intending to portray this as a huge performance issue
4  that impacted my future employment with this
5  organization at some period in time, then I would have
6  understood, had he phrased it in the form of a
7  performance improvement plan, which he clearly didn't
8  do.
9  Q. What I'm asking you is: As an experienced
10  manager seeing these E-mails come flying by you time
11  after time again, you must have realized that from his
12  perspective, he viewed that there was a serious
13  performance problem, whether or not he used
14  performance improvement language. Don't you agree
15  with that?
16  A. I agree that we differed over how to achieve
17  objectives and results. I don't agree with the
18  premise as you present it to me.
19  Q. There is no requirement under Harleysville's
20  policies that anyone be put on a performance
21  improvement plan; is there?
22  A. That's not my understanding.
23  Q. Where does your understanding come from?
24  A. It was actually drilled into me in the

**Page 169**

1 supervisor's orientation session that Harleysville
2 prides itself in having a progressive disciplinary
3 policy which includes five steps. I can't articulate
4 from memory what they were, but if we go back to the
5 book, I'm sure we can find it.
6    Q. Why don't we go back to exhibit number 11,
7 which is the very thick document? If you want to go
8 towards the back of the document six pages from the
9 back --
10    A. What page are you on?
11    Q. Page three at the top. There's progressive
12 performance improvement procedures. Do you see that?
13    A. Yes, I do.
14    Q. You yourself have no knowledge as to exactly
15 how Harleysville had put into practice these
16 procedures prior to March 27th, 2000; have you?
17    A. No, I have no way to know that.
18    Q. And you yourself were not directly involved
19 in putting anyone on performance improvement between
20 March 27th, 2000 and September 6th, 2000; were you?
21    A. That's correct.
22    Q. So you yourself have no direct knowledge or
23 experience with the practice and procedure under this
24 policy; do you?

**Page 170**

1    A. Just what I was taught at the supervisor's
2 orientation session, which is a separate document from
3 this one.
4    Q. Do you still have a copy of that?
5    A. My counsel has a copy.
6    Q. Do you know whether that was provided to the
7 defendant in this case?
8    A. I know it was made available on the request
9 for production. I gave it to my attorney. What form
10 it may have been shared, I don't know.
11    Q. You do see at the bottom of the page that it
12 says specifically the company reserves the right to
13 terminate employment at will with or without reason at
14 any time?
15    A. I see that it says that.
16    Q. And it says, depending on the circumstances,
17 the company may, however, try to correct the problem
18 first.
19    A. I see that it says that.
20    Q. So there's no requirement that there be any
21 kind of progressive discipline in the policy; is
22 there?
23    A. Not in this document.
24    Q. Are you aware of any document in which there

**Page 171**

1 is a requirement with respect to progressive
2 discipline?
3    A. Well, I took some notes at the supervisor's
4 orientation meeting, but I don't remember what they
5 said.
6    Q. Do you understand that the procedures that
7 may be used for a long-term employee might be
8 different from those that might be used in the context
9 of somebody who had only been with the company a
10 relatively short amount of time?
11    A. I would not have a philosophical
12 distinction, if you will, that an organization may
13 choose to do that.
14    Q. In fact, you are aware that generally that
15 most companies reserve the right to terminate anybody
16 during an introductory period of six months without
17 any kind of performance analysis?
18    A. I don't know what most companies do. I know
19 that it's not unheard of for organizations to have a
20 probationary period. I know you have broad latitude
21 to ask questions in this setting that may not exist at
22 trial, but I don't understand the relevance of the
23 question. Maybe you can help me with that.
24    Q. I've put before you a document marked Vail

**Page 172**

1 deposition 22. Do you have that document in front of
2 you?
3    A. Yes.
4    Q. These are two E-mails, one dated July 20th,
5 2000 from Mr. Gary Weinstein to you, and then a
6 response from you to him, and then a short response
7 from him to you, again, all on the 20th. Do you see
8 that?
9    A. I do.
10    Q. This exchange starts with Mr. Weinstein
11 saying he was confused by your recollection of the
12 discussion of part-time status. Do you generally
13 recall that there was some confusion over apparently
14 what you said?
15    A. That's what he said.
16    Q. In his E-mail, he specifically asked you in
17 a direct question whether you can work full time at
18 that point in time with obviously accommodation to
19 take breaks and have a modified schedule. Do you see
20 that?
21    A. I do.
22    Q. Your response was, "Yes, I can, with those
23 accommodations;" right?
24    A. Those weren't my exact words, but to that

**Page 173**

1 effect.
2    Q. Your statement was, "Gary, I can do
3 full-time work with accommodation/restriction by
4 continuing to spread out my workday." That was your
5 response; right?
6    A. That's what it says, yes.
7    Q. So as of July 20th, there was no longer any
8 lingering issue as to whether there should be some
9 further reduction in your schedule. You were fully
10 committed to working on a full-time basis?
11    A. That was the plan.
12    Q. When did you return to work from the home
13 office?
14    A. To the Harleysville home office?
15    Q. Yes.
16    A. That was on or about August 21st, if I
17 recall correctly.
18    Q. In conjunction with your return to work, did
19 you provide any medical documentation?
20    A. My physician gave me two separate notes to
21 return to work. The first one that was handed to me
22 didn't have the lifting restrictions on it that we had
23 discussed, and I challenged the nurse practitioner
24 with that. She said, "Oh, you're right. Don't

**Page 174**

1 worry. I'll take care of it." I had two separate
2 versions of that return-to-work sign-off for the
3 position, if you will. I remember, upon my return to
4 Harleysville, that one of the people asked me, and I
5 can't recall specifically who it was. I think I have
6 an E-mail document that memorializes that exchange.
7 But asked me for a return-to-work document because if
8 I couldn't provide it, I would have to leave
9 immediately and go home. I rooted around in my bag
10 and pulled out what I had in my possession, which was
11 the first of the two notices, and I had to get
12 somewhere for work. It was some meeting or
13 something. I don't specifically remember what. I
14 remember this is odd I can't find the other one. I
15 gave it to the HR person or whoever that person was so
16 I wouldn't have to leave the office that day and root
17 around for it and find it later. There are two
18 versions of that. I've not been able to find the
19 other one yet. I'm still searching for it. I'll make
20 it available to counsel.
21    Q. I'd like to show you a document we'll mark
22 as 23.
23      (Whereupon exhibit Vail-23 was marked
24 for identification.)

Page 175

BY MR. HALLER:

1  Q. I've put before you a document I've marked
2  as exhibit-23. I'd ask you if that is the doctor's
3  note you just testified about that you gave to
4  Harleysville.
5    A. It is.
6    Q. You would agree that this reflects no
7  restrictions?
8    A. The restrictions that were discussed with
9  the physician are not noted on this form.
10   Q. Let me show you a document that we'll mark
11 as 24.
12       (Whereupon exhibit Vail-24 was marked
13 for identification.)
14       THE WITNESS: This is it.
15 BY MR. HALLER:
16   Q. So there's a subsequent doctor's note dated
17 the 9th of August which says that you can return to
18 work, but with a lifting restriction of 30 pounds and
19 above until further notice?
20   A. Although these documents have different
21 dates on them, they were given to me at the same
22 time.
23   Q. So this is the second note that you were

Page 176

1  referring to earlier in your testimony?
2    A. That's correct.
3    Q. So from Harleysville's perspective, you were
4  cleared in full to return to work, other than a
5  limitation on lifting 30 pounds or more?
6    A. I don't know from Harleysville's perspective
7  what they knew. I thought through conversation that
8  it had been made clear, and through visual observation
9  of me, it was obvious that I had difficulty
10 ambulating. So when we say fully cleared to work
11 except for lifting 30 pounds, from my perspective,
12 that would be an inaccurate assessment or certainly
13 incomplete.
14   Q. Are you saying this doctor's note, even
15 though you went back to them, is incomplete?
16   A. Dr. Reid was not known for his thoroughness
17 of documentation, although he's a very talented
18 surgeon.
19   Q. I'm going to show you another document we'll
20 mark as 25.
21       (Whereupon exhibit Vail-25 was marked
22 for identification.)
23 BY MR. HALLER:
24   Q. Have you ever seen this document before?

Page 177

1    A. Not that I can recall.
2    Q. This appears to be a supplementary
3  disability record dated the 6th of September completed
4  by Dr. Spence Reid; is that correct?
5    A. I'm looking for the date.
6    Q. Top left hand.
7    A. 9-6-2000 is what it says.
8    Q. In terms of any restrictions, it's no
9  lifting more than 25 pounds, no standing for more than
10 two hours a day and no walking for more than 30
11 minutes at a time. Is that an accurate reflection of
12 your understanding as to the limitations you had at
13 that point as of September 6th?
14   A. This is the first I've seen this document.
15 It sounds reasonable to me as it's presented.
16   Q. As of September 6th, 2000, could you
17 describe to me what your daily routine was?
18   A. September 6th, 2000, I don't know that I
19 still had a daily routine at that point. September
20 6th, my recollection was I was driving to the --
21   Q. I'm not asking you what you did on September
22 6th. I'm just trying to make a time frame. In early
23 September of 2000, describe to me just how you would
24 operate on a daily basis. You would get up in the

Page 178

1  morning and brush your teeth, and then I don't know.
2  I just want to know how you were doing on a daily
3  basis.
4    A. You want that level of detail?
5    Q. Yes.
6    A. The alarm clock would go off. I would get
7  up, and I would get ready for work, and I would get my
8  materials ready for the day. As of September 6th, I
9  may have had a crutch or a cane. I don't recall
10 specifically. I believe on the 6th, it might have
11 been a cane. I would either go to the Harleysville
12 office to process work, or in the case of actually
13 what occurred on September 6th, I would go off to a
14 field appointment, in which case, I did so to go to
15 the Harrisburg branch office called the Susquehanna
16 branch.
17   Q. You were able to drive on your own?
18   A. It was painful, but I could do it. I was
19 able to put either the crutch or the cane next to me
20 and drive down the road carefully. My intention that
21 day was to continue on to meet with Robert Panlayo for
22 a field survey, and my recollection is that prior to
23 arriving at the Susquehanna branch office in the
24 Harrisburg area, en route, I had received a phone call

Page 179

1  from Gary Weinstein asking where I was going and why
2  he didn't know about it.
3    Q. I'm really trying to stay away from the
4  specific events of the day at work. I'm just trying
5  to find out what your daily routine was.
6    A. I don't know at that point there was a
7  routine. I had gone into the office. I tried to make
8  sense out of where my possessions were and put them in
9  place. There were numerous boxes that were in a
10 common area in the office that Gary Weinstein asked me
11 to lift and put away. I said, "Gary, that's not
12 possible, given my current condition, with this
13 weight." Then he said it could wait. I was being
14 pressured to move boxes, trying to get the computer
15 system working appropriately. It had numerous
16 glitches upon my return to the office in getting the
17 focus system to print. I got those challenges out of
18 the way. There was a new administrative assistant
19 named Debbie, who was not my assistant, but a
20 departmental assistant. Craig Campbell arranged
21 appointments with vendors without my knowledge. They
22 were showing up, and there were meetings, and I got
23 called into meetings on the fly. When I say fly, I
24 don't mean with pointed speed, but without planning.

