# EXHIBITS B - H

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———

| | | |
|---|---|---|
| KENNETH T. VAIL, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 02-CV-2933 |
| VS. | : | |
| | : | |
| HARLEYSVILLE GROUP, INC., | : | |
| Defendant. | : | |

———

Monday, May 24, 2004

———

Oral Deposition of GARY WEINSTEIN, taken pursuant to notice, at the Law Offices of Blank Rome, LLP, One Logan Square, 18th & Cherry Streets, Philadelphia, Pennsylvania, beginning at 12:45 PM, before Dennis Corsi, Registered Professional Reporter and Notary Public.

———

DENNIS CORSI COURT REPORTING
Registered Professional Reporters
814 Park Avenue
Collingswood, New Jersey 08108
(856) 854-7223

CONDENSED TRANSCRIPT WITH KEY-WORD INDEX

**Page 1**

```
 1
 2
 3              IN THE UNITED STATES DISTRICT COURT
 4            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 5
 6   KENNETH T. VAIL,          :  CIVIL ACTION
          Plaintiff,           :
 7                             :  NO. 02-CV-2933
     VS.                       :
 8                             :
     HARLEYSVILLE GROUP, INC., :
 9        Defendant.           :
10
11              Monday, May 24, 2004
12
13        Oral Deposition of GARY WEINSTEIN,
14   taken pursuant to notice, at the Law Offices of Blank
15   Rome, LLP, One Logan Square, 18th & Cherry Streets,
16   Philadelphia, Pennsylvania, beginning at 12:45 PM,
17   before Dennis Corsi, Registered Professional Reporter
18   and Notary Public.
19                      ---
20
21
22            DENNIS CORSI COURT REPORTING
            Registered Professional Reporters
23                  814 Park Avenue
            Collingswood, New Jersey 08108
24                 (856) 854-7223
```

**Page 2**

```
 1
 2   APPEARANCES:
 3            DONALD P. RUSSO, ESQUIRE
            Law Office of Donald P. Russo
 4              117 East Broad Street
                  P.O. Box 1890
 5             Bethlehem, PA  18016-1890
 6                  Counsel for Plaintiff
 7            ANTHONY B. HALLER, ESQUIRE
               Blank Rome, LLP
 8              One Logan Square
              18th and Cherry Streets
 9            Philadelphia, PA  19103-6998
10                  Counsel for Defendant
11
12          (It is stipulated by and between
13   counsel for the respective parties that signing,
14   sealing, certification and filing are waived; and
15   that all objections, except as to the form of the
16   question, are reserved until the time of trial.)
17                      ---
18        ...GARY WEINSTEIN, having been duly
19   sworn, was examined and testified as follows...
20                      ---
21
22
23
24
```

**Page 3**

```
 1   BY MR. RUSSO:
 2      Q.  Would you state your full name for the
 3   record, please?  Let me know if at any point you can't
 4   hear me because this is being done telephonically.
 5      A.  Gary Weinstein.
 6      Q.  Mr. Weinstein, my name is Donald Russo.  I
 7   represent Ken Vail, who's a plaintiff in a lawsuit
 8   filed against Harleysville.  I'm going to be asking
 9   you questions this afternoon about allegations
10   contained in Mr. Vail's complaint.
11          If for any reason you can't hear me or
12   understand my question, please, let me know before you
13   put your answer on the record and make sure that you
14   don't start providing me with your reply or your
15   response until I finish my question because even in
16   ordinary circumstances, that's a concern, but because
17   you and I are at opposite ends of the telephone line,
18   we want to make sure we don't have overlapping
19   conversations for purposes of keeping the record
20   straight.
21          The first thing I'm going to ask you is
22   where you're currently employed.
23      A.  Citizens Insurance Company.
24      Q.  Where is Citizens Insurance Company
```

**Page 4**

```
 1   located?
 2      A.  In Alma, Michigan.
 3      Q.  Do you reside in Michigan now?
 4      A.  Yes.
 5      Q.  How long have you been working for
 6   Citizens?
 7      A.  About a year-and-a-half.
 8      Q.  Who was your immediate employer prior to
 9   your current position?
10      A.  Zurich.
11      Q.  I'm sorry.
12      A.  Zurich.
13      Q.  How long were you with Zurich?
14      A.  Three months, roughly.
15      Q.  Prior to Zurich, where were you employed?
16      A.  Harleysville Insurance.
17      Q.  How long were you at Harleysville?
18      A.  About 11 or 12 years.
19      Q.  What was your last job title at
20   Harleysville?
21      A.  My last job title was vice president of Loss
22   Control and Premium Audit Department.
23      Q.  What was the approximate date that you left
24   Harleysville?
```

**Page 5**

```
 1      A.  I think it was approximately February of
 2   2001.
 3      Q.  Did you leave Harleysville voluntarily?
 4      A.  No.
 5      Q.  During the course of your employment, I take
 6   it that you recruited the plaintiff, Ken Vail.
 7      A.  Correct.
 8      Q.  Did you contact Mr. Vail while he was still
 9   employed by another employer?
10      A.  I don't remember.  I'm not entirely sure.
11      Q.  But it is your recollection that you, in
12   fact, were the one to contact him?
13      A.  I'm not sure.  I do know that I did discuss
14   the position with him and did recruit him once we
15   chatted.  I don't remember who made the first call.
16      Q.  Do you have any recollection as to how you
17   learned of Mr. Vail and his availability?
18      A.  I don't have a recollection of exactly how I
19   knew if he was available or not.  We did chat before
20   he was hired, and I did make the hiring decision.
21      Q.  When you hired Mr. Vail, was this for a
22   newly created position for loss control manager?
23      A.  It was a new position of regional loss
24   control manager.
```

**Page 6**

```
 1      Q.  Mr. Vail, there were no predecessors in that
 2   specific position, shall we say?
 3      A.  No.  There were three peers, but no
 4   predecessors.
 5      Q.  At that point, had there been a
 6   reorganization within the company?
 7      A.  Within the loss control department, there
 8   had been a reorganization.
 9      Q.  Was that due to some type of merger?
10      A.  No.  It was due to centralizing the loss
11   control function and centralizing the management
12   position through these regional manager jobs.
13      Q.  When did you make a decision to perform or
14   construct this reorganization, or I should say, to
15   create this new position for the reorganization?
16      A.  The position was executed very early in the
17   year 2000, I believe.
18      Q.  At the time that you put this together, did
19   you draft a written job description?
20      A.  Yes.
21      Q.  Did you have to have that reviewed by
22   anybody in either a higher-up or human resources?
23      A.  Yes.  Human resources coordinated all job
24   descriptions.
```

Page 7

1    Q. Is there a process at Harleysville whereby a
2  manager's job description becomes incorporated into
3  the official records of the company and assigned a
4  stamp or some kind of an indication that it's been
5  certified by the company?
6    A. No, not that I know of as far as a stamp.
7  The normal procedure if there's a need for a
8  description, a person in that department or myself
9  drafts a description, and the human resources
10  department assigns that and makes sure it follows the
11  normal format, and once it's approved, it's adopted
12  and put into place and distributed. That's the normal
13  process.
14    Q. Did you, at the time that you interviewed
15  Mr. Vail, provide him with a copy of the written job
16  description for this position?
17    A. He did receive a copy of the written job
18  description. I don't recall whether this was a week
19  or two prior to starting or after. He received a
20  document prior to starting specifying the function of
21  the job.
22    Q. Was that an E-mail or a memo from yourself?
23    A. Yes, a memo from myself sent to him via
24  E-mail.

Page 8

1    Q. This E-mail we're referring to now, was it
2  somewhat informal, or was it to be followed up with
3  something more specific?
4    A. I don't want to characterize it as
5  informal. It was pretty detailed. It was a welcome
6  aboard, and you have accepted the position a week or
7  two prior to starting the position. It just detailed
8  welcome aboard. Here's the specific things we do with
9  this position, and so on and so forth.
10    Q. You don't know exactly when you would have
11  given a written job description to Mr. Vail?
12    A. Typically, we would have given it within the
13  first couple of weeks of employment.
14    Q. But you don't have any records or any
15  indication as to what dates that would have been
16  though?
17    A. That's not something I would have a record
18  of or would have kept a record of.
19    Q. Did you or the company provide Mr. Vail with
20  any training for his new job?
21    A. He was recruited and hired and represented
22  himself as an experienced manager and had worked in
23  several jobs where he had leadership positions, so
24  specifically training on individual functions, he was

Page 9

1  given some training on the way Harleysville did some
2  functions, but I'm not sure exactly what you're asking
3  with the rest of it.
4    Q. How about his management requirements; was
5  he given any training as to how Harleysville would
6  require him to deal with subordinates and supervise
7  and discipline subordinates? Were there any policies
8  reviewed with him regarding how he was to treat his
9  subordinates according to Harleysville policy?
10    A. Not that I'm aware of. I mean, I'm not sure
11  if he did or didn't.
12    Q. Was Mr. Vail given an employee handbook?
13    A. I would guess that he was.
14    Q. I take it you were not the one responsible
15  for giving an employee handbook.
16    A. Let me clarify my answer. I don't know if
17  it was on line at that point or whether it was a paper
18  copy. He was given access to it. I don't remember
19  whether that's when it was a notebook or the same
20  material was on line.
21    Q. You don't have a signed receipt for the
22  handbook?
23    A. It wasn't our practice to get a signed
24  receipt.

Page 10

1    Q. Did you inform Mr. Vail that he was hired as
2  an at-will employee?
3    A. Generally, the employment offer refers to
4  that.
5    Q. Did you give him a written employment
6  offer?
7    A. Yes, to the best of my knowledge.
8    Q. How many interviews did you have with Mr.
9  Vail prior to making the decision to hire him?
10    A. At least two that I specifically recall in
11  person.
12    Q. They were face to face at your office?
13    A. One was at my office, and one was at a
14  restaurant.
15    Q. Did you ever provide Mr. Vail with a written
16  Harleysville employment application?
17    A. I don't directly recall, but it was the
18  practice generally to get a written application.
19    Q. To the best of your knowledge, did
20  Harleysville have an application form that generally
21  it would have applicants fill out and sign?
22    A. Yes.
23    Q. But there is no signed employment
24  application that would respect Mr. Vail's employment

Page 11

1  that you're aware of; correct?
2    A. I have no knowledge. It's not something
3  that I would have kept or had. I have no idea.
4    Q. Would one of Mr. Vail's jobs be to review
5  service files?
6    A. Yes.
7    Q. Were the files electronically available to
8  Mr. Vail on his computer, or were they something that
9  had to be retrieved via hard copy?
10    A. There were a limited number of service
11  files, and they were in hard copy. All the other
12  files, all the non-service files, which was the vast
13  majority, and the survey request was all electronic.
14    Q. Did Mr. Vail, as part of his job
15  responsibilities, have to review reports of the loss
16  control representatives who reported to him?
17    A. Yes.
18    Q. Did you ever review, as his manager, his
19  progress in reviewing these loss control
20  representative reports?
21    A. Yes. On numerous occasions, verbally and in
22  writing, I had asked him how he was doing and
23  continually gave him feedback that he was not doing
24  enough quality reviews or reports for his staff.

Page 12

1    Q. Did you ever indicate to him in writing that
2  he was ever making any progress in reviewing these
3  reports?
4      MR. HALLER: Objection to the form of
5  the question.
6  BY MR. RUSSO:
7    Q. Did you ever give him any written feedback
8  about his review of the reports, either negative or
9  positive?
10    A. I gave him quite a bit of negative feedback
11  regarding the fact that he just didn't do the reports
12  at all for a long time, and then didn't do enough.
13    Q. How about positive reviews; did you ever
14  give him any positive feedback?
15    A. Not that I recall.
16    Q. Did you ever send him an E-mail on May 12th
17  of 2000 saying that he was doing a good job?
18    A. I don't have an E-mail like that in front of
19  me. Is there additional information or question
20  there?
21    Q. This would have been exhibit-12 to Mr.
22  Vail's deposition.
23      MR. RUSSO: Anthony, would you have
24  exhibit-12 to Mr. Vail's deposition in front of you?

Page 13

1    MR. HALLER: No, but we can get it.
2    MR. RUSSO: I'll move on to the next
3 question. If it's possible to get that though, I'd
4 appreciate it if you'd show it to him. We'll go on to
5 another question here.
6 BY MR. RUSSO:
7    Q. Did Mr. Vail ever issue any written
8 performance feedback to his staff that you're aware
9 of?
10    A. I don't really recall. I know there was
11 verbal feedback that was poorly received.
12    Q. Did you ever review any performance feedback
13 memorandum that Mr. Vail may have given to his staff?
14    A. I don't recall seeing any.
15    Q. Does Harleysville, as part of its stated
16 policies, have progressive discipline that reaches out
17 to manages who are having difficulties in their job?
18    A. What do you mean?
19    Q. If you're going to terminate a manager, do
20 you just terminate him without prior notice, or is
21 there a policy that says you can give him certain
22 steps leading up to termination.
23    A. Well, I can speak from my own personal
24 experience; that when my employment ended with

Page 14

1 Harleysville, I wasn't given any progressive
2 discipline. In Ken's case, I provided him with a
3 number of memos on the same topic, including some
4 warnings warning him that it was important, and I
5 don't remember the exact wording, but something about
6 mission critical or top priority to get these done.
7 His success depended on getting these things done.
8    Q. Did you ever give Mr. Vail a warning that
9 unless certain matters were corrected, he would or
10 could be terminated?
11    A. At the wording I just gave you, and I'm
12 shooting from memory, to the best of my recollection,
13 on two separate occasions, I gave him wording that
14 said his success at the job or at the company depended
15 on doing these things right and another one that said
16 very unacceptably low level of service, or something
17 of that nature, so, yes, it was given that kind of
18 wording.
19    Q. Did you ever put him on a performance
20 improvement plan that would warn him if certain areas
21 of performance weren't correct by a certain date, he
22 could be disciplined?
23    A. I'm not sure what you mean.
24    Q. Let me rephrase the question. You were a

Page 15

1 manager there at Harleysville for many years, I take
2 it; correct?
3    A. Yes.
4    Q. Did you ever put any of your subordinates on
5 a written performance plan whereby you would lay out
6 areas of improvement and give them 30 or 60 or 90 days
7 to correct their performance?
8    A. I don't recall if I specifically did. I do
9 know that that's something we could do in certain
10 cases if we wanted to.
11    Q. You mention in your own case you were not
12 given any kind of progressive discipline.
13    A. Yes.
14    Q. Were you terminated without any prior
15 warning or notice?
16    A. Yes.
17    Q. You're saying it's your position you were
18 terminated without any prior warning or without any
19 prior notice?
20    A. Yes.
21    Q. Did it come as a surprise to you?
22    A. Actually, yes.
23    Q. Was it your position that the company should
24 have given you some warning about what was going to

Page 16

1 happen with you?
2    A. No. It had been my experience that managers
3 at all levels, you're expected to do certain things,
4 and even if there wasn't a specific thing you had
5 specifically done wrong or had been accused of, if it
6 wasn't working out, an employee at will, etcetera,
7 etcetera. That's my understanding of my termination.
8    Q. Did you sign a severance agreement?
9    A. Yes, I did.
10    Q. And you were paid money pursuant to the
11 terms of the severance agreement?
12    A. Yes.
13    Q. You were satisfied with the money that was
14 being paid to you?
15    A. Somewhat. I would have liked to have more,
16 I guess.
17    Q. Did Mr. Vail ask for a number of days off in
18 late May and early June of 2000?
19    A. Yes. My recollection is that when he was
20 hired, he suggested that he had a family camping trip
21 and had set aside some time that was very, very
22 important to him. Even though the rules don't permit
23 any paid vacation for the first six months, he said it
24 was very important to him, and I had agreed to give

Page 17

1 him that time off without pay.
2    Q. There was some type of an incident where he
3 was paid by mistake, and then that was deducted back
4 from him; is that correct?
5    A. I'm not crystal clear on that.
6    Q. But to the best of your recollection, his
7 time off was intended to be time off without pay?
8    A. It was a short week. I think there was a
9 holiday on a Monday, and the rest of the week he was
10 to be off without pay, yes.
11    Q. At that point, had you given Mr. Vail any
12 type of formal written performance appraisals?
13    A. Yes. I had given him a number of E-mails.
14 We worked closely. He was a direct report, and I had
15 given him feedback that certain key tasks weren't
16 being done.
17    Q. Did Harleysville have a specific form for
18 formal performance appraisals?
19    A. Well, there's no formal one that you use
20 during the year. At the end of each full year, there
21 was a form that was used, but that hadn't occurred
22 yet. It hadn't been a year yet.
23    Q. Is it your understanding that during these
24 days off, Mr. Vail was injured?

