**EXHIBIT AA**

LEXSEE 2004 U.S. DIST. LEXIS 6355

**KENNETH L. HOFFMAN v. JOHN E. POTTER, Postmaster General, United States Postal Service**

**CIVIL ACTION No. 02-3678**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 6355*

**March 2, 2004, Decided**
**March 2, 2004, Filed, Entered**

**DISPOSITION:** [*1] Defendant's renewed motion for summary judgment granted. Judgment entered in favor of defendant and against plaintiff.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former probationary letter carrier filed an action against defendant, the Postmaster General of the United States Postal Service, after his employment was terminated. He alleged age and disability discrimination in violation of the Age Discrimination in Employment Act (ADEA), *29 U.S.C.S. § 621* et seq., and the Rehabilitation Act of 1973 (RA), *29 U.S.C.S. § 701* et seq. The Postmaster General moved for summary judgment.

**OVERVIEW:** The carrier was hired as a letter carrier in a Pennsylvania post office. Two other persons, who were under 40 years old and in good health, were offered permanent positions. The carrier's employment was terminated at the end of his probationary employment period. He alleged that he was terminated because he was over 40 and suffered from a medical disability arising from hypertension and anxiety; he asserted that the purported reason for his termination, his inadequate job performance, was merely a pretext for age and disability discrimination. In entering summary judgment against him, the court held that the carrier had failed to prove that his performance during the probationary period qualified him for permanent employment as a letter carrier, that he was "disabled" for purposes of the Rehabilitation Act, or that the Postmaster General's legitimate and non-discriminatory reason for firing him

was a mere pretext for illegal discrimination. Clock ring evidence was unpersuasive because it did not provide any information concerning the quality of the carrier's work. His evaluations uniformly showed that he had received "unacceptable" ratings during the probationary period.

**OUTCOME:** The court granted the summary judgment motion and entered a judgment in favor of the Postmaster General and against the carrier.

**LexisNexis(R) Headnotes**

**COUNSEL:** KENNETH L. HOFFMAN, Plaintiff, Pro se, MALVERN, PA.

For KENNETH L. HOFFMAN, Plaintiff: HAROLD M. GOLDNER, LEAD ATTORNEY, LAW OFFICE OF HAROLD M. GOLDNER, PHILADELPHIA, PA.

For JOHN E. POTTER, UNITED STATES POSTAL SERVICE, Defendants: NURIYE C. UYGUR, LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, PHILADELPHIA, PA.

**JUDGES:** Thomas N. O'Neill, Jr, J.

**OPINIONBY:** Thomas N. O'Neill, Jr

**OPINION:**

MEMORANDUM

INTRODUCTION

2004 U.S. Dist. LEXIS 6355, *

Plaintiff, Kenneth L. Hoffinan, brings this action against John E. Potter, Postmaster General of the United States Postal Service alleging age and disability discrimination in violation of the Age Discrimination in Employment Act, *29 U.S.C. § 621 et seq.* and the Rehabilitation Act of 1973, *29 U.S.C. § 701, et seq.* n1 In addition to actual damages, attorneys' fees and costs, plaintiff has requested punitive damages. Before me now is defendant's motion for summary judgment, plaintiff's response thereto and defendant's reply brief.

> n1 The amended complaint purports to bring plaintiff's disability discrimination claim under the Americans with Disabilities Act, *42 U.S.C. § 12101, et seq.* The U.S. Postal Service is not subject to suit under the ADA. *42 U.S.C. § 12111(5)(B)(i).* Congress imposed upon the Postal Service the standards set forth in the ADA by enacting the Rehabilitation Act. *Shiring v. Runyon, 90 F.3d 827, 830-31 (3d Cir. 1996).* Therefore, I will treat plaintiff's disability discrimination claim as if plead under the Rehabilitation Act.

[*2]

BACKGROUND

The U.S. Postal Service hired plaintiff in February 1996. Plaintiff was assigned to be a letter carrier in the Phoenixville, Pennsylvania post office. The Postal Service hires new letter carriers for a ninety day probationary period. At the time of his hiring plaintiff was over the age of forty and had been diagnosed as suffering from hypertension and anxiety.

At or about the time plaintiff was hired the Postal Service hired two additional probationary letter carriers at the Phoenixville post office. Both of the other probationary letter carriers were under forty years old and without disability. They were hired at the end of their probationary period.

Prior to the end of his probationary employment period the Postal Service terminated plaintiff's employment. Plaintiff claims that he successfully performed the duties of his position, despite the disparate training and treatment he claims to have received as a result of age and disability discrimination. Plaintiff alleges that his termination was also a result of age and disability discrimination by the Postal Service and that the Postal Service's purported reason for the termination, his inadequate performance, was merely [*3] a pretext for that discrimination.

STANDARD OF REVIEW

*Rule 56 of the Federal Rules of Civil Procedure* provides that "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact," the moving party is entitled to summary judgment. *Fed. R. Civ. P. 56(c).* I will apply the this rule in accordance with Supreme Court and Third Circuit precedent. See, e.g., *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).*

DISCUSSION

I. The ADEA

The burden of proof for discrimination cases was established by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* n2 Under the McDonnell Douglas line of cases, as applied to the ADEA, a three step analysis applies to pretext discrimination cases. *Id. at 802-04.* First, the plaintiff [*4] must establish a prima facie case of discrimination. *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* Plaintiff establishes a prima facie case if he shows that he (1) is a member of the protected class, i.e. at least 40 years of age; (2) is qualified for the position; (3) suffered an adverse employment decision; and (4) has sufficient evidence to create an inference of age discrimination. *Simpson v. Kay Jewelers, 142 F.3d 639, 644, n.5 (3rd Cir. 1998).* The standard by which plaintiff must prove his prima facie case is by a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207 (1981).* Second, upon such a showing by the plaintiff, the burden shifts to the employer to produce evidence of a legitimate nondiscriminatory reason for the adverse decision. *Hicks, 509 U.S. at 506-07.* Third, the plaintiff must then demonstrate that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination. *Id. at 507.* The burden of proving discrimination rests at all times with plaintiff. *Burdine, 450 U.S. at 253.* [*5]

> n2 Although *McDonnell Douglas* involved a claim brought under *Title VII of the Civil Rights Act of 1964*, its analytical framework applies to claims brought under the ADEA and the Rehabilitation Act. See *Simpson v. Kay Jewelers, 142 F.3d 639, 643-44 (3d Cir. 1998); Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995).*

## A. Plaintiff's Prima Facie Case

Plaintiff has established that he is a member of the protected class of the ADEA. He was over forty years old when all relevant employment decisions were made. He suffered an adverse employment action when he was discharged from his position as probationary letter carrier.

