**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

KENNETH T. VAIL,                    :
                                    :        NO.  02-CV-2933
                    Plaintiff       :
                                    :
        v.                          :
                                    :
HARLEYSVILLE GROUP, INC.            :
                                    :
                                    :
                                    :
                    Defendant       :

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.        INTRODUCTION**

On or about June 22, 2004, Plaintiff Kenneth T. Vail ("Plaintiff") filed an Amended Complaint asserting wrongful termination of his employment.  Plaintiff's Complaint contains one cause of action: Count I - Violation of Americans With Disabilities Act, 42 U.S.C. 12101 *et. seq.;* Plaintiff submits this Memorandum of Law In Opposition To Defendant's Motion for Summary Judgment.

Based upon the evidence adduced, as further discussed in the foregoing analysis outlined in the following sections, Plaintiff contends that he was terminated for discriminatory reasons.

**A.        ANALYSIS OF DEPOSITION TESTIMONY.**

**1.  Deposition of Kenneth T. Vail.**

Plaintiff's starting salary at Harleysville was $82,004 a year.  Dep. at 21.  Gary Weinstein contacted Plaintiff about coming to work for Harleysville.  Dep. at 43-44.  Plaintiff began

working for Defendant in March 2000.  Dep. at 63.  Plaintiff's position at Harleysville was Loss

Control Regional Manager.  Dep. at 54.  Plaintiff reported to the Vice-President of Loss Control

and Premium Audit.  Dep. at 54.  Plaintiff interviewed with Barry Weinstein.  Dep. at 55.

Plaintiff was a commercial underwriter.  Dep. at 56.

 Plaintiff's position as Loss Control Regional Manager was a new position.  Dep. at 63.

Plaintiff described his daily responsibilities as including clerical tasks which, he stated, should

have been handled by a support staff person.  Dep. at 65.  His responsibilities also included

reviewing work on an automated system and assigning work in that system to loss control

representatives or to vendors.  Dep. at 65.  He also was responsible for coaching and counseling

staff.  Dep. at 65.  Plaintiff also worked with underwriting units to focus where they could

profitably write business and in what segments of what markets.  Dep. at 66.  Plaintiff also

provided loss control training for managers and underwriters as well as loss control staff.  Dep. at

66.

 Plaintiff testified that many people on his staff lacked the fundamental skills to correctly

do their job.  Dep. at 67.  Plaintiff described his motivational skills as manager as including the

following:  providing direct feedback to help them do a better job, helping people identify where

they can improve, providing them with target dates for completion where appropriate,

challenging staff as to the basic nature of the job, and how staff positions fit into the bigger

picture.  Dep. at 69-70.

 Plaintiff stated that he would not purposely offend anyone on his staff.  Dep. at 72.  Prior

to starting with Harleysville, he never had staff revolt against his management style.  Dep. at 72.

Plaintiff testified that he spoke with Gary Weinstein about an informed assessment of the skills

and abilities of his staff.  Dep. at 74.  Plaintiff testified that he didn't finish the assessment

process because of his injury.  Dep. at 74.  Plaintiff had many conversations with Gary Weinstein and Craig Campbell regarding his staff.  Dep. at 75.  Gary Weinstein referred to one employee, Robert Panlayo as a "less talented" staff member with great promise given the right counseling and coaching.  Dep. at 75-76.  Plaintiff was in the process of going to Maryland to do an assessment on said individual when he got an angry phone call from Gary Weinstein questioning Plaintiff as to why he was out in the field.  Dep. at 75-76.

Plaintiff was only with Harleysville 2 months before he sustained his gunshot injury.  Dep. at 82.  Plaintiff's recollection of Defendant's policy was that an employee of less than one year was entitled to 16 weeks of disability.  Dep. at 82.  Plaintiff's further understanding was that he was guaranteed his position upon his return from disability leave.  Dep. at 82.

From May 27, 2000 to June 2, 2000, Plaintiff was on approved leave.  Dep. at 98.  Plaintiff was injured on June 2, 2000.  Dep. at 106.  Plaintiff was shot in the right hip area.  Dep. at 108.  Plaintiff's upper right leg was injured, shattering his right femur and breaking his pelvis.  Dep. at 108.  Plaintiff underwent two operations.  Dep. at 108.  Plaintiff spoke with Gary Weinstein on June 2nd but stated that he was on morphine at the time of his conversation.  Dep. at 109.  Plaintiff recalls telling Weinstein that he wouldn't be in on Monday for work and that he told Weinstein the incident involved a tower.  Dep. at 109.

Plaintiff was injured at a National Tactical Invitational event where he was a range officer.  Dep. at 110.  Plaintiff contacted Weinstein on June 12 and expressed an interest in returning to work.  Dep. at 111.  Plaintiff described the accommodations that he was looking for as a modified schedule, and an ability to work at home if he felt up to it.  Dep. at 112.  Plaintiff testified that his ability to travel was compromised because he could not walk unaided and that his surgeon had strongly advised against unnecessary travel.  Dep. at112-113.  Plaintiff resumed

3

work from home with the modifications on June 19, 2000.  Dep. at 118.  Plaintiff had significant

pain and the medications made him drowsy.  Dep. at 119.

