IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENNETH T. VAIL, : | |
| : | No. 02-CV-2933 |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| HARLEYSVILLE GROUP, INC., : | |
| : | JURY TRIAL DEMANDED |
| Defendant : | Electronically Filed |

### DEFENDANT HARLEYSVILLE GROUP, INC.'S TRIAL MEMORANDUM

BLANK ROME LLP

Anthony B, Haller, Esquire (PA 37017)
Julie E. Reid, Esquire (PA 89848)
One Logan Square
Philadelphia, PA 19103
(215) 569-5690
(215) 832-5690 (facsimile)

Attorneys for Defendant
Harleysville Group, Inc.

<u>Dated</u>:  August 30, 2004

Pursuant to Local Rule 16.1(c) and the Court's January 26, 2004 Jury Trial Attachment Order, Defendant Harleysville Group, Inc. ("Harleysville"), by and through its undersigned counsel, respectfully submits this Trial Memorandum in the above-captioned matter.

I.  **BRIEF STATEMENT OF NATURE OF ACTION AND BASIS FOR JURISDICTION**

In his amended complaint, Plaintiff Kenneth T. Vail ("Vail") claims that Harleysville violated the American's With Disabilities Act ("ADA") by terminating his employment on September 7, 2000.[1] This Court has jurisdiction under 28 U.S.C. § 1331. Harleysville estimates that a trial in this matter will require approximately 5 days. The evidence at trial will demonstrate that under controlling legal principles, Vail's claims are without merit. Vail is not an individual with a disability within the meaning of ADA; Harleysville did not regard him as disabled; Harleysville fully "accommodated" Vail's injury; and Harleysville terminated Vail for performance problems which permeated his short tenure with the company and culminated in open dissent among his staff who complained bitterly about his abusive management style.

Following a re-organization, Vail was hired to fill one of four newly created Loss Control Regional Manager positions. His job was to build and manage a team of employees and to perform a variety of critical administrative tasks such as quality reviews and vendor reports. From the start, Vail's performance was substandard. His manager, Gary Weinstein ("Weinstein"), Vice President of Loss Control and Premium Audit, voiced concerns about work not getting done and, as early as May 2, 2000, set these concerns out in writing.

On June 2, 2000, Vail was shot in the leg while attending a rifle competition, and his injury required surgery. After a brief period in the hospital, Vail began recuperating and

---

[1] On June 22, 2004, Vail filed an amended complaint in which he withdrew his claim of age discrimination under the Age Discrimination in Employment Act.

2

receiving physical therapy at home. The prognosis for full recovery was good. Within two weeks, Vail requested permission to start work from home because he was temporarily limited in driving. By August 21, 2000, Vail was able to return to full responsibilities. Other than using a crutch or a cane to help him walk, he was able as of September 1, 2000 to perform all of his daily life activities. His outpatient physical therapy records show him getting progressively fitter, walking, jogging, biking, and sprinting. There is no evidence of any substantial, long term or permanent limitation on his physical abilities, and Vail admits that he returned to his prior functional level.

Vail's performance did not improve when he returned to work from his injury. Despite being relieved of a large portion of his responsibilities as an accommodation to his temporary limitation, Vail failed to submit timely quality reviews and vendor reports, leading to complaints from underwriters. With increasing frustration, Weinstein counseled him about the unacceptable lack of progress and told him explicitly that his future depended on immediate improvement. This did not occur. When Vail's staff learned he was to resume field duties, they approached Weinstein to complain about his management style. At a meeting held on August 31, 2000 at the end of an off-site seminar, Harleysville received a stream of complaints about Vail from his staff. Against the backdrop of his performance issues, Harleysville decided to terminate Vail's employment. The company did not experience similar problems with any of the other three new Regional Loss Control Managers.

## II.   BRIEF STATEMENT OF FACTS

### A.   Background to Vail's Hiring

Harleysville is an insurance company underwriting commercial, property, and casualty lines of insurance, headquartered in Harleysville, Pennsylvania. Its Loss Control Department is involved in supporting underwriters by assessing, identifying and managing risks for customers

who are clients or potential clients. In early 2000, Harleysville reorganized and consolidated the Loss Control Department. Spearheaded by Weinstein, Vice President of Loss Control and Premium Audit, Harleysville centralized the loss control function by creating four (4) new Regional Manager positions. Weinstein sought managers with leadership skills and the ability to quickly and effectively build a team and motivate staff members. Vail was hired to fill the Regional Manager position for the Mid-Atlantic Region. He began employment with Harleysville on March 27, 2000 and reported directly to Weinstein. Vail's responsibilities, like those of the other three Regional Managers, included managing his staff, conducting field visits, assigning and reviewing vendor reports and surveys, and conducting regular quality reviews of his staff. He was also responsible for working with underwriting units to identify target market segments, and to review service files and non-service files, the vast majority of which were available electronically.