Page 180

1  When you asked me what the routine was, at that point
2  after the seminar in Harrisburg which took place on or
3  about a period of time from the 28th to on or about
4  the 31st, and I don't recall specifically, there was a
5  day that I had off in September that I remember going
6  on my crutches to spend one of the last days of the
7  summer at the shore, since I entirely missed the
8  family vacation that had been scheduled due to my
9  injury. I couldn't swim and didn't go near the
10 water. I sat on a bench and looked out over the
11 ocean, and for that moment, life was pleasurable. The
12 next day, I returned to work and treated rather coldly
13 by Gary Weinstein. There was no routine.
14   Q. That may be the answer. I'm not asking you
15 currently specific events. I'm trying to find out how
16 you were living your life during that time frame, and
17 I'm hearing you say you were able to get up in the
18 morning, brush your teeth, get breakfast, do normal
19 things; right?
20   A. With difficulty ambulating.
21   Q. So that the limitation that you had was with
22 respect to some limitations on your ability to walk?
23   A. I would say serious limitations on my
24 ability to walk; i.e., I couldn't walk without a

Page 181

1  device.
2    Q. When you say device, you're talking about a
3  cane at this point in time; right?
4    A. A crutch or a cane occasionally. In early
5  September, which is the period you queried me about, I
6  was using them both.
7    Q. And then, as I understand it, the prognosis
8  was that you would be able to walk without a cane in a
9  relatively short amount of time.
10   A. I don't have that level of understanding.
11   Q. By November of 2000, you were able to walk
12  without a cane based on your exercise regimen?
13   A. I would say in the latter part of the year,
14  and I won't warrant November of 2000, but in December,
15  I could take short steps for periods without using a
16  cane. Through a lot of hard work on my own, it
17  progressively improved, but prospectively as of the
18  date of my discharge from Harleysville, as I said
19  previously, nobody knew when or if I'd be able to walk
20  normally again. I needed to use a device at that
21  point in time, and it was clear to anyone who could
22  see me that there was a problem with my gait.
23   Q. But you could walk with the help of a
24  device. You could do everything that you needed to do

Page 182

1  to go about your daily life activities?
2    A. Well, my daily life activities were impacted
3  by my ability to ambulate.
4    Q. That's not my question. You were, with some
5  limitation on your ability to ambulate, able to do all
6  of your daily life activities?
7    A. Well, my daily life activities prior to my
8  injury involved a lot of athletic and outdoor
9  activities that I couldn't do at that point because of
10  my injury.
11   Q. What were those?
12   A. I was an avid mountain biker. I previously
13  raced mountain bikes. I don't do that now. I seldom
14  ride. I still ride occasionally, but not frequently.
15  I used to kayak. I sold the kayak and never kayaked
16  again and haven't since. I used to hike in the
17  outdoors in the wilderness. Very seldom will I
18  attempt to do that now. I don't consider myself quite
19  as safe doing it as I once did.
20   Q. But you will do it on occasion?
21   A. Not to the same degree that I did before,
22  but as of the date of my discharge, I couldn't do it
23  at all.
24   Q. The limitations you had were on mountain

Page 183

1  biking, kayaking and serious hiking?
2    A. You asked me about my life-style and
3  activities, and those are some of my activities.
4    Q. Is there anything else of that ilk that you
5  weren't able to do?
6    A. I couldn't climb a ladder at that point, so
7  if I was in a situation where I had to climb a ladder,
8  I probably wouldn't be able to do it.
9    Q. Climbing a ladder was not something you
10  needed to do on a daily basis?
11   A. Well, in terms of the job situation, there
12  may have been a necessity at some point to observe an
13  elevated or a lowered operational exposure at a
14  client.
15   Q. Mr. Vail, please, listen to my question.
16  It's not something you needed to do on a daily basis?
17   A. It depends. There was no routine. There
18  could have been five days in a row that that may have
19  been a requirement.
20   Q. At any point in time that you were working
21  at Harleysville, did you have to climb a ladder five
22  days in a row?
23   A. No.
24   Q. At any time, did you have to climb a ladder

Page 184

1  that you can think of?
2    A. Many times.
3    Q. When did that occur?
4    A. Not in my time at Harleysville because I
5  hadn't yet had the opportunity to get back into the
6  field.
7    Q. My question was at Harleysville. Anything
8  else, other than the mountain biking, kayaking,
9  serious hiking and climbing a ladder?
10   A. I couldn't drive a car until I was medically
11  cleared to do so.
12   Q. We're talking about early September when you
13  had been medically cleared.
14   A. I could drive at that point.
15   Q. Anything else, other than the four things we
16  mentioning; mountain biking, kayaking, serious hiking
17  and climbing a ladder?
18   A. The disruption in my life basically revolved
19  around the inability to ambulate the same way I could
20  before. That's what I can think of right now. There
21  may have been others that may come to mind, given
22  enough time to think about it.
23   Q. I'm giving you the opportunity now. This is
24  your deposition.

Page 185

1    A. That's what I can think of right now.
2    MR. HALLER: Could we take a
3  five-minute break?
4    MS. HUTNIK: Sure.
5    (Break taken in the proceedings from
6  3:38 PM to 4:00 PM.)
7    (Whereupon exhibits Vail-26 through
8  Vail-28 were marked for identification.)
9  BY MR. HALLER:
10   Q. Mr. Vail, I've shown you three documents
11  marked 26, 27 and 28 respectively, and I'd like to ask
12  you about exhibit-26 first. This is a letter you sent
13  to Dr. Spence Reid on August 25th concerning your
14  return to work and a request for a supplementary
15  disability record form; is that right?
16   A. Yes.
17   Q. In it, you say that the doctor released you
18  to return to work at the office with a 30-pound
19  lifting restriction effective August 21st, 2000. Do
20  you see that?
21   A. Yes, I do.
22   Q. You make no mention of any other
23  restrictions at that point in time; do you?
24   A. Not in this letter.

Page 186

1    Q. Am I correct in understanding your testimony
2  that you were contacted by Luanne Arcaro at some point
3  after your return to say that the company had not
4  received any kind of authorization for you to return
5  to work?
6    A. My recollection is the same as this E-mail
7  on or about September 6th; that she sent me a message
8  about the doctor's note from work.
9    Q. As of 4:36 PM on September 6th, the company
10  didn't have any documentation of the release to work?
11   A. I don't know what they had. I don't recall
12  being asked to provide one before this time.
13   Q. You had not provided anything?
14   A. No.
15   Q. To your knowledge, Dr. Spence Reid did not
16  provide anything?
17   A. Other than what he might have sent them on
18  the previous disability forms. I don't recall which
19  exhibit and what date that was.
20   Q. Back in June.
21   A. That would be my understanding.
22   Q. So Luanne contacted you on September 6th at
23  3:57 PM to say she hadn't received a doctor's note,
24  and you responded at 4:36 PM saying that you hand

Page 187

1  delivered a signed original authorization?
2      A. Yes.
3      Q. So that was sometime after 3:57, but before
4  4:36?
5      A. Yes.
6      Q. Do you have exhibit-28 in front of you?
7      A. Yes, I do.
8      Q. Do you see that that exhibit includes a copy
9  of the return-to-work slip that you provided, which is
10  the one that makes no mention of any restriction, and
11  it has at the top received 9-6-00 from Ken Vail with
12  the initials LMA?
13      A. Yes.
14      Q. That would be what you gave Luanne Arcaro on
15  the 6th of September sometime after 3:57 PM?
16      A. Yes. As I mentioned earlier, I
17  inadvertently had two of these versions and gave her
18  the one that I could readily access.
19      Q. So as far as the medical documentation at
20  that point in time in Harleysville's possession, you
21  were cleared to return to work without any
22  restrictions?
23      A. This document doesn't indicate restrictions
24  that were discussed with the physician.

Page 188

1      Q. Understood. All I'm saying is that from the
2  perspective of what Harleysville was told by your
3  doctor based on the note that you gave them, there
4  were no restrictions?
5      A. Based on this note. The restrictions that
6  had been verbally discussed with Gary Weinstein and
7  also I had discussed with Dr. Reid and also with the
8  nurse practitioner were not indicated in this
9  document.
10      Q. What did you discuss with Gary Weinstein?
11      A. That I had serious mobility restrictions;
12  that I couldn't travel unless it was absolutely
13  necessary for business; that there was still somewhat
14  of restriction on what I could and what I couldn't do
15  based on the types of configuration of terrain and how
16  far away it might be; that I couldn't lift bulky,
17  heavy items.
18      Q. When did you have this conversation with
19  Gary Weinstein?
20      A. I remember having it again specifically when
21  he asked me to move the heavy boxes of files that were
22  sitting on the floor that were basically left over
23  from the previous branch manager.
24      Q. Let's take it in stages. In terms of any

Page 189

1  medical documentation, you would agree that what was
2  provided to Harleysville as of the 6th did not contain
3  any reference to limitations?
4      A. I don't recall what the previous disability
5  sheet said. Maybe we can go back to that exhibit, and
6  I can answer your question. I don't recall what it
7  said.
8      Q. You have no idea of when that was received
9  by Harleysville?
10      A. I never received that document, so I
11  wouldn't know.
12      Q. So based on what you had given them, there
13  were no restrictions?
14      A. In print, yes.
15      Q. You attended a loss prevention seminar in
16  late August?
17      A. Yes.
18      Q. You did a presentation at that seminar?
19      A. I did.
20      Q. How many days was the seminar?
21      A. On or about the 28th through the 31st.
22      Q. Was that for everyone in the loss control
23  group?
24      A. My understanding is that the entire loss

Page 190

1  control organization was to be there.
2      Q. Did you spend the whole time at the
3  seminar? Were you there for the whole thing?
4      A. My recollection is that I was.
5      Q. Where was the seminar?
6      A. I recall it was at a Holiday Inn in the
7  Harrisburg area.
8      Q. You drove to Harrisburg from your house?
9      A. I did.
10      Q. Approximately how long a drive is that?
11      A. If I were to estimate from my home to that
12  facility, approximately 80 miles to 85, perhaps.
13  That's just a guess.
14      Q. You actually did a presentation at the
15  seminar?
16      A. I did.
17      Q. Were you using a cane at the seminar?
18      A. I was using both a crutch and a cane
19  interchangeably.
20      Q. Were you using a single crutch?
21      A. A single crutch. Not at the same time. I
22  said interchangeably.
23      Q. So when you used the crutch, you would not
24  have weight on your leg; is that right?

Page 191

1      A. Well, the purpose of using the assistive
2  device was to have more stable ambulation than what I
3  could do otherwise. I couldn't walk without the
4  device.
5      Q. But you could put pressure on your leg?
6      A. I could put some pressure, but I couldn't
7  put full weight bearing on it.
8      Q. So you were using both a cane and a crutch
9  during that seminar?
10      A. Yes.
11      Q. Do you recall having any conversations with
12  Gary Weinstein during that seminar about your
13  performance?
14      A. Not specifically in the context of my
15  performance. I remember having conversations with
16  Craig Campbell and Gary Weinstein about scheduling of
17  work and assignment of work.
18      Q. What do you recall being discussed?
19      A. That we would make some reassignments among
20  individuals based on the work-load pattern that the
21  people had in hand currently.
22      Q. Anything else that you can recall being
23  discussed about work assignments?
24      A. Not specifically.

Page 192

1      Q. Do you recall where you were on catching up
2  with the QC reports and the vendor reports and
3  recommendations at that time?
4      A. I don't recall specifically where that was.
5      Q. Were you aware that members of your staff
6  made complaints about you to Alice Geckeler during
7  that seminar?
8      A. What I'm aware of is that the human
9  resources department and Gary Weinstein assembled my
10  staff immediately after a human resources seminar on
11  various aspects of harassment and different types of
12  treatment.
13      Q. Alice Geckeler was there making a
14  presentation?
15      A. I believe so. I recall that she was.
16      Q. At what point in the seminar was that
17  presentation?
18      A. That was, to my recollection, near the end.
19  Whether it was the very last one, I can't recall
20  specifically, but I'm sure the agenda from that
21  seminar would show it.
22      Q. How do you know that your staff met with
23  Alice Geckeler?
24      A. Gary Weinstein told me that he was

Page 193

1 assembling the staff to meet with Alice Geckeler in a
2 closed-door session, and I should not be there.
3    Q. When did he tell you this?
4    A. I don't recall specifically what time of
5 day, but it was somewhere near the end of the
6 seminar.
7    Q. So he told you this was going to happen at
8 the seminar?
9    A. Correct. The way it was portrayed to me was
10 that it was in the context of soliciting staff
11 feedback.
12    Q. So Gary Weinstein came up to you at some
13 point towards the end of the day of that third day of
14 the seminar; right?
15    A. I don't recall specifically what day it was,
16 but it was near the end.
17    Q. Do you remember where you were when this
18 conversation occurred?
19    A. Not specifically. I have a vague
20 recollection that we may have been by ourselves in the
21 seminar room after the other participants had left for
22 the day. Alternatively, and I'm speculating, but I
23 don't recall specifically, the other place it could
24 have been, and I don't have a specific recollection of

Page 194

1 where that was, was in the lobby of the hotel on one
2 of the couches. I don't recall specifically.
3    Q. What do you remember as specifically as you
4 can recall from beginning to end in chronological
5 order that Gary said to you?
6    A. I don't recall specifically what he said,
7 other than that he was gathering the staff together to
8 meet with Alice Geckeler to solicit feedback, and I
9 thought that was kind of odd, but I found Mr.
10 Weinstein to be somewhat unpredictable over the course
11 of my association with him, so that type of behavior
12 in and of itself wasn't necessarily strange for him.
13    Q. My question was what was said.
14    A. I don't recall specifically what was said,
15 other than what I've already portrayed to you.
16    Q. Beyond what you've just said, you have no
17 information as to how that meeting came about?
18    A. No, other than that's what I was told. I
19 was also told after that meeting that there would be a
20 debrief of what information was gleaned at that
21 meeting, and the pretext for summoning me on September
22 7th was to have that feedback discussion. I had no
23 idea I was about to be discharged.
24    Q. I'm trying to go sequentially through this.

Page 195

1 Try to answer the question as asked. Beyond being
2 told that Gary Weinstein was assembling your staff to
3 meet with Alice Geckeler, you have no information as
4 to how that came about?
5    A. No.
6    Q. You were not privy to the discussions that
7 occurred between your staff and Alice Geckeler?
8    A. No. Quite to the contrary, I was
9 specifically told not to be in attendance.
10    Q. So you obviously did not go to the meeting.
11 Did anyone report to you what had occurred at the
12 meeting?
13    A. No.
14    Q. Did you leave Harrisburg whilst that meeting
15 was going on?
16    A. My recollection was that the Mid-Atlantic
17 staff were retained for that discussion, and that all
18 others were free to leave. I specifically was asked
19 not to stay.
20    Q. So you left?
21    A. I left.
22    Q. You have no knowledge as to the internal
23 discussions within Harleysville about the information
24 that they received from that group meeting?