Page 18

1    A. Yes.
2    Q. And he told you he fell off of a tower or
3 something like that?
4    A. Yes. Sometime after his injury, he called
5 me at the office and told me that he was in the
6 hospital and fell of a tower and got hurt and was
7 camping, or whatever, etcetera.
8    Q. How soon after this injury did this call
9 come in?
10    A. My recollection is he was still in the
11 hospital. It was probably several days, but I'm not
12 sure if it was one day or three or four days.
13    Q. Did he ever send you an E-mail setting forth
14 what happened to him?
15    A. He called me by phone several days
16 later telling me that he was in the hospital and had
17 to have surgery, you know, his doctors said he would
18 get better. At some point, I mentioned to him, you
19 know, some of the staff had seen the local news story
20 with his name and a town given indicating he'd been
21 shot, and I asked him if that, in fact, had anything
22 to do with his injury. At some point, he said that it
23 did. He told me a significantly different story
24 regarding his injury, and I believe within a day or

Page 19

1 two, the person that had been running that event where
2 he got shot sent me a note explaining the event and
3 Ken's involvement.
4          MR. RUSSO: Was that turned over,
5 Anthony? I don't remember seeing that.
6          MR. HALLER: Yes. It was part of the
7 materials.
8          MR. RUSSO: I'll double check. I don't
9 recall. There was a lot of paper there.
10          MR. HALLER: It's a document that you
11 produced to us as well.
12          MR. RUSSO: I'm sorry. I do have
13 that. I see that here. I was thinking it was
14 something other than that.
15 BY MR. RUSSO:
16      Q. Mr. Weinstein, is how you learned about the
17 shooting injury through this communication?
18      A. Well, no. That's when I had it confirmed in
19 writing from Ken, but the first time I heard about it
20 was when some of the staff called me after he told me
21 about the tower. I had sent out an E-mail to the
22 staff saying he was injured in a tower accident. They
23 said on the news the next day that he had been shot,
24 and Ken told me the day after that that he had been

Page 20

1 shot.
2      Q. What type of event do you understand he was
3 at that resulted in him being shot?
4      A. Some kind of sporting gun shooting event of
5 sorts.
6      Q. Does Harleysville have any policy against
7 the legal use of firearms?
8      A. What kind of use?
9      Q. The legal use of firearms.
10      A. Not that I know of.
11      Q. So Mr. Vail's participation in this
12 tournament would not in any way have violated any
13 Harleysville rule that you're aware of?
14      A. I have no way of knowing. I didn't know
15 that he was involved in the thing until after the fact
16 and have no knowledge of any rules.
17      Q. Carley Jespersen, who is she?
18      A. Carley was hired by Ken. Each manager had
19 an administrative assistant, and Ken hired Carley
20 after he came on board, and she was to assist him in
21 his functions.
22      Q. And Miss Jespersen resigned at some point?
23      A. Yes, at sometime later.
24      Q. Did she talk to you about why she resigned

Page 21

1 or someone else?
2      A. She talked to someone else. I didn't have
3 firsthand knowledge. I had knowledge that she had
4 been way overloaded and couldn't seem to process the
5 work and felt she wasn't given enough direction from
6 Ken to complete the work. When she would ask how he
7 would want her to handle this or that, she didn't get
8 enough information for that.
9      Q. Did Miss Jespersen sign a letter of
10 resignation or anything of the like?
11      A. I don't remember.
12      Q. Did you ever receive any formal or written
13 medical reports from Mr. Vail's physicians?
14      A. At the time, I did not receive them.
15 Initially, I think they were given directly to human
16 resources. I did have a number of E-mails from Ken
17 giving me the prognosis and giving me reports of how
18 well he was doing; he was getting better and expected
19 a full recovery, and so on and so forth. The one I
20 remember the most was near the end of his tenure. It
21 said he couldn't lift over 30 pounds, but other than
22 that, he was good to go.
23      Q. So Mr. Vail was giving you medical
24 documentation in order to monitor his condition?

Page 22

1          MR. HALLER: Objection to the form of
2 the question.
3 BY MR. RUSSO:
4      Q. You can answer the question.
5      A. I'm not sure I understand the question.
6      Q. Was there ever any medical information that
7 you requested that Mr. Vail did not provide to you?
8      A. No. I guess he kept me updated on how he
9 thought he was doing and what his doctor thought.
10      Q. Did Mr. Vail have the right when he was
11 injured to apply for long-term disability insurance?
12      A. The right to apply? I don't think he was
13 eligible yet because of his tenure with the company.
14      Q. Was there any type of short-term disability
15 that he could have applied for?
16      A. My recollection is that there's not; that he
17 was with the company for such a short period that I
18 don't believe he was eligible for those programs yet.
19      Q. Was there any special long-term disability
20 policy in effect for employees with less than three
21 years of service with the company?
22      A. I don't know about three years or not. I
23 think that some of those policies, long or short term,
24 don't start until six months with the company.

Page 23

1      Q. Were you aware of any type of income
2 protection insurance that Mr. Vail would have applied
3 for after he was out of work for 30 days or more?
4      A. I really don't know. I'm not sure.
5      Q. Did you ever sit down with him and go over
6 company policies in terms of what would have been used
7 to provide him with income continuation while he was
8 out with his injuries?
9      A. I don't believe he ever asked. If he asked,
10 I guess I would have answered his questions. I think
11 he had some contact with human resources, but I'm not
12 sure about the time you're talking about.
13      Q. After his injury, did Mr. Vail tell you that
14 he was interested in continuing to work?
15      A. Yes. In writing a couple times, he told me
16 that he wanted to work full time. I believe he had a
17 concern about continuing his income. We had asked him
18 if he wanted to work part time, and he suggested full
19 time, and we went along with him.
20      Q. Were there any special accommodations that
21 he requested in order to continue working?
22          MR. HALLER: Objection to the form of
23 the question.
24          You can answer.

Page 24

1          MR. RUSSO: I'll rephrase it.
2 BY MR. RUSSO:
3      Q. What did Mr. Vail tell you he would need
4 from the company in order to allow him to continue to
5 work?
6      A. He specifically said he would not be able to
7 drive a car, and his leg needed to be elevated. He
8 wanted a printer in his home, so I brought him that,
9 and he said those were the things that he needed, and
10 he wants to work from home while he couldn't drive a
11 car, so that's what he did.
12      Q. Did you ever go to his home to set him up
13 with these items?
14      A. He invited me to his home shortly after his
15 injury and a short time after he started working from
16 the home. He requested a printer. I don't remember
17 if I also brought him his computer or if he had that.
18 I brought a box of items at his request to his house
19 and dropped them off to him.
20      Q. What was your observation when you went to
21 Mr. Vail's home? What was your observation about Mr.
22 Vail's physical condition at that point? Was he
23 walking? Was he ambulatory?
24      A. Yes. Actually, from what I recall, I've

Page 25

1  never been to his house before, but I didn't go
2  upstairs where his office was. He met me on his
3  first floor. It was a two-story house. We chatted,
4  and then I left, and he went back upstairs, I guess.
5      Q. Was he using any type of a cane or walking
6  device?
7      A. I don't remember exactly, but he may have
8  been using a cane or a crutch.
9      Q. When he came back to work at his office at
10 Harleysville, was he using a crutch?
11     A. I don't remember seeing a crutch or a cane,
12 but I do remember him telling me that he might have to
13 use one, or whatever.
14     Q. Based on your discussions with Mr. Vail and
15 your understanding of his injury, can you describe
16 what type of injury he sustained?
17     A. My recollection is that he got shot in the
18 upper leg, maybe rear end, and that he broke a bone or
19 something related to that.
20     Q. Did you ever ask Mr. Vail to lift any boxes
21 in his office?
22     A. No.
23     Q. On September 6th, 2000, did you ever ask him
24 to move dozens of boxes and files that were stored in

Page 26

1  his office?
2      A. There were boxes of service files, and we
3  repeatedly asked him before and after the injury to
4  sort through some of the files. These were the
5  service files. It didn't involve moving them. It
6  involved reviewing them, going through them and
7  pitching what we didn't need and keeping what we did
8  need.
9      Q. You did specifically allow Mr. Vail to work
10 out of his home; correct?
11     A. Yes.
12     Q. Did you yourself or anybody working at your
13 behest deliver any of these service files to Mr. Vail
14 to his home?
15     A. No. It wasn't one of the key parts that he
16 had to do while he was working at his home. The
17 majority of the items that he was supposed to do from
18 home were all done electronically over his computer.
19     Q. Was there any work that you assigned to him
20 while he was working at home that he could not access
21 because he could not retrieve the hard copy?
22     A. No.
23     Q. So any work that you gave Mr. Vail to do in
24 that period when he was working at home, he could have

Page 27

1  accessed that work and those files electronically at
2  home?
3      A. To the best of my recollection, that would
4  be correct.
5      Q. But didn't we discuss earlier that I think
6  you indicated that the service files were not
7  available on the electronic database?
8      A. Right. That was something from the day that
9  he began employment that he and his peers went through
10 and got in order. While he was away, we didn't ask
11 him to do that. As soon as he returned, we asked him
12 to focus on those service files.
13     Q. Prior to his injury, did you believe that he
14 had enough time to do that work with the service files
15 while he still had access to them?
16     A. Yes. His peers had done it. I don't
17 remember whether they did it a week before that or
18 that week or the next week, but in that same general
19 time frame.
20     Q. Do you know a Harleysville employee by the
21 name of Ted Semakosky?
22     A. Yes.
23     Q. Is Mr. Semakosky still employed by
24 Harleysville?

Page 28

1      A. I don't know. I think not.
2      Q. Was Mr. Semakosky let go while you were
3  still employed there?
4      A. It was him or another employee. I had two
5  employees in Pittsburgh, Ted and another employee, and
6  one of the two of them was let go by me during the
7  downsizing. I don't recall whether it was Ted or
8  Scott.
9      Q. Did you ever have a discussion with Mr. Vail
10 in which you referred to Mr. Semakosky as a "turd",
11 T-U-R-D?
12     A. I certainly don't recall that, and it does
13 not sound like something that I said.
14     Q. Did you ever have a discussion with Mr. Vail
15 in which you reflected adversely on Mr. Semakosky's
16 abilities?
17     A. I don't understand the question.
18     Q. Did you ever have a conversation with Mr.
19 Vail in which you indicated that you had some problems
20 with Mr. Semakosky's performance?
21     A. I really don't recall. It's possible with
22 any of the employees that I have talked about any
23 issue regarding any of the staff members. Mr.
24 Semakosky was one of Ken's direct reports?

Page 29

1      Q. How about Robert Panlayo?
2      A. It's Pantalayo, but I'm aware of who he is.
3      Q. Was this an individual who Mr. Vail had to
4  terminate, or was there some discipline against this
5  individual?
6      A. I remember that the individual was in
7  Maryland. I remember that he was on Ken's staff. I
8  don't remember if Ken terminated him or not. I
9  thought that the gentleman left for another job. In
10 fact, I'm pretty sure he did leave for another job.
11     Q. Did Mr. Vail's staff ever go to human
12 resources to complain about him?
13     A. Yes.
14     Q. There was a group of individuals that did
15 this en masse?
16     A. No. To the best of my recollection, when
17 Ken was returning to work or just prior to returning
18 to work, several different staff members with
19 complaints or issues contacted me, and after hearing
20 several of them speaking about harassment and unfair
21 treatment and one particularly unhappy employee
22 regarding a comment made regarding who might have
23 fathered his baby --
24     Q. That is Mr. Semakosky; correct?

Page 30

1      A. Yes, I believe. After hearing comments from
2  several of his direct reports, more than several, more
3  than a handful, we were having a conference coming up
4  with all the staff coming in, and I had my human
5  resource consultant meet with some of the people that
6  had some of the issues.
7      Q. Who was the human resource consultant?
8      A. Alice Geckeler.
9      Q. Did Miss Geckeler put her observations in
10 writing?
11     A. I'm not sure.
12     Q. Were these complaints from employees ever
13 discussed with Mr. Vail?
14     A. Yes, they were briefly discussed during his
15 termination conference.
16     Q. But not prior to that?
17     A. The meeting that took place with Alice
18 Geckeler occurred the end of August, beginning of
19 September, and taken with the performance issues that
20 had been repeatedly discussed verbally and in writing
21 with Ken, he was terminated probably within a week
22 after that.
23     Q. So is it safe to say that Mr. Vail never had
24 an opportunity to be confronted with these employee

Page 31

1  complaints prior to his termination?
2      A. No. The employees told him about how they
3  were feeling. Before they complained to me, they were
4  telling him about how uncomfortable his comments made
5  them or he wasn't fair.
6      Q. Did human resources or you ever confront Mr.
7  Vail with these employee complaints prior to
8  terminating him?
9      A. I don't recall because the main reason he
10 was terminated were performance issues that predated
11 his injury that were documented from four or five
12 weeks after he started throughout his entire short
13 tenure of employment.
14     Q. Did the employees ever put any complaints in
15 writing?
16     A. Not to my knowledge. I can't speak to who
17 else they may have written to. Did I get a written
18 complaint?
19     Q. Yes.
20     A. Not to my recollection.
21     Q. Do you know if human resources did?
22     A. I don't know.
23     Q. Did you have any concerns about the fact
24 that you hired a regional manager to be a tough

Page 32

1  manager, and then you're going to allow his
2  subordinates going over his head to complain to you?
3          MR. HALLER: Objection to the form of
4  the question.
5  BY MR. RUSSO:
6      Q. You can answer it.
7      A. There seems to be two different parts to
8  that.
9      Q. Were you concerned about the fact that you
10 were allowing the subordinates of one of your managers
11 to go over the manager's head to come directly to
12 you? Is that something that you regularly did?
13     A. Yes. Actually, it didn't happen very often,
14 I don't think, and I don't recall it happening in the
15 other three regions, but it's not unheard of from the
16 standpoint that an employee at any level, if they have
17 a problem with the direct supervisor, I believe it was
18 Harleysville's policy and it was my personal policy to
19 go to the next level, no matter what level that was.
20     Q. When you get a complaint like that from a
21 subordinate, wouldn't you want to immediately confront
22 your manager and say hey, look, so and so made a
23 complaint to me; what do you have to say about this?
24     A. Well, I did discuss the one specific

Page 33

1  complaint that I received by phone that was very
2  specific and had specific details regarding the
3  fatherhood of an expected wife's child. The employee
4  called me, and I asked the employee if he mentioned it
5  to Ken. He had. I met with Ken, and I discussed that
6  particular case, and Ken agreed that it was
7  inappropriate and agreed to apologize. That was the
8  one specific one that I remember. I don't know what
9  the other ones were specifically in time and place.
10     Q. Did Mr. Vail tell you that he was not aware
11 of the fact that Mr. Semakosky and his wife had had
12 problems with fertility?
13     A. He may have. I don't remember the details.
14     Q. How much traveling did Mr. Vail have to do
15 as part of his ordinary job responsibilities?
16     A. Well, none during most of the time that he
17 was there, but his peers, maybe 30 percent of their
18 duties involved riding with field staff, going to
19 attend branch office meetings and things of that
20 nature.
21     Q. As the regional manager, approximately 30
22 percent of his duties would be traveling to the field
23 office?
24     A. Yes. He probably had 10 or a dozen direct

Page 34

1  reports, and he would ride with them and monitor their
2  work quality.
3      Q. Did you have to excuse him from that
4  responsibility after he was injured?
5      A. Yes. He indicated that he couldn't drive,
6  so in order to assist him to continue, we allowed him
7  to skip that 30 percent or so of his job and focus on
8  the rest of it.
9      Q. Did Mr. Vail have, as part of his
10 responsibilities, quality control assessments to
11 make?
12     A. Yes. That was one of the largest duties.
13     Q. Did you give him written standards and
14 policies to utilize in doing his quality control
15 assessments?
16     A. I don't remember the exact time frame, but I
17 believe we had, if not headings to be used on an
18 electronic document, we may have had some kind of
19 form. I don't remember exactly which date we put that
20 together. There was a standard written feedback
21 procedure. It wasn't just informal to send an E-mail
22 to somebody and tell them they're doing great.
23     Q. Do you have any proof of having met with Mr.
24 Vail to go over some written standards that he was to

Page 35

1  put in practice?
2      A. You're taxing my recollection that Ken
3  helped develop the standards. We just reorganized.
4  It's my recollection that we had a meeting in Richmond
5  with the regional managers. We had some procedures
6  where each branch had a manager before we centralized
7  it. It's my recollection that Ken helped us put
8  together the quality control format.
9      Q. At the time that you hired Mr. Vail, did you
10 tell him that you were hiring him because there were
11 some fundamental problems in the organization that you
12 wanted him to work on?
13     A. I don't recall that I said fundamental
14 problems. We were looking to improve the quality.
15 The quality reviews were very important because the
16 quality of work wasn't up to the standard where it
17 needed to be. We were definitely looking to make
18 improvements.
19     Q. Getting back to the immediate period of time
20 after the injury, did Mr. Vail ever apply for any kind
21 of company benefits of any sort, whether they be
22 salary continuation or any type of disability?
23     A. I don't know.
24     Q. Did you ever discuss that with him?