The parties agree that a letter carrier must be proficient at casing n3 and delivering mail. Plaintiff's only evidence in support of his contention that he was qualified for the position of letter carrier is employee time records from the Phoenixville post office. Each letter carrier has an identification badge which he is to swipe in a computer [*6] system to keep track of what task he has just completed. The computer system prints reports of letter carrier time called "clock rings" so that supervisors can monitor how much time each carrier is spending on his daily tasks. Plaintiff points to the clock rings of himself and two younger probationary employees who were hired, Phil Marcantonio and Brian Bonsall, as evidence supporting his position that he was qualified for the position. Pl.'s Reply to Def.'s Mot. for Summ. J. app. at 68-111. I find those clock rings to be of no probative value because they do not contain items of information that are necessary to explain the quality of the work completed by each employee; for example, what tasks plaintiff was assigned (more than just the route number on which he was working), the quality of his work (whether mail was cased and delivered correctly), whether he required assistance to finish his assignments and whether he showed signs of improving his level of performance.

n3 "Casing" is the term used by the Post Office to describe the job of sorting mail by address so that it is ready to be delivered.

[*7]

Plaintiff attempts to create an inference of age discrimination by comparing his own time records to those of the two younger probationary letter carriers who started at the Phoenixville post office about the same time plaintiff began working there. Plaintiff argues that the clock rings show both that the younger letter carriers received more training than he did and that plaintiff performed the job of letter carrier better than they did.

Because Bonsall's clock rings only cover his first 32 days on the job, I will compare the records of each employee's first 32 days in the employ of the Postal Service to determine whether plaintiff has produced evidence that he received less casing time because he is older. Using the records plaintiff has provided for the first 32 days of each letter carrier's employment I find that plaintiff spent approximately 86 hours casing mail, Marcantonio spent approximately 65 hours casing and Bonsall spent approximately 74 hours casing. n4 Pl.'s Reply app. at 106-10. Because he actually spent more time casing mail than either of the younger letter carriers, plaintiff has not presented evidence that he was discriminated against in the amount of casing time [*8] he was given.

n4 Postmaster Schoch reports different numbers covering a different period. His tally is more reliable than mine because he has access to more detailed records than I do and can distinguish casing time from other office work. He considers the entire period of plaintiff's employment, but the result is the same: plaintiff received more casing time than either of the younger probationary letter carriers.

Postmaster Schoch's affidavit states:

For the time period of February 12, 1996 through April 30, 1996, the following casing times were recorded for Kenneth Hoffman, Brian Bonsall and Phil Marcantonio:

```
Probationary Employee   Total Casing Time (AM and PM)
Kenneth L. Hoffman       189.39
Brian Bonsall             75.89
Phil Marcantonio         114.34
```

Def.'s Mot. for Summ. J. app. at 61-64.

Plaintiff's evidence does not show that he performed better that the two younger probationary letter carriers. The evidence that plaintiff points to on this issue is again

Case 2:02-cv-02933-JKG    Document 21-12    Filed 07/15/2004    Page 5 of 14

Page 4
2004 U.S. Dist. LEXIS 6355, *

the clock rings of the three [*9] employees. Plaintiff argues that the clock rings show that he was more successful at casing and delivering a route when given the opportunity than were the other two probationary letter carriers. As I mentioned before, I find that the clock rings are not probative on the issue of job performance because they do not contain sufficient information. They do not show whether the letter carrier had help on the route, misdelivered mail or created other customer service problems.

## B. Defendant's Non-discriminatory Reason

Even if plaintiff had made out a prima facie case of age discrimination, defendant presents a well-supported claim that it had a legitimate non-discriminatory reason for not offering plaintiff a permanent letter carrier position. Defendant states that plaintiff was not hired because he failed to master the essential functions of a letter carrier.

As standard practice the Postal Service has probationary letter carriers' supervisors complete an Employee Evaluation and/or Probationary Report 30, 60 and 80 days after the employee begins working for the Postal Service. Kenneth Sands, a delivery supervisor at the Phoenixville post office, completed the evaluations of plaintiff's [*10] performance. Pl.'s Reply app. at 25-26. Sands testified that for these reviews he gathered information about what the probationary employee had done. Id. at 27-28. He stated that his expectations would vary with what assignments the employee had been given. Id. Two important factors that Sands mentioned were attendance and reporting times, "to see if they're on schedule, to see how long they're taking." Id. Sands also considered whether the employee had any assistance while delivering the mail. Id. at 31. Postmaster Schoch added that customer complaints and mis- delivered mail are problems that would affect a letter carrier's performance evaluation. Id. at 48-49.

Plaintiff's scores for almost every category on his 30, 60 and 80 day evaluations were "unacceptable." Def. Mot. app. at 3, boxes 7b, 8b and 9b. At each review he received a "satisfactory" rating for work relations and at the 60 and 80 day reviews he received a "satisfactory" rating for work methods. Id. His "unacceptable" ratings were for: work quantity, work quality, dependability and personal conduct. Id. Plaintiff signed each review. Id.