Gary Weinstein told Plaintiff that his "top priority" was reviewing and deleting or

rewriting any recommendations for transmittal to the underwriters and recommendations to

policyholders.  Dep. at 120.  Weinstein also wanted Plaintiff to concentrate on quality control

reviews and feedback to staff on reports, survey assignments to staff and vendor report and

recommendation review.  Dep. at 120.  Plaintiff testified that given his medical condition at the

time, that all of these tasks were monumental for someone in his condition.  Dep. at 120.

Plaintiff told Weinstein a couple of weeks later that he was having problems concentrating.  Dep.

at 121.

As of June 27, Plaintiff was using crutches.  Dep. at 123.   Plaintiff sent a letter to a Dr.

Reid on June 26 stating that working from home was "okay" provided that Plaintiff could take

frequent breaks.  Dep. at 126.  Plaintiff stated in the letter that he wished to return to work on

August 28, 2000 "provided that it was safe to do so." Dep. at 126.  Plaintiff stated that he picked

that date because Mr. Weinstein had wanted him to be a presenter on that date.  Dep. at 127.

Plaintiff testified, however, that as of June 26th, he still felt "horrible."  Dep. at 127.

Plaintiff testified that Dr. Reid stated to him that it was not unusual to take 14 weeks to

get to the point where one could ambulate on two legs without crutches.  Dep. at 130.  When

Plaintiff was discharged from Harleysville, he was using a cane.  Dep. at 134.  Plaintiff went

through physical therapy at Muhlenberg Outpatient Physical Therapy through 2001.  Dep. at 135.

Plaintiff still finds it uncomfortable to go on long walks or jogs.  Dep. at 137.

Plaintiff recalled receiving an email from Gary Weinstein on July 18, 2000 regarding

overdue work in his territory.  Dep. at 139.  Plaintiff felt that part of the problem was that he

couldn't be on site to help manage the work process for an assistant named Carley Jespersen. Dep. at 142.  Plaintiff also could not get out to meet with vendors.  Dep. at 142.  Plaintiff also stated that the Defendant's email system was inefficient and contributed to the barriers to effective completion of his work.  Dep. at 143.

Plaintiff received an email from Gary Weinstein on July 15, 2000 criticizing plaintiff for some performance issues.  Dep. at 144.  Plaintiff could not review service files because he did not have the files in his home office.  Dep. at 147.  Plaintiff states that the administrative assistant had been terminated which further impeded access to materials.  Dep. at 147-148. Plaintiff recalls having a conversation with Gary Weinstein about reduced hours and understood that that was not an option.  Dep. at 152.  Plaintiff found it physically demanding to even sit in a chair.  Dep. at 152.

Plaintiff returned to work from the home office on August 21, 2000.  Dep. at 173.  On September 6, 2000, Dr. Reid noted that Plaintiff was not to lift more than 25 pounds, no standing for more than two hours at a time and no walking for more than 30 minutes per day.   Dep. at 177.  When asked to describe his daily routine as of September 6, 2000, Plaintiff stated that he believed he was still using a cane to ambulate.  Dep. at 178.  Plaintiff reiterated that as of September 6, 2000 he had **serious limitations on his ability to walk**.  Dep. at 180.

After a seminar in Harrisburg, Plaintiff testified that Weinstein and the Human Resources Department assembled his staff and told Plaintiff that he was not invited to attend.  Dep. at 193. No one ever reported what was said in the meeting.  Dep. at 195.  Gary Weinstein terminated Plaintiff on September 7, 2000.  Dep. at 201.  Plaintiff asked for a performance improvement plan. Dep. at 202.  Weinstein replied that Plaintiff's job was at a level that did not require a performance plan.  Dep. at 202.  Plaintiff was also given a packet indicating that his job had been

5

eliminated as part of a reduction in force.  Dep. at 202.  After Plaintiff consulted an attorney,

Defendant received notification that the reduction in force paperwork had been given to

Defendant in error.  Dep. at 203.  Plaintiff had no idea that there were complaints about him from

his staff.  Dep. at 207.

<h3 style="text-align:center">2.    <u>Deposition of Gary Weinstein.</u></h3>

Gary Weinstein's job title at Harleysville was Vice-President of Loss Control and

Premium Audit Department.  Dep. at 3-4.  There were no predecessors for Plaintiff's position.

Dep. at 6.  Within the loss control department, there had been a reorganization due to

centralizing the loss control function and centralizing the management position through the

regional manager jobs.  Dep. at 6.  Weinstein did not know if Plaintiff was given any training as

to how Defendant would require him to deal with subordinates.  Dep. at 9-10.  One of Plaintiff's

job duties would be to review service files, which were in a hard copy format.  Dep. at 11.