### B.   Early Performance Problems

From early on in Vail's tenure, Weinstein began having concerns about Vail's ability to successfully perform his job. Weinstein communicated his priorities and expectations to Vail both verbally and in writing and gave him feedback that certain tasks, including providing quality reviews or reports for his staff members, were not being completed  Vail admitted that these concerns were raised with him. On May 2, 2002 Weinstein wrote an e-mail to Vail expressing his frustration about tasks not getting done. Vail responded by saying he would improve. As Harleysville later discovered, Vail was also having significant problems managing and relating to his staff.

### C.   Vail's Injury and Return to Work

On Monday, June 5, 2000, Vail informed Weinstein that he was unable to come to the office because he had been injured on June 2, 2000 when he fell off of a tower. On June 7, 2000,

4

Vail told Weinstein that he had in fact been shot at a sporting gun event, was hospitalized, and would undergo surgery. On June 12, 2000, Vail informed Weinstein that he was looking forward to a quick and speedy recovery and returning to work as soon as it was prudent to do so and he could continue to effectively contribute from his home office. Vail had no sick leave or short-term disability benefits available to him and wanted to promptly return to work. Although Weinstein offered Vail the opportunity to work part-time, Vail insisted that he could work full-time beginning on June 19, 2000.

Harleysville granted all of Vail's requests to enable him to work full-time and receive his full compensation including allowing him to work from home until he could resume working from the office, extending his work day to whatever hours he desired to allow for frequent breaks throughout the day, and eliminating all of his travel-related responsibilities (i.e., thirty (30) percent of his job functions) while he worked from home. Throughout the summer of 2000, Vail continuously relayed to Harleysville that his prognosis was good, that he was healing quickly and that he expected fully to recover. He reiterated his desire to work full-time and insisted he could effectively do so with the "accommodations" Harleysville provided him.

### D.  Continued Performance Problems

Upon his return to work in mid-June 2000, and over the next several weeks, Vail failed to complete several critical job tasks, such as reviewing vendor reports, preparing a sufficient number of quality control reports for his staff and reviewing service files from his region. These problems started to impact the business, and underwriters complained to Weinstein about the backlog. Weinstein repeatedly communicated with Vail via telephone and email about his dissatisfaction with Vail's performance and the poor service level in Vail's region. On July 15, 2000, Weinstein sent a detailed e-mail reviewing the recurring problems with Vail's performance and told him unambiguously that his success going forwarded depended on his timely and

5

thorough completion of these tasks. Vail accepted responsibility for his region's poor performance and admitted that Weinstein was "not a happy camper."

### E. Staff Complaints

In anticipation of Vail's return to the office and his field responsibilities in August 2000, several of Vail's staff members raised serious complaints about Vail's management style with Weinstein and Alice Geckeler ("Geckeler"), Assistant Vice President, Recruitment and Retention. On or about August 31, 2000, Geckeler met with Vail's staff after a conference in Harrisburg, Pennsylvania. She was told that Vail made his staff uncomfortable, he was abrasive and nasty, he harassed and verbally abused them, he threatened to fire them, he humiliated them, he did not provide constructive feedback, he micro-managed and was an ineffective manager. In fact, at least one staff member stated that they would resign if Vail remained employed, and others said that they had sent out resumes in search of new employment opportunities.

### F. Decision to Terminate Vail's Employment

Based on the documented performance problems and the poor morale of Vail's staff members so bitterly expressed to Geckeler, Harleysville decided that the situation needed to be fixed. As a result, Harleysville decided to terminate Vail's employment and look for a replacement. On September 7, 2002, Weinstein and Geckeler meet with Vail and told him that, in their opinion, things were not working out and that he was a poor fit for the organization. To help him bridge to new employment, Vail was offered a severance package. He was presented with a form document used normally in the context of a reduction in force.[2] This form

---

[2] Harleysville does not normally give severance when employees are terminated for cause so there was no form for this situation.