Page 196

1    A. No. None of that was shared with me. In
2 fact, I expected the debrief to happen, and that it
3 would be shared with me, but that never took place.
4    Q. Did you at any time talk to members of your
5 staff to try and find out what had been said at the
6 meeting?
7    A. After the discharge was effected, I had
8 called one individual who did not return the call, and
9 I received a call from Craig Campbell who had assumed
10 some, if not all of the responsibilities that I had,
11 and Craig asked me not to call anyone else. I honored
12 that wish.
13    Q. So you really got no information?
14    A. None.
15    Q. Sitting here today, you have no additional
16 information as to what happened at that meeting?
17    A. Well, there were some scribble notes
18 produced to the EEOC. I found them repugnant to go
19 through, so I didn't go through them page by page. I
20 have no knowledge as far as anybody participating in
21 that meeting as far as what was said or what the
22 context was. Nothing was shared with me.
23    Q. When you say you found it repugnant to go
24 through those notes, what do you mean by that?

Page 197

1    A. What I saw in my recollection were issues
2 that were taken out of context and twisted almost as
3 if there was a conspiracy that those kind of comments
4 were openly solicited, but I have no knowledge because
5 I wasn't at the meeting, nor was I debriefed about its
6 contents.
7    Q. You are aware, based upon those notes, that
8 there were complaints made by your staff about your
9 management style and interaction with them?
10    A. I found the notes hard to decipher, but I
11 could make out bits and pieces enough to know that
12 there were concerns that were shared. Again, this is
13 all well after the termination.
14    Q. So that Harrisburg meeting was right at the
15 end of August. Was there Labor Day somewhere in
16 between?
17    A. That's my recollection.
18    Q. Was the 6th your first day back at work
19 after Labor Day?
20    A. After the Labor Day holiday, no, I don't
21 believe so. I don't have a calendar in front of me,
22 so I can't recall the specific sequence of dates. It
23 may have been the 4th or 5th. The 6th would have been
24 a Wednesday. I believe the 5th was a Tuesday. So my

Page 198

1 basic recollection is that would have been on or about
2 the Tuesday I came back to work, and I remember
3 spending time in the office that day.
4    Q. The next day, you were supposed to go on a
5 field trip?
6    A. The next day, in fact, I did.
7    Q. Did you have any interaction with Mr.
8 Weinstein either on the 5th or 6th that you can
9 recall?
10    A. Mr. Weinstein would have spoken with me on
11 the 5th. Mr. Weinstein called me on the 6th as I was
12 en route, as I had mentioned before, to go to the
13 Susquehanna branch office, and Mr. Weinstein directed
14 me to return to the Harleysville home office that day;
15 to basically terminate my trip to Maryland where I was
16 headed and turn around and come back.
17    Q. Was it in the morning that you had that
18 conversation with him?
19    A. Yes, it would have been on or about late
20 morning. There may be cell phone records that may
21 establish the exact time.
22    Q. You came back to the office about what
23 time?
24    A. I don't recall specifically. It was

**Page 199**

1 afternoon, perhaps mid afternoon.
2    Q. Did you speak to Mr. Weinstein that
3 afternoon?
4    A. Yes, I did. Mr. Weinstein told me that he
5 intended to arrange a meeting with Alice Geckeler and
6 myself to go through the staff feedback that had been
7 collected at that meeting at the seminar in
8 Harrisburg.
9    Q. Do you remember what time of day he said
10 that to you?
11    A. It would have been after my return. I'm
12 just guessing. I don't remember specifically, but it
13 would have been late afternoon.
14    Q. Did you have any other interaction with Mr.
15 Weinstein on that day?
16    A. Which day?
17    Q. September 6th.
18    A. That was the day Mr. Weinstein asked me to
19 move the boxes. We were sitting in his office.
20 "Gary, I can't move boxes right now. Can't that wait
21 until some other time?" He said, yes, it could. He
22 told me he was dissatisfied with my performance. He
23 didn't discuss any specific consequences with that. I
24 expected when he said that we were going to meet with

**Page 200**

1 Alice Geckeler for a debrief, that that's what it was
2 about. I had no idea that he planned to terminate my
3 employment.
4    Q. Anything else you can recall about your
5 interaction with Mr. Weinstein on that day, the 6th of
6 September?
7    A. The most remarkable components that I can
8 recall on the 6th were being called to return to the
9 home office because there was an urgent meeting he
10 wanted me to have with Alice Geckeler. I got back to
11 the office. Mr. Weinstein avoided me for most of that
12 period, and then later, he came out to speak with me
13 and summoned me to his office. I took my crutch or
14 cane, whatever I had at the time, and went over to his
15 office. We had the discussion. He asked me about the
16 boxes. We already talked about that. The meeting
17 that was supposed to be so urgent never took place, so
18 he asked me to return to the office again tomorrow on
19 the 7th, which I did.
20    Q. So the next day you came in, and at some
21 point, you had a meeting with Alice Geckeler and Gary
22 Weinstein?
23    A. Yes. I don't remember exactly when that
24 was. It could have been mid to late morning. Most of

**Page 201**

1 that morning, Mr. Weinstein had avoided eye contact
2 with me. I didn't know what to make of that. He
3 summoned me to the meeting. He was apparently already
4 in Miss Geckeler's office and called me to come over,
5 which was on the far side of the facility at that
6 time, but it was quite a distance to get to, so it
7 took me some amount of time to get there. They
8 invited me into the office. The first thing I asked
9 is, and I have a specific recollection of this,
10 "Before we get started, can you tell me where it
11 stands with posting the open position on the
12 Monster.com website?" I was recruiting for a loss
13 control representative at that point. Alice Geckeler
14 deferred that answer to Gary, and we never really got
15 into it. I remember Gary Weinstein told me that
16 things weren't working out. I can't recall the exact
17 language. I don't have a transcript. I didn't take
18 specific notes of what was said. I do recall in
19 general he said that my employment was being
20 terminated. I was surprised by that. I didn't expect
21 that. I truly expected that he was honoring his word
22 to bring me in for a debrief with staff, which never
23 occurred.
24    Q. Can we focus on what was then as opposed to

**Page 202**

1 your comment?
2    A. We can do that.
3    Q. So he told you that he was terminating your
4 employment?
5    A. Yes, he did. Since he had told me the
6 comment the previous day that he was dissatisfied with
7 my performance, I asked, "Is there a reason I'm not
8 being offered a performance improvement plan?" I
9 asked that question to Alice Geckeler. Miss Geckeler
10 put her hands up and gestured toward Mr. Weinstein and
11 kind of shrugged her shoulders for him to answer. Mr.
12 Weinstein answered that question by stating, "You're
13 at the level in the organization that we don't have to
14 follow those procedures." I was given a packet of
15 information, and when I opened the packet of
16 information, what it said was that my job had been
17 eliminated. There was a reduction-in-force inventory
18 attached to it that showed the individuals who were
19 impacted as a result of the reduction in force. There
20 was a severance agreement that was included in the
21 packet that said that my performance was acceptable or
22 satisfactory. I can't remember the exact language.
23 If I would sign off on the severance agreement, I
24 would be eligible for certain resources, which

**Page 203**

1 included a one-time payment plus extension of COBRA
2 benefits plus whatever else the agreement said, which
3 I'm sure you can go through specifically if you wish.
4    Q. At some point soon thereafter, you went and
5 consulted with a lawyer; is that right?
6    A. The severance agreement paperwork suggested
7 that this document be run through legal counsel, and I
8 followed that suggestion and went to see counsel.
9    Q. Then your counsel corresponded with
10 Harleysville about the severance package; is that
11 correct?
12    A. Yes. I had authorized counsel to write to
13 Catherine Strauss, who by my recollection was the
14 senior human resources officer for Harleysville,
15 requesting her to give consideration to what I
16 considered to be more equitable compensation for
17 severance, given the nature and character with which
18 the discharge was conducted.
19    Q. Then do you recall that your counsel
20 received a letter explaining that the paperwork
21 reflecting a reduction in force had been given to you
22 in error; that that was not the situation?
23    A. I understand that Harleysville's counsel
24 wrote that letter, and I disagree that the premise was

**Page 204**

1 in error. I remember my counsel received that
2 letter.
3    Q. So you were aware shortly after your
4 termination that from Harleysville's perspective, this
5 was a termination for performance reasons and not a
6 reduction in force?
7    A. At that point, paperwork I had been given
8 was clear as to reduction in force.
9    Q. I understand, Mr. Vail, but that was given
10 to you. Very soon thereafter, somebody from
11 Harleysville explained that that paperwork was given
12 in error, and this was a performance-based
13 termination?
14    A. There was another provision.
15    Q. Can you answer my question? That's what
16 happened; isn't it? I didn't ask you about another
17 provision right now.
18    A. Please, restate the question.
19    Q. The question was: Shortly after you
20 received the package, your counsel was put on notice
21 by Harleysville that the package stating there was a
22 reduction in force was given to you in error?
23    A. That's my understanding.
24    Q. You have no personal knowledge as to the

Page 205

1 circumstances under which that package was put
2 together; do you?
3  A. I'm not sure I understand the question.
4  Q. You have no personal knowledge how it came
5 about that the package saying that there was a
6 reduction in force came to be put together and handed
7 to you?
8  A. All I know is that Alice Geckeler signed the
9 letter. What I don't know is who may have been
10 involved in crafting the decision.
11  Q. You personally have no firsthand knowledge
12 as to the reasons for your termination?
13  A. Other than what was shared with me with the
14 documents on September 7th.
15  Q. Gary Weinstein told you in the meeting that
16 you were being terminated for performance reasons,
17 didn't he, on September 7th?
18  A. I don't recall that language being used.
19 What I recall specifically was that it's a poor-fit
20 issue. I don't recall ever being given anything that
21 said that I was being terminated for performance.
22 Quite the contrary, I was given a document that said I
23 was being terminated for reduction in force. There
24 was no discussion by Gary Weinstein that I was being

Page 206

1 terminated because of performance, and Alice Geckeler
2 told me that was a fit issue.
3  Q. She told you that --
4  A. She told me it was a poor fit.
5  Q. Please, let me finish my question.
6  A. I thought you were finished.
7  Q. She told you that the company decided that
8 you were not a good fit for the organization?
9  A. That's the gist of it.
10  Q. Did you understand that in the circumstances
11 of the performance counseling you'd received from Mr.
12 Weinstein plus the complaints received from your
13 direct reports that Harleysville did, in fact, reach
14 the conclusion that this was obviously not a good fit
15 for the organization?
16   MS. HUTNIK: I'm going to object to the
17 form.
18 BY MR. HALLER:
19  Q. You may answer.
20  A. Please, restate the question. I don't want
21 to presume I remember it.
22  Q. When you were told in the termination
23 meeting that you were being terminated because of a
24 poor fit, did you understand that the company had

Page 207

1 reached that conclusion based on performance issues
2 that Gary Weinstein had directly raised with you, as
3 well as complaints received from your staff?
4  A. Let's take that as a two-part question
5 because that's what's being asked of me. The first
6 part is the performance issues shared by Gary
7 Weinstein. I had no idea that my job was in jeopardy
8 because of those so-called performance issues. The
9 second part of your question involves complaints from
10 staff. The complaints from staff that were allegedly
11 gathered as of the close of the seminar in Harrisburg
12 were never shared with me at that point, so I would
13 have had no knowledge of what those complaints were.
14 To answer your question, no.
15  Q. Did that thought ever occur to you; that
16 maybe the writing was on the wall, and I understand
17 how the decision was made, although you may not have
18 agreed with it?
19  A. Well, given the fact that I asked the
20 question why wasn't I being offered a performance
21 improvement plan, the notion entered my mind that
22 based on the prior discussion the day before with Mr.
23 Weinstein about performance and then having been lied
24 to for the purpose of meeting, it was an appropriate

Page 208

1 question, and I asked it. I think the answer to your
2 question is, yes. However, the answer I got was
3 something very different. I wasn't told expressly
4 that it wasn't for performance. I was told that it
5 was a fit issue.
6  Q. When you asked the question about a
7 performance plan, did Mr. Weinstein answer the
8 question?
9  A. He answered the question, but not in a
10 manner that I would have expected based on my
11 knowledge of Harleysville's supervisor orientation
12 session.
13  He said, "We don't have to do that for
14 someone at your level?"
15  A. In essence, that's what he said.
16  Q. Do you have any personal knowledge as to
17 what Mr. Scott Welsh said to Alice Geckeler about his
18 experience with you?
19  A. No.
20  Q. Do you agree that it's an unusual thing for
21 staff members to take up the courage to complain about
22 their manager?
23  A. I've heard of it done briefly, but never
24 like this. I find it highly unusual.