Page 36

1      A. No. The only discussions that I recall
2  having were that he insisted that he really wanted to
3  work full time; that he didn't want to have any unpaid
4  time beyond what he had to have, and then later on, we
5  discussed part time twice again in writing, and my
6  recollection is that he wanted to work full time. He
7  kept thinking he could work full time going forward.
8      Q. Did you ever inform Mr. Vail that according
9  to Harleysville policy that someone with less than one
10 year of service could get long-term disability?
11     A. I don't know that we had that discussion.
12     Q. Were you aware of any discussion about
13 Harleysville policy that one with less than one year
14 of service could get paid LTD?
15     A. I don't recall.
16     Q. But you don't recall having a conversation
17 one way or the other with Mr. Vail regarding
18 disability availability?
19     A. I don't recall that. We discussed when he
20 was injured, and he was talking about what he wanted
21 to do or didn't want to do. I recall him telling me
22 that he wanted to work full time. I recall discussing
23 with him that he did not have any sick leave accrued
24 yet.

Page 37

1  Q. Mr. Vail said to you he didn't want to go on
2  disability, and he wanted to keep working; right?
3  A. That's my recollection, yes.
4  Q. Were you aware that Mr. Vail's physician had
5  approved him to work at home under certain
6  restrictions?
7  A. Yes. Well, the only restriction I knew of
8  was that he couldn't drive a car, and in the very
9  beginning, his leg had to be elevated.
10  Q. Did you ever review the doctor's written
11  restrictions?
12  A. During the time that Ken was working at
13  home, I only had the E-mails that Ken sent me
14  regarding his doctor's comments and whatnot. Towards
15  the very end of his working from home, he gave us a
16  note -- he sent me an E-mail saying that his only
17  restriction was that he couldn't lift things over 30
18  pounds.
19  Q. Did there ever come a point in June of 2000
20  that Mr. Vail got a letter from his doctor saying,
21  yes, you can now return to work? Maybe I should
22  clarify that. Did you ever see any indication from
23  Mr. Vail's doctor in June of 2000 that Mr. Vail could
24  return to work with certain restrictions?

Page 38

1  A. In June of 2000?
2  Q. Right.
3  A. I don't recall. My recollection was --
4  Maybe I'm thinking of the wrong date or E-mail. I did
5  see one E-mail where Ken said his doctor said he could
6  come back as long as he didn't have to lift over 30
7  pounds. Ken copied me on an E-mail that he sent to
8  his doctor where Ken was telling the doctor that he
9  felt great, and he was good to go back, and all of
10  that.
11  Q. There was an initial period of time for a
12  couple of weeks after Mr. Vail first was shot that he
13  was completely unable to work; correct?
14  A. No. Well, I'm not sure. I know that it
15  wouldn't have been appropriate for him to bring a
16  computer to the hospital. I know that somewhere
17  during the period, I think a week or so that he
18  remained in the hospital.
19  Q. But he had surgery?
20  A. It's my understanding that he did, yes.
21  Q. And that surgery involved various
22  reconstructive devices and implants?
23  A. I don't know if that's the case or not. He
24  called me from the hospital twice, and he told me that

Page 39

1  he was going home at sometime or another, but I don't
2  know what they did at the hospital, other than
3  surgery.
4  Q. But you would agree that at least for a
5  short period of time immediately after he was shot, he
6  was completely incapacitated?
7  A. I'm not sure. That's what he told me. I
8  didn't visit him. By the time I visited him two
9  weeks later or whatever time, I had come by his home,
10  and he came downstairs, and he met me to pick up the
11  printer and other stuff.
12  Q. Did you ever ask him for additional medical
13  documentation, or did Miss Geckeler ask him for
14  additional medical documentation?
15  A. I can't speak for the others, but in the
16  position that I had, I relied on the human resources
17  department to track that stuff and get releases from
18  the doctor and follow up on it.
19  Q. I think you already established that to the
20  best of your recollection, there was never any issue
21  regarding Mr. Vail needing to provide medical
22  documentation. Was he providing medical
23  documentation?
24  A. I'm not sure what they got. I didn't

Page 40

1  require a form that he didn't give me. It wasn't my
2  position to require those forms. Human resources
3  coordinated.
4  Q. Do you recall having a conversation with Mr.
5  Vail regarding the need to have staff assignments
6  completed within certain deadlines that were
7  established by the underwriters?
8  A. I don't recall a specific conversation, but,
9  yes, that's true; that that was the procedure.
10  Q. Was there any question or ever any
11  discussion between you and Mr. Vail regarding the
12  backdating of those reports, I mean, entering them
13  into the system on time?
14  A. I vaguely recall something, and I don't
15  remember if it was just Ken, but we did not permit or
16  condone backdating of reports. It was not an
17  acceptable practice. The record keeping was to track
18  which reports were sent to the underwriters by the
19  time they needed them.
20  Q. Who, if anyone, was backdating reports?
21  A. I don't recall the specifics, but I do
22  remember that we chatted with everybody to make sure
23  that they knew that that was an unacceptable practice.
24  Q. Did you ever send a memo to Mr. Vail in

Page 41

1  which you told him that he had to QC all reports? I
2  take it that means quality control all reports.
3  A. I don't recall if I said all. We had
4  specific guidelines that all the regional managers
5  were supposed to file the work in their territory, and
6  when Ken worked at home and was not required to do any
7  travel, we asked him to do 10 reports each month.
8  Q. Did you change any of Mr. Vail's work
9  assignments in order to reflect his working at home
10  and some of his special needs of working at home?
11  A. I'm not sure of the special needs, but we
12  changed it that he was not required to meet with
13  anybody face to face or travel at all, and that was up
14  to a third of the work-load for a regional manager.
15  The work we left him with related to the electronic
16  work and not specific paper files or anything related
17  to the travel.
18  Q. Did you ever tell him at any time that you
19  had designed the manager's job with a lot of hands-on
20  involvement?
21  A. Yes, that sounds like something I would have
22  said.
23  Q. At the time that you were interviewing Mr.
24  Vail and describing the job to him, did you tell him

Page 42

1  the job was going to have a lot of hands-on
2  development, or did the job evolve to where you
3  changed that?
4  A. It wasn't changed. Prior to him coming on
5  board with the company, I had put in writing a welcome
6  note to him, as well as the other peers starting the
7  same position at the same time, and in that note, we
8  discussed the hands-on and the important need to do
9  the quality reviews and the reports and so on.
10  Q. When you use the phrase hands-on work,
11  you're referring to what you just identified in your
12  previous answer?
13  A. Well, I can expand upon that. It was also
14  processing recommendations, the vendor work,
15  monitoring the results and making sure it got back on
16  time and making sure it got to the underwriters on
17  time. It was hands-on from the standpoint that it
18  wasn't as much strategic and administrated.
19  Q. Did you ever provide Mr. Vail with anything
20  in writing indicating that you were assigning a higher
21  priority to having quality control work done on the
22  reports and having information logged in and out on a
23  timely fashion?
24  A. At least on four or five occasions, I

Page 43

1 reminded him of the importance, in addition to the
2 verbal times we discussed it. He said, "I know I can
3 get to it, and I'll do it now," and then it just
4 didn't happen. It didn't get done.
5    Q. Did any of that have to do with him working
6 at home and having any kind of shortcomings working at
7 home?
8    A. No. My understanding from everything he
9 sent me in writing was that he was a hundred percent
10 ready to go and repeated he wanted to work full time
11 and was committed to do it. At no point did he say,
12 "I can't and won't do it."
13    Q. Did Mr. Vail ever send you an E-mail to
14 request an accommodation such as restricted hours?
15          MR. HALLER: Objection to the form of
16 the question.
17 BY MR. RUSSO:
18    Q. Did Mr. Vail ever E-mail you requesting a
19 modified work schedule?
20    A. Within the first week or two, he suggested
21 that he wanted to spread his work out throughout the
22 day. Sitting for more than six or eight hours at a
23 stretch was difficult for him, and we told him, "Feel
24 free to spread it out all you want," and again asked

Page 44

1 him if he wanted to go on a part-time basis, and he
2 affirmed in writing that he wanted to go full time.
3    Q. He never actually switched to a part-time
4 basis?
5    A. No.
6    Q. Did he ever tell you about a warning he had
7 gotten from his surgeon not to do any unnecessary
8 travel due to the plates and screws in his leg due to
9 the surgery?
10    A. No, never. In fact, you mentioned twice
11 today that he had a plate or something, and I don't
12 think I ever knew that he had any kind of anything. I
13 knew that he broke his leg.
14    Q. Did there ever come a point that you were
15 concerned that perhaps Mr. Vail wasn't recovering from
16 his injuries as fast as you had expected him to
17 recover?
18    A. I didn't have any expectations. A couple
19 times a week I touched base with him by phone or
20 E-mail, and the answer was always, "I'm doing great.
21 I'm getting better. Prognosis is good, and full
22 recovery is expected." It was very positive and
23 upbeat.
24    Q. Who is Craig Campbell?

Page 45

1    A. Craig Campbell is a home office person that
2 worked, to some degree, with the regional managers.
3 He was a direct report to me as well.
4    Q. Was Craig Campbell Mr. Vail's supervisor?
5    A. Well, no. I was Mr. Vail's supervisor.
6 However, during Mr. Vail temporarily working from
7 home, my recollection is that Craig Campbell, along
8 with Bill Castle and others, did various parts of the
9 job to assist Ken during his injury.
10    Q. When Mr. Vail was working out of his home,
11 did his assistant, Carley Jespersen, begin reporting
12 to Craig Campbell?
13    A. I don't remember if she reported to Craig or
14 to Bill Castle, but I vaguely recall that somebody was
15 providing some day-to-day oversight, some vision, and
16 she was getting frustrated that even if she talked to
17 Ken, Ken wasn't giving the type of guidance she was
18 hoping for.
19    Q. Did Miss Jespersen express these complaints
20 to Mr. Campbell?
21    A. I don't remember who she told them to. I
22 was aware of the complaints, I guess maybe in
23 passing. My office was somewhat near where she
24 worked. We were all in one department. She may have

Page 46

1 mentioned it to me in passing, but I don't recall her
2 sitting down and giving the details to me. I think
3 she was letting all the people she worked with know
4 that she was swamped.
5    Q. Mr. Vail made a statement about Miss
6 Jespersen complaining about Mennonite control of the
7 Harleysville organization. Did Mr. Campbell ever
8 indicate to you that Miss Jespersen was complaining
9 about Mennonites controlling Harleysville?
10    A. That's peculiar. I don't remember anybody
11 saying anything about that.
12    Q. Are there Mennonites that control the board
13 of directors of Harleysville?
14    A. I would have no way of knowing, but not to
15 my knowledge, and I have met the board at times and
16 various other people, and to the best of my knowledge,
17 they weren't.
18    Q. To the best of your knowledge, there would
19 be nothing about the Mennonite religion that would be
20 reflected in any work policy at Harleysville?
21    A. Not that I know of. I'm not a Mennonite and
22 have not received any Mennonite -- I don't know what
23 the impact would have been.
24    Q. Is Craig Campbell a Mennonite?

Page 47

1    A. No.
2    Q. Who is Scott Welsh?
3    A. Scott Welsh was one of the direct reports to
4 Ken. He was Pittsburgh home based like all the staff;
5 loss control staff member.
6    Q. Did Scott Welsh ever complain to Alice
7 Geckeler about Ken Vail?
8    A. I don't remember whether he complained
9 directly to Alice or whether he complained to me. He
10 was one of the people who talked to Alice towards the
11 end when a lot of staff members chatted with him.
12    Q. What was his problem with Mr. Vail?
13    A. I don't recall specifically which person had
14 which complaint, but the complaints were generally
15 that he was abrasive and abusive, did not give
16 constructive feedback, micro managed, was nasty. I
17 don't remember whether it was him or Ted, but one of
18 them was sent back into a place of business three or
19 four times, which was humiliating, and kept sending
20 him back several times asking one more question.
21    Q. Did anyone put these complaints in writing?
22    A. It didn't come to me in writing.
23    Q. Was there a Jerry Walker that was a direct
24 report to Mr. Vail?

Page 48

1    A. Jerry Walker was in the Harrisburg area and
2 reported to Ken Vail.
3    Q. He reported to Mr. Vail?
4    A. I don't remember specifically. I know
5 several employees complained.
6    Q. Did they ever complain in writing?
7    A. I don't recall.
8    Q. Did you ever talk to Mr. Vail about Scott
9 Welsh's and/or Jerry Walker's complaints?
10          MR. HALLER: Objection to the form of
11 the question.
12 BY MR. RUSSO:
13    Q. Did you ever meet with Mr. Vail and say,
14 "Look, I received a complaint from Scott Welsh?"
15    A. I don't recall, but probably not. The time
16 frame was such that I heard the complaints. Alice,
17 the human resource person, met with some of the staff
18 members that had the issues, and Ken ended up
19 terminated shortly thereafter.
20    Q. You did not meet with him to discuss that
21 with him?
22    A. We did during the termination meeting, but
23 we would not have met with him prior to that.
24    Q. Who made the decision to terminate Mr. Vail?