In addition to the performance reviews, defendant [*11] has provided testimony by plaintiff's supervisors that support its position that plaintiff was not qualified for the job. Postmaster Schoch testified that plaintiff's ability to case the mail was "the biggest thing that hurt him." Id. at 69. One of the shift supervisors testified that he helped plaintiff with his casing "many times". Id. at 38. Plaintiff never met the minimum standards of casing

ability expected for probationary letter carriers. Id. at 41; 59-60; 63.

There is also evidence that plaintiff did not meet the performance requirements for delivering mail. Postmaster Schoch testified that postal customers called him to complain about plaintiff asking them to help him find addresses on his route. Id. at 57. Schoch also sent other carriers to assist plaintiff in delivering the mail on his route. Id. at 58.

## C. Pretext

The plaintiff's burden at the pretext stage has been summed up this way: "the plaintiff cannot simply show that the employer's decision was wrong or mistaken ... Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate [*12] reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)* (citation and internal quotation marks omitted). Plaintiff does not make an argument specifically on pretext; however, I assume he would reiterate his prima facie case arguments and support them with the same evidence. As previously stated, plaintiff has not come forward with any evidence that defendant discriminated against him because of his age.

## II. The Rehabilitation Act

### A. Plaintiff's Prima Facie Case

To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must demonstrate that he:

> (1) is person with a disability withing the meaning of the Rehabilitation Act;
>
> (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and
>
> (3) has suffered an adverse employment decision as a result of discrimination.

*Shaner v. Synthes (USA), 204 F.3d 494, 500 (3d Cir. 2000).* [*13]

Defendant moves for summary judgment on plaintiff's claim under the Rehabilitation Act because plaintiff does not meet the Act's definition of a person with a disability. The Act defines a "disability" as "a

2004 U.S. Dist. LEXIS 6355, *

physical or mental impairment which substantially limits one or more of major life activities" or "being regarded as having such an impairment." *29 C.F.R. § 1614.203(a)(1)* (providing that ADA standards apply to Rehabilitation Act claims); *42 U.S.C. § 12102* (ADA definition of "disability). In deciding this issue I rely on the law developed in relevant statutory, regulatory and case law. See, e.g. *42 U.S.C. § 12101 et seq.*; *29 U.S.C. § 791 et seq.*; *Toyota Motors Mfg. v. Williams, 534 U.S. 184, 197 (2002)*; *Sutton v. United Airlines, Inc., 527 U.S. 471, 482-83, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999)*; *29 C.F.R. § 1630.*

Under the applicable law plaintiff was not a person with a disability and has not come forward with any evidence that he was regarded as having a disability. Therefore, he is not entitled to the protection of the Rehabilitation Act.

Plaintiff [*14] testified that he was diagnosed with anxiety at the time he was honorably discharged from the United States Navy in 1971, but that he did not seek treatment for the condition until 1994 or 1995. Def.'s Mot. app. at 22-24. He served in the Vietnam War. Id. at 2. His discharge papers from the Navy indicate that plaintiff was "entitled to receive severance pay" due to a "physical disability." Id. It is undisputed that plaintiff has taken medication for years to control hypertension. Id. at 23. It is also undisputed that he was taking medication for anxiety during the period he worked for the Postal Service.

Plaintiff's own testimony proves that he did not have a disability under the Rehabilitation Act. When asked if he thought his anxiety disorder "affected [his] being able to work at the Postal Service" or "affected [his] casing ability," plaintiff answered "no," partly because at that time he was under medication. Id. at 13. Plaintiff went on to add that "even without medications" he had "held jobs." Id. He did not testify that any major life activity is affected by his anxiety. Nor has plaintiff come forward with evidence that he was regarded as having a disability. [*15] He testified that he did not tell his supervisors at the Phoenixville Post Office about his

anxiety condition. Id. at 12. Plaintiff did have a veteran's preference because of a disability-either hypertension or anxiety-but a veteran's preference does not indicate a disability of the severity that it would substantially limit one or more of plaintiff's major life activities.

Plaintiff has not presented evidence that he was qualified for the position of letter carrier. Furthermore, he has not testified to or presented any other evidence of any accommodation that would allow him to perform as a letter carrier.

## B. Defendant's Non-discriminatory Reason

Again, even if plaintiff made out a prima facie case of disability discrimination, defendant has met the burden of showing a legitimate non-discriminatory reason for plaintiff's termination.

## C. Pretext

Plaintiff has not produced any evidence indicating that the Postal Service discriminated against him because of a disability or record thereof.

CONCLUSION

I will grant defendant's motion for summary judgment. Plaintiff has failed to prove that he was qualified for the position of letter carrier or that he is a person [*16] with a disability as defined by the Rehabilitation Act. Defendant has presented a legitimate non-discriminatory reason for discharging plaintiff and plaintiff has failed to come forward with evidence that creates a genuine issue of material fact regarding pretext.

## ORDER

AND NOW, this 2 day of March 2004, after considering defendant's renewed motion for summary judgment and plaintiff's response thereto, and for reasons set forth in the accompanying memorandum, the motion is GRANTED. Judgment is entered in favor of defendant and against plaintiff.

Thomas N. O'Neill, Jr, J.

LEXSEE 2004 U.S. DIST. LEXIS 1165

**LOUIS YUDKOVITZ, v. BELL ATLANTIC CORPORATION, et al.**

**CIVIL ACTION NO. 02-CV-3029**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 1165*

**January 12, 2004, Decided**
**January 12, 2004, Filed, Entered**

**DISPOSITION:** [*1] Defendants Bell Atlantic Corporation, Bell Atlantic Network Services, Inc., Verizon Communications Inc. and Verizon Services Corp.'s Motion to for Summary Judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant former employer filed a motion for summary judgment under *Fed. R. Civ. P. 56* in plaintiff former employee's action alleging disability discrimination in violation of the Americans with Disabilities Act (ADA) and the Pennsylvania Human Relations Act (PHRA).