Mr. Weinstein testified that Plaintiff kept him apprised of his medical condition after the

gunshot accident.  Dep. at 22.  Plaintiff told Weinstein that he would not be able to drive a car

and that his leg needed to be elevated.  Dep. at 24.  Plaintiff requested that he work from home.

Dep. at 24.  Mr. Weinstein recalls visiting Plaintiff at home after the accident and that Plaintiff

may have been using a crutch or a cane.  Dep. at 25.  Weinstein testified that he asked Plaintiff to

go through service files but that no one ever brought the files to Plaintiff's home.  Dep. at 26.

Mr. Weinstein testified that quality control assessments were one of Plaintiff's greatest

responsibilities.  Dep. at 34.  He further testified that Mr. Vail was hired because Defendant was

looking to improve the quality of work was not up to standard.  Dep. at 35.  Weinstein knew that

Plaintiff's doctor had approved Plaintiff to work at home with certain restrictions.  Dep. at 37.

Weinstein testified that Plaintiff requested to spread his work out throughout the day because

sitting for more than six to eight hours was difficult.  Dep. at 43.  Mr. Weinstein did not receive

any complaints in writing about Plaintiff's managerial style.  Dep. at 47.

### 3.        Deposition of Alice Geckler.

Alice Geckler is Assistant Vice-President of Recruitment and Retention.  Dep. at 3.

Plaintiff's position was created because the loss control department was undergoing a

regorganization.  Dep. at 6.  Geckler was present when Plaintiff was terminated.  Dep. at 6.

Geckler gave Plaintiff a cover letter that read " As part of the expense reduction effort in the

home office, your position with Harleysville Group, Inc. has been eliminated, and your last day

of employment will be September 8th 2000.  Dep. at 7.  Geckler testified that this was an error.

Dep. at 7.  Geckler agrees that she signed the reduction in force letter.  Dep. at 8.  **Plaintiff also**

**stated that the language contained in Plaintiff's severance agreement that stated "Whereas**

**employee had satisfactorily performed his/her job responsibilities through September 8,**

**2000" was also an error.**  Dep. at 11.  Geckler stated that the severance amount was not an

error.  Dep. at 12.

Mr. Weinstein did not tell Plaintiff what specific complaints the staff had had about him.

Dep. at 14.  Geckler did not believe that there were any written complaints from staff in

Plaintiff's personnel file.  Dep. at 15.  Geckler recalls getting an email from Plaintiff wherein he

states, "Gary and Alice, I met with my orthopedic surgeon, Dr. Spence Reid, at Hershey Medical

Center June 21st.  He was pleased at my progress."  Dep. at 28. He also states that Dr. Reid does

not want him to drive or put body weight on the trauma leg.  Dep. at 28.

Geckler confirmed that Plaintiff was sent a disability form.  Dep. at 29-30.  She stated

that the form was sent to Plaintiff because he was out more than 5 days and that would be

considered a disability.   Dep. at 30.  In an email in response to a request from Weinstein

regarding an update on Plaintiff's condition, a Jennifer Ludwig stated responded that "it was too early to talk about long-term limitations.  Short-term through the end of August, Mr. Vail could not put any weight on his leg.   He's not allowed to drive, and he is not allowed to move his leg sideways".  Dep. at 33.  Furthermore, Geckler testified that Mr. Weinstein never discussed with her any possible long-term limitations on Plaintiff when he returned to work.  Dep. at 34.

## II.    SUMMARY JUDGMENT STANDARDS IN EMPLOYMENT DISCRIMINATION CASES.

### A.    ALL INFERENCES TO THE PLAINTIFF; GIVE NO CREDIT TO ADVERSE TESTIMONY FROM EMPLOYER'S INTERESTED WITNESSES.

Summary judgment should be granted only where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law".  Fed. R. Civ. P. 56(c).  In making its determination, the court should view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor.  Reeves v. Sanderson Plumbing, Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2510-2511, 91 L. Ed. 2d 202 (1986).  These requirements are to be applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues.  Stewart v. Rutgers University, 120 F.3d 426, 431 (3rd Cir. 1997);  Zysk v. FFE Minerals, USA, Inc. et al., Civ. Action No. 00-5874, 2001 U.S. Dist. LEXIS 20914 (E.D. Pa. Dec. 15, 2001), *6-7, citing Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 321 (3rd Cir. 2000); Gallagher v. Delaney, 139 F. 3d 338, 343-44 (2nd Cir. 1998); Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 277-78 (3rd Cir. 2001); Johnson v. U. of Cincinnati, 215 F.3d 561, 578 (6th Cir. 2000); Cherry v. Menard, Inc., 101 F.Supp. 2d 1160, 1167 (N.D. Iowa 2000) (collecting cases holding that summary

8

judgment should seldom be used in employment discrimination cases).