6

mistakenly referred to the termination as being a layoff. Harleysville promptly corrected this mistake and any resulting confusion.[3]

### G. Vail's Injury, Prognosis And Recovery.

Soon after his injury, both Vail and his attending surgeon, Dr. J. Spence Reid, reported that his prognosis was good and that he should fully recover and be able to return to the office in August 2000. The physical therapists who worked with Vail at his home in June and July 2000 noted that he was progressing well. Vail admitted that as of his return to the office on August 21, 2000, his only limitations involved walking with an assistive device, not lifting over thirty (30) pounds, and not traveling excessively, and that as of September 7, 2000, he could perform all major life activities.

Throughout the fall of 2000, Vail's physical therapy regimen progressed to skipping, running, biking and sprinting. Vail admitted he could sprint but not "like Carl Lewis." By December 6, 2000, Vail could walk without an assistive device. As of June 2001, Dr. Reid reported that Vail's fracture had completed healed, his range of motion was nearly symmetric with the opposite uninjured side, his prognosis was excellent, and no limitations were placed on any activities. With time, Vail progressed and returned to his prior functional level including recreational hiking and mountain biking on less challenging trails. His only testimony as to continuing limitations was that he stopped kayaking, serious hiking and mountain biking on demanding trails.

---

[3] In an October 6, 2000 letter to Vail's counsel, Harleysville wrote as follows: "The letter Mr. Vail received from the Human Resources Department regarding his termination should not have been sent to him – it was a mistake. Mr. Vail's position, the Loss Control Manager for the Mid-Atlantic region, was not eliminated. . . . .Therefore please disregard the letter. As Mr. Vail knows from the meeting he attended on 9/7/00 with Gary Weinstein and Alice Geckeler, his employment was terminated because of his poor performance of his job duties. Neither his age nor his physical limitations played a role in the decision to terminate his employment."

H.  **Applicable Employment Policies**

Harleysville's Employee Manual makes clear that all employees are terminable at will (i.e. at any time for any reason not prohibited by law). There is no specific requirement that employees be placed on a formal corrective action plan before termination. By way of example, Gary Weinstein was terminated in or around February 2001 without counseling or warning of any kind because his department was under-performing. The Supervisors' Supplement to the Employee Manual provides a guide to supervisors and managers in giving performance feedback to employees and states as follows:

> The procedures listed below are to be used to aid an employee in correcting performance problems. The sooner a problem is addressed, the sooner it will be corrected. For instance, if it is obvious in the first month of employment that the employee cannot do the job for which he or she was hired, termination can occur fairly easily after holding corrective discussions with the employee.
>
> The Company reserves the right to terminate employment at will, with or without reason, at any time. Depending on the circumstances, the Company may however, try to correct the problem first….

The guide differentiates between the level of counseling and warning necessary depending on an individual's length of service. Vail received consistent counseling and warning of the type and level to be expected given his short tenure.

As a short tenured employee, Vail was not eligible to receive sick pay or short term disability benefits. He could, after a 30-day waiting period, have applied for long-term disability benefits; however, he was back at work within two weeks with doctor's clearance.

I.  **Events Following Vail's Termination of Employment with Harleysville**

In February 2002, Vail commenced employment with St. Luke's Hospital and Health Network and made over $90,000 that year, more than he could have earned in one year at

8

Harleysville. At the time Vail applied for a position at St. Luke's in October 2001, he needed no accommodation of any kind for any physical limitation. Vail also recovered a $385,000 settlement against the individual who shot him in an action which included a claim for lost wages and compensation.

### III. STATEMENT OF SIGNIFICANT/UNIQUE LEGAL OR PROCEDURAL ISSUES ON WHICH THE COURT WILL BE REQUIRED TO RULE

As a threshold legal issue, Vail is not an individual with a disability within the meaning of the Americans with Disabilities Act and Harleysville did not regard him as disabled. These issues are fully briefed in Harleysville's Motion for Summary Judgment which is currently pending before the Court. Harleysville believes this threshold issue is dispositive of all issues in the case.

Additionally, Vail's economic damages are limited to back pay from the period between September 7, 2000 to February 17, 2002, when Vail commenced employment at St. Luke's Hospital and Health Network.. Vail made over $90,000 in 2002, more than he could have made in one year at Harleysville.[4] Vail is not entitled to any front pay damages.