Page 209

1  Q. Do you have any knowledge as to what Jerry
2 Walker told Alice Geckeler about his interaction with
3 you?
4  A. No. In fact, I have no knowledge about what
5 any of the staff said about me. If you want to go
6 through it item by item, you can solve that now.
7  Q. You have not talked to any of them about
8 what they said?
9  A. No. As I told you previously, I made one
10 phone call to one individual, and I was asked not to
11 contact anyone, and I honored that request.
12  Q. In circumstances where staff members have
13 expressed serious concerns about management style and
14 confidence in the manager, do you understand that it's
15 a legitimate conclusion for the company to reach that
16 this isn't a good fit?
17   MS. HUTNIK: Objection to form.
18   You can answer.
19   THE WITNESS: Having been denied, from
20 my perspective, due process under Harleysville's own
21 procedures, no, I don't agree with that as a
22 reasonable conclusion.
23 BY MR. HALLER:
24  Q. Let's put due process aside. I understand

Page 210

1 you're claiming that you should have gone through a
2 performance improvement plan. Would you, at least,
3 concede that when a manager has lost the confidence of
4 his entire staff, whether you agree with it or not,
5 that it's a reasonable conclusion for the company to
6 say this isn't a good fit?
7  A. I don't have the knowledge to speak to your
8 basic premise. I don't know what was said. I don't
9 know the context. I had no chance to put it in
10 perspective or rebut it at this time. I think there
11 were some very strong personalities that thought they
12 could manipulate the system to buck a demanding boss
13 off their backs, and I think that's exactly what
14 happened.
15  Q. Do you understand that a performance
16 improvement plan necessarily requires the achievement
17 of certain achievable objectives in order to be
18 effective?
19  A. It would be my preference to construct a
20 performance improvement plan where the objectives are
21 reasonable and achievable, yes.
22  Q. Do you understand and agree that it's very
23 difficult to even consider a performance improvement
24 plan when the issues include total loss of confidence

Page 217

1  your question is that's correct.
2      Q. What I'm trying to do is understand your
3  personal knowledge in this case.
4      A. Sure.
5      Q. I appreciate that answer. Other than what
6  you've described in today's deposition, do you have
7  any facts which support your claim for age
8  discrimination?
9      A. One interaction that I had with Craig
10 Campbell prior to the termination involved him
11 incorrectly guessing my age. He had me pegged as
12 early to mid thirties for some reason, and he was
13 quite shocked to find out that I was over 40. I
14 remember him remarking about that. I do know that he
15 did pick up a substantial part of the work-load when I
16 was incapacitated. I would offer you that.
17     Q. Was this in a conversation with him that the
18 issue of your age came up?
19     A. Yes.
20     Q. Can you describe the context to me of that
21 conversation?
22     A. I don't recall specifically what the topic
23 was that led to it, but I do recall that he found it
24 to be remarkable.

Page 218

1      Q. He thought you were younger than you were?
2      A. Correct.
3      Q. Did you take that as a compliment?
4      A. I took that as an observation.
5      Q. Other than what you've just described and
6  your earlier testimony in your deposition, do you have
7  any other facts which you believe support your claim
8  of age discrimination?
9      A. Going back to the original reduction in
10 force paperwork, no other manager similarly in my age
11 group within the loss control services were discharged
12 as a result of that reduction in force.
13     Q. So the older people were retained?
14     A. That's my understanding.
15     Q. It's true, is it not, that, in fact, nobody
16 was being laid off at that time based on that
17 paperwork that you were given?
18     A. I'm sorry. I don't have that
19 understanding. I believe that if we were to go back
20 to the actual reduction in force inventory, you would
21 see that there were other individuals, not necessarily
22 in loss control services, who were impacted by a
23 reduction in force, at least that's what the paperwork
24 says.

Page 219

1      Q. There was nobody in loss control services
2  that was being impacted by a reduction in force; was
3  there, on the paperwork you received?
4      A. Not to my knowledge.
5      Q. Other than what you've now described in this
6  deposition, do you have any other facts to support
7  your claim of age discrimination?
8      A. That's all I can think of right now.
9      Q. Other than what you've described today in
10 your deposition, do you have any other facts to
11 support your claim of disability discrimination?
12     A. Yes. It's quite possible that Harleysville
13 not only perceived me as being disabled, but, in fact,
14 thought that the disability was worse than what it
15 was.
16     Q. I'm not asking for your speculation. I'm
17 asking whether you have any facts, other than what
18 you've described, that would support your claim of
19 disability discrimination.
20     A. What's covered in the complaint and what's
21 been shared in the request for production of documents
22 would speak to the issue of discrimination. The fact
23 that my gait was clearly noticeable to anyone who
24 looked at me in Harleysville. In fact, frequently

Page 220

1  associates at Harleysville asked me what happened and
2  why am I on crutches or why am I walking funny. I
3  would answer them and tell them that I was injured,
4  and I don't know if I'll recover, but hopefully, I
5  will, and I'll do my best to do it. It was clear to
6  anyone that I encountered, whether it was in the
7  cafeteria, in the hallway, somebody who saw me moving
8  slowly, whether it was Steve Vondercrone staring at me
9  from the other side of the room at a seminar. Anybody
10 could tell that I had a serious ambulation problem.
11 Looking at this case with the information that was
12 known to Harleysville about whether I would or
13 wouldn't return to some semblance of even normal
14 ambulation, they had no way to know that. I think we
15 need to look at this case from the decision freeze
16 framed as of September 7th whether they made the
17 determination to discharge me.
18     Q. I'm trying to get at what facts you have.
19 We've been through the deposition and gone through the
20 events that occurred and conversations you've had.
21 I'm not asking for your theory of the case. I'm not
22 asking for your speculation as to what may have
23 happened. I'm just simply asking: From your personal
24 knowledge, is there anything beyond that which you

Page 221

1  have described in your deposition up to the last
2  question and answer, any other facts that you believe
3  support your claim for disability discrimination?
4      A. The facts for my disability discrimination
5  really revolves around the ambulation issue, and as I
6  can recall it at this point, the information that's
7  been shared with the EEOC and in the complaint and
8  introduced for discovery covers that issue. I can't
9  think of anything else right now.
10     Q. If we freeze frame it, as you suggested, as
11 of September 7th, you agree, do you not, that what the
12 company was told in a return-to-work slip was that you
13 were free to return without restriction?
14     A. I disagree with that statement. Based on
15 the document --
16     Q. Based on what document?
17     A. The one I'm referring to is the one that Dr.
18 Spence Reid sent to human resources in Harleysville
19 having the restriction on weight lifting and the
20 reduction on ambulation. There were three
21 restrictions in that document. We can go back to it.
22     Q. But you have no knowledge, and we've talked
23 about this before, when that was received by
24 Harleysville?

Page 222

1      A. Other than the date that's on it.
2      Q. Throughout the summer of 2000, you were
3  telling Mr. Weinstein that you expected to make a full
4  recovery; correct?
5      A. I expected to. Whether I could, who knew?
6      Q. And it was your position throughout the
7  summer that you were able to perform the essential
8  functions of your job with the modifications that were
9  made to your schedule; right?
10     A. I thought so at the time.
11     Q. When you were ready to come back to work,
12 you thought you were able to fully perform your job as
13 of August 21st, 2000?
14     A. What I thought at that point on August 21st
15 of 2000 was I was increasingly able to perform all
16 aspects. In terms of ambulation on field construction
17 sites and whatnot, that would not have been my
18 expectation at that point in time.
19     Q. Did you personally make any written requests
20 to Gary Weinstein or anyone else at Harleysville for
21 any limitations on your work after August 21st?
22     A. Other than the documents that have been
23 shared, I don't recall any specifically. Gary and I
24 had oral conversations around that issue.

Page 223

```
 1   Q. Did you make a request to Gary orally for
 2 any modifications or limitations to be in effect after
 3 your return to work on August 21st?
 4   A. Yes.
 5   Q. What specifically did you request of him
 6 orally?
 7   A. On September 6th, I asked him to defer
 8 handling the clean-up of those various boxes of
 9 materials and files, among others.
10   Q. Which he respected. Anything else?
11   A. We talked about the restriction on travel to
12 the point where I could get up to full speed on going
13 out to, say, western Pennsylvania again, which at that
14 point, I really wasn't prepared to do. Other than
15 those, there are none that I can recall at this
16 point.
17   Q. So beyond what we've now discussed in the
18 deposition, is there anything else that you believe
19 would support your claim for disability
20 discrimination?
21   A. Not that I can think of right now.
22   Q. As far as you're aware from the company's
23 perspective, they were of the belief that you should
24 be able to fully perform your job as of August 21st?
```

Page 224

```
 1   A. I don't know what the company believed.
 2   Q. So we'd have to ask Gary Weinstein, Alice
 3 Geckeler and others as to what they believed?
 4   A. I think that would be a reasonable
 5 expectation.
 6   Q. In response to interrogatories, you listed
 7 Steve Vondercrone who might have information relevant
 8 to this case. Could you explain what information he
 9 may have?
10   A. He, as I recall, was Harleysville's general
11 counsel, and I don't know specifically what
12 documentation or consultations he may have been
13 involved in, but I do know that when I returned after
14 August 21st, I was involved in a seminar that he was
15 also involved in, and I noticed a distinct change in
16 his demeanor, in which he looked at me quite different
17 than he did before my injury. My inference from that
18 is that he seemed to know something that I didn't.
19 What that something was is yet to be discovered from
20 my perspective.
21   Q. Did you have any dealings with him before
22 you went out on your injury? Did you have any direct
23 contacts with him before you went out on your medical
24 leave?
```

Page 225

```
 1   A. Yes.
 2   Q. In what context did you deal with Steve
 3 Vondercrone?
 4   A. He was a presenter in one of the seminars.
 5 I believe it was the supervisory orientation session,
 6 if I'm not mistaken. He was, at the time, pinch
 7 hitting for one of his associates who, I believe, was
 8 sick. He actually presented it to the class.
 9   Q. You were in a class environment?
10   A. Yes.
11   Q. Did you have any one-on-one contact with
12 him?
13   A. I did. We had some discussion. I told him
14 I thought he did a nice job in the seminar. We talked
15 a little bit about some of the concepts. It was maybe
16 a five-minute discussion.
17   Q. When was the next time you had any direct
18 dealings with him?
19   A. Direct dealings were visual in nature after
20 my return after August 21st. I don't recall the exact
21 date. It may have been on or about August 23rd.
22 There was some seminar that I was scheduled to be in
23 that had been scheduled before my injury that he
24 apparently was also participating in.
```

Page 226

```
 1   Q. Did you have any conversation with him?
 2   A. I think I might have said hello to him.
 3   Q. Did he say hello back?
 4   A. I believe so.
 5   Q. Did anything else transpire between the two
 6 of you?
 7   A. Not that I can recall on that day.
 8   Q. Did you have any other dealings with him?
 9   A. Other dealings with him? I've seen him out
10 and about, but not in any way connected to business or
11 personal discussions.
12   Q. So what you've just described is the full
13 extent of what you believe is his involvement in this
14 case?
15   A. That's my personal knowledge. I've given
16 you the best I have to explain it.
17   Q. So you just have some vague perception that
18 he looked at you differently in August than in the
19 earlier seminar?
20   A. It's a specific recollection. It's not
21 vague. What involvement he may have will have to be
22 discovered.
23   Q. Could you describe the look? I don't really
24 understand your testimony. You said hello to him, and
```

Page 227

```
 1 he said hello to you. What else happened
 2 specifically?
 3   A. It was a long, blank stare, a stone-faced
 4 stare like I wasn't even there.
 5   Q. Maybe he didn't remember you.
 6   A. Perhaps not.
 7   Q. So you really don't know what is behind the
 8 blank stare?
 9   A. Not specifically, no.
10   Q. Could he have been preoccupied with
11 something else?
12   A. I'd just be speculating.
13   Q. We have not received the seminar materials
14 that you claim were produced to your counsel
15 concerning the orientation. I would request that to
16 the extent that you have those that they be produced.
17   A. Please, make your request to counsel.
18   Q. I'm doing it on the record.
19     MS. HUTNIK: I'll contact you.
20 BY MR. HALLER:
21   Q. Since September 7th, 2000, have you
22 undergone or received any treatment for any mental or
23 emotional problems?
24   A. No.
```

Page 228

```
 1   Q. Other than what you've described in terms of
 2 the activities such as mountain biking, kayaking and
 3 serious hiking, have there been any other significant
 4 changes in your life-style since your injury?
 5   A. You mean at the time of my discharge, or do
 6 you mean now?
 7   Q. I mean in general terms in that entire
 8 period of time.
 9   A. In general terms, let's go back to September
10 7th. There were significant reductions in what I
11 could and couldn't do ambulation-wise. You asked the
12 question. I'm just answering it.
13   Q. Other than that.
14   A. I had restrictions on travel, which I think
15 I addressed previously. I don't want to rehash ground
16 we've already been over.
17   Q. Did you have a strong relationship with your
18 wife?
19   A. In the context of our relationship, if
20 you're asking physically did we continue to have
21 relations, no, that was seriously impacted as a result
22 of the injury. I'd prefer not to get into those
23 details, as I'm sure you could appreciate.
24   Q. I understand that in the early stages of
```

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

— — —

| | | |
|---|---|---|
| KENNETH T. VAIL, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 02-CV-2933 |
| VS. | : | |
| | : | |
| HARLEYSVILLE GROUP, INC., | : | |
| Defendant. | : | |

— — —

Friday, June 11, 2004

— — —

Oral Deposition of KENNETH T. VAIL,
taken pursuant to notice, at the Law Office of Donald
P. Russo, 117 East Broad Street, Bethlehem,
Pennsylvania, beginning at 3:40 PM, before Dennis
Corsi, Registered Professional Reporter and Notary
Public.