Page 49

1  A. I did.
2  Q. Why?
3  A. The performance issues started pretty much
4  within the first few weeks with the company, and four
5  or five times I told him in writing how important it
6  was to do these key core duties; moving the work,
7  getting it out, doing the recommendations and quality
8  reviews, and so on and so forth, and despite repeated
9  E-mails and even several warnings that it was critical
10  to his success at Harleysville, he just didn't do
11  those functions.
12  Q. Did you determine or did you conclude that
13  his gunshot injury had anything to do with the
14  deficiency in his performance?
15  A. No. Quite the opposite. His insufficiency
16  became apparent within the first couple of weeks, and
17  he did not work with his new administrative assistant
18  and prepare for that when he came in, and that was
19  prior to his injury.
20  Q. So you're saying that you terminated him
21  based upon some assessments you made prior to his
22  injury?
23  A. Throughout his entire short tenure, there
24  were fundamental problems with the key components of

Page 50

1  doing the job. One of the last problems to come to
2  light was that his staff was not comfortable with him
3  and felt harassed and abused, and that he was abrasive
4  and ineffective, but throughout the entire course of
5  his employment, his quality reviews, work process and
6  so forth wasn't done.
7  Q. You indicated that you hired him because
8  there were some basic problems in the organization
9  that had to be worked out.
10  A. I hired him because we went to a regional
11  structure, and we went to more managers than just four
12  and centralized it. That's the reason we hired him.
13  In all areas we were seeking improvement, but he
14  wasn't hired specifically because there was a
15  problem. He was hired because we had gone to the new
16  structure.
17  Q. Would you say that even under normal
18  circumstances, it would be an uphill climb for a new
19  manager who's taking a newly created job after a new
20  reorganization?
21  A. There were four of these exact same
22  positions, and the other three managers seemed to be
23  progressing well and progressing at a certain pace and
24  getting the work done; the key quality reviews,

Page 51

1  transmittals, vendor report reviews, and so on, as
2  well as working with their staff. So framed against
3  those, three out of the four were pretty successful.
4  Q. Did any of these three have any health
5  issues similar to Mr. Vail?
6  A. Not that I'm aware of.
7  Q. So none of those had any key health issues?
8  A. Not that I'm aware of.
9  Q. When you terminated Mr. Vail, did you give
10  him anything in writing laying out what your critique
11  was or what your areas of concern were?
12  A. We gave him a severance package document. I
13  don't know if he walked out with documents or if it
14  was mailed to him the same day or the next day, but we
15  discussed with him the performance issues, including
16  the staffs concerns, but additionally, the repeated
17  problems getting the fundamental core aspects of his
18  job done throughout his tenure.
19  Q. Was Mr. Vail terminated because of a
20  reduction in force or terminated for cause?
21  A. He was terminated for cause. We told him
22  that when we met.
23  Q. Do you know why he was sent a letter saying
24  he was being terminated because of a reduction in

Page 52

1  force?
2  A. Yes. There was a form letter that was done
3  for a reduction in force, and it was used mistakenly
4  with Ken, but his later EEOC documents indicated that
5  when we chatted with him prior to leaving the company,
6  we told him we were not satisfied with his
7  performance.
8  Q. So it was a mistake that it was sent to
9  him?
10  A. It was a form letter, and it was sent to him
11  by mistake, but in Alice's office, we explained to him
12  that it was because of his performance.
13  Q. Does Harleysville offer a severance package
14  when they're terminated for cause?
15  A. Well, generally with a tenure of less than a
16  year, they would not offer a severance package, but I
17  lobbied for that as a manager to help Ken's
18  transition, but generally, no, he would not be
19  entitled to a severance package.
20  Q. How was the amount of the severance package
21  determined?
22  A. I discussed it with human resources. We
23  wanted to give him something. He was, by company
24  rule, entitled to nothing, and so human resources

Page 53

1  suggested that amount of weeks or pay.
2  Q. So you feel that due to your personal
3  intercession or your lobbying, a word that you used,
4  the package was offered, and otherwise, it would not
5  have been offered?
6  A. It definitely, in my opinion, would not have
7  been offered had I not asked for it. Lobbying perhaps
8  was an incorrect word. I suggested and requested, and
9  the company was able to accommodate my request.
10  Q. Mr. Vail did not sign off or accept that
11  severance package?
12  A. It's my understanding he did not.
13  Q. Were you still employed by Harleysville when
14  Harleysville received Mr. Vail's EEOC charge?
15  A. I don't recall. I left Harleysville in
16  early 2001, so if that document you're referring to is
17  before early 2001, I guess I wasn't there.
18  Q. Did you have anything to do with providing
19  information to counsel to allow a response to the EEOC
20  charge?
21  A. Yes, I think I did. At one point, I signed
22  a document.
23  Q. Did you work with a Roslyn Pollack as part
24  of that process?

Page 54

1  A. No.
2  MR. RUSSO: I don't have any further
3  questions, sir.
4  MR. HALLER: Could we take a minute off
5  the record?
6  MR. RUSSO: Sure.
7  (Break taken in the proceedings.)
8  MR. HALLER: I have no questions.
9  ---
10  (Witness excused.)
11  (Deposition concluded.)
12  ---

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

KENNETH T. VAIL,          :   CIVIL ACTION
        Plaintiff,     :
                     :   NO. 02-CV-2933
        VS.          :
                     :
HARLEYSVILLE GROUP, INC., :
        Defendant.    :

---

Friday, June 18, 2004

---

Oral Deposition of ALICE GECKELER, taken pursuant to notice, at the Law Offices of Blank Rome, LLP, One Logan Square, 18th & Cherry Streets, Philadelphia, Pennsylvania, beginning at 2:05 PM, before Dennis Corsi, Registered Professional Reporter and Notary Public.

---

DENNIS CORSI COURT REPORTING
Registered Professional Reporters
814 Park Avenue
Collingswood, New Jersey 08108
(856) 854-7223

CONDENSED TRANSCRIPT WITH KEY-WORD INDEX

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                              ---
KENNETH T. VAIL,              : CIVIL ACTION
          Plaintiff,          :
    VS.                       : NO. 02-CV-2933
HARLEYSVILLE GROUP, INC.,     :
          Defendant.          :

             Friday, June 18, 2004

         Oral Deposition of ALICE GECKELER,
taken pursuant to notice, at the Law Offices of Blank
Rome, LLP, One Logan Square, 18th & Cherry Streets,
Philadelphia, Pennsylvania, beginning at 2:05 PM,
before Dennis Corsi, Registered Professional Reporter
and Notary Public.
                              ---



              DENNIS CORSI COURT REPORTING
             Registered Professional Reporters
                   814 Park Avenue
             Collingswood, New Jersey 08108
                    (856) 854-7223
```

Page 2

```
APPEARANCES:

         DONALD P. RUSSO, ESQUIRE
    Law Office of Donald P. Russo
         117 East Broad Street
         P.O. Box 1890
         Bethlehem, PA  18016-1890
              Counsel for Plaintiff

         ANTHONY B. HALLER, ESQUIRE
    Blank Rome, LLP
         One Logan Square
         18th and Cherry Streets
         Philadelphia, PA  19103-6998
              Counsel for Defendant
                     ---

    (It is stipulated by and between
counsel for the respective parties that signing,
sealing, certification and filing are waived; and
that all objections, except as to the form of the
question, are reserved until the time of trial.)
                     ---