**OVERVIEW:** The employer discharged the employee from his software manager position less than one year after the employee was hired. The employer cited unsatisfactory performance as the reason for the termination. The employee contended that his termination resulted from the fact that he suffered from relapsing-remitting multiple sclerosis (MS). The court granted the employer's motion for summary judgment after concluding that the employee was not disabled within the meaning of the ADA. Although MS qualified as a physical impairment and the employee's walking and lifting were major life activities, the court found that the employee failed to show that his MS substantially limited his ability to walk or lift. Therefore, the employee failed to establish a prima facie case of discrimination under the ADA. Further, the employee failed to show that the employer's explanation for the termination was a pretext because the evidence showed that the performance concerns were communicated to the employee long before the employer knew that the

employee suffered from MS. The court's analysis under the ADA also led to the conclusion that he failed to establish discrimination under the PHRA.

**OUTCOME:** The court granted the employer's motion for summary judgment.

**LexisNexis(R) Headnotes**

**COUNSEL:** For LOUIS YUDKOVITZ, Plaintiff: ANDREW S. ABRAMSON, LEAD ATTORNEY, LAW OFFICES OF ANDREW S. ABRAMSON, JENKINTOWN, PA.

For BELL ATLANTIC CORPORATION, BELL ATLANTIC NETWORK SERVICES, INC., VERIZON COMMUNICATIONS INC., VERIZON SERVICES CORP., Defendants: JAMES S. URBAN, JOHN E. IOLE, TODD C. DUFFIELD, LEAD ATTORNEYS, JONES DAY REAVIS & POGUE, PITTSBURGH, PA.

**JUDGES:** LEGROME D. DAVIS, J.

**OPINIONBY:** LEGROME D. DAVIS

**OPINION:**

### MEMORANDUM ORDER

Presently before this Court is Defendants Bell Atlantic Corporation, Bell Atlantic Network Services, Inc., Verizon Communications Inc. and Verizon Services Corp.'s (collectively, "Verizon") Motion to for Summary Judgment (Dkt. No. 19). For the reasons discussed below, Defendants' Motion is **GRANTED.**

I. Factual Background

A. Yudkovitz's Medical Condition

Plaintiff Louis Yudkovitz ("Yudkovitz") suffers from relapsing-remitting multiple sclerosis ("MS"). Plaintiff's Memorandum of Law in Opposition to Defendants' Motion [*2] for Summary Judgment ("Pl.'s Mem."), Ex. E at 102-03 (Dkt. No. 21). His exacerbation frequency appears to be approximately once per year and each exacerbation lasts from one week to a month. When he experiences a "flare-up," Yudkovitz gets dizzy, loses control over his left side and has difficulty climbing steps. Id. at 104. He also has "to be careful about getting around with [his] left leg," Id., and cannot carry "heavy objects" in his left hand. Compl. P 47. When his MS is in remission, Yudkovitz still experiences problems in his left leg and left arm. Pl.'s Mem., Ex. E at 474. As a result, Yudkovitz walks slower, has difficulty climbing steps, lacks the mobility he had in his youth, and is unable to lift or move things around the house. Id. at 474-75. Yudkovitz, however, does not have a problem walking around the house or on a flat surface. Id. at 109. Outdoors, Yudkovitz is able to walk, but is careful not to trip over uneven pavement. Id. To date though, Yudkovitz has never fallen while walking. Id. at 110-11. Further, when working for Verizon, Yudkovitz's MS never affected his job performance. Id. at 196; Defs.' Brief in Support of Its Motion for [*3] Summary Judgment ("Defs.' Br."), Ex. C at 2.

B. Yudkovitz's Tenure with Verizon

In March 1999, Yudkovitz sought employment through a recruiting firm, Romac International ("Romac"). Pl.'s Mem., Ex. E at 136-37. Romac arranged a job interview with Verizon for a position in its Order Management Department. Id. at 140-41; Pl.'s Mem., Ex. J at 12. Yudkovitz interviewed with Elizabeth Cass-Schmidt, Senior Manager in Verizon's Order Management Department, and Kathy Buttil, Verizon's Hiring Manager. Pl.'s Mem., Ex. J at 6-8. Yudkovitz presented himself as an experienced project manager who had worked for 22 different companies over 31 years. Defs.' Br., Ex. A; Pl.'s Mem., Ex. J at 13; Pl.'s Mem., Ex. E at 147. Yudkovitz, however, did not disclose during the interview that he had MS. Id. at 15; Pl.'s Mem., Ex. E at 146, 361-62.

On June 1, 1999, Verizon hired Yudkovitz over five other candidates as a Software Manager, Level III in the Release Management Department. Id. at 15-16; Pl.'s Mem., Ex. E at 252-53; Pl.'s Mem., Ex. H at 16; Pl.'s Mem., Ex. J at 13; Pl.'s Mem., Ex. E at 147. As a Software Engineer Level III, Yudkovitz was expected "to come in the door and be, in a very, [*4] very quick period of time, if not immediately, very, very productive." Pl.'s Mem., Ex. J at 16, 45-46.

About three months into the job, Plaintiff was assigned the task of recording minutes at weekly department meetings and distributing them to his co-workers before the next meeting. Pl.'s Mem., Ex. E at 266. On several occasions, Yudkovitz was unable to generate meeting minutes in a timely fashion. Id. at 268. Plaintiff was also assigned the task of making an oral presentation on production support to a group of managers, including Ms. Cass-Schmidt. Id. at 277. According to Ms. Cass-Schmidt, Plaintiff's presentation was incomplete, factually incorrect and poorly organized. Pl.'s Mem., Ex. J at 36-37. Rosemary Brown, who became Yudkovitz's supervisor in October 1999, also attended the presentation and concluded that Yudkovitz had organizational deficiencies and lacked strong presentation skills. Pl.'s Mem., Ex. H at 29-30. Neither Ms. Cass-Schmidt nor Ms. Brown knew, at the time, that Yudkovitz suffered from MS. Pl.'s Mem., Ex. E at 283-84.