Even when the facts are not in dispute, summary judgment should be denied if competing inferences could be drawn from the undisputed facts on material issues.  Hunt v. Cromartie, 526 U.S. 541, 119 S. Ct. 1545 at 1551-52, 143 L. Ed. 2d 731 (1999).  (Where reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage).  The court should review the record as a whole, but it must disregard all evidence favorable to the employer that the jury is not required to believe.  Thus, if the employer's evidence is contradicted, or comes from an interested witness, it cannot be credited unless it is favorable to the plaintiff.  Reeves, supra, 119 S. Ct. at 2100, quoting 9A C. Wright & A. Miller, Federal Practice and Procedure 2529 (2d Ed. 1995) at 300.

When the disputed issue turns on a question of motive and intent "jury judgments about credibility are typically thought to be of special importance".  Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091 (1st Cir. 1995) ("No credibility assessment may be resolved in favor of the party seeking summary judgment."); see also, Poller v. Columbia Broad. Sys., 368 U.S. 464, 473, 82 S. Ct. 486, 491, 7 L. Ed. 2d 458 (1962) ("summary judgment procedures should be used sparingly . . . where the issues of motive and intent play leading roles"); Pullman-Standard v. Swint, et al., 456 U.S. 273, 288-90, 102 S. Ct. 1781, 1790-1791, 72 L. Ed. 2d 66 (1982) (discriminatory intent is a factual matter for the trier of fact);  Coll v. PB Diagnostic Sys., Inc.,

## B.   BURDEN SHIFTING PARADIGM.

To block an employer's motion for summary judgment, plaintiff first shows that his evidence is sufficient to prove the elements of a prima facie case to a reasonable fact finder.  St.

Mary's Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 401 (1993).  For

Plaintiff's prima facie case of disability discrimination, he must show that:  (1) he is a disabled

person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential

functions of the job, with or without reasonable accommodations by the employer; and (3) he has

suffered an otherwise adverse employment decision as a result of the discrimination.  Shaner v.

Synthes, 204 F.3d 494, 500 (3rd Cir. 2000).

　　　In addition to being actually disabled, a plaintiff can show that he was "regarded as"

being disabled by the employer.  Olsen v. General Electric Astrospace, 101 F.3d 947, 954-55 (3rd

Cir. 1996); Deane v. Pocono Medical Center, 142 F.3d 138, 148-49 (3rd Cir 1998) (en banc);

Buskirk v. Apollio Metals, 116 F. Supp. 2d 591, 601-02 (E.D. Pa. 2000); Murray v. Surgical

Specialties Corp., Civil Action No. 97-0444, 1999 U.S. Dist. LEXIS 277 (E.D. Pa. Jan. 14,

1999); Katz v. City Metal Co, Inc., et al., 87 F.3d 26 (1st Cir. 1996).  Pursuant to the ADA, a

plaintiff may allege both that he was disabled in fact, and, that his employer **regarded** him as

being disabled.  Rowles v. Automated Production Systems, Inc., 92 F. Supp. 2d 424, 427 (M.D.

Pa. 2000); Julia v. Janssen , Inc., 92 F. Supp. 2d 25, 37 (D. Puerto Rico 2000).

## C.  　EFFECT OF DESERT PALACE V. COSTA.

　　　In Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84

(2003), the Supreme Court analyzed 42 U.S.C. ¶ 2000e-2(m), part of the 1991 Civil Rights Act,

and concluded that a Title VII plaintiff need not present direct evidence of discrimination in

order to either obtain a mixed-motive jury instruction or to establish liability in a mixed motive

case. Since Desert Palace was handed down one year ago, many courts have shown an

inclination to incorporate a Desert Palace rationale into their traditional summary judgment

analysis. In Rachid v. Jack in the Box, Inc., ___ F.3 ____, 2004 WL 1427046 (5th Cir. June 25,

2004), the Fifth Circuit Court of Appeals held that a Desert Palace mixed motives analysis would apply to a summary judgment motion filed in an ADEA case.

Moreover, the <u>Rashid</u> Court also held that direct evidence of age discrimination was not necessary. The Court adumbrated an integrated McDonnell Douglas/Desert Palace test. Under this integrated approach, the plaintiff must still demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its adverse decision against the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's disability.  If a plaintiff demonstrates that disability was a motivating factor in the employment decision, it then falls to the defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus.

*Id*

### D.    PLAINTIFF HAS ESTABLISHED GENUINE ISSUES OF MATERIAL FACT WITH RESPECT TO HIS CLAIMS UNDER THE ADA.

#### 1.    Plaintiff's Evidence Reveals That He Has Established A Prima Facie Case Under The ADA.

To state a cognizable cause of action for discrimination under the ADA, the plaintiff must show that:  (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of the discrimination.  <u>Shaner v. Synthes</u>, 204 F.3d 494, 500 (3rd Cir. 2000).

Plaintiff could perform the essential functions of his job, and in fact had performed them well prior to his termination.