There is no basis in this case for any claim of punitive damages. To the extent that Vail seeks to proffer evidence as to this issue, it should be excluded.

### IV. LIST OF TRIAL EXHIBITS

Attached hereto as Exhibit "A" is a Schedule of Harleysville's Trial Exhibits.

### V. EXPERT WITNESSES

Harleysville intends to call the following expert witnesses at trial:

   1.   Dr. Mark Avart, Philadelphia Orthopoedic Group, 2 Bala Plaza, Suite 1LI, Bala Cynwyd, PA 19004. Field of expertise – Orthopedic surgery (expert witness as to liability).

---

[4] By letter dated May 14, 2004, Vail's counsel acknowledged that beginning in February 2002, Vail has earned more money that he would have made at Harleysville.

    2.    Brian P. Sullivan, Ph.D, Vice President and Senior Economist, The Center for Forensic Economic Studies, 1608 Walnut Street, Suite 1201, Philadelphia, PA 19103. Field of expertise – Economic and statistical analysis of damages in employment-related litigation (expert witness as to damages).

    3.    Jerome M. Staller, Ph.D., President, The Center for Forensic Economic Studies, 1608 Walnut Street, Suite 1201, Philadelphia, PA 19103. Field of expertise – Economic and statistical analysis of damages in employment-related litigation (expert witness as to damages).[5]

## VI. CURRICULUM VITAE FOR EXPERT WITNESSES

Curriculum vitaes are attached hereto as Exhibit "B".

## VII. FACT WITNESSES

Harleysville intends to call the following fact witnesses at trial (all are witnesses as to liability except as otherwise designated):

    1.    Kenneth Vail, 4513 Greenfield Road, Bethlehem, Pennsylvania 18017-9189. Mr. Vail will likely testify about Harleysville's organization, his hire at Harleysville, Harleysville's employment policies, his interactions with and communications with other Harleysville employees, his performance at Harleysville, his injury, his treatment for and rehabilitation from his injury, his termination from employment, his mitigation efforts, and his employment at St. Luke's Hospital and Health Network (liability and damages witness).

    2.    Gary Weinstein, 2152 Ore Creek Lane, Brighton, MI 48114. Mr. Weinstein was Harleysville's Vice President of Loss Control and Premium Audit and will likely testify about Harleysville's organization, the hiring of Vail, his interaction and communications with Vail, Vail's actions and performance during his tenure with Harleysville, complaints about Vail's treatment of subordinates, Vail's injury and Vail's lawful termination.

    3.    Alice Geckeler, 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297. Ms. Geckeler was Harleysville's Assistant Vice President, Recruitment and Retention and will likely testify about Harleysville's personnel policies and their application to Vail, Vail's injury, her interactions and communications with Vail, her role in the employment decisions about Vail, numerous complaints from Vail's staff, Vail's lawful termination of employment, and the paperwork provided to Vail upon his termination.

    4.    Catherine Strauss, 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297. Ms. Strauss was Harleysville's Executive Vice President, Human Resources and Public Affairs and will likely testify about Harleysville's personnel policies and their application to Vail, Vail's injury, her role in the employment decisions about Vail, numerous complaints from Vail's staff,

---

[5] Harleysville expects to call *either* Dr. Sullivan or Dr. Staller.

120113.00201/21306902v1

Vail's lawful termination of employment, and the paperwork provided to Vail upon his termination.

5. Dave Bond, 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297. Mr. Bond was Harleysville's Senior Vice President, Commercial Lines and will likely testify about Harleysville's organization, the hiring of Vail, his interaction with Vail, Vail's actions and performance during his tenure with Harleysville, complaints bout Vail's treatment of subordinates, Vail's injury and Vail's lawful termination.

6. Donna Dever – 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297. Ms. Dever was Vice President and Associate General Counsel and will likely testify about correspondence with Vail following his lawful termination.

7. Craig Campbell, 3215 Suffolk Lane, Fallston, MD 21047. Mr. Campbell was Home Office Loss Control Technical Services Manager and will likely testify about the job responsibilities of Vail's position, his interaction with Vail, and Vail's injury.

8. Dennis Putthoff, 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297. Mr. Putthoff was Loss Control Regional Manager (South) and will likely testify about the job responsibilities of Vail's position, his interaction with Vail, and Vail's injury.