— — —

DENNIS CORSI COURT REPORTING
Registered Professional Reporters
814 Park Avenue
Collingswood, New Jersey 08108
(856) 854-7223

CONDENSED TRANSCRIPT WITH KEY-WORD INDEX

Page 236

```
 1
 2
 3              IN THE UNITED STATES DISTRICT COURT
 4          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 5
 6   KENNETH T. VAIL,          :    CIVIL ACTION
 7          Plaintiff,         :
         vs.                   :    NO: 02-CV-2933
 8   HARLEYSVILLE GROUP, INC., :
 9          Defendant.         :
10                             ---
11               Friday, June 11, 2004
12                             ---
13          Oral Deposition of KENNETH T. VAIL,
14   taken pursuant to notice, at the Law Office of Donald
15   P. Russo, 117 East Broad Street, Bethlehem,
16   Pennsylvania, beginning at 3:40 PM, before Dennis
17   Corsi, Registered Professional Reporter and Notary
18   Public.
19                             ---
20
21
22          DENNIS CORSI COURT REPORTING
23           Registered Professional Reporters
              814 Park Avenue
24           Collingswood, New Jersey 08108
                  (856) 854-7223
```

Page 237

```
 1
 2   APPEARANCES:
 3       MICKEY K. THOMPSON, ESQUIRE
          Law Office of Donald P. Russo
 4         117 East Broad Street
           P.O. Box 1890
 5         Bethlehem, PA  18016-1890
 6             Counsel for Plaintiff
 7       ANTHONY B. HALLER, ESQUIRE
          Blank Rome, LLP
 8         One Logan Square
           18th and Cherry Streets
 9         Philadelphia, PA  19103-6998
10            Counsel for Defendant
11                             ---
12           (It is stipulated by and between
13    counsel for the respective parties that signing,
14    sealing, certification and filing are waived; and
15    that all objections, except as to the form of the
16    question, are reserved until the time of trial.)
17                             ---
18          ...KENNETH T. VAIL, having been duly
19    sworn, was examined and testified as follows...
20                             ---
21
22
23
24
```

Page 238

```
 1  BY MR. HALLER:
 2     Q. Good afternoon, Mr. Vail. This is the
 3  resumption of your deposition. I want, first of all,
 4  to just go back through the ground rules which we had
 5  established to make sure they're fresh in your mind.
 6  First of all, would you agree to answer the questions
 7  that I ask fully and to the best of your knowledge?
 8     A. Yes.
 9     Q. If you don't understand a question that I
10  ask, please, would you tell me?
11     A. I will.
12     Q. If you don't say anything, I'll assume that
13  you've understood the question. Is that fair and
14  understood?
15     A. I understand.
16          MR. THOMPSON: Before we begin, I
17  believe we've agreed that there was an hour's length
18  of deposition today.
19          MR. HALLER: I believe we have an hour
20  left. What I'd like to do is try and finish whatever
21  we need to do without going to the court. I think we
22  can do it in an hour.
23          MR. THOMPSON: Okay.
24  BY MR. HALLER:
```

Page 239

```
 1     Q. Mr. Vail, I'm going to put before you what
 2  we'll mark as Vail deposition 30.
 3          (Whereupon exhibit Vail-30 was marked
 4  for identification.)
 5  BY MR. HALLER:
 6     Q. Mr. Vail, do you recognize this to be a
 7  complaint that you and your wife filed against an
 8  individual named Peter Gill in connection with the
 9  injury that you sustained on or about June 2nd, 2000?
10     A. Yes, I remember filing a complaint. I can't
11  recall the exact word-by-word. If you care for me to
12  read it, I will.
13     Q. I'm just asking you generally if you
14  recognize this document.
15     A. Generally, yes.
16     Q. If you go to the second but last page, do
17  you see that there is a verification with your
18  signature on it?
19     A. I do.
20     Q. That is your signature; is it not?
21     A. It is.
22     Q. Do you in general terms, and, please, refer
23  to the document if you want, recollect that in the
24  lawsuit that you brought against Mr. Gill that you
```

Page 240

```
 1  claimed that he was negligent when he shot you at the
 2  National Tactical Invitational on June 2nd, 2000?
 3     A. Yes. In general, I recall that was one of
 4  the elements in the complaint.
 5     Q. Do you recall, in your lawsuit, claiming
 6  that as a result of his negligence and your injury
 7  that you had suffered lost wages and other lost
 8  employment benefits?
 9     A. I'd have to look back through the
10  complaint. I don't have a recollection of that.
11     Q. Do you want to go to paragraph 16 of the
12  complaint?
13     A. Yes, that's in the complaint.
14     Q. It's true, is it not, that in the complaint,
15  you allege that you would be unable to pursue your
16  usual occupation for extended periods of time? Do you
17  see that?
18     A. That's what it says.
19     Q. And that you had suffered lost wages and
20  other lost employment benefits. Do you see that?
21     A. Yes, I do.
22     Q. It's true, is it not, that you ultimately
23  agreed to a settlement of your claims against Mr.
24  Gill?
```

Page 241

```
 1     A. Yes, it is.
 2     Q. And that you recovered a significant amount
 3  of money in that lawsuit; isn't that true?
 4     A. There was a settlement, yes.
 5     Q. A settlement of a significant amount of
 6  money; right?
 7     A. I'd like to define a significant amount
 8  of money.
 9     Q. Do you want to tell me what the settlement
10  was?
11     A. I don't recall the specific amount of
12  money. Do you have a settlement sheet that would show
13  it?
14     Q. I may, but if you remember.
15     A. I don't recall specifically.
16     Q. Do you consider $100,000 a significant
17  amount of money?
18     A. It depends on the context.
19     Q. It's true, is it not, that you settled your
20  lawsuit for $385,000?
21     A. I believe that's what the amount was. If
22  you care to show it to me, I'd be happy to look at
23  it.
24     Q. That settlement was for all of the claimed
```

**Page 242**

1 damages that you had brought in the litigation; isn't
2 that correct?
3    A. I don't recall specifically what the
4 settlement sheet spoke to. My recollection of the
5 settlement was that in exchange for a release, there
6 would be an exchange of money payable. I don't recall
7 any specific breakdown as far as what that settlement
8 was.
9    Q. Let me show you a document we'll mark as
10 Vail deposition 31.
11       (Whereupon exhibit Vail-31 was marked
12 for identification.)
13 BY MR. HALLER:
14    Q. Do you have before you what we've marked as
15 Vail deposition 31?
16    A. Yes, I do.
17    Q. Do you recognize this to be the general
18 release that you signed?
19    A. It appears to be.
20    Q. This shows that you were to receive $385,000
21 paid by Allstate Insurance Company paid on behalf of
22 Peter Gill. Do you see that?
23    A. I see it.
24    Q. If you look at the bottom of the page, do

**Page 243**

1 you agree that this release that you signed covered
2 any medical treatment and other benefits, including
3 income loss benefits?
4    A. That's what it says.
5    Q. You agree, do you not, that your settlement
6 covered both your personal injuries and any lost
7 income that you may have received as a result of those
8 injuries?
9    A. That was not my understanding.
10    Q. Do you agree that the settlement covered all
11 of your claims for damages in the case?
12       MR. THOMPSON: I object to the form.
13 BY MR. HALLER:
14    Q. You may answer.
15    A. Could you repeat the question, please?
16    Q. Do you agree that the settlement covered all
17 your claims for damages in the lawsuit?
18    A. That was not my understanding.
19    Q. Well, looking at this document, and you can
20 take a minute to read it --
21    A. What this document says is that the
22 releasors agree to indemnify releasees and their
23 attorneys, and to hold releasees and their attorneys
24 harmless, from any and all existing and potential

**Page 244**

1 subrogation liens in connection with any medical
2 treatment and other benefits, including income loss
3 benefits, rendered to Kenneth T. Vail due to any
4 injuries sustained by Kenneth T. Vail from the subject
5 incident. Nowhere in this document does it say that
6 all wage income losses are included. If I'm
7 misinterpreting something, please, help me to
8 understand it.
9    Q. I'm looking at the first paragraph, Mr.
10 Vail. It says that basically you will be paid
11 $385,000 by Allstate Insurance. Do you agree with
12 that?
13    A. That's what it says.
14    Q. And that in return for that, you would be
15 releasing Allstate Insurance Company and Peter Gill
16 for any and all courses of action involving personal
17 injury. Would you agree with that?
18    A. Yes, I would.
19    Q. You would also agree, would you not, that
20 that release covers all claims, demands, damages,
21 costs, loss of services, expenses, compensation and
22 all consequential damage on account of, or in any way
23 growing out of, any personal injury that you
24 sustained; right?

**Page 245**

1    A. That's what it says.
2    Q. You would agree with me that that
3 description would cover and did cover your claims for
4 lost wages and benefits?
5    A. No, I wouldn't agree with you.
6    Q. Well, let me ask it differently, Mr. Vail.
7 You had a claim, you agree, for lost wages and
8 benefits in the lawsuit against Mr. Gill?
9    A. That's correct.
10    Q. And you did not reserve your right to pursue
11 those claims in addition to the money for which you
12 settled; did you?
13    A. Pursue the claims against whom?
14    Q. Let me try this again. It's very simple,
15 but I assume that you're having difficulty with it.
16 You made a claim, as part of your lawsuit, for lost
17 wages and benefits; did you not?
18    A. I did.
19    Q. And you settled the entirety of your claim;
20 right?
21    A. That's my understanding.
22    Q. As part of the settlement, you settled your
23 claim for lost wages and benefits, as well as your
24 claim for personal injuries; did you not?

**Page 246**

1    A. I settled the claim -- My understanding of
2 the settlement --
3    Q. Could you answer my question?
4    A. Please, ask it again. I didn't understand
5 it.
6    Q. Your settlement covered all of your claims,
7 including your claim for lost wages and benefits;
8 didn't it?
9    A. The settlement releases Mr. Gill from any
10 future claims. I don't have that understanding that
11 you're asking me to speak to.
12    Q. There was nothing left over in terms of your
13 claims after you reached a settlement that's referred
14 to in the general release marked as Vail deposition
15 31; was there?
16    A. Nothing left over against whom?
17    Q. Against Allstate Insurance Company or Peter
18 Gill.
19    A. With Peter Gill and Allstate, that
20 settlement, to my understanding, settled all claims
21 against them.
22    Q. All claims. All I'm asking is: That
23 settlement of all claims included your claims for lost
24 wages and benefits resulting from your injury; didn't

**Page 247**

1 it?
2    A. Against Gill and Allstate, yes.
3    Q. That's all I'm asking. You agree with
4 that?
5    A. Against Gill and Allstate, absolutely.
6    Q. You're not suggesting in this litigation,
7 Mr. Vail, are you, that you're entitled to receive
8 lost compensation from Allstate and Peter Gill for
9 wages and benefits and also get that same lost wages
10 and benefits from Harleysville; are you?
11    A. Which litigation are you referring to?
12    Q. Let me start again. You're not suggesting
13 in this litigation; that is, the case you have against
14 Harleysville, that you are entitled to receive lost
15 income and benefits both from Allstate Insurance
16 Company and from Harleysville for the same period of
17 time; are you?
18    A. I expect to be made whole. I don't believe
19 I've been made whole from Harleysville. The general
20 release that I signed in the context of the Gill
21 litigation had absolutely nothing to do with any
22 release with Harleysville, nor does this release speak
23 to any apportionment of funds relating to lost wages.
24 Therefore, I consider that I have a valid lost wage

Page 248

1  claim against Harleysville.
2    Q. Is it your testimony that there was no
3  apportionment of the wage loss in the litigation
4  against Mr. Gill?
5    A. I don't know what it may have been. I never
6  was presented with any numbers to show any breakdown.
7    Q. This release was signed on the 10th of
8  January, 2003; is that right?
9    A. That's what it says.
10    Q. And your testimony is you don't know the
11  exact apportionment of the $385,000?
12    A. It's my understanding there was no
13  apportionment. It's my understanding that in the
14  context of this settlement, there was never any
15  discussion around any number attached to wage loss,
16  and I had no knowledge that signing such a release
17  would release Harleysville from anything.
18    Q. I think you're sort of assuming things about
19  my question that's probably not appropriate.
20    A. Please, try again.
21    Q. Okay. I thought you said in response to my
22  last-but-one question that you didn't know the details
23  of any apportionment. You didn't know how the
24  $385,000 was apportioned; is that correct?