    ...ALICE GECKELER, having been duly
sworn, was examined and testified as follows...
                     ---
```

Page 3

1  BY MR. RUSSO:
2  Q. Ms. Geckeler, my name is Donald Russo.
3  A. Hi.
4  Q. I'm going to be asking you some questions
5  this afternoon about this Ken Vail case.
6  A. Okay.
7  Q. If you can't hear me, let me know, and I'll
8  try to rephrase it. We're doing this by telephone, so
9  that makes it a little more difficult. Am I coming
10 through all right?
11 A. Yes, fine.
12 Q. The first thing I'll ask you to do is state
13 your full name for the record.
14 A. My name is Alice Geckeler.
15 Q. You're employed by Harleysville Insurance
16 Company, the defendant?
17 A. That's correct.
18 Q. What is your title at Harleysville?
19 A. I'm assistant vice president, recruitment
20 and retention.
21 Q. What department is that in?
22 A. Human resources.
23 Q. How long have you worked in human resources
24 for the defendant?

Page 4

1  A. I have worked for Harleysville since 1999.
2  Q. Prior to your current position, did you hold
3  any other or different position in the human resources
4  department?
5  A. At Harleysville or prior to Harleysville?
6  Q. At Harleysville.
7  A. I was the human resources manager and human
8  resources consultant.
9  Q. At Harleysville?
10 A. At Harleysville.
11 Q. Prior to your employment with Harleysville,
12 where were you employed?
13 A. I was employed with Risk Enterprise
14 Management in New York City and Philadelphia and the
15 Home Insurance Company in Philadelphia and New York,
16 and Cigna.
17 Q. What were the dates of those different
18 positions that you just identified?
19 A. I don't remember the dates offhand.
20 Q. Do you know Kenneth Vail, the plaintiff in
21 this case?
22 A. Yes.
23 Q. I take it the first time you met would have
24 been when he came to work at Harleysville?

Page 5

1  A. Correct.
2  Q. Were you engaged or involved in any way in
3  the process by which he was hired?
4  A. The only involvement that I would have had
5  is Gary Weinstein telling me that he was hiring Ken,
6  and in processing the paperwork to put him on payroll,
7  giving him an orientation to the company, that type of
8  thing. I did not interview him initially when he came
9  to the company.
10 Q. Do you know who made the decision to hire
11 Mr. Vail?
12 A. That would have been Gary.
13 Q. Was anybody else involved in that process?
14 A. Not to my knowledge.
15 Q. Was there a particular position that Mr.
16 Vail was hired to fill?
17 A. He was hired to fill the regional loss
18 control manager position in our middle Atlantic area.
19 Q. Was that a new position, or was it a vacancy
20 of an existing position?
21 A. It was a new position.
22 Q. Any particular reason why that position was
23 created?
24 A. The loss control department was reorganizing

Page 6

1  and creating regional positions in order to better
2  service the customers, and that was one of four
3  regional positions.
4  Q. To whom did Mr. Vail report throughout the
5  course of his employment at Harleysville?
6  A. He reported to Gary.
7  Q. Was Mr. Vail terminated by Harleysville?
8  A. Yes, he was.
9  Q. Was it an involuntary termination?
10 A. It was an involuntary termination, yes.
11 Q. Was he terminated for cause, i.e., for a
12 particular reason?
13 A. He was terminated for performance.
14 Q. Did you announce his termination to him, or
15 did somebody else do that?
16 A. Gary and I met with Ken and advised him that
17 he was being terminated for performance in my office.
18 Q. Do you remember the approximate date of that
19 meeting?
20 A. I believe it was September 7th of 2000.
21 Q. Did you give Mr. Vail a letter on September
22 7th, 2000?
23 A. We gave him a severance agreement, a
24 severance release and cover letter to that release.

Page 7

1  Q. And you signed the cover letter?
2  A. Yes.
3  Q. The first sentence of the cover letter says,
4  "As part of the expense reduction effort in the home
5  office, your position with Harleysville Group, Inc.
6  has been eliminated, and your last day of employment
7  will be September 8th, 2000." What was the reason for
8  that choice of words on your part?
9  A. The letter was given to him in error. That
10 comment was in error. I believe we sent you some
11 information saying that that was in error. It was a
12 form letter that we used in all of our reduction in
13 force situations, and because we were giving a
14 severance letter, the cover letter went with that.
15 Q. So who made the error?
16 A. Whoever was responsible for putting those
17 documents together for me.
18 Q. Do you know who was responsible for putting
19 them together?
20 A. It would have been one of the assistants in
21 the human resources department.
22 Q. When you sent that letter of September 7th,
23 2000, did you read it before you signed it?
24 A. I don't remember at this point. I know we

Page 8

1  did discover that the letter was not correct after I
2  gave it to him, and I don't recall.
3  Q. Your signature is on the letter. It's a
4  page-and-a-half long letter. It appears to be your
5  signature. You don't quarrel with the fact that that
6  is your signature?
7  A. That's my signature.
8  Q. When was it that you caught or detected the
9  error?
10 A. I don't remember.
11 Q. Do you know how Mr. Vail was notified about
12 the error?
13 A. I want to say we sent him a letter in
14 writing or to you in writing that said that this was
15 an error, and that his position was not eliminated;
16 that he was terminated for performance.
17 Q. The only thing I have is a letter I wrote.
18 Are you independently aware of any phone calls or any
19 letters that you may have sent directly to Mr. Vail
20 notifying him of this error?
21 A. I don't recall whether we sent him an
22 individual letter. I don't remember.
23 Q. The release and severance agreement that was
24 presented to Mr. Vail, who drafted that?

Page 9

1  MR. HALLER: Objection to the form.
2  You're asking originally or on that particular day?
3  BY MR. RUSSO:
4  Q. On that particular day, under cover of your
5  September 7th, 2000 letter, you provided Mr. Vail with
6  a release and severance agreement. Was that prepared
7  for Mr. Vail's situation, or was that just a form
8  you had on file?
9  A. The severance agreement is the severance
10 agreement that we use any time we provide severance to
11 employees.
12 Q. Did you review the release and severance
13 agreement at the time that you tendered it to Mr.
14 Vail?
15 A. The only thing I would have reviewed was the
16 number of weeks severance and the termination date. I
17 wouldn't go through the entire severance agreement
18 because it's one that we normally use with these
19 situations.
20 Q. Did you have it reviewed by counsel before
21 you sent it to Mr. Vail?
22 A. No, we did not.
23 Q. The first page of that release and severance
24 agreement, the second whereas clause, "Whereas

Page 10

1  employee had satisfactorily performed his job
2  responsibilities through September 8th, 2000," who
3  selected that language to be put into the agreement?
4  A. That's in all of the agreements that we
5  provide to employees. We will give you a severance
6  agreement if you satisfactorily perform your
7  responsibilities until the term date. That's general
8  language that we have in there.
9  Q. Was that also an error, the statement in
10 there that he had satisfactorily performed his job
11 responsibilities? Is it your position that was an
12 error?
13 A. Don, I would have to look at the severance
14 agreement. I don't think it says that. I think it
15 says you have to perform your duties from the time
16 that we're talking to the individual in order to
17 receive severance, but I have to see the document.
18 Q. It's Vail-10. Those are documents in the
19 file that are Bates stamped 10.
20 MR. HALLER: Are you saying it's Bates
21 stamped number 10?
22 MR. RUSSO: Yes. That would be my
23 Bates stamp.
24 MR. HALLER: The letter that you sent

Page 11

1  us asked to bring the documents we had produced, so
2  that's what I have in front of me. Those are the
3  documents we have in the room.
4  MR. RUSSO: Is there a fax number I can
5  send you this one page?
6  MR. HALLER: Why don't we go off the
7  record for a second, and let's see if we can find it?
8  MR. RUSSO: Okay. If you have my
9  documents that I turned over, it would be Vail-10,
10 010.
11 MR. HALLER: Give me a minute, Don, to
12 find it.
13 MR. RUSSO: Fine.
14 (Break taken in the proceedings from
15 2:20 PM to 2:30 PM.)
16 BY MR. RUSSO:
17 Q. Ms. Geckeler, I was referring to Vail-010.
18 The document is entitled Release and Severance
19 Agreement. Do you recognize that document?
20 A. Yes.
21 Q. What I was referring to was the whereas
22 clause. It says, "Whereas employee had satisfactorily
23 performed his/her job responsibilities through
24 September 8th, 2000." Do you see that language in the

Page 12

1  document?
2  A. That is the language within the document,
3  and that's the normal language that we have in all of
4  our release and severance agreements, and that's the
5  document that we gave him, but I believe we sent you
6  some information that said that that was not correct,
7  and the cover letter was not correct where it said
8  that his job was eliminated.
9  Q. The severance that was offered was $6,308.
10 Was that a mistake?
11 A. That was not a mistake. We offered him
12 severance because he'd only been with the company a
13 short period of time, and we wanted to give him a
14 cushion to find something from the time he left
15 Harleysville to finding another position at another
16 company.
17 Q. Because on Vail-23, which is the employee
18 listing that was attached to the release and severance
19 agreement, the job loss control regional manager is
20 listed yes as having giving him severance, and the age
21 was 42. The offering of the severance agreement was
22 not a mistake, even though you're saying some of the
23 other language was?
24 A. We were offering him a severance to breach

Page 13

1  him from the time he left our position to the time he
2  found another position. He had only been with the
3  company for a short period of time. He was in a
4  management role, and we wanted him to be able to have
5  something coming in until he found something else.
6      Q. The meeting in which you notified Mr. Vail
7  was yourself and Mr. Weinstein and Mr. Vail; is that
8  correct?
9      A. Yes.
10     Q. Was anybody else in the room?
11     A. No.
12     Q. Did Mr. Vail come to that meeting that day
13 knowing that he was going to be terminated?
14     A. I believe he came to the meeting with Gary.
15 I believe Gary said that he was coming over just to
16 talk with me. We didn't give him a reason for having
17 the meeting.
18     Q. Did Mr. Vail open the meeting by asking you
19 whether or not you had placed on Monster.com an ad for
20 a loss control representative position that he was
21 recruited for?
22     A. I don't recall. I don't remember.
23     Q. In this meeting with Mr. Weinstein, this
24 termination meeting I'll call it, was there any

Page 14

1  discussion of staff feedback with Mr. Vail?
2      A. When we talked to him, we told him that he
3  was being terminated for the ongoing performance
4  issues as well as the feedback that we received from
5  his staff at the meeting at the end of August.
6      Q. Did you go over any specific staff feedback
7  issues with him?
8      A. I don't believe we went over any of the
9  specifics with him. We just said that the information
10 that he had received was part of the ongoing
11 performance issues that Gary had been discussing with
12 him.
13     Q. So it's your understanding that Mr.
14 Weinstein had ongoing performance discussions with Mr.
15 Vail?
16     A. That's correct.
17     Q. Had you been present at any of those
18 discussions?
19     A. I was not present at the discussions, no.
20     Q. Were those discussions reduced to writing in
21 a format that would have been placed in Mr. Vail's
22 personnel file?
23     A. Yes, I believe they were. I think you have
24 copies of all of them.

Page 15

1      Q. Are you talking about documents that were
2  turned over as part of the personnel file or documents
3  that were turned over as part of a document request in
4  the litigation?
5      A. The documents that you got as part of the
6  litigation.
7      Q. Right. I guess my question was:
8  Independent of any documents turned over in the
9  litigation, were you aware of anything that was placed
10 in Mr. Vail's formal personnel file that involved the
11 criticism of his performance with the staff?
12     MR. HALLER: Objection to the form of
13 the question.
14     You may answer.
15     THE WITNESS: I believe the personnel
16 file did not have any of those documents. I believe
17 all of the documents were in E-mails that Gary had
18 sent to Ken Vail.
19 BY MR. RUSSO:
20     Q. Mr. Vail, prior to being terminated, had he
21 been accepting any form of disability benefits from
22 Harleysville?
23     A. No, he was not.
24     Q. Had he ever applied for any type of

Page 16

1  disability with Harleysville?
2      A. He was not eligible for disability with
3  Harleysville because he wasn't with the company long
4  enough to avail himself of those.
5      Q. Doesn't the company have a policy that
6  employees with less than one year of service can get
7  20 weeks of long-term disability?
8      A. Yes, that was the policy, but he had to be
9  out on disability 30 days, which is the waiting period
10 in order to have available to him the long-term
11 disability.
12     Q. Are you aware whether or not Mr. Vail tried
13 to come back to work as soon as possible after his
14 injury?
15     A. My understanding is he did come back to
16 work. He was working at home for a short period of
17 time, and I believe he came back to work at the end of
18 August. So, in effect, he was not on a disability.
19 He was only out two weeks, and long term would not
20 have come into play.
21     Q. Did Harleysville assist Mr. Vail with any
22 equipment setups or any other type of assistance to
23 enable him to get an office at home?
24     A. Yes. While he was working at home, I

Page 17

1  believe he had the equipment that he needed to perform
2  work at home.
3      Q. Were there any telephone lines that were
4  installed specifically for allowing him to work at
5  home?
6      A. I don't know that.
7      Q. Was Mr. Vail providing you with adequate
8  medical documentation regarding the nature of his
9  injury?
10     MR. HALLER: Objection to the form of
11 the question. Do you mean you personally, or do you
12 mean Harleysville?
13     MR. RUSSO: Harleysville.
14     THE WITNESS: I'm sure he was providing
15 the documentation to Harleysville. It was something
16 that would not come to me, but it would go to the
17 benefits department.
18 BY MR. RUSSO:
19     Q. Do you have any recollection or knowledge of
20 any issue there may have been of Mr. Vail not giving
21 enough medical documentation?
22     A. I don't have any knowledge of that.
23     Q. When did you first learn about the injury
24 that Mr. Vail had sustained?

Page 18

1      A. I believe Gary informed me the day that he
2  found out.
3      Q. Do you know how Gary Weinstein found out?
4      A. I want to say that Ken had called him and
5  advised him of his medical condition.
6      Q. Mr. Weinstein then gave you that
7  information?
8      A. Yes. I don't know the exact time, but
9  shortly thereafter.
10     Q. In your capacity as a human resources
11 specialist, do you ever work with the Family Medical
12 Leave Act?
13     A. I do. I am aware of the Family Medical
14 Leave Act. Anything that would come under the family
15 medical leave though would be handled by our benefits
16 department.
17     Q. Who is Jenny Hill Ludwig?
18     A. Jenny was the nurse that was employed by
19 Harleysville at that time. She's no longer working
20 for Harleysville.
21     Q. What department did she come under as an
22 occupational health nurse?
23     A. She was working for human resources.
24     Q. She worked under the auspices of human

ALICE GECKELER                     CondenseIt!™                     JUNE 18, 2004

Page 19

1 resources?
2    A. That's correct.
3    Q. Could you turn to Harleysville Bates stamp
4 0028? Let me know when you have it in front of you.
5        MR. HALLER: Just getting it in. The
6 witness has it.
7 BY MR. RUSSO:
8    Q. It's a one-page document. It's addressed to
9 Kenneth Vail dated June 22nd, 2000.
10    A. That's correct.
11        MR. RUSSO: I think we should stay on
12 the record because the first document that we were
13 looking at, the release document, I'd like to have
14 that marked as exhibit-A. That would have began as
15 010. It was a Vail document.
16        MR. HALLER: These are our original
17 copies, so I'm not marking anything.
18        MR. RUSSO: The documents are here.
19 Can we agree that this is Harleysville 0028?
20        MR. HALLER: Right.
21        MR. RUSSO: You have the original in
22 front of you. Let the deposition transcript reflect
23 the fact that I'm referring to a Bates stamp that we
24 both agree on.

Page 20

1        MR. HALLER: That's fine.
2 BY MR. RUSSO:
3    Q. Ms. Geckeler, have you ever seen this letter
4 before?
5    A. I've seen it as part of the documents that
6 were provided, but other than that, I did not see it.
7    Q. Are you aware that Mr. Vail is being offered
8 a Family and Medical Leave Act leave?
9    A. Would you repeat the question?
10    Q. Were you aware that Mr. Vail was being
11 offered an FMLA leave?
12        MR. HALLER: Objection to the form of
13 the question.
14 BY MR. RUSSO:
15    Q. What is the purpose of this letter of June
16 22nd, 2000?
17    A. Can you give me a minute to read it?
18    Q. Sure.
19        MR. HALLER: I just want to interpose
20 that the letter refers to some other things that,
21 obviously, you have not chosen to place before the
22 witness at this point in time.
23        MR. RUSSO: Right.
24        MR. HALLER: The witness has reviewed

Page 21

1 the letter.
2 BY MR. RUSSO:
3    Q. The middle of the letter refers to a
4 disability record form. Do you know, in your capacity
5 as a human resources officer, what a disability record
6 form was?
7    A. It was the record that the benefits
8 department would maintain on any illnesses that would
9 be reported to them.
10    Q. This letter also refers to enclosures being
11 a salary continuation and long-term disability
12 brochure.
13    A. Yes.
14    Q. Do you know why it is that this particular
15 brochure was being sent to Mr. Vail?
16    A. Again, this is a form letter that we send to
17 everyone, and when anyone is out more than five days,
18 we send them information on those benefits.
19    Q. The next document I'd like you to turn to
20 would be Harleysville Bates stamp 0019. It's a
21 two-page document, 0019, and Harleysville 0020.
22        MR. HALLER: The witness has those two
23 pages in front of her.
24 BY MR. RUSSO:

Page 22

1    Q. Have you ever seen these? It looks to me
2 like they're copies of E-mails. Have you ever seen
3 this before?
4    A. I don't believe I have.
5    Q. Were you working with Gary Weinstein and Mr.
6 Vail to help Mr. Vail throughout the period of his
7 convalescence and his attempt to return to work?
8        MR. HALLER: Objection to the form of
9 the question.
10        You may answer.
11        THE WITNESS: I was talking with Gary
12 on a regular basis as to what he was doing at home,
13 how he was doing, that type of thing, if that's what
14 you're referring to.
15 BY MR. RUSSO:
16    Q. In Mr. Vail's E-mail of July 20th, 2000, he
17 starts off by saying, "Gary, I can do full-time work
18 with accommodation/restriction by continuing to spread
19 out my workday." Do you know what he meant by that?
20    A. I think Gary and he had a conversation that
21 he could perform work at home. He didn't have to
22 perform it within a 9:00-to-5:00 time frame; that he
23 could spread it out over longer periods of time so
24 that he could work with his medical condition.

Page 23