On November 11, 1999, Yudkovitz was hospitalized after suffering a relapse while walking through a shopping mall. Id. at 204-05. The [*5] following day, Yudkovitz called his then-immediate supervisor, Ms. Brown to inform her that he would be out sick because his "neurological disorder had flared up." Id. at 207. In response, Ms. Brown instructed Yudkovitz to contact CORE Inc. ("CORE"), an independent third-party company that provides Verizon with employee disability management. Id. at 208-09; Pl.'s Mem., Ex. H at 33-34. Yudkovitz called CORE "continuously" and "kept them informed" during his absence. Id. at 209. CORE notified Verizon that Yudkovitz qualified for short-term disability, but it did not share with Verizon any information about the nature of Yudkovitz's condition. Defendants' Reply Brief in Support of Its Motion for Summary Judgment ("Defs.' Reply Br."), Ex. A PP 2-9; Pl.'s Mem., Ex. H at 32. Yudkovitz also called Ms. Brown on several occasions to update her as to his status. Pl.'s Mem., Ex. E at 211. During those calls, Yudkovitz described his symptoms to Ms. Brown, saying he felt weak and dizzy. Id. at 212. Yudkovitz did not, however, disclose that he suffered from multiple sclerosis. Id. at 214.

Prior to Yudkovitz's November 1999 hospitalization, Ms. Brown noticed he walked with a [*6] "slight limp." Pl.'s Mem., Ex. H at 33. Ms. Brown recalls discussing Yudkovitz's limp with her predecessor, Michael DiTomasso, because they thought he "had a problem with his knee or his ankle." Id. Ms. Brown also may have noticed Yudkovitz using a quad-based cane. n1 Id. at 36.

n1 Ms. Brown and Ms. Cass-Schmidt noticed Yudkovitz using a quad-based cane subsequent to

his November 1999 hospitalization. Pl.'s Mem., Ex. H at 36; Pl's Mem., Ex. J at 23.

Ms. Brown continued to supervise Yudkovitz after he returned to work in December 1999, and during the course of her supervision, developed a number of concerns regarding Yudkovitz's performance. Ms. Brown believed that "he had not shown an understanding of the applications and processes within [the] organization." She was also "concerned about the accuracy and timeliness of documents that [Yudkovitz] submitted[, ...] about his lack of PC skills and use of management tools[, ...] about his inability to react to feedback[, and] the quantity of [*7] assignments that he could take on." Pl.'s Mem., Ex. H at 48. As a result, in March 2000, Ms. Brown drafted her review of Yudkovitz and rated his performance as unsatisfactory. n2 Defs.' Br., Ex. F. Ms. Cass-Schmidt reviewed a draft of Ms. Brown's review of Yudkovitz and agreed with Ms. Brown's assessment of his performance. Pl.'s Mem., Ex. H at 67; Pl.'s Mem., Ex. J at 43, 49.

n2 Verizon annually evaluates its employees during the first three months of a calendar year.

Because Yudkovitz's performance was rated as unsatisfactory, he was placed on a Management Performance Improvement Plan (the "MPIP"), n3 Pl.'s Mem., Ex. J at 43, 49, a written copy of which was given and explained to Yudkovitz on March 13, 2000. Defs.' Br., Ex. G. The MPIP notified Yudkovitz that a failure to rectify his performance deficiencies "could result in discipline up to and including dismissal." Id.

n3 Any Verizon employee whose performance is rated below satisfactory level is placed on a Management Performance Improvement Plan, which is a structured plan to help improve their performance. Pl.'s Br., Ex. E at 407-08; Pl.'s Br., Ex. J at 49.

[*8]

Pursuant to the MPIP, Yudkovitz was required to satisfactorily complete two assignments by the end of March 2000, and pursue some computer training. Id. With respect to the two assignments, Yudkovitz completed them only after receiving from Ms. Brown a great deal of guidance. Pl.'s Mem., Ex. H at 67-69, 79; Pl.'s Mem., Ex. E at 312. Ms. Brown noticed "some improvement, although [Yudkovitz] was not to the level where [she] thought he should be." As for the computer

training, Yudkovitz completed Microsoft Excel training and took a Lotus Notes class via the internet. Pl.'s Mem., Ex. H at 76.

Although Yudkovitz struggled with the two assignments, Ms. Brown decided to extend the MPIP because "she wanted to see if there were other tasks [Yudkovitz] would perform better." Id. at 76. Ms. Brown drafted the extended Management Performance Improvement Plan (the "EMPIP") on April 11, 2000. Defs.' Br., Ex. H; Pl.'s Mem., Ex. H at 78.

On April 18, 2000, Yudkovitz asked Ms. Brown if there would be any consequences if he missed any more time from work. Pl.'s Mem., Ex. E at 313-14. Ms. Brown told Yudkovitz that it would probably cost him his job. Id. at 314. Yudkovitz, in response, [*9] disclosed for the first time that he had MS. Id. at 214, 301; Pl.'s Mem., Ex. H at 37-38; Pl.'s Mem., Ex. J at 51-52.

On the same day, Ms. Brown provided Plaintiff with a copy of the EMPIP, which consisted of three additional assignments to be completed by the end of April 2000. Defs.' Br., Ex. H; Pl.'s Mem., Ex. H at 78-79. Yudkovitz performed the first assignment unsatisfactorily, showed improvement in completing the second, although he required significant feedback to get it correct, and completed the third, despite initially looking at the wrong set of documents. Pl.'s Mem., Ex. H at 77-78.