### a.    ADA Discrimination.

#### i.    Plaintiff is disabled and Defendant regarded Plaintiff as disabled.

To satisfy the first element of the prima facie case, the plaintiff must demonstrate that he is disabled. See, <u>Deane v. Pocono Medical Ctr.</u>, 142 F.3d 138, 143 (3rd Cir. 1998) (*en banc*).  To establish a disability under the ADA, the plaintiff must show:  (1) he has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) he has record of such impairment; or (3) he is regarded as having such an impairment. 42 U.S.C. ¶ 12102(2).

In determining whether a disability qualifies as a substantial limitation of a major life activity, courts are to consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long term impact of or resulting from the impairment.  <u>Kolecyck-Yap v. MCI Worldcom, Inc.</u>, 99 CV 8414, 2001 WL 245531 (N.D. Ill. March 12, 2001).  The ADA requires an individualized inquiry of the individual's impairment.  <u>Id</u>.

Since the ADA does not define major life activities, the Eighth Circuit Court of Appeals has been guided by the definition provided in 29 C.F.R. ¶ 1630.2 of the EEOC regulations on implementation of Title I of the ADA.  <u>Wheaton v. Ogden Newspapers, Inc. d/b/a Messenger Printing</u>, 66 F. Supp. 2d 1053 (1999).  As defined in 29 C.F.R. ¶ 1630.2, the phrase major life activities  means functions such as caring for oneself, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning and working.  Id.  This list is not exhaustive.  Id.  For example, other major life activities include, but are not limited to, sitting, standing, lifting, and reaching. Id.

Plaintiff was shot in the right hip and the bullet passed through his body injuring his upper right leg, shattering his upper right femur and breaking his pelvis.  Vail Dep. at 108.  Plaintiff had two operations where doctors attached plates and screws to bones and joints.  Dep. at 108.  Plaintiff initially walked with crutches.  Vail Dep. at 133.  Plaintiff still finds walking painful.  Dep. at 136.  Vail does not walk the same as he did before the injury.  Dep. at 282-283.

Defendant devotes a great deal of time in its brief to the argument that Plaintiff was "not substantially limited" in any life activity.  As noted already, Plaintiff was limited in several other major life activities, including, concentrating, driving, standing, and walking.

Defendant relies on Sutton, et al. v. United Airlines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999) to bolster its argument in this regard.  However, the limits of Sutton were detailed by the Second Circuit Court of Appeals in Bartlett v. New York State Board of Bar Examiners, 226 F.3d 69, 83-84 (2nd Cir. 2000).  In Bartlett, the Court of Appeals distinguished Sutton, by pointing out that the job of airline pilot (as in Sutton) presented a plaintiff with a limited range of jobs, whereas the Plaintiff in Bartlett (who was unable to take her state bar exam due to a learning disability) would not be able to become a practicing attorney.

In Bartlett, the Court noted that the range of jobs applicable to the class of attorneys met the statutory definition of "wide range of jobs" referred to in the ADA's implementing regulations.  In Bartlett, the Circuit Court of Appeals noted that a person with a law degree who was unable to become a practicing attorney was in fact substantially limited in the range of jobs she could perform.  Moreover, the Appendix to Part 1630 (29 C.F.R. Part 1630), Interpretive

13

Guidance on Title I of the ADA, under § 1630.2(j) states in part: "The terms 'number and types of jobs' and 'number and types of other jobs . . . are not intended to require an onerous evidentiary showing. . .". See also, *e.g.*, Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 785 (3rd Cir. 1998) (in determining the major life activity of working, the court has to make an individualized assessment of the employee's affliction, coupled with an assessment of that employee's personal characteristics).

Plaintiff resumed his job duties from home on June 19, 2000. In an email sent to Gary Weinstein on July 20, 2000, Plaintiff writes in part: "Perhaps the work schedule that we originally discussed was too much, too fast." He goes on to say, "On July 6th I asked if you would consider reduced hours for the weeks of July 10 & 17, and you didn't want to do that." See Defendant's Exhibit "I." Plaintiff told Gary Weinstein that he was having problems concentrating. Vail Dep. at 121. Plaintiff testified during his deposition that he as of June 22, 2000 he was pressured by Gary Weinstein to return to work. Vail Dep. at 124. In response, Plaintiff sent Gary Weinstein an email stating that he was instructed by his doctor not to drive or put body-weight on his trauma leg. See Defendant's Exhibit "T".

As noted by the Sixth Circuit Court of Appeals in Ross v. Campbell Soup Company, 237 F.3d 701, 709 (6th Cir. 2001), "proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind". Defendant has ignored the fact that the ADA, 42 U.S.C. § 12112(a), does not contemplate "a stark dichotomy between 'disability' and 'disability-related conduct', but rather protects both". See, Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1088 (10th Cir. 1997); McKenzie v. Dovala, 242 F.3d 967, 974 (10th Cir. 2001); Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2nd Cir. 2000);

14

Walsted v. Woodbury County, 113 F. Supp. 2d 1318, 1339-1342 (D. Iowa 2000).  In the final analysis, Defendant fired Plaintiff because it perceived that his disability was preventing him from doing his job.  If Vail's shortcomings were attributable to his health problems, then this termination was an illegal act on Defendant's part.