9. John Strouse, 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297. Mr. Strouse was Loss Control Regional Manager (North) and will likely testify about the job responsibilities of Vail's position, his interaction with Vail, and Vail's injury.

10. John Diehl, 306 Zion Road, Mt. Holly Springs, PA 17065. Mr. Diehl was a Senior Loss Control Representative and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's alleged injury.

11. Ann Dymond, 355 Maple Avenue, Harleysville, PA 19438. Ms. Dymond was a Loss Control Representative and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, her experience with Vail, complaints made about Vail's management style, and Vail's injury.

12. Robert P. Griffith, 406 Cedar Avenue, Morton, PA 19070. Mr. Griffith was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

13. Gary Gillespie, 355 Maple Avenue, Harleysville, PA 19438. Mr. Gillespie was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in

11

August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

14. Jerry Walker, 355 Maple Avenue, Harleysville, PA 19438. Mr. Walker was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

15. Scott Welch, 355 Maple Avenue, Harleysville, PA 19438. Mr. Welch was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

16. Ed Dornbach, 355 Maple Avenue, Harleysville, PA 19438. Mr. Dombach was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

17. Jim Frantz, 3309 Forge Hill Road, Street, MD 21154. Mr. Frantz was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

18. Robert Pantaleo, 1720 Gatekeeper Drive, Finksburg, MD 21048. Mr. Pantaleo was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

19. Frank (Ted) Semetkoskey, 134 Lucille Drive, Pittsburgh, PA 15235. Mr. Semetkoskey was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

20. David Thompson, 355 Maple Avenue, Harleysville, PA 19438. Mr. Thompson was a Loss Control Consultant and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

21. Bill Cassell, 355 Maple Avenue, Harleysville, PA 19438. Mr. Cassell was a Home Office Loss Control Technical Staff Member and will likely testify about the job

responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, the Loss Control meeting in August 2000, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

22. Carly Jespersen, 106 Amy Lane, Perkiomenville, PA 18074. Ms. Jespersen was Vail's administrative assistant and will likely testify about her personal design to resign from Harleysville.

23. Dennis Hyland, 56 Mcmichael Drive, Pinehurst, NC 28374-6701. Mr. Hyland was Vail's subordinate and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

24. Albert C. Wagner, 215 Summit Road, Malvern, PA 19355. Mr. Wagner was a Loss Control Technical Representative and will likely testify about the job responsibilities of Vail's position, Vail's actions and performance during his tenure with the Company, his experience with Vail, complaints made about Vail's management style, and Vail's injury.

25. Mary Genevieve (Jenny) Hill-Ludwig, 860 Store Road, Harleysville, PA 19438. Ms. Ludwig was an Occupational Health Nurse and will likely testify about Harleysville's personnel and benefits policies, her communication with Vail during his employment, Vail's injury, and the paperwork regarding Vail's injury.

26. Luanne Arcaro, 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297. Ms. Lucaro was a Human Resources Specialist – Benefits and will likely testify about Harleysville's personnel and benefits policies, her communication with Vail during his employment, Vail's injury, and the paperwork regarding Vail's injury.

27. Carrie Hrichak, Lehigh Valley Home Care, 2166 South 12th Street, Suite 101, Allentown, Pennsylvania 18103. Ms. Hrichak was a physical therapist who treated Vail following his injury and will likely testify about Vail's injury, her treatment of Vail and Vail's progress.

28. Beth Pretti, Lehigh Valley Home Care, 2166 South 12th Street, Suite 101, Allentown, Pennsylvania 18103. Ms. Pretti was a physical therapist who treated Vail following his injury and will likely testify about Vail's injury, her treatment of Vail and Vail's progress.

29. Custodian of Records, Lehigh Valley Home Care, 2166 South 12th Street, Suite 101, Allentown, Pennsylvania 18103. The Custodian of Records will likely testify about the authenticity of Vail's treatment and progress notes.

30. Brian Boyle, Muhlenberg Hospital Center, 2545 Schoernersville Road, Bethlehem, PA 18018. Mr. Boyle was a physical therapist who treated Vail after his injury and will likely testify about Vail's injury, his treatment of Vail, and Vail's progress.

120113.00201/21306902v1

31. Custodian of Records, Muhlenberg Hospital Center, 2545 Schoernersville Road, Bethlehem, PA 18018. The Custodian of Records will likely testify about the authenticity of Vail's treatment and progress notes.