Page 249

1    A. Well, apportionment in the sense that I knew
2  that my attorney was going to take roughly 33 percent
3  plus expenses right off the top, so the 385,000 that's
4  mentioned in this general release never made it to
5  me. I never saw that money. It went to my attorney.
6  He deducted his fees and expenses. In my discussions
7  with attorneys prior to signing this general release,
8  there was no discussion that I can recall that
9  indicated that in any way future claims against
10  Harleysville would be barred by signing this release.
11  To the contrary, it was my understanding that any
12  action against Harleysville from an employment
13  liability standpoint for damages for lost wages would
14  continue.
15    Q. That having been said, all I'm asking is
16  that of the 385,000, you don't know how much of that,
17  if any, was allocated to the lost wage component of
18  your damage claim as opposed to the personal injury
19  component of your damage claim; do you?
20    A. I don't recall being presented with any
21  information that would show that.
22    Q. You don't know?
23    A. I would agree with that.
24    Q. You do agree in principle with the following

Page 250

1  proposition, which is that if, for example, $100,000
2  of the 385 had been attributable to your lost wages
3  and benefits for the period after your injury that you
4  wouldn't be able to get from Harleysville that amount
5  of money, since you already were compensated for your
6  lost wages?
7    MR. THOMPSON: Object to the form.
8    You can answer.
9    THE WITNESS: That would be for a jury
10  to decide.
11  BY MR. HALLER:
12    Q. Do you think you can double dip? Do you
13  think you can get your lost wages and income from two
14  sources and double up on the losses?
15    MR. THOMPSON: Object to form.
16  BY MR. HALLER:
17    Q. You may answer.
18    A. In no way do I consider it double dipping.
19  I have no understanding that there was any double
20  dipping going on here.
21    Q. I realize, you don't know, it is an
22  assumption, but assuming that a significant portion of
23  the $385,000 was allocated to your claim for lost
24  wages and benefits, do you agree that it would not be

Page 251

1  fair or right for you then to recover for the same
2  period of time lost wages and benefits from
3  Harleysville?
4    A. I reject your assumption.
5    Q. You do? So you think that you can, in fact,
6  in this litigation double dip?
7    A. Let me answer the question again. I think I
8  was misunderstood. I reject your assumption that a
9  significant component was devoted to wage loss.
10    Q. That wasn't my question.
11    A. That's the assumption you asked me to make.
12  I'm objecting to your assumption.
13    Q. I understand. That's what your lawyers
14  object to. I'm asking you hypothetically if there was
15  that allegation that you would agree that it's not
16  fair or right for you to double dip. That's all.
17    MR. THOMPSON: Object to form.
18    THE WITNESS: I don't think there's any
19  double dipping going on here.
20  BY MR. HALLER:
21    Q. Mr. Vail, that isn't my question. Let me
22  try and ask it just in a different way, and then we'll
23  move on. Do you think that it's appropriate for you
24  to receive payment for lost wages and income for the

Page 252

1  same period of time from both Allstate Insurance on
2  behalf of Peter Gill and from Harleysville?
3    A. I think that's for a jury to decide.
4    Q. I'm asking you.
5    A. I've answered your question twice now.
6    Q. No. I'm asking you whether you think that
7  that's fair or right.
8    A. You're asking me to make an assumption based
9  on information I don't have regarding the information
10  in the settlement. I don't see any double dipping
11  going on here whatsoever.
12    Q. Let me come back, Mr. Vail, and then I'll
13  move on because I don't think I have an answer. I've
14  tried it many different ways. Assuming that some
15  portion of this money, let's say $100,000, was
16  attributable to your claim for lost wages and
17  benefits, which we agree was part of your claim, do
18  you in this case consider it appropriate that you
19  receive lost wages and benefits from Harleysville for
20  the same period of time as covered by that $100,000?
21    A. It may, in fact, be. It depends on the
22  facts and circumstances.
23    Q. What facts and circumstances are those?
24    A. It would depend on what the settlement

Page 253

1  delineated in terms of apportionment of how the
2  settlement was constructed.
3    Q. You don't know how it was constructed?
4    A. I don't have specific knowledge, no.
5    Q. Is there anyone you can think of that would
6  know?
7    A. The only one I could think of who would know
8  would be Jerry Knafo.
9    Q. He was your attorney?
10    A. He was my counsel.
11    Q. How about somebody representing Allstate;
12  might they know how it was attributed?
13    A. That would be conjecture.
14    Q. But we're clear in this deposition that you
15  don't know?
16    A. That's correct.
17    Q. And for all you know, the full amount,
18  385,000, may have been attributable to lost wages and
19  benefits?
20    A. Counsel explained to me that the settlement
21  was intended to cover my pain and suffering, medical
22  expenses and such things. There was never any
23  discussion that I can recall with my counsel regarding
24  wage loss.

Page 254

1  Q. There must have been because it was in your
2  complaint; wasn't it?
3  A. I'm sorry.
4  Q. It was in your complaint?
5  A. What was in my complaint?
6  Q. Your wage loss.
7  A. That was mentioned in my complaint.
8  Q. It was a major component of your claim for
9  damages?
10  A. I disagree it was a major component.
11  Q. Mr. Vail, other than Allstate's attorneys
12  and your attorney, is there anyone else who might know
13  how this was allocated?
14  A. Not to my knowledge.
15  Q. Does your wife have any specific knowledge?
16  MR. THOMPSON: I object.
17  BY MR. HALLER:
18  Q. Does your wife have any specific knowledge
19  about how this was allocated?
20  A. Other than what was explained to Attorney
21  Knafo, I don't have a specific recollection that she
22  would.
23  Q. Did you have any out-of-pocket medical
24  expenses?

Page 255

1  A. Yes.
2  Q. What were those?
3  A. I don't recall.
4  Q. How much were they?
5  A. I don't recall.
6  Q. Can you give me some general estimate as to
7  how much in the nature of out-of-pocket medical
8  expenses that you had?
9  A. I really don't recall. If you want that
10  information, I believe Attorney Knafo can probably
11  provide it.
12  Q. Was it less than $10,000?
13  MR. THOMPSON: I object. He said he
14  didn't know.
15  BY MR. HALLER:
16  Q. Was it less than $10,000?
17  A. I don't recall.
18  Q. Do you have the medical bills to support
19  those claims?
20  A. I believe Attorney Knafo has them. I don't
21  have specific knowledge of that.
22  Q. Let's go through it. Your in-hospital
23  treatment was covered by insurance; wasn't it?
24  A. I don't believe all of it was.

Page 256

1  Q. When you say Mr. Knafo has it, did you not
2  keep a copy of the information you provided him?
3  A. I may have. I don't have a specific
4  recollection.
5  Q. You may actually have that information?
6  A. It's possible.
7  Q. You can request it from Mr. Knafo; right?
8  A. I believe so.
9  MR. THOMPSON: Make a request, and I'll
10  follow up in writing for any medical expenses that
11  were incurred as a result of the injury.
12  BY MR. HALLER:
13  Q. You were treated at Hershey Medical Center;
14  were you not, for your injury?
15  A. I was.
16  Q. Dr. Spence Reid was the primary physician
17  responsible for your surgery; is that right?
18  A. He was one of the surgeons who attended to
19  me. He was not the only one.
20  Q. Who else was responsible?
21  A. I recall the surgeon Charles Davis, and I
22  recall a chief surgical resident, whose name escapes
23  me at the moment, but I'm sure it would be reflected
24  in the medical records.

Page 257

1  Q. You would agree that Dr. Spence Reid's
2  medical records and any other treating physician's
3  medical records would reflect the nature of the
4  surgery that was performed on you?
5  A. It's supposed to.
6  Q. Have you, at any point before this
7  deposition, reviewed any of those medical records?
8  A. No.
9  Q. You were admitted on June 2nd, 2000 and
10  discharged from the hospital on June 10th, 2000; is
11  that correct?
12  A. That's my recollection.
13  Q. Then you received in-home physical therapy
14  treatment from Lehigh Valley Home Care after your
15  discharge from the hospital; did you not?
16  A. I recall that was the case, yes.
17  Q. Do you recall who the individuals were from
18  Lehigh Valley Home Care who assisted you with your
19  in-home physical therapy?
20  A. My recollection was there were two
21  therapists. The first was Beth Predy, and the
22  second, as I recall, was a Carey Hrichak.
23  Q. How often did they come to work with you?
24  A. I don't recall specifically.

Page 258

1  Q. Once a week, twice a week?
2  A. I don't recall. It was four years ago. I
3  don't recall specifically.
4  Q. Do you recall that they would do assessments
5  of your physical progress?
6  A. I don't recall specifically what paperwork
7  they completed.
8  Q. Do you recall what you did with them when
9  they were there?
10  A. I remember that the initial therapist was
11  working on very basic movement therapies, and the
12  second therapist worked on those initial therapies and
13  extended into a greater range of motion, as I recall.
14  Q. Mr. Vail, I have in front of me a report
15  written by Carey Hrichak from July 7th, which is just
16  over a month from your injury. Do you recall her
17  doing an evaluation on July 7th?
18  A. Not specifically.
19  Q. You're not suggesting she didn't? You just
20  don't remember?
21  A. I don't recall.
22  Q. It's true, is it not, that by July 7th, 2000
23  that you were able to groom yourself unaided?
24  A. What's the definition of groom?

Page 259

1  Q. There isn't a definition. If you don't
2  understand the question or the term, you can tell me.
3  A. Would you, please, elaborate on what you
4  mean by groom?
5  Q. Brush your hair, brush your teeth, go to the
6  bathroom.
7  A. I can recall doing those things.
8  Q. So you were able to groom yourself unaided
9  at that point?
10  A. If that's your definition of groom, I can do
11  those things.
12  Q. You were able to get your clothes out from
13  the closets and drawers and put them on and off
14  without assistance?
15  A. I recall I was given, and I can't remember
16  which therapist gave these items to me, it may have
17  been at Hershey Medical Center, I was given a specific
18  device to be able to reach things. It had an
19  extension, and it had a red handle and a pincher on
20  the end so I could reach things from closets that I
21  wouldn't otherwise be able to reach because of the
22  medical condition that I had, and I remember being
23  given a special -- I don't recall specifically what it
24  was called, but it's a long piece of metal, a device

Page 260

1 you would use to put your shoe on you, but it's not
2 your standard shoehorn that's just a few inches long.
3 This was two feet or more long that I could use to
4 apply a sock. In July, my recollection was that I was
5 still using those devices for dressing.
6 Q. Can you explain why she says that you were
7 able to take clothes out of closets and drawers and put
8 them on and remove them from the upper body without
9 assistance?
10 A. I think you'd have to ask her that
11 question.
12 Q. Were you able to, at that time, put your
13 clothes on and off without assistance?
14 A. I could dress myself, but the clothing I
15 chose to wear was easy to take on and off. I couldn't
16 dress myself with certain pieces of clothing that were
17 difficult to get on over my neck. I don't have a
18 specific recollection of the context in which that
19 comment might have been made.
20 Q. It's true, is it not, that by that time, you
21 were able to walk on even and uneven surfaces and
22 stairs with or without railings?
23 A. Not without crutches.
24 Q. With crutches, you were able to be that?