1    Q. If you look toward the bottom, there's an
2 E-mail from Gary to Ken Vail of July 20th, 2000. Mr.
3 Weinstein starts off by saying, "I was confused by
4 your recollection of our discussion regarding
5 part-time status." Was there any confusion at that
6 time between you and Mr. Weinstein and Mr. Vail
7 regarding the part-time status of Mr. Vail?
8        MR. HALLER: Objection to the form of
9 the question.
10 BY MR. RUSSO:
11    Q. You can still answer the question unless or
12 until your attorney tells you not to.
13    A. Could you repeat the question, please?
14    Q. Do you know what Mr. Weinstein means when he
15 says, "I was confused by your recollection of our
16 discussion regarding part-time status?"
17    A. I don't know what Gary was referring to
18 there.
19    Q. Had Mr. Weinstein ever had a conversation
20 with you about Mr. Vail's part-time status?
21    A. To my knowledge, he wasn't working part
22 time. He was working a full day's work. He was just
23 working at home instead of in the office in order to
24 let him convalesce, as you said, faster, quicker so he

Page 24

1 could return to work. He was the one that was
2 insistent that he work at home so that he could keep
3 on top of the new job that he just got into.
4    Q. Was there ever any concern on your part
5 about Mr. Vail's pain medication that he was taking?
6    A. I'm not aware of him taking any pain
7 medication. I would not have had a conversation with
8 anyone about that.
9    Q. Do you know that in Mr. Weinstein's E-mail
10 to Mr. Vail, he refers to you were off pain medication
11 getting stronger every day. If you're not aware of
12 that as being an issue, then I won't ask you anything
13 further about it.
14        MR. RUSSO: I would ask if you could
15 show her 0002 and 0003. I think I have a question
16 about both of them.
17        MR. HALLER: The witness has
18 Harleysville 0002 and 0003 in front of her.
19 BY MR. RUSSO:
20    Q. Have you seen this 0002 before?
21    A. I have seen this as part of the
22 documentation, yes.
23    Q. The reason I coupled it to 0003 is because
24 it appears that there was a Word file that was

Page 25

1 attached. The file was called Ken medical doc, and it
2 appears that you were copied on that, if you look at
3 0003.
4    A. Correct.
5    Q. What was the purpose of 0002 from Mr.
6 Gochenour?
7    A. I don't know what the purpose of it was.
8    Q. Did you or Mr. Weinstein request that Mr.
9 Gochenour provide that information?
10    A. I did not request it. Whether Gary did or
11 not, I don't believe he did.
12    Q. But you did receive this information?
13    A. I did receive it from Gary, I believe.
14        MR. RUSSO: If the witness could turn,
15 please, to 0005.
16        MR. HALLER: The witness has 0005 in
17 front of her.
18 BY MR. RUSSO:
19    Q. This is an E-mail from Mr. Vail to Mr.
20 Weinstein of June 14th. Have you ever seen this
21 before?
22    A. I've seen this the same as the others, as
23 part of the documentation.
24    Q. In this E-mail, Mr. Vail refers to a Dr.

Page 26

1 Reid, R-E-I-D, no relation to Julie Reid, I take it,
2 as being his surgeon at Hershey Medical Center. Do
3 you remember that name as being a physician that was
4 providing Harleysville information about Mr. Vail's
5 injuries?
6    A. Don, I would not have access to any
7 information from any medical providers. That goes
8 directly to the benefits department.
9    Q. You never had any conversations with Dr.
10 Reid?
11    A. Not to my knowledge.
12    Q. Could you turn, please, to 0007?
13        MR. HALLER: The witness has it in
14 front of her.
15 BY MR. RUSSO:
16    Q. This is an E-mail from Mr. Vail to a host of
17 people. It's dated June 19th, 2000. It indicates
18 that Mr. Vail was going to return to work on a
19 restricted basis on June 19th. Were you aware of
20 that? Were you aware of that date as being the date
21 that Mr. Vail was going to return to work on a
22 restricted basis?
23    A. I knew that Ken was coming back on a
24 restricted basis. I don't know that I was aware of

Page 27

1 that date.
2    Q. Do you know what Mr. Vail means when he uses
3 the phrase restricted basis working from his
4 residential office?
5    A. Meaning that he was performing most of his
6 responsibilities, but he wasn't able to drive the
7 car. Driving his car is part of his normal duties.
8    Q. He also goes on to say that he was still in
9 considerable pain and needed to take relatively
10 frequent breaks during the day. Did he clear that
11 with anybody, such as Mr. Weinstein?
12    A. I think that's in the previous memo that you
13 were looking at where we said that he could spread his
14 time out over longer periods of time. That would
15 include those breaks.
16    Q. Could you turn, please, to 0009? Do you
17 have that in front of you?
18        MR. HALLER: I'm just finding it. The
19 witness has it. She hasn't yet reviewed it.
20        MR. RUSSO: Anthony, you said she has
21 not?
22        MR. HALLER: Correct.
23 BY MR. RUSSO:
24    Q. Do you need a moment to look at it?

Page 28

1    A. Yes, please. Okay.
2    Q. This appears to be an E-mail from Mr. Vail
3 to Gary Weinstein and Alice Geckeler. Do you remember
4 receiving this?
5    A. Yes.
6    Q. This indicates, "Gary and Alice, I met with
7 my orthopedic surgeon, Dr. Spence Reid, at Hershey
8 Medical Center June 21st. He was pleased at my
9 progress." Do you know why Mr. Vail sent you this?
10 Was he asked to send you this?
11    A. I would assume Gary would have told him to
12 send it to me.
13    Q. Mr. Vail said that Dr. Reid does not want
14 him to drive or put body weight on his trauma leg
15 before the next visit. Strike that.
16        Was significant driving part of Mr. Vail's
17 job responsibilities?
18    A. I believe it was. I think 30 percent maybe
19 was part of his job.
20    Q. Mr. Weinstein's response was, "Thanks for
21 the note. Drink lots of milk. Build new bones. Rest
22 up and get well." Did he send that response to you as
23 well?
24    A. Yes, he did. Actually, no, he didn't. It

Page 29

1 doesn't say it was copied to me. It was only sent to
2 Ken.
3    Q. You don't remember seeing that at the time?
4    A. No, I don't.
5    Q. Would you turn to Harleysville 0013? Do you
6 have that?
7        MR. HALLER: Yes, the witness has it.
8 BY MR. RUSSO:
9    Q. Do you need a minute to look at that?
10        MR. HALLER: She has it, and she's
11 ready to answer questions on it.
12 BY MR. RUSSO:
13    Q. Who is Luanne Arcaro?
14    A. Luanne works in our benefits department and
15 handles the short-term and long-term disability.
16    Q. Does she work in human resources?
17    A. She does.
18    Q. So you know her, I take it.
19    A. Yes.
20    Q. The subject was disability form. That is a
21 specific form that you generally use?
22    A. Any time anyone goes out on an illness, they
23 have to complete the disability form, and it usually
24 applies after five days, and Luanne is the one that

Page 30

1 coordinates all that with the employee.
2    Q. Any particular reason why this disability
3 form was sent?
4    A. Sent to Ken?
5    Q. Yes.
6    A. Because Ken was out more than five days, and
7 it would be something that she would have sent to
8 him.
9    Q. The fact that the form says disability form
10 doesn't mean that Mr. Vail had a disability?
11    A. It means that he was out more than five
12 days, and more than five days would be considered a
13 disability.
14    Q. Did Mr. Vail return this form?
15    A. I don't know. The disability form is a form
16 that we would use for anybody that goes out for any
17 type of illness or injury. It's titled disability
18 form, but it's a generic form that we use for all
19 situations.
20    Q. The next document is 0014, if you would look
21 at that, please.
22        MR. HALLER: The witness has it.
23 BY MR. RUSSO:
24    Q. This appears to contain a medical slip from

**ALICE GECKELER**     CondenseIt!™     **JUNE 18, 2004**

Page 31

1 Penn State Geisinger Health System. It says, "May
2 return to work on 8-21-2000." Do you remember seeing
3 this?
4    A. I would not have seen this when received.
5 I've seen it as part of the documentation.
6    Q. Do you know who Donna Harn is?
7    A. She's the person sending the fax, but I have
8 no idea who she is.
9    Q. We've identified Luanne Arcaro.
10    A. Correct.
11    Q. Do you know who wrote "Please, rush" on
12 that?
13    A. I do not.
14    Q. Do you know whether or not August 21st, 2000
15 was, indeed, the day that Mr. Vail was released by Dr.
16 Reid to return to work?
17    A. According to this document, it says he was
18 released to return to work.
19    Q. And it is signed by J. Spence Reid, who was
20 the physician identified as doing his surgery?
21    A. Correct.
22    Q. This was turned over by Harleysville, 0014,
23 so I take it was in Harleysville's files.
24    A. Correct.

Page 32

1    Q. If you recall, was 8-21-2000 the day that
2 Mr. Vail no longer was working at home? Was this a
3 time when he was to report to his office at
4 Harleysville full time?
5    A. I believe that was the day that he returned
6 to work, yes.
7    Q. If you would, turn, please, to Harleysville
8 0021. On July 12th, 2000, Mr. Vail sent an E-mail to
9 Jenny Hill Ludwig asking her if she had received a
10 disability form, and she responded on July 13th, 2000
11 indicating that she had, indeed, received the
12 disability form. Was the purpose of that disability
13 form to provide Mr. Vail with any type of disability
14 benefits, or was it just to explain why he was out of
15 work?
16    A. The purpose of the disability form is to get
17 medical documentation completed by the doctor or the
18 physician to show that he was, indeed, out and this
19 was the reason for him being out.
20    Q. To further explain the reason why I'm asking
21 the question, I think we've already resolved the fact
22 that Mr. Vail didn't have any type of long-term
23 disability benefits or short-term disability benefits,
24 but yet, he's returning this disability form. For any

Page 33

1 employee of Harleysville who was going to be out for
2 more than five days for a medical reason, I take it
3 that they'd have to complete and send in this
4 disability form.
5    A. That's correct.
6    Q. So this is to allow Harleysville to know
7 what the problem is and why they're out?
8    A. That's correct.
9    Q. If you would, turn to Harleysville 0024. Do
10 you have that?
11    A. We do have it.
12    Q. 0024 is an E-mail from Gary Weinstein to
13 Jenny Hill Ludwig saying, "Please, chat with Ken's
14 doctor to get an up-to-date prognosis. What can he do
15 now? Any limitations? When he would recover, any
16 restrictions?" Ms. Ludwig responded on July 6th to
17 Mr. Weinstein. In her E-mail, she said it was too
18 early to talk about long-term limitations. Short-term
19 through the end of August, Mr. Vail could not put any
20 weight on his leg. He's not allowed to drive, and he
21 is not allowed to move his leg sideways. My question
22 to you is: Did Ms. Hill Ludwig ever discuss with you
23 whether or not Mr. Vail was going to have any
24 long-term limitations when he returned to work?

Page 34

1    A. She did not.
2    Q. Did Mr. Weinstein ever discuss with you
3 whether or not Mr. Vail would have any long-term
4 limitations when he returned to work?
5    A. He did not.
6    Q. Do you know why Mr. Weinstein was seeking
7 this information from Ms. Hill Ludwig?
8    A. I don't know.
9    Q. The next document I'd ask you to turn to
10 would be Harleysville 0025.
11    A. I have that.
12    Q. There appears to be three E-mails on here
13 between Mr. Vail and Ms. Hill Ludwig, and it appears
14 that you were copied on, at least, two of them. Do
15 you know what the purpose of Ms. Hill Ludwig's inquiry
16 to Mr. Vail was on this E-mail?
17      MR. HALLER: Which E-mail are you
18 referring to?
19      MR. RUSSO: The first one on the bottom
20 of June 26th.
21      MR. HALLER: The first E-mail on June
22 26th is from Mr. Vail to Jenny Hill Ludwig. I think
23 we're confused as to the question. Do you want to
24 restate the question?

Page 35

1 BY MR. RUSSO:
2    Q. For example, at the top, there's an E-mail
3 from Mr. Vail to Ms. Hill Ludwig, and on the bottom,
4 there's one from Mr. Vail to Ms. Hill Ludwig. Do you
5 know why you were copied on those?
6    A. I believe Ken was copying me on a lot of the
7 correspondence that he sent to Harleysville. I don't
8 know why.
9    Q. Did he ever discuss with you that he wanted
10 to keep you in the loop as his human resources
11 officer?
12    A. I don't remember.
13    Q. Was this helpful to you that he was keeping
14 you copied with this material?
15    A. It was information, but I didn't have
16 anything to do with it, so it was more of a
17 correspondence with him and the nurse at that time.
18    Q. If you would, turn to Harleysville 0051.
19 It's a two-page memo.
20      MR. HALLER: 0050 and 0051?
21      MR. RUSSO: 0051 and 0052.
22      MR. HALLER: 0051 is part of an E-mail.
23      MR. RUSSO: For some reason, I didn't
24 have 0050. Is 0050 the first page of the three-page

Page 36

1 E-mail?
2      MR. HALLER: Yes.
3      MR. RUSSO: Then the second page of
4 that E-mail, which is page 0051, right about
5 two-thirds of the way down, it says on Friday, June
6 9th. Do you see that paragraph?
7      THE WITNESS: Yes.
8 BY MR. RUSSO:
9    Q. Mr. Vail says, "On Friday, June 9th, 2000,
10 we spoke by phone, and we further discussed the
11 circumstances and specifics of my injury. I advised
12 that I plan to return to the office on Tuesday, June
13 13th, 2000, and that we will speak again then perhaps
14 with Alice Geckeler of human resources." My question
15 is: Do you recall having a meeting with Mr. Weinstein
16 and Mr. Vail on June 13th, 2000?
17    A. No, I don't recall that.
18    Q. Do you know why Mr. Vail would have
19 suggested having a meeting with you at that time; what
20 the purpose of that would have been?
21      MR. HALLER: Objection to the form of
22 the question; the hypothetical nature of it.
23      You may answer, if you know.
24      THE WITNESS: I don't know.

Page 37

1 BY MR. RUSSO:
2    Q. The next E-mail is Harleysville 0040.
3        MR. HALLER: The witness has it.
4 BY MR. RUSSO:
5    Q. It's an E-mail from Luanne Arcaro to Gary
6 Weinstein. "Gary, I have been assigned to the
7 administration of our disability program, and I am
8 following up on Ken Vail's disability. As of August
9 8th, 2000, do you know what Ken Vail's disability
10 was?"
11        MR. HALLER: Objection to the form of
12 the question.
13        You may answer.
14        THE WITNESS: I don't. Could you
15 repeat the question?
16 BY MR. RUSSO:
17    Q. I was reading from the E-mail of Luanne
18 Arcaro. She was the benefits specialist?
19    A. She took over for Jenny Hill Ludwig.
20    Q. Is Ms. Arcaro a nurse?
21    A. No, she is not.
22    Q. But she handled all the disability programs?
23    A. She handled the program, yes.
24    Q. She's referring to Ken Vail's disability,

Page 38

1 and I wanted to know if you were aware, as of August
2 8th, 2000, what Mr. Vail's disability was.
3    A. To my knowledge, he was not on a
4 disability. He was out sick. He was working at
5 home. She was probably following up on the form that
6 we had that said his illness started on whatever the
7 date was that it started and picking up from Jenny to
8 see if that was closed or it was still open or
9 whatever the case might me.
10    Q. If you'll turn, please, to Harleysville
11 0039.
12    A. I have that.
13    Q. This is dated August 10th. The subject was
14 Ken's return to the office August 21st. It says,
15 "Gary, my doctor approved me to return to the office
16 on August 21st, 2000. I am to use one crutch to walk
17 until my next doctor visit. My next medical
18 evaluation is scheduled for September 6th, 2000.
19 Until then, I'm restricted from putting full body
20 weight on my trauma leg. I can walk with a crutch,
21 sit and stand. I'm restricted to lifting a maximum of
22 30 pounds. Please, let me know if any arrangements
23 need to be made with building services for phone, PC
24 connections or for office furniture." Do you know why

Page 39

1 Mr. Vail sent this E-mail to Mr. Weinstein on August
2 10th?
3        MR. HALLER: Objection to the form of
4 the question; the hypothetical nature of it.
5        You may answer.
6        THE WITNESS: I would assume it was
7 ongoing correspondence with Ken and Gary as to when he
8 was going to be returning to the office as opposed to
9 working at home.
10 BY MR. RUSSO:
11    Q. Were Mr. Vail to return on August 21st, did
12 he arrive on the premises using a crutch?
13    A. I don't know.
14    Q. Were you aware of any lifting restriction he
15 had of 30 pounds?
16    A. I'm not aware of that.
17    Q. He says that his next medical evaluation was
18 scheduled for September 6th, 2000. Wasn't that the
19 day that you notified him that he was going to be
20 terminated?
21        MR. HALLER: Objection. The witness
22 testified earlier that the date was the 7th.
23        MR. RUSSO: The 7th was the day he was
24 terminated?

Page 40

1        THE WITNESS: That's correct.
2 BY MR. RUSSO:
3    Q. Did Mr. Vail have to use any vacation days
4 during the time he was out?
5    A. He was not eligible for vacation. He wasn't
6 with the company long enough. He had to be with the
7 company four months or longer in order to have any
8 type of vacation.
9    Q. If you could, turn to Harleysville 0045,
10 please, the reason I'm confused by this is because
11 0045 refers to deductions for vacation and deductions
12 for sick time, but the notation "unpaid" is made
13 there. Can you explain that? You say he wasn't
14 eligible for vacation. Is this just a paper that says
15 a deduction was made for vacation time, but yet, he
16 wasn't being paid for it?
17    A. That's correct. When we submit our time
18 sheets to payroll, we would say that he didn't have
19 any time. We would use it as vacation deduct,
20 unpaid. That's the recording mechanism that we use in
21 our payroll department.
22    Q. I was just seeking an explanation as to why
23 that was.
24        Harleysville 0042 is a memorandum from Mr.

Page 41

1 Vail referring to a vacation day. It's a two-sentence
2 E-mail. Do you have that in front of you?
3        MR. HALLER: Not yet. She does now.
4 BY MR. RUSSO:
5    Q. The vacation day that Mr. Vail is referring
6 to, he's referring to one of those unpaid vacation
7 days, I take it.
8    A. It would have to be an unpaid because he did
9 not have any paid vacation time.
10    Q. If you would, turn, please, to Harleysville
11 0047. 0047 is a follow-up E-mail from a previous
12 E-mail that we identified. At the very top of 0047,
13 there's an E-mail from Gary Weinstein to Jenny
14 Ludwig. It says, "Ken is back to work
15 tele-communicating from his home; has been for the
16 past few weeks. We're expecting, at the end of
17 August, a conference, even if we have to drive him
18 ourselves and put him in a wheelchair. He is one of
19 our key presenters. Thanks for keeping a handle on
20 this unusual case." Do you know anything about an
21 August conference that Mr. Vail was going to attend?
22    A. Yes. Gary was having a conference at the
23 end of August with all of the loss control staff, and
24 Ken was part of that conference.

Page 42

1    Q. Do you know why Mr. Weinstein said, "Even if
2 we have to drive him ourselves and put him in a
3 wheelchair?"
4    A. I would think he was trying to help Ken
5 because Ken was insistent upon being at the
6 conference, and if he wasn't able to drive at the
7 time, they would have driven him.
8    Q. Mr. Weinstein refers to Mr. Vail as being
9 one of the key presenters. Is that your
10 understanding?
11    A. That's correct. As a regional manager, he
12 and the other three regional managers were presenting
13 at this conference.
14    Q. The next E-mail is Harleysville 0037. It is
15 an E-mail from Ken Vail to yourself and Gary
16 Weinstein.
17    A. I have that.
18    Q. Do you recall getting this?
19    A. It was sent to me, so I assume I got it. I
20 don't remember receiving it.