On or about April 27, 2000, because of Yudkovitz's performance on the MPIP, Ms. Brown recommended to Ms. Cass-Schmidt that Verizon terminate Yudkovitz's employment. Pl.'s Mem., Ex. H at 90.

On May 1, 2000, Yudkovitz suffered another relapse while at home. Pl.'s Mem., Ex. E at 440-41. His symptoms were an "inability to move around, difficulty walking [and] balance off." Id. at 441. On May 8, 2000, three days after he returned to work, Yudkovitz was notified that his employment was terminated for performance reasons. Id. at 442-43; Pl.'s Mem., Ex. H at 91-92.

C. Yudkovitz's [*10] Requests to Telecommute

In July 1999, Yudkovitz asked his then-immediate supervisor, Mr. DiTomasso, if he could work from home. Pl.'s Mem., Ex. E at 284-86. Mr. DiTomasso responded that he did not know how an employee could arrange to work from home. Id. After raising the issue with another manager, Mary Kivlin, in October 1999, Yudkovitz approached Ms. Cass-Schmidt and requested that he be permitted to work from home. Id. at 286-87; Pl.'s Mem., Ex. J at 25. Yudkovitz wanted to work from home because his "wife had to drive [him] into work and then pick [him] up" and it was difficult for Yudkovitz to commute to and from the train station. Pl.'s Mem., Ex. E at 222, 427-28. In furtherance of his desire to work from

home, Yudkovitz filled out and submitted to Ms. Cass-Schmidt a Telecommuting Commitment form, in which Yudkovitz wrote, among other things, that working from home would provide him with "instant communications without the need for public transportation." Id. at 229-34; Defs.' Br., Ex. I. Yudkovitz made no mention of his health issues. Ms. Cass-Schmidt signed the Telecommuting Commitment form, approving Yudkovitz's request for at-home computer access so that [*11] he could telecommute during off-hours shifts. Id. at 230-34, 238, 296-97; Defs.' Br., Ex. I; Pl.'s Mem., Ex. J at 25-26.

Following his November 1999 hospitalization, Yudkovitz once again asked Ms. Cass-Schmidt if he could work from home during off-hour shifts. Id. at 220-21. The reason Yudkovitz gave for wanting to work from home was his "neurological disorder." Id. at 323. Ms. Cass-Schmidt said that she would try to move Yudkovitz's request along.

In March 2000, a Verizon technician appeared at Yudkovitz's home to install an extra telephone line and set up his computer for at-home access. Id. at 223-24. Thereafter, Yudkovitz asked Ms. Brown for assistance in connecting his personal computer to Verizon's network. Id. at 224-26. Ms. Brown allowed Yudkovitz and one of his colleagues, Tim Monaghan, to leave work early, proceed to Yudkovitz's home, and attempt to link Yudkovitz's personal computer with Verizon's network. Id. Mr. Monaghan was unable to link Yudkovitz's personal computer with Verizon's network because Yudkovitz's personal computer did not have sufficient memory to run the software necessary to telecommute. Id. at 225. In the end, Yudkovitz [*12] never successfully established a link with Verizon's network. Id. at 299.

II. Procedural History

Following his termination, Yudkovitz filed a charge of disability discrimination with the Equal Employment Opportunity Commission (the "EEOC") n4 and the Pennsylvania Human Relations Commission (the "PHRC"). After receiving a right to sue letter from the EEOC, Pl.'s Mem., Ex. C, Yudkovitz filed suit against Verizon alleging disability discrimination in violation of the *Americans with Disabilities Act* (the "ADA" or the "Act") (Count I) and failure to pay wages in violation of the *Pennsylvania Wage Payment and Collection Law* (Count II). (Dkt. No. 1). Yudkovitz later amended his complaint to add an additional Count alleging disability discrimination in violation of the *Pennsylvania Human Relations Act* (Count III) after receiving notification from the PHRC that his case had been closed administratively. (Dkt. No. 14). On March 12, 2003, the parties jointly filed a Stipulation to dismiss with

prejudice Count II. (Dkt. No. 20). As a result, the only claims that remain before the Court are Counts I and III.

n4 EEOC determinations should not be considered in deciding a motion for summary judgment. See *Stewart v. Personnel Pool of Am., Inc.*, 1993 U.S. Dist. LEXIS 18347, Civ. A. No., 9202581, 1993 WL 525575, at *6 (D.N.J. Dec. 16, 1993) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 458 (3d Cir. 1989)).

[*13]

Verizon now moves for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. With respect to Yudkovitz's claim that Verizon failed to accommodate his alleged disability by refusing to allow Yudkovitz to work from home, Verizon argues that: (1) he did not have a covered disability; (2) Yudkovitz never requested an accommodation for any disability; and (3) Yudkovitz never requested any reasonable accommodation. Defs.' Br. 1. As for Yudkovitz's claim that Verizon discriminated-against him on the basis of his alleged disability when it terminated his employment, Verizon argues that: (1) he was not "disabled;" and (2) Yudkovitz cannot adduce evidence that Verizon's reasons for terminating his employment were a pretext for discrimination. Id. Yudkovitz responds that he has an ADA-covered disability, Verizon denied his request to telecommute, which is a reasonable accommodation under the ADA, and a reasonable jury could find that Verizon's reasons for terminating his employment were a pretext for discrimination. Pl.'s Mem. 17-28.

III. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers [*14] to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The moving party bears the burden of showing that the record discloses no genuine issues as to any material fact and that he or she is entitled to judgment as a matter of law. See *Fed. R. Civ. P. 56(c)*; see also *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970). Once the moving party has met its burden, the non-moving party must go beyond the

pleadings to set forth specific facts showing that there is a genuine issue for trial. See *Fed. R. Civ. P. 56(e)* [*15] ; see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. There is a genuine issue for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 249*. "Such affirmative evidence -- regardless of whether it is direct or circumstantial - must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams, 891 F.2d at 460-61.*

IV. Analysis

A. Disability Claims

The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." *42 U.S.C. § 12112(b)(5)(A)*. A "qualified individual with a disability" is defined as "an individual with a disability, who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. [*16] *§ 12111(8)*.