### ii.    Plaintiff is a qualified individual with a disability.

The second element of the prima facie case requires the plaintiff to show that he is a Aqualified individual.  See Deane, 142 F.3d at 145.  The ADA defines this term as an individual Awho, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires@.  42 U.S.C. ¶ 12111(8).  This inquiry is divided into two prongs.  See Deane, 142 F.3d at 145; 29 C.F.R. pt. 1630, app. Section 1630.2(m).  The court must decide:  (1) whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires" and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought.  Deane, 142 F.3d at 145 (citing 29 C.F.R. pt. 1630, app. ¶ 1630.2(m)).

Harleysville takes the position that Plaintiff was terminated because of poor performance and "staff complaints."  At the time of his termination, Plaintiff was given a letter that stated he was being terminated for "reduction in workforce."  One month later, Harleysville sent Plaintiff's counsel a letter indicating that the "reduction in workforce" reason was an **error** and that the reason for termination was poor performance.  Plaintiff strongly believes that Harleysville "error" is a question of fact for the jury as to the real reason for Plaintiff's termination. Shifting explanations of the reason for termination of a person can create a prima facie case.  Moreover,

changing positions is strong evidence of an attempt to hide discrimination. See Bell v.

Birmingham Linen Service, 715 F.2d 1552, 1559 (11th Cir. 1983), Thurman v. Yellow Freight

Co. 97 F.3d 833 (6th Cir 1996) Payne v. Norwest Corp., 113 F.3d 1079 (9th Cir. 1997).

   Harleysville hired Plaintiff as a regional loss control manager, a newly created position

within the organization.  Dep. Weinstein at 5.  Plaintiff was the first person hired for the position.

Dep. Weinstein at 6.  Although Weinstein was Plaintiff's superior, Weinstein testified that he did

not know if Plaintiff was trained as to how to deal with subordinates.  Dep. Weinstein at 9-10.

Weinstein further testified that Plaintiff was only trained on certain functions of the job.  Dep.

Weinstein at 8.

   Defendant argues in brief that Plaintiff failed to review service files as part of his job

responsibilities.  Weinstein admitted during his deposition that the service files were in hard

copy format.  Weinstein Dep. at 11.  Weinstein further testified that no one delivered the service

files to Plaintiff while Plaintiff was working out of his home.  Weinstein Dep. at 23-25.

   Defendant attempts to argue that Plaintiff's "performance problems" preceded his injury

and points to an email dated May 1, 2000 from Gary Weinstein.  See Defendant's Exhibit "G."

In the email, Weinstein addresses an issue regarding logging out work and backdating.

Weinstein further states:  "[t]he pace is always hectic with a new job, changing management

environment (regionalization, and solid line management).  You are doing a great job for us, I

just need you to MASTER most of the clerical functions so you can train staff, monitor their

quality, manage the workload and vendors, and accurately appraise carleys [sic] performance."

It goes on to say:  "You are doing great, just humor me and knock out the oldest styuff [sic] from

the vendors…"

Plaintiff responds in pertinent part as follows:  "Please keep in mind that when I got here there was no structure in place for this region, some of my initial orientation turned out to be counterproductive, the staff was (& in some cases are) clearing reports with absolutely no risk improvement value (another issue for another day), some prior "supervisors" were requesting fee work that should no have gone outside, others were merely passing reports thru without sending recs, & some were sending out fee recs directly with no editing, files were piled up… This is not a complaint, just a recognition of reality.  This tanker isn't going to turn on a dime.  But it will improve quickly."

Plaintiff was hired in a newly created position after a restructuring took place.  Plaintiff is quite clear in his response to Weinstein that the problems complained about preceded Plaintiff's joining the staff and he was attempting to do the best he could to address the problems.  The May 2000 email is the only documented complaint of Plaintiff's work performance predating his injury, which Plaintiff addressed as a problem that existed prior to his joining the staff.

### iii.    Harleysville Did Not Earnestly Engage In the Interactive Process  Required under the ADA.

Pursuant to the ADA, an employer is obligated to engage in an interactive process with its employee.  The employer may not just peremptorily reach its own conclusion that an employee is disabled and therefore must be fired.  See, *e.g.*, Sicoli v. Nabisco Biscuit Co., No. 96-6053, 1998 U.S. Dist. LEXIS 8429, 11-13 (E.D. Pa. June 8, 1998).  In Vendetta v. Bell Atlantic Corporation, Civil Action No. 97-4838, 1998 U.S. Dist. LEXIS 14014 (E.D. Pa. Sept. 8, 1999), this court, *citing* Mengine v. Runyon, 114 F.3d 415, 416 (3rd Cir. 1997), held that the process of accommodation should be a joint undertaking, or interactive process between the disabled employee seeking an accommodation, and his or her employer.

In Point-Du-Jour v. County of Bucks, No. 99-583, 2000 U.S. Dist. LEXIS 3061 (E.D. Pa. March 7, 2000), the district court examined the steps to be taken as part of the informal interactive process. First of all, an employee's request need not be in writing but must make clear that the employee wants assistance for his or her disability.