32. Dr. Charles Davis, Milton S. Hershey Medical, Center, 500 University Drive, Hershey, Pennsylvania 17033. Dr. Davis is a physician who treated Vail following his injury and will likely testify about Vail's injury, medical treatment and rehabilitation.

33. Dr. J. Spence Reid, Milton S. Hershey Medical Center, 500 University Drive, Hershey, Pennsylvania 17033. Dr. Reid is a physician who treated Vail following his injury and will likely testify about Vail's injury, medical treatment and rehabilitation.

34. Custodian of Records, Milton S. Hershey Medical Center, 500 University Drive, Hershey, Pennsylvania 17033. The Custodian of Records will likely testify about the authenticity of Vail's treatment and progress notes.

35. Custodian of Records, St. Luke's Hospital and Health Network, 4379 Easton Avenue, Bethlehem, PA 18020. The Custodian of Records will likely testify about the authenticity of Vail's personnel records including the resume submitted to St. Luke's and St. Luke's letter to Vail offering him employment (liability and damages witness).

36. Any witness identified by Vail.

Defendant reserves the right to update this list up until and during the time of trial.

**VIII. STATEMENT OF DAMAGES AND/OR RELIEF SOUGHT**

There is no back pay liability in this case after February 18, 2002, the date Vail began employment at St. Luke's Hospital and Health Network, where he earns more money that he would have earned at Harleysville. Moreover, for the period of back pay liability, Vail received compensation for his lost wages and other lost employment benefits from part of the $385,000 settlement of his personal injury lawsuit against Peter T. Gill relating to his June 2, 2000 gunshot injury, which covered his losses through May 24, 2002. Therefore, Vail has already recovered more money than he might be entitled to as back pay compensation.

Vail is not entitled to any front pay damages.

There is no basis in this case for any claim of punitive damages.

### IX. PARTIES' NAMES AND ADDRESSES

To the best of Harleysville's knowledge, Vail resides at 4513 Greenfield Road, Bethlehem, Pennsylvania 18017-9189 and resided there at the time that the cause of action arose. Harleysville's address at present, and at the time the cause of action arose, is 355 Maple Avenue, Harleysville, Pennsylvania 19428-2297.

### X. TRIAL COUNSEL'S CONTACT INFORMATION

Anthony B. Haller, Esquire is lead trial counsel for Harleysville, and Julie E. Reid, Esquire is assistant trial counsel. Their contact information is as follows: Blank Rome LLP, One Logan Square, Philadelphia, PA 19103, 215-569-5690 (Mr. Haller); 215-569-5584 (Ms. Reid); 215-569-5500 (main firm telephone number).

### XI. PROPOSED VOIR DIRE QUESTIONS

Attached hereto as Exhibit "C" are Harleysville's Proposed Voir Dire Questions.

### XII. PROPOSED FORM OF VERDICT

Attached hereto as Exhibit "D" is Harleysville's Proposed Form of Verdict.

Respectfully submitted by:

BLANK ROME LLP

/s/ Anthony B. Haller
Anthony B, Haller, Esquire (PA 37017)
Julie E. Reid, Esquire (PA 89848)
One Logan Square
Philadelphia, PA 19103
(215) 569-5690
(215) 832-5690 (facsimile)

Attorneys for Defendant
Harleysville Group, Inc.

Dated: August 30, 2004

120113.00201/21306902v1

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I filed Defendant Harleysville Group, Inc.'s Trial Memorandum and accompanying exhibits electronically via the Court's Electronic Case Filing ("ECF") System, and the documents are available for reviewing and downloading from the ECF System. Additionally, on August 31, 2004, I will serve a true and correct copy of the Trial Memorandum and accompanying exhibits via hand delivery upon:

>Donald P. Russo, Esquire
>117 East Broad Street
>P.O. Box 1890
>Bethlehem, PA  18016-1890
>
>Susan Hutnik, Esquire
>720 Washington Street
>Easton, PA  18042
>
>Vanessa M. Nenni, Esquire
>117 East Broad Street
>Bethlehem, PA  18018
>
>Mickey K. Thompson, Esquire
>Thompson Law Offices
>115 East Broad Street
>Bethlehem, PA  18018

>/s/ Anthony B. Haller
>Anthony B. Haller

Dated:  August 30, 2004