Page 261

1 A. The only way I could ambulate in July of
2 2000, if that's the period that you're referencing,
3 was with crutches.
4 Q. You were able to do light housecleaning
5 tasks, cook and other things that you needed to do in
6 the home, at that time?
7 A. Well, I could move about the kitchen, and I
8 had a chair that was on wheels, but in terms of what I
9 would consider normal for my pre-injury tasks around
10 the house, no, I couldn't do the same things. I could
11 make very basic things in the kitchen, but I had
12 difficulty reaching the microwave and the freezer. I
13 had to use crutches or roll on a chair on wheels to be
14 able to move about the kitchen.
15 Q. By the time you were able to come back to
16 work though, all of those things had improved, so that
17 you were able to go about the daily tasks of living,
18 isn't that true?
19 A. What things?
20 Q. The things that you had mentioned that you
21 had some limitations on as of July 7th.
22 A. When I returned to the office in
23 Harleysville, which was on or about August 21st, as I
24 recall, of 2000, I was on crutches, and my ambulation

Page 262

1 was still significantly impaired, so I don't
2 understand the context of the question.
3 Q. The things related to your daily life, which
4 is dressing, brushing your hair, brushing your teeth,
5 making meals, dressing, all those things you could do;
6 couldn't you?
7 A. I considered my daily routine severely
8 disrupted.
9 Q. You could do all of those things; couldn't
10 you? You could do all of those things that I just
11 mentioned; couldn't you?
12 A. I'm trying to answer your question, Mr.
13 Haller. There's no need to be --
14 Q. I'm getting very frustrated because we have
15 limited time. You could brush your teeth and brush
16 your hair, go to the toilet, get dressed, make meals
17 as of August 21st; couldn't you?
18 A. I could make meals, yes. I could brush my
19 teeth, yes. I could brush my hair, yes. I could
20 dress myself with the clothing that I picked out to
21 dress myself with, yes.
22 Q. Thank you.
23 A. I don't understand what all of those things
24 mean, Mr. Haller. If you want to be specific, I'll

Page 263

1 gladly answer them.
2 Q. You could watch TV?
3 A. I could watch TV.
4 Q. You could read a book?
5 A. Yes.
6 Q. You could get in a car and drive to work on
7 August 21st; couldn't you?
8 A. I could do that with great difficulty.
9 Q. But you could do it?
10 A. I did it, yes.
11 Q. You could go to work and concentrate on your
12 work; couldn't you?
13 A. I went to work, and I did my best.
14 Q. And you could concentrate; couldn't you?
15 You were mentally able to do the job at that point in
16 time; weren't you?
17 A. I could concentrate, yes.
18 Q. As of August 21st, the limitations that you
19 had with respect to walking without an assistive
20 device, such as crutches or a cane?
21 A. That is one of the limitations I had. The
22 other limitations that I recall was that my surgeon
23 instructed me not to travel more than necessary and
24 not to lift objects if I didn't have to.

Page 264

1 Q. I think we established in the last
2 deposition that the limitation on lifting was not more
3 than 30 pounds. Do you recall that?
4 Q. You asked me the question, and I answered.
5 Q. But do you recall that that was the
6 limitation, 30 pounds?
7 A. Are you done speaking? There's been a
8 pattern several times that I've tried to answer and
9 started, and you continue. Will you, please, repeat
10 the question?
11 Q. Do you recall that the limitation on lifting
12 was 30 pounds when you came back to work?
13 A. I remember that there was a note I received
14 from the doctor, and I recall, at the previous
15 deposition, there was the document that Dr. Reid had
16 supplied to Harleysville that I hadn't previously
17 seen, and there may have been a discrepancy on the two
18 numbers. I don't recall specifically.
19 Q. Since you don't, we'd have to look at the
20 document to see what the restriction was on lifting;
21 right?
22 A. I presume so.
23 Q. But you do agree, do you not, Mr. Vail, that
24 you were able to lift, but there was a limitation on

Page 265

1 lifting over a certain defined weight?
2 A. Yes, I remember that. From a practical
3 standpoint too, Mr. Haller, I could lift, but I was on
4 an assistive device. I didn't have both hands free.
5 Q. You were using a cane at that point?
6 A. I was using a crutch or a cane, depending on
7 what day we're talking about.
8 Q. You began outpatient physical therapy at
9 Muhlenberg Hospital Center in September of 2000; did
10 you not?
11 A. My therapy, as I recall, was at an
12 outpatient location, not in the hospital itself.
13 Q. Do you remember who you worked with at
14 Muhlenberg?
15 A. My recollection was the primary therapist
16 was Brian Boyle.
17 Q. You saw Brian Boyle regularly over the
18 course of the next several weeks; is that correct?
19 A. How would you define regularly?
20 Q. How would you define regularly, Mr. Vail?
21 A. If you were to ask me my opinion if you're
22 asking me regularly, I would say that would be, at
23 least, once a week, maybe two, perhaps three.
24 Q. Were you seeing him once a week?

Page 266

```
 1    A. I don't recall specifically.  I believe it
 2 was, at least, that for a period of time, but I don't
 3 recall specifically.
 4    Q. I have his notes in front of me, and it
 5 seems like you were going on a regular basis to see
 6 him.  Would you agree with that?
 7    A. Yes.
 8    Q. Do you recall that the two of you set
 9 certain goals for what you were trying to achieve for
10 short-term goals and long-term goals?
11    A. I remember discussions around goals, but I
12 don't recall what they were specifically.
13    Q. Do you recall what the goals were?
14        MR. THOMPSON:  Objection; asked and
15 answered.
16        MR. HALLER:  Maybe I didn't fully hear
17 the answer.
18 BY MR. HALLER:
19    Q. Are you saying you don't remember what the
20 goals were?
21    A. Perhaps we can ask the court reporter to
22 read back my answer.
23    Q. I don't think we need to do that.  I'm just
24 asking you the question.
```

Page 267

```
 1    A. I'm confused.
 2        MR. THOMPSON:  He said he didn't know,
 3 and you asked the question again.  That's why he said
 4 he didn't know again.
 5 BY MR. HALLER:
 6    Q. Let me go back so the record is clear.  The
 7 question I asked you was:  Do you recall that you and
 8 Mr. Boyle agreed to certain short-term and certain
 9 long-term goals?
10    A. My answer to you is:  I remember a
11 discussion about goals, but I don't recall them
12 specifically.
13    Q. So we'd have to look at the medical records
14 to see what those goals were?
15    A. I'm sorry.  Is that a question?
16    Q. Yes.
17    A. I presume so.
18    Q. Understand, Mr. Vail, all I'm trying to do
19 is, from the perspective of the defendant, find out
20 information, and if you don't know it, I need to know
21 where I can go and get it.
22        So you're telling me under oath that you
23 simply don't remember the goals that you set for
24 yourself with Mr. Boyle; right?
```

Page 268

```
 1    A. That's correct.  I don't recall them
 2 specifically, as I stated.
 3    Q. So if they are set out in detail in his
 4 notes, you have no basis to contradict what's in his
 5 notes; do you?
 6    A. If you care to share them with me, it might
 7 refresh my memory.
 8    Q. I thought that's what you were going to
 9 say.
10        Do you recall that he gave you a home
11 exercise program?
12    A. Yes, I do.
13    Q. Did you regularly perform that home exercise
14 program?
15    A. Yes, I did.
16    Q. Did you ever see any of his assessments of
17 you?
18    A. It's possible I may have seen them while he
19 was completing the form behind the desk, but I don't
20 recall him completing an assessment and showing it to
21 me.
22    Q. Do you recall him telling you, as of your
23 first visit on September 18th, 2000, that you had
24 excellent rehab potential to return to your prior
```

Page 269

```
 1 functional level?
 2    A. Not specifically, no.
 3    Q. You don't recall a discussion about that?
 4    A. No, sorry.
 5    Q. You did have a general understanding when
 6 you began therapy that if you worked hard that you
 7 could return to your prior functional level?
 8    A. That was the dream at that point for me.  I
 9 had no specific understanding that that would be
10 achieved.
11    Q. But you were, in fact, able to achieve it;
12 weren't you?
13    A. Retrospectively looking at the case, I think
14 history would prove that to be, but at the time, I had
15 no knowledge that that would occur.
16    Q. He did not tell you that, even though it's
17 in his notes?
18    A. I don't have a recollection of him doing
19 so.
20    Q. Do you recall saying that what you would
21 like to achieve was to be able to ride a mountain
22 bike, run and play golf?
23    A. I remember talking about those activities,
24 yes.
```

Page 270

```
 1    Q. When you were with Mr. Boyle, you would do a
 2 variety of exercises?
 3    A. There were different exercises.  I don't
 4 know quite how you would characterize a variety.
 5    Q. What kind of things would you do with Mr.
 6 Boyle when you went to visit?
 7    A. They were range of motion exercises that
 8 that therapist, Boyle, had me undergoing that were
 9 very simple and basic at first, and then expanded in
10 terms of building strength and expanded -- Some of the
11 goals, as I recall --  Some of this is coming back to
12 me.  One of the goals that he had and that I had was
13 to be to, at some point, walk without a cane.  When I
14 walked in his door the first time, I could not walk
15 without a cane.  Over time, I do recall that he was
16 able to assist me to achieving that goal for limited
17 periods of time, but I still relied on the cane, and
18 as I sit here now, I don't recall when the therapy
19 sessions ended.  If you have the records, I might be
20 able to speak to it.  Yes, I do recall discussions
21 around it.
22    Q. So one of your goals was to walk without a
23 cane; right?
24    A. As a goal?
```

Page 271

```
 1    Q. Yes.
 2    A. If it could be achieved, yes.
 3    Q. You were able to walk with a cane, but your
 4 goal was to be able to walk without a cane; right?
 5    A. I had hoped to be able to achieve that, yes.
 6    Q. You did, in fact, achieve that during your
 7 therapy with Mr. Boyle; right?
 8    A. I don't recall specifically.  Is that what
 9 the record says?
10    Q. I'm asking you.
11    A. I don't recall.
12    Q. You may have, and you may not have?  You
13 don't recall?
14    A. That's correct.
15    Q. We'd have to look at the records to see
16 exactly what you were able to do at a given point in
17 time; right?
18    A. That may jog my memory.
19    Q. Do you recall that as of November 22nd that
20 you told Mr. Boyle that you had been able to walk all
21 over Manhattan the day before?
22    A. No, I don't recall telling him that.
23    Q. If his notes reflected that statement from
24 you, you wouldn't disagree that that had occurred;
```

Page 272

1 would you?
2     A. It's possible that Mr. Boyle took a comment
3 out of context or wrote it down wrong. I'd just be
4 conjecturing, but at no time did I walk all over
5 Manhattan in -- In November?
6     Q. November.
7     A. I did not walk all over Manhattan in
8 November of 2000.
9     Q. Did you visit Manhattan in November of
10 2000?
11     A. I recall that I did.
12     Q. Did you walk in Manhattan?
13     A. Yes.
14     Q. And you walked without a cane; right?
15     A. I believe I did.
16     Q. Why did you go to Manhattan? Was it a visit
17 as a tourist?
18     A. My recollection is I was in Manhattan for a
19 job interview.
20     Q. Where did you walk in Manhattan?
21     A. I walked from the World Trade Center to an
22 address on Water Street.
23     Q. How did you get to the World Trade Center?
24     A. I took a bus from Lehigh Valley to

Page 273

1 Manhattan.
2     Q. It's true, is it not, that by October, 2000
3 that you were mountain biking, including biking off
4 the road?
5     A. What time period?
6     Q. By the end of October of 2000.
7     A. My recollection in October was that I was
8 riding a mountain bike on smooth dirt roads, but I
9 would not characterize it as mountain biking.
10     Q. How far were you able to ride your mountain
11 bike on a smooth dirt road?
12     A. My recollection was a very limited
13 distance.
14     Q. How far?
15     A. I don't recall specifically.
16     Q. Are you telling us you just don't recall how
17 far you had biked at that point in time?
18     A. Yes, that's what I'm telling you.
19         MR. THOMPSON: I believe we have about
20 15 minutes left.
21         MR. HALLER: We can play that game, but
22 I'm having a lot of difficulty with this witness
23 getting what I think are straightforward answers to my
24 questions.

Page 274

1         MR. THOMPSON: And I think he's
2 answering the questions. We can play the game if
3 you'd like to. I was told we have an hour. I'm not
4 going to go beyond that.
5         MR. HALLER: We'll continue to whatever
6 point, and we'll try and get the judge and see if we
7 can continue for the extra 15 minutes, or we'll come
8 back after we file a motion. I'm trying to get
9 through. One of the reasons we're doing this is
10 because we didn't have the records.
11         MR. THOMPSON: Okay.
12         MR. HALLER: Despite having requested
13 them several times prior to the last deposition.
14 BY MR. HALLER:
15     Q. It's true, is it not --
16         MR. THOMPSON: Do you want to confer
17 with me?
18         THE WITNESS: Yes.
19         (Break taken in the proceedings from
20 4:27 PM to 4:34 PM.)
21 BY MR. HALLER:
22     Q. Do you recall, on October 18th, telling Mr.
23 Boyle that you had noticed the day before for the
24 first time that you didn't need to even think about

Page 275

1 your walking?
2     A. I don't recall.
3     Q. You have no reason to test the accuracy of
4 that statement in his records; do you?
5     A. I don't know what he may have based that
6 on. I don't recall that.
7     Q. Other than what you told him, do you have
8 any knowledge of what you would base it on?
9     A. No, I don't.
10     Q. It's true, is it not, that as of early
11 November, you were doing a light jog on a treadmill?
12     A. I remember being on a treadmill being
13 supported by rails, and I remember a treadmill was
14 part of the progression therapy. I don't recall
15 specifically what date.
16     Q. Do you remember, in fact, that you began
17 jogging on a treadmill toward the end of October?
18     A. Not specifically, although if that's what
19 the medical record states, I have no reason to doubt
20 that I did so.
21     Q. Do you recall that as of the end of
22 September that you were already riding your bike on
23 the road and that you were riding a stationary bike
24 for, at least, 10 minutes?