21    Q. You never discussed this personally with Mr.
22 Vail?
23    A. I don't believe I did.
24    Q. Bear with me one moment here. If you would,

Page 43

1 turn, please, to Harleysville 0008.
2         MR. HALLER: The witness has it.
3 BY MR. RUSSO:
4     Q. 0008 refers to a cell phone. Do you know
5 what it means by that?
6     A. I don't.
7     Q. Do you know who Ken Orner is?
8     A. Ken was the person responsible for cell
9 phones at Harleysville.
10     Q. These are cell phones that are paid for by
11 the company?
12     A. Correct.
13     Q. If you'll turn, please, to Harleysville
14 0015.
15     A. I have that.
16     Q. 0015 is dated September 6th, 2000. It says,
17 "Please, return this form by 9-7-2000 to Luanne
18 Arcaro, HR specialist, benefits." It's entitled
19 Supplementary Disability Record. Do you know what
20 this document is?
21     A. This is usually the form that the benefits
22 department will send out to the employee to follow up
23 on how long they're going to be out of work.
24     Q. Do you know why Ms. Arcaro sent Mr. Vail

Page 44

1 this on September 6th, 2000?
2     A. I don't.
3     Q. She asked him to return it to her on
4 September 7th, 2000, but that, indeed, was the day
5 that Mr. Vail was terminated; correct?
6     A. That is correct.
7     Q. If you'll turn, please, to Harleysville
8 0011.
9         MR. HALLER: The witness has 0011 in
10 front of her.
11 BY MR. RUSSO:
12     Q. At the very top, it's an E-mail that's dated
13 Sunday. Any idea why Mr. Weinstein sends out E-mails
14 on Sunday?
15     A. Because he's probably very busy during the
16 week and trying to catch up.
17     Q. It sounds as bad as me. July 9th, 2000, Mr.
18 Weinstein sent an E-mail to Mr. Vail, and he copies
19 you on it, and he's referring to this disability
20 record form again. Mr. Weinstein says, "I'm afraid
21 payroll insists on bumping you to unpaid leave status
22 rather than your current tele-communicating full-time
23 status." I guess I should have read the whole
24 sentence. "If your doctor does not take Jenny's calls

Page 45

1 and provide the information needed." As of July 9th,
2 was there any concern that Mr. Vail's physician was
3 not providing adequate information to the company?
4     A. I wouldn't know that. If you read this,
5 they may have had a concern, but I don't know that.
6     Q. You don't have any independent recollection
7 of any problem that you can recall right now with
8 information being disseminated by Mr. Vail's
9 physician?
10     A. No. As I said before, I wouldn't be
11 involved in any of that. That would be handled
12 strictly by the benefits department and the employee.
13     Q. I'm looking through a couple of these pages
14 because, I think, there are duplicates. Turn, please,
15 to Harleysville 0029.
16         MR. HALLER: The witness has it.
17 BY MR. RUSSO:
18     Q. This is a request for family medical leave
19 form; correct?
20     A. Correct.
21     Q. It says in paragraph one that Mr. Vail was
22 not eligible for FMLA leave.
23     A. That's correct.
24     Q. Do you know who made that determination?

Page 46

1     A. The law, I believe, would make that
2 determination. He was not with the company long
3 enough to be eligible for FMLA.
4     Q. I know that. My question was: Was that Ms.
5 Hill Ludwig's determination to make?
6     A. It was Jenny's position to advise employees,
7 yes.
8     Q. The next document is Harleysville 0043, if
9 you would look at that, please.
10         MR. HALLER: The witness has the
11 document.
12 BY MR. RUSSO:
13     Q. In the middle of Harleysville 0043, an
14 E-mail from Ms. Hill to Mr. Vail says, "I was told
15 that you were working at home. I was also told that
16 you only missed two full weeks of work." Is this
17 information correct? "Are you tracking the hours that
18 you are working?" Was it necessary, when Mr. Vail
19 worked at home, to provide Harleysville with a record
20 of his actual work hours?
21     A. I don't know that.
22     Q. So you weren't involved in that process of
23 following up on that?
24     A. No, I would not be involved in that process.

Page 47

1         MR. HALLER: Mr. Russo, the witness
2 wanted to add something to her response.
3         THE WITNESS: I'm making hand signals
4 here.
5         MR. HALLER: Go ahead.
6         THE WITNESS: Normally when a person is
7 out ill and they are working at home, some of that
8 time might be counted toward STD or LTD. That would
9 have been what Jenny was referring to about keeping
10 track of his hours, but he was only out for a short
11 period of time, so it wouldn't have applied.
12 BY MR. RUSSO:
13     Q. The next document is Harleysville 0034. I
14 think this is the last document.
15     A. I have that.
16     Q. It's an E-mail from Gary Weinstein to Ken
17 Vail, and it's copied to yourself. Is says toward the
18 end, "Please, take ownership of the communication
19 process between Jenny and your doctor." What is that
20 supposed to mean?
21     A. I don't know.
22     Q. It goes on to say, "Let's not simply wait
23 until the next visit and hope that the doctor provide
24 what Jenny needs."

Page 48

1     A. It sounds like the doctor wasn't providing
2 Gary with the information.
3     Q. In response, Mr. Vail says in his E-mail of
4 July 10th that the form was sent by fax to
5 Harleysville on July 7th, so it should be in HR now.
6 I take it the disability record form then was received
7 by July 10th.
8     A. Again, I wouldn't be involved in that, so I
9 really don't know.
10         MR. RUSSO: That's all, I think, I have
11 right now. As far as I'm concerned, that's all I'm
12 going to need.
13         Anthony, do you have any questions?
14         MR. HALLER: I have one question.
15 BY MR. HALLER:
16     Q. You were asked a question by Mr. Russo about
17 whether you were present for discussions between Mr.
18 Weinstein and Mr. Vail concerning his performance
19 during the period after his injury. Do you recall
20 that question in general?
21     A. Yes, I recall the question.
22     Q. Am I correct that you were not physically
23 present in a meeting?
24     A. That's correct.

**EXHIBIT D**



Harleysville
*Good people to know*

| Home | Employment | Agents only | Press | Site index | Search | Contact us |
| About us | **Products** | Investors | Governance | Policyholders | Locations | Find agent | File claim |

## Products

**Business**
**Contact us**
**Find agent**
**Flood**
**Life**
**Loss control**
**Non-profit**
**Our offices**
**Personal**
**Surety**
**Workers comp**

### Protection for your business

Harleysville offers a wide variety of insurance products for businesses...from coverage for your building and its contents to your general liability needs...from your vehicles to your employees...everything you need to protect you and your business! We also have specialty products such as surety. And, don't forget about your business life insurance needs!

Are you one of the millions of entrepreneurs across America who runs a business out of your home? If so, Harleysville has got you covered! Our Home Business Solutions™ endorsement can protect you whether you're at home or on the road developing those new leads. You'll also want to click here for information about flood insurance for your business property as well as your home. This important protection—excluded in standard homeowners policies—is available from your Harleysville agent.

While we insure many different types of businesses, we also offer a number of customized programs for certain customer segments. These programs have been designed with the special needs of these businesses in mind. Check to see if we offer a special program for your business.

Harleysville can provide small to mid-size non-profit organizations with valuable coverage to protect individual directors and officers—and the organization itself—against a wide range of "professional" liability exposures.

While our products are important, service is still our priority. We offer our commercial customers a host of value-added services, in addition to our quality insurance protection. For example, if you insure your business with us, we offer personalized loss control programs to help you keep your workplace safe for you and your employees and to protect your facility from fire and other potential hazards.

If you can't find what you're looking for or if you have additional questions, contact an agent in your area or get in touch with our office nearest you.



Home | Employment | Agents only | Press | Site index
Search | Contact us | About us | Products | Investors
Governance | Policyholders | Locations | Find agent | File claim
Disclaimer | Privacy

© Copyright 2000-2003 Harleysville Group Inc., Harleysville, Pa., U.S.A. All rights reserved.
The products described on this Web site are not

available in all states of the United States.
Please read our disclaimer and privacy policy.



**Harleysville**
*Good people to know*

| Home | Employment | Agents only | Press | Site index | Search | Contact us |
| About us | Products | Investors | Governance | Policyholders | Locations | Find agent | File claim |

## Products

**Business**

**Contact us**

**Find agent**

**Flood**

**Life**

**Loss control**

**Non-profit**

**Our offices**

**Personal**

**Surety**

**Workers comp**

### Loss control

#### Our mission

Loss control contributes to your goals by reducing risk and developing a safer environment that directly leads to your overall success and makes a positive impact to your bottom line. We provide the following tools for policyholders.

- **Inspections**: On-site evaluation of risk for the purpose of determining insurability.

- **Services**: Goal-oriented activities or products to you that are typically aimed at loss reduction and risk improvement.

- **Contributions**: Goal-oriented activities or products, other than inspections or services that contribute to your goals and enhance our relationship.

Click here for loss control programs

For help contact losscontrol@harleysvillegroup.com
Phone: 800.523.6344, ext. 8100
Fax: 215.513.8157

Home | Employment | Agents only | Press | Site index
Search | Contact us | About us | Products | Investors
Governance | Policyholders | Locations | Find agent | File claim
Disclaimer | Privacy

© Copyright 2004 Harleysville Group Inc., Harleysville, Pa., U.S.A. All rights reserved.
The products described on this Web site are not
available in all states of the United States.
Please read our disclaimer and privacy policy.

**EXHIBIT E**

EXHIBIT

VAIL - 11
3-24-04 MCC



# The Harleysville
# Insurance Companies

A National Network of Regional Insurers

# Employee manual

H000076

**Section 1**
**General Information**

68080



| Employee Manual | Section 1: General Information | Ed. 6/99 | Page 1 |
|---|---|---|---|

## I - YOUR EMPLOYMENT

### EMPLOYMENT AT WILL

The nature of the relationship between the Company and all of its employees is employment-at-will; either the employer or the employee can terminate the relationship at any time for any reason that is not prohibited by law. Nothing contained in this handbook changes the employment-at-will relationship or creates a contract, express or implied, between an employee and the Company.

### EQUAL EMPLOYMENT OPPORTUNITY

You are now part of a professional team of highly qualified employees. It is the policy of our Company to hire qualified people to perform varied tasks. An integral part of this policy is to administer hiring, transfers, promotions, terminations, working conditions, benefits, and privileges of employment, compensation and training for all employees without regard to race, color, creed, religion, age, marital status, gender, ancestry, national origin, disability or sexual orientation. Our policies prohibit illegal discrimination or harassment of any kind.

**Violation of Company policies may result in discipline, up to and including termination and/or criminal charges. During the investigation of any allegations of violations of the Company's policies, the Company may suspend the employee(s) involved.**

**Felony Convictions: Because of the Federal Crime Bill, any employee who is convicted of a felony must immediately notify the human resources department.**

### ATTENDANCE

It is extremely important that you be here and prepared to work during your scheduled hours. Your supervisor will advise you of your scheduled work hours and the overtime requirements of your position.

If you are going to be late or absent, you must call your supervisor no later than one half-hour after your scheduled starting time. The call must be made by you to your supervisor or his or her designee. It is not appropriate to leave a message with a co-worker or to have a spouse call, except in cases of emergency. If you do not call your supervisor to report your absence for two consecutive days, you are deemed to have voluntarily resigned from your job and your employment will be terminated.

An absence of more than five (5) days requires a doctor's note stating why the absence was medically necessary and that you are able to return to work. Chronic absence or lateness may be cause for disciplinary action unless the absence or lateness qualifies as Family and Medical leave. An occurrence is an absence of one or more consecutive days or lateness on any one day. Disciplinary action may be taken when you exceed three (3) occurrences totaling more than six (6) days in any twelve (12) month period.

Employees with less than six (6) months of service may be terminated for lateness or absence after two (2) occurrences.

**Section 4**
**Salary Continuation**
**Plan**

H000191



| Employee Manual | Section 4: Salary Continuation Plan | Ed. 4/97 | Page 2 |

**Agent for Service of Legal Process**

The Company is the agent for service of legal process. Any communication should be sent to:

> Harleysville Group Inc.
> 355 Maple Avenue
> Harleysville, Pennsylvania 19438
> Attention: Law Department

**Source of Benefits**

The benefits of the Plan are provided from the general assets of the Harleysville Group Inc. This is not an insured program.

**Plan Financing**

The Company pays the full cost of the Plan.

**Eligibility and Entry Date**

If you are a regular full-time employee, you are eligible to participate in the Plan after six months continuous service with Harleysville.

**Determination of Benefits**

For absence due to an illness or injury which disables you, you will receive full salary compensation determined by your length of service at the onset of the illness or injury.

H000195



| Employee Manual | Section 4: Salary Continuation Plan | Ed. 4/97 | Page 3 |
|---|---|---|---|

| Length of Employment At Onset of Illness or Injury | Covered Period Per Anniversary Year** |
|---|---|

(Each week calculated @ 38.5 hours)*

| | |
|---|---|
| Less than 6 months | 0 |
| 6 months to 1 year | 1 week*** |
| 1 but less than 2 years | 2 weeks |
| 2 but less than 3 years | 3 weeks |
| 3 but less than 4 years | 5 weeks |
| 4 but less than 5 years | 7 weeks |
| 5 but less than 6 years | 12 weeks |
| 6 but less than 7 years | 14 weeks |
| 7 but less than 8 years | 16 weeks |
| 8 but less than 9 years | 18 weeks |
| 9 but less than 10 years | 20 weeks |
| 10 or more years | 26 weeks |

\* 38.75 hours for employees who perform all or substantially all of their services for Lake States Insurance Company. 40 hours for employees who perform the same for Minnesota Fire and Casualty Insurance Company.

\*\* Anniversary year for all but Lake States Insurance Company and Minnesota Fire and Casualty Insurance Company employees is the anniversary of their date of hire; for Lake States Insurance Company and Minnesota Fire and Casualty Insurance Company employees, it is January 1.

\*\*\* One-half day per month for employees who perform all or substantially all of their services for Lake States Insurance Company.

If your employment anniversary occurs during a disability, the new benefit will become effective **after you return to active status**.

**Part-time and Temporary full or part-time** employees are not entitled to benefits under this Plan.

**Additional Benefits – Long Term Disability**

If you have exhausted the Salary Continuation benefits and continue to be medically certified as disabled, you may be eligible to receive benefits under the Long-Term Disability Plan. (The Long-Term Disability benefits are explained in the Long-Term Disability section of this manual.)

**Recurrent Disability**

If you return to work full time and are again disabled within twenty-six (26) weeks due to the same or a related condition, your disability will be deemed a continuation of your prior disability. Your benefit payments will be resumed for the unused "Covered Period."

**Holiday During Disability**

If a holiday observed by the Company occurs during a period of disability which includes the workday before and the workday after the holiday, the entire period (including the holiday) will be considered a disability for the purpose of determining Salary Continuation benefits.

Section 5
Long Term
Disability Plan

H000201



| Employee Manual | Section 5: Long Term Disability Plan | Ed. 4/97 | Page 2 |
|---|---|---|---|

**Agent for Service of Legal Process**

The Company is the agent for service of legal process. Any communication should be sent to:

> Harleysville Group Inc.
> 355 Maple Avenue
> Harleysville, Pennsylvania 19438
> Attention: Law Department

**Source of Benefits Provided**

The Benefits of the Plan are provided from the general assets of the Harleysville Group Inc. This is not an insured program.

**Plan Financing**

The Company pays the full cost of the Plan.

**Eligibility and Entry Date**

If you are a regular full-time employee with **less than three (3) years** of service, you are eligible to participate in the Long Term Disability Plan thirty (30) **workdays** after the onset of an illness or injury.

If you are a regular full-time employee with three (3) or more years of service, you are eligible to participate in the Long Term Disability Plan after Salary Continuation benefits have been exhausted as follows:

1. Immediately when the illness is the same or related condition which will be deemed a continuation of the disability, or

2. On the sixth day of disability, if the absence period exceeds five (5) consecutive workdays for an absence due to an unrelated condition.

**Amount of Benefits**

When you become eligible for Long Term Disability benefits, you will receive a Long Term Disability benefit at the rate of sixty percent (60%) of your base salary.

**Maximum Duration of Benefits**

**If you have less than three (3) years** of Harleysville employment at the onset of illness or injury causing a continuous period of disability, the maximum duration of Long Term Disability benefits is twenty (20) weeks after benefits commence.

If you have **three (3) or more years** of Harleysville employment at the onset of illness or injury causing a continuous period of disability, your benefits will terminate upon the occurrence of the earlier of:

1. the date employment terminates, or

2. the date you cease to be disabled, or

# SUPERVISOR

# SUPPLEMENT

**S U P E R V I S O R   S U P P L E M E M T**

## RELOCATION

The company may offer relocation assistance to a newly hired or transferred employee. All relocation packages are handled through the benefits department in human resources and depend on level of the position and other factors. If relocation assistance is approved, the benefits department will coordinate all parts of the relocation and the employee will be required to work with approved relocation companies.

## POLICY INFRACTIONS

In the event you suspect wrongdoing on the part of an employee, contact human resources immediately. Your human resources consultant will assist you with how to proceed. General guidelines are as follows:

- Conduct all investigations in the presence of a second member of management.
- Refrain from making unnecessary accusatory comments but ask the employee for a full explanation.
- Document in writing exactly what took place including date, time and the name of others who were present.