"In order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability." *Deane v. Pocono Med. Ctr., 142 F.3d 138, 1998 WL 173100, at *3 (3d Cir. 1998)* (citing *Gaul v. Lucent Techs. Inc., 134 F.3d 576, 580 (3d Cir. 1998))*. The Act defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *42 U.S.C. § 12102(2)*.

1. Substantially Limited in a Major Life Activity

To qualify as disabled under *subsection (A) of the ADA*, Yudkovitz must demonstrate that (1) he has a physical or mental impairment (2) that the impairment limits a major life activity and (3) that the limitation on the major life activity is substantial. It is undisputed that MS qualifies as a physical impairment under *45 C.F.R. § 84.3(j)(2)(I)* n5 and that walking and [*17] lifting are major life activities. n6 Thus, the relevant question is whether Yudkovitz has shown that his MS *substantially* limits his ability to walk or lift.

n5 A physical or mental impairment is:

(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinal; hemic and lymphatic; skin; and endocrine; or (B) any mental or physiological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

*45 C.F.R. § 84.3(j)(2)(I)*.n6 Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *29 C.F.R. § 1630.2(I) (1997)*. More specifically, "'major life activities' are those basic activities that the average person in the general population can perform with little or no difficulty ... including siting, standing, lifting, [and] reaching." *29 C.F.R. Pt. 1630, App. § 1630.2(I)*.

[*18]

The EEOC regulations provide that an individual is substantially limited in a major life activity if he is "unable to perform a major life activity that the average person in the general population can perform" or is "significantly restricted as to the condition, manner or duration under which [he or she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *29 C.F.R. § 1630.2(j)*. In determining whether an impairment substantially limits a major life activity, the regulations instruct courts to consider the following factors: "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *29 C.F.R. § 1630.2(j)(2)*.

Yudkovitz alleges that "MS greatly affects the left side of his body in general and greatly restricts his left leg, causing [him] to have trouble with his balance, great difficulty in walking and prevents him from carrying [*19] heavy objects." Compl. P 47. When asked during his deposition about his limitations, Yudkovitz stated that he walks slower, has difficulty climbing steps, uses a quad-based cane as needed, n7 and is unable to carry

2004 U.S. Dist. LEXIS 1165, *

things in his left hand. Pl.'s Br., Ex. E at 104, 474-75. Yudkovitz also submitted office notes from his treating physician, David S. Roby, M.D., in which Dr. Roby stated that Yudkovitz experiences left-sided weakness, fatigue and an altered gait. Pl.'s Br., Ex. G.

n7 Although Yudkovitz claims that he has had to "constantly" use a quad-based cane since his November 1999 hospitalization, Dr. Roby noted in February 2001 that Yudkovitz uses a quad-based cane "as needed," and in June 2001, that Yudkovitz "is now walking without an assistive device." Pl.'s Br., Ex. G.

Yudkovitz, however, presented no evidence that the restriction on his ability to walk is more than moderate. Like the plaintiff in Kelly v. Drexel Univ., Yudkovitz is still physically capable of walking and climbing stairs. *94 F.3d 102, 106 (3d Cir. 1996).* [*20] Yudkovitz also failed to offer any guidance as to the limitations on his lifting other than an inability to carry "heavy objects." n8 Compl. P 47. Moderate restrictions on the ability to walk do not amount to a substantial limitation. See *Kelly, 94 F.3d at 106* (Plaintiff's inability to walk "'more than a mile or so'" and his difficulty climbing stairs do not constitute a substantial limitation in his ability to walk.); *Talk v. Delta Airlines, Inc., 165 F.3d 1021, 1025 (5th Cir. 1999)* (holding that limping, "moving at a significantly slower pace than the average person," and difficulty walking in extreme cold do not constitute a substantial impairment); *Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997)* ("Moderate difficulty or pain experienced while walking does not rise to the level of a disability."); see also *29 C.F.R. Pt. 1630, App. § 1630.2(j)* (An individual's walking is substantially limited if he or she "can only walk for very brief periods of time."). Nor does the inability to lift heavy objects constitute a substantial limitation. See *Marinelli v. City of Erie, 216 F.3d 354, 363-64 (3d Cir. 2000)* [*21] (Plaintiff's inability to lift more than ten pounds did not constitute a substantial limitation on the major life activity of lifting.); *Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 21 (1st Cir. 2002)* (The "inability to lift heavy objects does not constitute a substantial limitation on a person's overall ability to lift [as the] capacity to perform heavy lifting is not a trait shared by the majority of the population."); *McCoy v. USF Dugan, Inc., 42 Fed. Appx. 295, 2002 WL 1435908, at *2-*3 (10th Cir. 2002)* (holding that plaintiff was not substantially limited in the major life activity of lifting because she was unable to lift more than twenty pounds); *Thompson v. Holy Family Hosp., 121 F.3d 537, 539-40 (9th Cir. 1997)* (finding plaintiff's twenty-five pound

lifting restriction not substantially limiting). Therefore, the Court, although sympathetic towards Yudkovitz's condition, is satisfied that it does not substantially limit him in the relevant major life activities of walking and lifting.

n8 Yudkovitz stated during his deposition that he cannot carry things in his left hand during a relapse and, when his MS is in remission, he can only "just lift so much." Pl.'s Mem., Ex. E at 104, 193.