Simply stated, the employer must know of both the disability and the employee's desire for an accommodation of the disability. At that point, the employer's obligation to engage in the interactive process has been triggered. Once the interactive process has been triggered, the employer must make a reasonable effort to identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations. The interactive process requires that employers make a good faith effort to seek accommodations, such as, meeting with an employee who requests an accommodation, asking the employee what he or she specifically wants, and offering and discussing available alternatives when the request is too burdensome. In the case at bar, no such effort was ever made by Harleysville.

The employer's obligation to engage in this process is codified in the applicable regulations. See, 29 C.F.R.¶ 1630.2(o)(3). Whether an employer has reasonably accommodated an employee's disability is a question of fact that ordinarily should be resolved by a jury. See Frye v. Aspin, 997 F.2d 426, 428 (8th Cir. 1993). Under the ADA, an employee begins the accommodation "process" by informing his employer of his disability; at that point, an employer's liability is triggered for failure to provide accommodations.

The Areasonable accommodation@ element of the ADA imposes a duty upon employers to engage in the aforementioned flexible, interactive process with the disabled employee needing

18

accommodation so that, together, they might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working. Hendricks-Robinson v. Excel Corp., 154 F.3d 685 (7th Cir. 1998). See also, *e.g.*, Davoll, et al. v. Webb, 194 F.3d 1116 (10th Cir. 1999); Lenker v. Methodist Hospital, 210 F.3d 792, 797 (7th Cir. 2000); Taylor v. Pathmark Stores, Inc. 177 F.3d 180 (3rd Cir. 1999); Clark v. Germantown Hospital and Medical Center, Civil Action No. 00-3862, 2001 U.S. Dist. LEXIS 1221 (E.D. Pa. Feb. 13, 2001); Dayoub v. Penn-Del Directory Co., 90 F. Supp. 2d 636 (E.D. Pa. 2000).

In the case at bar, and discussed *supra*, Plaintiff requested, but was denied, reduced work hours for the weeks of July 10 & 17. Plaintiff told Defendant that he was having trouble concentrating and emphasized that "I don't want to be in a position of failure because I did not take the necessary time to heal properly." Defendant's Exhibit "I." Rather than accommodate Plaintiff's request, Defendant responded by "ratcheting" up the pressure on Plaintiff to perform at a level that he was just not ready to perform.

### iv.    Plaintiff suffered an adverse employment action on the basis of his disability.

Plaintiff's termination on September 7, 2000 was certainly an adverse employment action, under any definition. See, Deane v. Pocono Medical Center, 142 F.3d 138, 149 (3rd Cir. 1998)(*en banc)* (a phone call terminating the plaintiff because of her handicap was uncontroverted direct evidence that she had suffered an adverse employment action); see also, Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2nd Cir. 1998); Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3rd Cir. 1998); Taylor v. Phoenixville School District, 998

F. Supp. 561, 565 (E.D. Pa. 1998) (setting forth analysis for prima facie case of unlawful discrimination for failure to accommodate under the ADA).

Interestingly, Plaintiff received a letter at the time of his termination indicating that his termination was as a result of a reduction in workforce. Defendant later sent Plaintiff's counsel a letter indicating that the letter was an error and Plaintiff's termination was as a result of "poor performance." Alice Geckler, Assistant Vice-President of Recruitment and Retention at Harleysville admitted in her deposition that she gave Plaintiff the letter indicating that he was terminated for "reduction in workforce." Her signature appears on the letter. Geckler Dep. at 7. Geckler further confirmed upon questioning by Plaintiff's counsel that the language contained in the letter stated "Whereas employee had satisfactorily performed his/her job responsibilities through September 8, 2000." Geckler Dep. at 10-11.

Plaintiff testified that he was not expressly told that his performance was the issue at his September 7, 2000 meeting with Weinstein. Vail Dep. at 208. Furthermore, there was no discussion with Plaintiff with regards to what complaints staff had with regards to his managerial style. There was no performance plan offered and no warning that Plaintiff was to be terminated. There were no complaints from staff regarding Plaintiff in his personnel file. Weinstein Dep. at 31. There are numerous questions of fact for the jury to decide as to reason Plaintiff was terminated.

### 2. Harleysville Perceived That Plaintiff Was Disabled.

As noted earlier, everything seemed to change for Plaintiff as soon as he told Gary Weinstein that he was injured and needed some help in the form of an accommodation. It was not until after Plaintiff's injury that Weinstein's criticism of Plaintiff's performance was full force. Plaintiff was under enormous pressure from Gary Weinstein to get back into the office

even though he was not thoroughly healed.  Further, Plaintiff could not review files that could

not be electronically transmitted and Plaintiff had no administrative assistant.  Meanwhile,

Weinstein added administrative assistant tasks to Plaintiff's workload.  Vail Dep. at 148.  Asking

for assistance in one's job responsibilities is a reasonable request for an accommodation under

the ADA.  See, <u>Borkowski v. Valley Central School District</u>, 63 F. 3d 131, 134 (2nd Cir. 1995).