Page 276

1     A. I recall riding a stationary bike in
2 therapy. I don't recall the time-frame.
3     Q. Do you recall that by the end of November
4 that you were running and sprinting?
5     A. I recall that originally, I couldn't take
6 more than three strides, at most, without significant
7 pain and having to stop. I do recall a progression
8 over some period of time, but I don't recall exactly
9 when that was.
10     Q. During the time that you were receiving
11 therapy from Mr. Boyle, do you recall, at some point,
12 running and sprinting within the context of that
13 therapy?
14     A. If we define sprinting as starting from zero
15 and progressing to some forward speed, I remember
16 doing that. I wouldn't call it sprinting in the sense
17 of a Carl Lewis or some professional athlete. I do
18 remember being able to take more than a few strides.
19 I do remember, at some point in the progression of the
20 therapy, being able to jog very slowly but awkwardly
21 around the parking lot outside the therapy office.
22     Q. You do recall doing that; right?
23     A. Yes, I do.
24     Q. Do you recall that you ran in excess of a

Page 277

1 quarter of a mile around the parking lot?
2     A. No, I don't have that recollection. I
3 remember running around the parking lot, but what
4 distance it was, I don't recall.
5     Q. If the notes reflected that it was a quarter
6 of a mile, you wouldn't disagree with that; would
7 you?
8     A. It would depend on how it was measured. I
9 don't know what the therapist based that on.
10     Q. Do you recall that by the last session with
11 Mr. Boyle that you were jogging approximately a
12 quarter of a mile?
13     A. Do I recall? No.
14     Q. Do you recall that, in fact, you performed
15 sprinting exercises with six repetitions over a
16 50-yard distance?
17     A. I don't recall that.
18     Q. You don't recall doing that?
19     A. I don't recall doing that.
20     Q. You're not saying you didn't? You just
21 don't remember?
22     A. I don't remember doing that.
23     Q. Are you saying you didn't do that?
24     A. No, I'm not.

Page 278

1  Q. His notes reflect that you were doing that.
2  A. I recall there was a grassy area next to the
3  parking lot that I was doing some type of
4  back-and-forth exercise on. I don't recall
5  specifically what the distance was.
6  Q. Do you recall that by the end of your
7  sessions that you had met both your short-term and
8  long-term goals, whatever they specifically may have
9  been?
10  A. No.
11  Q. You don't remember that?
12  A. No, I don't.
13  Q. You're not saying you didn't? You just
14  don't remember?
15  A. You asked me about my goals previously, and
16  I had mentioned that they were a dream of mine to
17  achieve it. I don't recall specifically achieving
18  everything. If you want to go through them with me,
19  I'll see if I can remember.
20  Q. By the time you finished and were discharged
21  from your therapy from Muhlenberg, you were able to
22  jog for, at least, five minutes; right?
23  A. If that's what it says. You're reading the
24  document.

Page 279

1  Q. I'm asking you.
2  A. I don't recall.
3  Q. Mr. Vail, you're here, and it's your
4  deposition. I'm asking what you recollect. That's
5  all. Do you recollect that you were able to jog by
6  the end of your sessions? Do you recollect that you
7  were able to jog? If you don't recollect, just tell
8  me.
9  A. I told you several times. I just told you I
10  don't recall.
11  Q. Do you recall that you were able to sprint?
12  A. I remember one of the exercises was going
13  back and forth on the grassy field. I would not
14  characterize that as a world-class sprint.
15  Q. Do you recall that you could walk without a
16  cane or a crutch?
17  A. For brief periods, yes, I recall doing
18  that.
19  Q. For sustained periods.
20  A. How do you define sustained? I don't have
21  that recollection.
22  Q. How about if I define sustained from the bus
23  station in Manhattan to Water Street?
24  A. I was able to do that.

Page 280

1  Q. You were able to do that?
2  A. I was.
3  Q. You were able to go mountain biking for more
4  than one mile?
5  A. I was able to ride a bicycle. I would not
6  characterize it as mountain biking.
7  Q. You were able to drive?
8  A. At what period of time?
9  Q. As of the time of your discharge from
10  Muhlenberg, which was December of 2000.
11  A. Yes, I was.
12  Q. You were able to walk, at least, a mile
13  without a cane?
14  A. I don't recall that distance.
15  Q. You were able to play golf?
16  A. When was this?
17  Q. All of these questions are as of the end of
18  your therapy, which was in December of 2000.
19  A. I don't recall ever playing golf during my
20  therapy.
21  Q. But you were able to. You would have been
22  able to at that point in time; wouldn't you?
23  A. I have no way of knowing. I didn't play.
24  Q. You could walk far enough to get out of a

Page 281

1  car and hit a golf ball and get back in the car?
2  A. I have no knowledge.
3  Q. Have you played golf since December 6th of
4  2000? In 2001, could you play golf?
5  A. I'm sorry. What period of time?
6  Q. In 2001, could you play golf?
7  A. I remember playing golf at a benefit for my
8  deceased sister-in-law where I rode in a golf cart and
9  took a few swings with a golf club. That was in June
10  of 2001, if I'm not mistaken, but I would not
11  characterize it as a leisurely and enjoyable game of
12  golf.
13  Q. As of November of 2000, you were able to
14  walk an unlimited amount; weren't you?
15  A. I don't agree with that.
16  Q. Do you have any explanation why your medical
17  records from your treating physicians would say that
18  you had a slight limp, but you were able to walk an
19  unlimited amount as of November 11th, 2000?
20  A. Who signed that?
21  Q. These are the medical records provided by
22  Dr. Spence and Charles Davis. Do you have any
23  explanation for that, Mr. Vail?
24  A. No. I suggest you ask them.

Page 282

1  Q. Is there any reason why you're trying to
2  underestimate your degree of mobility as of the time
3  you were doing this therapy?
4  MR. THOMPSON: Object to the form.
5  BY MR. HALLER:
6  Q. Mr. Vail?
7  A. I don't believe I am underestimating it.
8  Q. Are you trying to suggest in this litigation
9  that you were more than injured than you were, in
10  fact, at the time?
11  MR. THOMPSON: Object to the form.
12  THE WITNESS: I'm telling you the
13  truth.
14  BY MR. HALLER:
15  Q. So your doctors are saying you could walk an
16  unlimited amount, and you're trying to tell us that
17  you were more limited than that?
18  A. You should ask the doctor that.
19  Q. It's true, is it not, that other than the
20  potential for episodic bursitis from having hardware
21  in your leg that you made a full recovery from your
22  gunshot wound?
23  A. At what point in time is this?
24  Q. Just answer my question, and we'll reference

Page 283

1  the time.
2  A. I believe the answer to your question is
3  contingent on what period.
4  Q. I'm asking you whether, in fact, other than
5  the potential for some episodic bursitis, you made a
6  full recovery. Yes or no?
7  A. I don't believe so.
8  Q. What are you saying are the limitations that
9  continue to exist?
10  A. I have constant pain. I don't walk the
11  same.
12  Q. Are you biking?
13  A. Not to the same degree I was before. I
14  can't do what I did before.
15  Q. We went through that the last time.
16  A. I'm answering the question that I thought
17  you asked me.
18  Q. As of early September when you started your
19  job search, I'd like to ask you some questions. You
20  do recall that after you were terminated from
21  Harleysville that you made efforts to find another
22  job?
23  A. I recall that I did.
24  Q. In general terms, what kind of jobs did you

Page 284

1 identify?
2    A. Initially, the search involved the insurance
3 industry in a similar capacity in which the position I
4 was terminated from.
5    Q. Did you identify jobs that you thought you
6 would be qualified for?
7    A. I did.
8    Q. And that you would be able to do?
9    A. Yes.
10    Q. And that you would be able to do from a
11 physical perspective; that is, you'd be able to get to
12 the work and do whatever you needed to do to do the
13 job?
14    A. I hoped to do that, yes.
15    Q. I'm going to take a minute off the record.
16 I guess we have five minutes left.
17        (Break taken in the proceedings from
18 4:46 PM to 4:52 PM.)
19 BY MR. HALLER:
20    Q. I have a discharge summary from Muhlenberg
21 dated December 6th, 2000. Do you recall that that was
22 the end of your therapy at Muhlenberg?
23    A. Not specifically, but I believe that's about
24 the time frame that it ended.

Page 285

1    Q. At that point, you stopped formal therapy
2 from the hospital setting?
3    A. I was given a discharge plan by the hospital
4 center to continue certain home-based exercises.
5    Q. What were the exercises that you were to
6 continue doing?
7    A. As I recall, and I don't have a specific
8 recollection of it, but it involved using a theraband,
9 which is an elastic strip which provides resistance to
10 continue range of motion exercises with the lower
11 extremities.
12    Q. Did you have, at that point, your own
13 exercise regime?
14    A. I don't recall if I'd call it a regime, but
15 I did some exercising in the home.
16    Q. What exercising did you do?
17    A. Using light weights with a bench. I would
18 do upper body exercises for strength.
19    Q. Did you do anything that was aerobic?
20    A. I tried to run, but I found it uncomfortable
21 and wound up continuing that. It was irritating my
22 right hip area. I no longer do that.
23        So I'm clear on your question, what time
24 frame are you asking me about?

Page 286

1    Q. I was asking after your therapy ended.
2    A. From Muhlenberg?
3    Q. Yes.
4    A. I remember trying to ride a bicycle, and I
5 believe, at that point in time, I had a bicycle and a
6 stationary trainer in by basement, and I would ride
7 that for brief periods of time; brief defined as a few
8 moments. I couldn't go on for too long, as I recall.
9 I had a bar in my basement that was fixed to the
10 rafters that I would hang from. That's what I can
11 recall.
12    Q. Then did you step up your exercise regime,
13 or whatever you call it, after that point in time?
14    A. I wouldn't call it a regime. It was fairly
15 informal. I don't have a recollection. Do you have
16 information?
17    Q. I'm just trying to get an idea about your
18 progression. You testified that you got back to
19 hiking, maybe not as far as you did before, but those
20 kind of things. What was the progression from your
21 therapy?
22    A. I don't recall a specific progression. I
23 believe I testified in the last deposition that I did
24 go on a hike. I may have done so twice.

Page 287

1    Occasionally, I rode a bicycle on the road. I
2 attempted to ride off road and found that I couldn't
3 perform to the same degree that I did before and
4 thought it unsafe and didn't continue in that
5 capacity. I don't know how to answer your question.
6    Q. Today, do you do off-road biking?
7    A. Do I ride a bicycle off road? On smooth
8 surfaces, yes, I do. I don't take them on any of the
9 trails where I used to go.
10    Q. What other exercises do you currently do?
11    A. Occasionally, upper body exercises with free
12 weights. That's about it.
13    Q. As of December of 2000 or when you finished
14 your treatment and therapy at Muhlenberg Hospital, you
15 were able to perform all of your daily life
16 activities; were you not?
17    A. In December of 2000, I had significant pain
18 in my right hip, but I could move about the house much
19 more easily than I could before, certainly before when
20 I was terminated from Harleysville in September. I
21 don't know that I would characterize it as resume all
22 daily life activities to the same degree because one
23 can fly a 747 for a minute before it crashes, and I
24 wouldn't say that one can fly a plane, even though one

Page 288

1 can make the argument if you sit in the pilot's seat
2 for a second, you're flying the plane before it
3 crashes. To say I could do everything I could do
4 before, I would not agree with that statement.
5    Q. I don't think that was my question, Mr.
6 Vail, with due respect. I'm really not asking you
7 whether you could fly an airplane or whether you can
8 sprint like Carl Lewis. I'm just asking you a very
9 simple and, I think, an understandable question, which
10 is that as of December 6th, 2000, you were able to go
11 about and do everything that any normal person does in
12 a day.
13    A. I believe I could do most things. I don't
14 recall that I could do everything the way I did it
15 before, if that's what you're asking me. I could
16 brush my teeth and comb my hair. I could make myself
17 lunch in the kitchen.
18    Q. You could do everything that you could do
19 before the injury that you needed to do on a daily
20 basis to live; couldn't you?
21    A. I suppose, if you mean to live and exist,
22 yes, I could. Could I do everything the way I did it
23 before, no, I couldn't.
24    Q. That's also true as of September of 2000?

Page 289

1 As of September of 2000 after you came back to work,
2 you could do everything necessary to live on a daily
3 basis; couldn't you?
4    A. It depends on how one defines living on a
5 daily basis. I could not do exactly what I could do
6 before. I had to ambulate with an assistive device in
7 September. September was not the same as later. The
8 information that I had was I hoped that I would
9 improve. It wasn't necessarily a guarantee.
10    Q. As of that time, September of 2000 -- Let
11 me ask you the other way around. Can you think of
12 anything that you needed to do on a daily basis in
13 order to just live; eating, brushing your teeth, going
14 to work? Is there anything that you could think of
15 that you couldn't do as of that point in time? I'm
16 not asking whether it was difficult.
17    A. I couldn't walk without assistance.
18    Q. But you could walk with assistance?
19    A. Yes, I could.
20    Q. As of December of 2000 by the time your
21 therapy had finished, you could walk without
22 assistance; right?
23    A. I was improved at that point, but I could
24 not walk the same way I did for the same duration and