## COOLING OFF/INVESTIGATIVE PERIODS

Sometimes it is appropriate for a supervisor to ask an employee to leave the workplace to allow time for tempers to cool and/or facts to be evaluated. For example, an emotional outburst may occur whereby an employee publicly displays disrespect for a co-worker or supervisor. Or a situation in which a fraudulent act is suspected may warrant that the employee leave the office to avoid possible tampering with records and to allow sufficient time to investigate the matter.

This policy enables such an action to take place without a determination of fault or the need for hasty decisions. Anyone taking this type of action should notify their manager and human resources. The fact that this action is deemed appropriate shall not in itself cast guilt on any of the involved parties, but is simply to provide time before a final resolution is made.

The duration is discretionary but may not exceed two (2) workdays without approval from human resources. Time off under this policy is paid time until a decision on the action to be taken is decided. The employee should be told when to return to work to discuss the final determination.

## PROGRESSIVE PERFORMANCE IMPROVEMENT PROCEDURES

The procedures listed below are to be used to aid an employee in correcting performance problems. The sooner a problem is addressed, the sooner it will be corrected. For instance, if it is obvious in the first month of employment that the employee cannot do the job for which he or she was hired, termination can occur fairly easily after holding corrective discussions with the employee.

The Company reserves the right to terminate employment at will, with or without reason, at any time. Depending on the circumstances, the Company may however, try to correct the problem first.

The first step is to notify human resources. Wording should be developed for one of the steps below. The wording should be approved by human resources prior to being presented to the employee. There are several different steps in the disciplinary process. Some or all may be used, as appropriate, based on the situation. These include:

- Verbal discussions
- Written warning
- Plan for improvement
- Plan for improvement with probation

The time required for each step will depend on the circumstances.

The following wording must be included in a <u>Plan for Improvement</u>:

**"If, at any time it appears that you are not trying or are unable to meet the terms of this plan, your employment will be terminated immediately. Any performance action or inaction, which is deemed materially detrimental to our business, may result in either a Plan for Improvement with Probation or the immediate termination of your employment. Failure to meet the terms of this Plan for Improvement at any time will result in a Plan for Improvement with Probation."**

The following wording must be in a <u>Plan for Improvement with Probation</u>:

**"If, at any time it appears that you are not trying or are unable to meet the terms of this plan, your employment will be terminated immediately. Any performance action or inaction, which is deemed materially detrimental to our business, will result in the immediate termination of your employment. Failure to meet the terms of this Plan for Improvement with Probation will result in termination of your employment."**

Original documents, signed by the employee, should be forwarded to human resources for the personnel file. A copy should be retained by the supervisor and the employee. Whether signed or unsigned, the plan is still in effect.

Effect on merit rating: An employee on a plan for improvement or a plan for improvement with probation is not eligible for a salary increase, promotion or transfer. The merit can either be displaced until a future merit cycle when the supervisor is certain the employee has corrected the problem, or the employee should be rated 'Development needed' or Unacceptable" This can mean a delay of up to one year.

## ASSIGNMENT OF COMPANY CAR

A company car is provided to an individual whose position requires substantial travel to accomplish job duties. Company car assignment is based on position title and/or a minimum number of business miles driven per year, as set by the accounting department.

**EXHIBIT F**

**THE HARLEYSVILLE INSURANCE COMPANIES**                    **JOB DESCRIPTION**

| | | | |
|---|---|---|---|
| **Job Title:** | Loss Control Regional Manager | **Reports to:** | VP, Loss Control and Premium Audit |
| **Unit:** | Loss Control | **Pay Grade:** | 17 |
| **Department:** | Underwriting | **Date Reviewed:** | 01/00 |

> **EXHIBIT**
> VAIL-9
> 3-24-04  RC°

## I.    OBJECTIVE AND SCOPE

Manage the administrative, technical, financial, and educational activities of the loss control unit on a continuing basis. Conduct audits for loss control operations and survey and evaluate large complex risks.

## II.    AUTHORITY

Perform duties within limit of established, major company policy and procedures with latitude for independent judgment.

## III.    ESSENTIAL DUTIES AND RESPONSIBILITIES

1.) Plan, organize, and oversee implementation of loss control activities of technical and clerical staff. Complete salary reviews and provide training as required. Complete field observation of staff activities.

2.) Monitor incoming work, assignments, and backlog of requests on each territory.

3.) Conduct departmental self-audits for loss control operations including report quality, turnaround time, hazard evaluation and analysis, and fee company activity.

4.) Monitor and approve outside expense costs of fee companies and other vendors. Correspond with fee companies as needed regarding overdue or inadequate inspection information and follow up by making random field visits.

5.) Survey and evaluate large complex risks, providing underwriting information as well as formulating recommendation to control existing hazards. Establish safety programs and conduct safety meetings where needed.

6.) Review, evaluate, and approve monthly statistical reports instituting corrective action as needed.

7.) Prepare budget for unit operations including seminars, training, and general operations.

8.) Provide technical assistance to loss control staff, underwriting, insureds, and agents whenever necessary.

## IV.    OTHER DUTIES AND RESPONSIBILITIES

-   Meet with top management of insureds to establish communication channels for effective safety activities.
-   Complete all supervisory training courses as required by home office loss control.
-   May perform other related duties and projects as assigned by manager.

## V.    SPECIAL RELATIONSHIPS (relationships to other people, internally and externally, cost control, etc.)

-   Frequent contact with underwriting and department managers to coordinate loss control activities.
-   Frequent outside contact with agents, counseling on loss control procedures and with top management the insured.
-   Contacts with trade groups, associations, governmental agencies for technical assistance.
-   Maintain or acquire appropriate certifications and/or designations as required by state guidelines.

- Keep abreast of latest developments in Loss Control area.
- Strong PC skills in a windows environment including various software packages.

## VI.    SPECIFIC JOB KNOWLEDGE (special skills, knowledge of machines, procedures, etc.)

- Comprehensive and thorough working knowledge of safety engineering, industrial hygiene, and fire science disciplines.
- Thorough working knowledge of OSHA and setting up safety program.
- Excellent interpersonal skills
- Excellent ability to coordinate activities with a variety of people.

## VII.    QUALIFICATIONS

- **Education/Credentials:** Bachelor Degree in Safety, Engineering or Industry or Equivalent, AIM, ALCM or CSP.
- **Experience:** Minimum of seven years of loss control experience in the insurance industry with a minimum of two years of supervisory/management experience.

## VIII.    JOB REQUIREMENTS (as required by the Americans with Disabilities Act):

- Comprehend procedural and technical concepts related to departmental loss control policies and effectively communicate them to staff to meet unit goals.
- Interpret and apply concepts based on law, contracts, regulations, codes and company policy and procedures and communicate effectively to staff.
- Conduct oral communications via telephone and in-person.
- Convey detailed important information to others accurately and quickly.
- Evaluate information from a variety of reports, forms, diagrams, photos, and other documents.
- Review and monitor quality of detailed reports of inspection findings and other statistical reports.
- Visually and physically inspect business and commercial properties, which could include exposure to extreme noises, poor ventilation, chemicals, and heights for limited time period. May enter access ports and climb up and down to extreme heights and depths to perform inspections.
- Conduct in-person meetings with insureds and agents in a variety of locations away from the home office.
- Work outdoors in all types of weather for a limited time period while inspecting properties.
- Calculate an accurate budget for unit operations using basic mathematical skills.
- Record aspects of inspection sites by taking notes and photographs and measuring dimensions.
- Transport cameras, measuring wheels, and other equipment weighing at maximum 40 lbs.
- Walk for extended periods of time on hard or uneven surfaces.
- Climb ladders and stairs both inside and outside of company structures.
- Access and enter information into computer system.
- Maintain acceptable attendance as defined in the company personnel policy.

**EXHIBIT G**

EXHIBIT

VAIL - 12
3-24-04 KQC

**Geckeler, Alice**

| | |
|---|---|
| **From:** | Vail, Kenneth |
| **Sent:** | Tuesday, May 02, 2000 8:35 AM |
| **To:** | Weinstein, Gary |
| **Cc:** | Campbell, Craig |
| **Subject:** | RE: vendor work log out |

Gary
I planned to use the close out of vendor reports as training for Carly. I have no intention of dumping this on her. I planned to start this on Wednesday, since my Tuesday is already committed.

Please keep in mind that when I got here there was no structure in place for this region, some of my initial orientation turned out to be counterproductive, the staff was (& in some cases are) clearing reports with absolutely no risk improvement value (another issue for another day), some prior "supervisors" were requesting fee work that should not have gone outside, others were merely passing reports thru without sending recs, & some were sending out fee recs directly with no editing, files were piled up... This is not a complaint, just a recognition of reality. This tanker isn't going to turn on a dime. But it will improve quickly.

Something has to give to get the region built, & the fee work was what I selected for that purpose, so I could concentrate on higher value tasks. QC work will follow once the operational structures have been built. I will be happy to discuss this situation & relative priorities, & also my frustrations, with you personally. This situation will improve. I appreciate your patience. Any immediate concerns, please call my cell.
Ken

-----Original Message-----
From: Weinstein, Gary
To: Vail, Kenneth
Sent: 5/1/00 5:53 PM
Subject: vendor work log out

Ken, I was asking Craig why some items had not yet been logged out of the system. He tells me you are waiting for Carley to do it all. If the work takes you a long time it will take her longer (she is newer). Our system wont permit backdating. There for anything not entered is not counted as done. we have a hard enough time meeting service requirements with out counting some ontime work as late.

Please spend at least 1/2 of he day on Tue logging the work out. If you put a huge pile in front of Carley she may get frusterated and quit.

Please QC all reports, write up the nec. rec's, and log the work out. Please even review PMA's work to see which reps do the best job.

This stuff may seem like a pain, but it is a necessary part of the job. While I don't want you to waste your time doing dime work instead of dollar work, I did design the reg. mgrs job with a lot of hands on involvement in mind.

The pace is always hectic with a new job, changing management enviornment (regionalization, and solid line management).

You are doing a great job for us, I just need you to MASTER most of the clerical functions so you can train staff, monitor their quality, manage

the workload and vendors, and accurately appraise carleys performance.

Also remember this system (focus) goes away by the end of summer. Better days ahead.

You are doing great, just humor me and knock out the oldest styuff from the vendors including anything that will be counted as late.

Please also know that I expect you to be accesible and spend a lot of time the first few weeks with Carley. You owe that to her. She can get a little training from Bill C, and Carol in NJ, but you must teach her YOUR way.

Thanks, keep up the good work..... I liked your idea regarding behavioral based safety. I will be in the office Thurs and Fri this week, but out the following week. Lets talk.....

**EXHIBIT H**

## Ken Vail

**From:** "Ken V." <Kenmtb1@email.msn.com>
**To:** <gweinste@harleysvillegroup.com>
**Cc:** <kvail@harleysvillegroup.com>; <ageckele@harleysvillegroup.com>
**Sent:** Monday, June 12, 2000 10:30 AM
**Subject:** Ken Vail's June 2, 2000 Injury & Disability



To: Gary Weinstein, Vice President
    Loss Control and Premium Audit
    Harleysville Insurance Companies

From: Ken Vail
    Loss Control Regional Manager
    610.868.8061 - home

RE: Injury & Disability of June 2, 2000

I want to follow up from our prior phone conversations about the
circumstances and details of my injury and disability.

On Friday, June 2, 2000, sometime late morning (approx. 11:30am, not sure of
exact time) I was seriously injured while involved as a Range Officer and
Judge for the National Tactical Invitational (NTI) event, at the West Shore
Sportsmen's Association in Fairview Township, York County. The event and my
participation in the event were/are completely legal. I will ask Skip
Gochenour, NTI Event Director, to send you a separate summary to you to
confirm the details of this matter, so you will also have that for your
records. This experience is directly relevant to loss control consulting for
municipalities and other insureds that train & have employees responsible
for the use of force, defensive tactics, firearms, and minimizing the impact
of violence to innocents.

At the time of my injury, I was observing an event participant, Peter Gill,
go through a tactical shooting exercise. Mr. Gill apparently became
disoriented, made unexpected movements that placed me at risk, and then he
mistook me for a target. I was shot once by Mr. Gill. The bullet struck my
frontal right hip area, and then passed though my body. The projectile
entered my upper right leg, shattered my upper right femur just below the
ball socket, broke my pelvis, and exited through my right buttock.

I was not/am not a suspect of a criminal investigation. There is an open
police investigation about the incident, and it is possible that the person
who shot me (Mr. Gill) may be criminally charged. There is NO question by
ANYONE that I was/am the victim in this scenario.

I was promptly attended to by an experienced on-site pre-hospital trauma
team. I was transported by ambulance to a nearby/waiting Life Lion medical
transport helicopter. The helicopter took me to Hershey Medical Center, the
designated regional trauma center. The HMC trauma team assessed my condition
and decided that I would need surgery to repair/reconstruct the damage.

I underwent surgery the evening of Friday, June 2, 2000. I was in
considerable pain, and under the influence of anesthesia and medication,
after the operation. Unfortunately, the operation was done badly. I was
informed that I would need a second operation. The second operation was
performed on Monday, June 5, 2000. Fortunately for me, the second operation
was successful. This operation involved removing all of the hardware that
was inserted in the first operation, and surgically attaching new hardware

consisting of stainless steel plates and screws to stabilize the femur, hip, and ball joint.

I believe I contacted you sometime on Monday, June 5, 2000 to advise you of my injury. I do not recall if we spoke in person, or if I left you a voice message, or what time of day that might have been. I do know that I was feeling extreme pain, and was under the influence of various medications, including narcotics. I was not thinking clearly, and in this situation, my judgment was impaired. I did not tell you the full situation of the circumstances of my injury during my June 5, 2000 contact with you. I do not know why. Perhaps it was due to deep-seated fear of job loss, relating to the circumstances of my disability, and how Harleysville would perceive the circumstances of my injury. I did not intended to mislead you, and I certainly would have told you the full and complete facts if I was thinking clearly at that time. I apologize for any pain or problems this has caused you or anyone within the Harleysville organization.

Thank you very much for sending the balloons and flowers to my room. That definitely brightened by spirits. I want you to know that I appreciated that very much.

By Wednesday, June 7, I was feeling much clearer headed. I was still in constant, significant pain, and heavily medicated. I was recovering from the second surgery and making progress. I called you by phone sometime on Wednesday, June 7, 2000 (I don't recall the exact time), and I advised you of a brief summary of the details of what happened on June 2, 2000. You mentioned at that time that we spoke there was a news report from WGAL Channel 8 (Lancaster PA) that at least one of my staff had seen. I did not see this story on WGAL, and I had/have no knowledge of what it was about or the validity of the content. I called you to advise you of what happened because I was now able to think more clearly, and I wanted you to know the facts.

Two newspaper reports that I subsequently saw were not accurate. I did not see any TV or web-based media coverage of my injury.

I continued to make progress during the remainder of the week. On Thursday, June 8, 2000 I left a voice mail for my staff, and also left a message for you so that we could speak further. I did not have access to my Harleysville computer while in the hospital. It was taken home for safekeeping.

On Friday, June 9, 2000 we spoke by phone, & we further discussed the circumstances and specifics of my injury. You advised that you plan to return to the office on Tuesday, June 13, 2000, and that we will speak again then, perhaps with Alice Geckeler of Human Resources. You asked me to have no further contact with my staff until further notice from you. Please let me know if there is any change with this.

Gary, I am looking to return to work as soon as it is prudent to do so. I do have limited mobility on crutches. At this point I cannot drive. I can work at my computer at home for limited periods. Dr. Reid instructed me to not bear weight on my trauma leg for 10 weeks from June 5, 2000 (second surgery). My orthopedic surgeon, Spence Reid of HMC, will see me for an evaluation on Monday June 19, 2000. At that point, we should have a better assessment on what my recovery will be, when I can return to work, and what restrictions/accommodations will be necessary.

I look forward to a speedy & full recovery. I hope to achieve both, and also to contribute to Harleysville's continued future successes. I know that I can continue to effectively contribute with appropriate accommodations. I heal quickly, and have a very positive mental outlook. There is much that I

can do from my home office.

Thanks again for your support, and the support of the Harleysville organization. Please advise what, if anything else, you need from me at this point. I look forward to speaking with you & whomever else is appropriate on June 13, 2000. Best wishes to everyone at Harleysville.

Ken