[*22]

2. Record of Impairment

Next, Yudkovitz asserts that he is disabled by virtue of a record of impairment. Compl. P 46. To maintain his claim based on a record of impairment, Yudkovitz must show that he had an impairment which substantially limited a major life activity. See *Olson v. GE Astrospace, 101 F.3d 947, 953 (3d Cir. 1996)* (regarding the plaintiff's record of impairment claim, the court stated that it was absolutely necessary for him to demonstrate that the impairment limited one or more of his major life activities); *Kresge v. Circuitek, 958 F. Supp. 223, 225 (E.D. Pa. 1997)* ("Plaintiff's impairment must be substantially limiting in order for his past records to be a 'record of such impairment.'"). As noted above, Yudkovitz's MS does not substantially limit his major life activities of walking or lifting. Therefore, Yudkovitz does not qualify as disabled under *subsection (B)* of the ADA. *42 U.S.C. § 12102(2)(B).*

3. Regarded as Disabled

Finally, Yudkovitz claims that he is disabled because Verizon regarded him as having a disability. Compl. P 46. An individual is regarded as disabled within the meaning of the [*23] ADA if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Airlines, Inc., 527 U.S. 471, 489, 119 S. Ct. 2139, 2149-50, 144 L. Ed. 2d 450 (1999).* The mere fact that an employer is aware of an employee's impairment, however, does not demonstrate that the employer regarded the employee as disabled. See *Kelly, 94 F.3d at 109* (noting that the district court properly rejected plaintiff's argument that he was "regarded as disabled" because his "limp was 'visible and apparent' and his supervisor was aware of his impairment"). That Verizon noticed Yudkovitz walked with a "slight limp" or knew of his physical impairment does not demonstrate

that it perceived Yudkovitz as being disabled. " Pl.'s Mem., Ex. H. at 33; Pl.'s Mem., Ex. E at 207, 212, 214. Accordingly, we conclude that Yudkovitz has not established that he is disabled under *subsection (C)* of the ADA. *42 U.S.C. § 12102(2)(C)*. [*24]

In sum, we find that Yudkovitz is not disabled within the meaning of the ADA.

B. Discrimination Claims

1. ADA Claim

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000)* (quoting *Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998)*. Because Yudkovitz is not disabled within the meaning of the ADA, he cannot establish a prima facie case of discrimination under the Act. Even if a prime facie case of discrimination could be established, Yudkovitz's claim fails because he has not carried his burden of persuasion under *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*.

The Third Circuit applies the McDonnell Douglas burden-shifting framework to ADA discrimination claims. See *Shaner, 204 F.3d at 500*. [*25] The McDonnell Douglas analysis proceeds in three stages:

> First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Finally, should the defendant carry this burden, the plaintiff then must have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)*.

Here, Verizon has articulated a legitimate, nondiscriminatory reason for terminating Yudkovitz's employment, namely, substandard performance. Having done so, the burden shifts to Yudkovitz to present

sufficient evidence from which a jury could conclude that Verizon's purported reason for terminating his employment was in actuality a pretext for intentional disability discrimination. See *Shaner, 204 F.3d at 501* (citing *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993))*. [*26] Specifically, Yudkovitz must point "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)* and *Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996))*. Yudkovitz, however, has failed to do so here.

Yudkovitz presented himself as an experienced project manager who could be expected to hit the ground running. Instead, he struggled, missing deadlines and making poor oral presentations. Yudkovitz's managers found that he lacked necessary computer skills, produced inaccurate documents, did not respond to feedback and was unable to handle multiple assignments at one time. As a result, Yudkovitz received a performance review of unsatisfactory and, accordingly, was placed on a performance improvement plan. Although Yudkovitz continued to struggle, his supervisor extended the plan, giving him every opportunity to display any [*27] skills. But when Yudkovitz failed to show significant improvement, Verizon terminated his employment for performance reasons.

There is nothing in the record to suggest that Yudkovitz's condition played any role in Verizon's criticism of his performance or its decision to terminate his employment. To the contrary, the record demonstrates that Yudkovitz's managers perceived his work to be deficient and were critical of Yudkovitz's performance beginning at least nine months before his termination. Further, they communicated their concerns to Yudkovitz long before they knew he had MS. Indeed, Yudkovitz did not disclose to his managers that he had MS until April 18, 2000, more than one month after he was placed on a performance improvement plan. That Yudkovitz's termination came within weeks of his disclosure, standing alone, is not sufficient evidence of pretext. See *Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001)*; accord *Nelson v. J.C. Penney, Inc., 75 F.3d 343, 346-47 (8th Cir. 1996)*; *Anderson v. Coors Brewing Co., 181 F.3d 1171, 1180 (10th Cir. 1999)*. Thus, even if Yudkovitz could establish a prime facie [*28] of discrimination under the Act, which he cannot, he has not presented sufficient evidence to permit the trier of fact either to disbelieve Verizon's

2004 U.S. Dist. LEXIS 1165, *

reasons, or to conclude that disability discrimination was the real reason for Verizon's adverse employment actions.

### 2. PHRA Claim

Courts "generally interpret the PHRA in accord with its federal counterparts." *Kelly, 94 F.3d at 105* (citations omitted). "Any analysis applied to the ADA claim applies equally to the PHRA claim." *Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 935 n.1 (3d Cir. 1997)* (citing *Kelly, 94 F.3d at 105*). Therefore, this Court finds that Yudkovitz has failed to establish discrimination under the PHRA.

### V. Conclusion

Accordingly, Verizon's motion is granted. An appropriate order follows.

### ORDER

AND NOW, this 12th day of January, 2004, upon consideration Defendants Bell Atlantic Corporation, Bell Atlantic Network Services, Inc., Verizon Communications Inc. and Verizon Services Corp.'s Motion to for Summary Judgment (Dkt. No. 19), and Plaintiff Louis Yudkovitz's response thereto, it is hereby ORDERED that Defendants' Motion is **GRANTED.** [*29] The Clerk is directed to statistically close this matter.

**BY THE COURT:**

**LEGROME D. DAVIS, J.**