      In view of the punitive actions that were taken against Plaintiff after he disclosed that he

was injured, it is evident that Harleysville perceived that he was disabled and could no longer

perform his former job duties.  See, *e.g.*, <u>Olson v. General Electric Astrospace</u>, *supra*; <u>Heyman v.</u>

<u>Queen's Village Committee For Mental Health, et al.</u>, 198 F.3d 68 (2nd Cir. 1999); <u>McInnis v.</u>

<u>Alamo Community College District</u>, 207 F.3d 276 (5th Cir. 2000); <u>Thalos v. Dillon Companies,</u>

<u>Inc.</u>, 86 F. Supp. 2d 566, 574-75 (D. N.J. 1999); <u>Doe v. County of Centre, et al.</u>, 242 F.3d 437,

448 (3rd Cir. 2001) (a person with a disability must not be excluded. . . based on stereotypes or

fear); <u>Deppe v. United Airlines</u>, 217 F.3d 1262 (9th Cir. 2001).

### 3. Harleysville's Alleged Dissatisfaction With Plaintiff's Job Performance is <u>Pretextual and Arose After He Made The Company Aware Of His Injury.</u>

      Pretext is established by the fact that nobody at Harleysville ever had any problem with

Plaintiff's job performance until he notified the company of his injury in June 2000.  There was

no performance plan or progressive disciplinary plan offered to Plaintiff.  The majority of the

emails from Weinstein to Plaintiff regarding "performance issues" occurred after Plaintiff was

injured and working from home.  As discussed *supra*, the only email discussing performance

issues **prior** to Plaintiff's injury was an email from Weinstein stating that discussed some

concerns but also stated that Plaintiff was "doing a great job" and to "keep up the good work."

Furthermore, Plaintiff addressed Weinstein's concerns in his May 2, 2000 response indicating that some of the problems preceded his employment with Harleysville and that "this tanker isn't going to turn on a dime."

If an employer never bothers to write down the standards of performance it expects its employees to meet, the employer cannot, after-the-fact, claim that the employee was not meeting expectations.  See, Roebuck v. Drexel University, 852 F.2d 715 (3rd Cir. 1988) (employer's standards had never been written down); Showalter v. University of Pittsburgh Medical Ctr., supra (jury could infer pretext from the invocation of what was a very unclear corporate policy); Lawrence v. National Westminster Bank of New Jersey , 98 F.3d 61 (3rd Cir. 1996) (possible pretextual nature of a sudden, drastic decline in performance – plaintiff was never provided with an evaluation during his employment); Duchon v. Cajon Co., 791 F.2d 43 (6th Cir. 1986) (employee never warned about her performance and received regular wage increases); Brewer v. Quaker State, 72 F.3d 326 (3rd Cir. 1995) (only documented criticisms of performance were those issued just prior to termination).

Another issue of pretext arises from the fact that Plaintiff was given no type of warning that he was going to be fired.  Weinstein testified that Harleysville had a progressive discipline policy.  Weinstein Dep. 15.  However, it was never applied to Plaintiff, and he was given no opportunities for performance improvement.  On the day he was terminated, he had no indication about what was going to happen.  An employer's failure to adhere to its own policies for termination and progressive discipline gives rise to an inference of pretext.  Zysk, supra, 2001 U.S. Dist. Lexis 20914 at *44, citing, Craig v. Y & Y Snacks, Inc., 721 F.2d 77, 80 (3rd Cir. 1983).  As the district court noted in Zysk:  "Even if his performance was substandard, his discharge may have been unusually hasty".  Id.

22

Discrimination can often be of such a subtle, insidious character that a plaintiff may only be able to offer circumstantial evidence to buttress his claim.  <u>Conway v. Electro Switch Corp.</u>, 825 F.2d 593, 597 (1st Cir. 1987).  Plaintiff has presented a raft of circumstantial evidence of discrimination.

**III.    <u>CONCLUSION</u>**

Based upon the foregoing arguments and authorities, Plaintiff, Kenneth T. Vail, respectfully requests your Honorable Court to deny and dismiss Harleysville Group Inc.'s Motion for Summary Judgment.

Respectfully submitted,

_____
DONALD P. RUSSO, ESQUIRE
Attorney for Plaintiff
117 E. Broad Street
P.O. Box 1890
Bethlehem, PA 18016-1890
(610) 954-8093
Attorney I.D. # 25873

## CERTIFICATE OF SERVICE


I, Donald P. Russo, hereby certify that on this date I served a true and correct copy of the

within Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary

Judgment upon opposing counsel, via United States first class mail, postage pre-paid, addressed

as follows:


Anthony B. Haller, Esquire
BLANK ROME
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6998



Date: _____July 29, 2004_____                    _____

                                                  DONALD P. RUSSO, ESQUIRE